D LANGE
04.17.2026

**Exhibit 81**

Vickie E. Wiechec

# INTERMEX PAYROLL MASTERCARD® PROGRAM
# EMPLOYER AGREEMENT

This Intermex Payroll Mastercard Program Employer Agreement ("Agreement") is made and entered into this **30** day of AUGUST , 20 23 (the "Effective Date"), by and between SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC. INC. ("Employer"), and INTERMEX WIRE TRANSFER, LLC, a Florida limited liability company ("INTERMEX"). Employer and Intermex are each, individually, referred to herein as a "Party" and together as the "Parties".

## RECITALS:

**WHEREAS**, INTERMEX is an independent sales organization for a payroll debit card program known as the "Intermex Payroll Mastercard Program" available to employers of H2A visa employees (the "Program"); and

**WHEREAS**, the Program is sponsored by and subject to the principal oversight of Central Bank of Kansas City, a Missouri-chartered bank and a member of the FDIC, as the bank issuer (the "Issuing Bank") of the payroll cards (each a "Card"); and

**WHEREAS**, Employer desires to offer the Cards to its H2A visa employees and Cards will be issued to each such employee who elects to participate in the Program (each a "Cardholder");

**NOW THEREFORE**, in consideration of the foregoing Recitals, the mutual promises and covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      **Obligations and Representations of INTERMEX.**

**1.1.**      The Program. INTERMEX agrees to coordinate the issuance of Cards by The Issuing Bank with one or more of the features ("Card Features") as set forth in the agreement between Cardholder and the Issuing Bank, as amended from time to time (the "Cardholder Agreement"). Card Features will be subject to applicable fees and availability of Cardholder funds as outlined in Cardholder Agreement. Employer acknowledges that the Cardholder Agreement creates a contractual and legal relationship between Cardholder and the Issuing Bank and is subject to amendment as set forth therein.

**1.2**      Enhancements. INTERMEX may from time to time implement new features (e.g. reward programs, etc.) or functional improvements, additions or modifications (each, an "Enhancement") in support of or related to the functionality of the Program. INTERMEX may notify and/or communicate to Employer and/or Cardholders, as applicable, from time to time regarding the availability of Enhancements and of any changes that may be required to the Program, fees and/or Cardholder Agreement, in order for Employer or Cardholders to utilize such Enhancements. Neither Employer nor Cardholders will have any right, title or interest to any Enhancements developed by INTERMEX or to any intellectual property or proprietary rights therein.

Confidential                                                                SCSCGA-036891

**1.3**    Materials. INTERMEX will provide Employer with enrollment materials to be provided to each eligible employee who is considering enrollment or who desires to enroll in the Program and to become a Cardholder, including (a) the Cardholder Agreement; (b) the Issuing Bank's privacy policy; (c) Fee Schedule; (d) notice required under the USA PATRIOT Act of 2001; and (e) any other information and materials provided by INTERMEX from time to time. Employer will use only the materials, procedures and information provided or approved by INTERMEX in promoting and implementing the Program.

**2.    Obligations and Representations of Employer.**

**2.1**    Eligibility. Employer represents, warrants, and covenants that Employer has provided and will continue to provide to INTERMEX all of the information requested in the Employer Application which is attached hereto as **Exhibit A**. All information provided is true and accurate as of the date of this Agreement. Employer is duly registered and legally authorized to do business in the State of LOUISIANA    , and shall remain in good standing throughout the term of this Agreement. Employer is the employer of record for all Cardholders that will be issued Cards under this Agreement and each Card is to be used exclusively for payroll deposit purposes to compensate its participating employees for wages, pension payments, commissions or reimbursement of legitimate business expenses.

**2.2**    Employee Verification. Employer will take all steps required by law to verify the identification of its employees at the time of their employment and prior to a Card being issued, and will maintain on file a completed Form I-9 as published by the Internal Revenue Service for each Cardholder. Employer understands that INTERMEX and the Issuing Bank are relying on the Form I-9 verification procedures of Employer to fulfill the obligation of INTERMEX and the Issuing Bank to verify the identification of Cardholders under the provisions of the USA PATRIOT Act of 2001.

**2.3**    Employee Information. Prior to issuing a Card to a participating employee in the Program, Employer shall provide INTERMEX with the employee information described in **Exhibit B** attached hereto and incorporated herein by reference. Information shall be provided to INTERMEX directly by Employer and in the format specified in **Exhibit B**.

**2.4**    Employee Documents to INTERMEX. Employer will timely furnish to INTERMEX or the Issuing Bank, as the case may be, any and all information and materials, including copies of Form I-9 information or identifying information supplied during the employment process, such as driver's license number, that INTERMEX or the Issuing Bank may, from time to time, reasonably request. Employer shall maintain such information regarding each Cardholder, including copies of all identification documentation presented, for a period of one (1) year following the closure date of each Card. Employer will take such action as INTERMEX may, from time to time, reasonably request in order to further the purposes of this Agreement and to ensure that all matters contemplated hereby will comply with all applicable statutory, regulatory, or other legal requirements.

2

SCSCGA-036892

**2.5**    <u>INTERMEX Documents To Employees</u>. Unless otherwise designated by INTERMEX, Employer will provide each employee with: (a) a copy of the Cardholder Agreement; (b) the Issuing Bank's privacy policy; (c) Fee Schedule; (d) notice required under the USA PATRIOT Act of 2001; and (e) any other information and materials provided by the Issuing Bank from time to time. In addition, Employer shall cause all participating employees to execute written evidence of each participating employee's (i) election to enroll in the Program; (ii) authorization or refusal of authorization to receive text and/or email messages with respect to the Program and any Enhancements; and (iii) authorization or refusal of authorization for Employer to enroll such participating employee in any other service offered from time to time by INTERMEX or its affiliates, including money transmission services, which is attached hereto as **Exhibit C**.

**2.6**    <u>Rights to Inspect</u>. Employer agrees that INTERMEX, the Issuing Bank and regulatory authorities which have jurisdiction over INTERMEX or the Issuing Bank shall have the right to audit and inspect Employer's books and records related to the Program and Employer's performance of its obligations with respect thereto, including, but not limited to: (a) any of Employer's records pertaining to enrollment of participating employees in the Program; and (b) the identity verification documents.

**2.7**    <u>Notification of Communication From Regulatory Authorities</u>. In the event a communication from a governmental authority regarding the Program is received by Employer: (a) Employer shall promptly, and in no event later than 48 hours, notify INTERMEX; (b) INTERMEX and the Issuing Bank shall commence a review of the communication and create a response to the communication and/or arrange a conference with the governmental authority from which such communication was received, subject to Employer's ongoing cooperation; and (c) INTERMEX and the Issuing Bank shall design and execute an action plan in response to the communication and/or as a result of communications or discussions with the governmental authority and provide Employer with ongoing status reports in connection with the same. Such action plan may include, if commercially reasonable, modifications to the Program. Employer also agrees to cooperate should INTERMEX receive a communication from a governmental authority regarding the Program.

**2.8**    <u>Provisions Assigned</u>. Employer acknowledges and agrees that INTERMEX (and its successors and assigns) is entitled to enforce each of the provisions hereof against Employer, including in equity and in law as if it or they were a party hereto. Except for the foregoing, this Agreement is entered into solely for the benefit of INTERMEX and Employer, and will not confer any rights upon any other persons not expressly a party to this Agreement, including Cardholders or employees of Employer.

**2.9**    <u>Card Handling</u>. Employer agrees to handle Card inventory in compliance with all Card network security requirements. Card inventory shall be stored in an alarm or camera monitored facility. Cards will be secured within a protected and locked mechanism with access limited to individuals meeting a comprehensive background screening. All Card stock shall be inventoried at the time of receipt under the control of two or more individuals. An Inventory Control Log shall be maintained, including the following information: (a) date and time the Cards are received; (b) names of persons receiving Cards; (c) the Card number on the first card and last card; and (d) the number of Cards received. Monthly inventory audits shall consist of (i) number

Confidential

SCSCGA-036893

of Cards remaining in storage; and (ii) the printed names and signatures of the employees conducting the inventory audit. All discrepancies shall be reported to INTERMEX within 48 hours of discovery. All audit logs shall be retained for a minimum of twenty-four (24) months and are subject to review by INTERMEX and the Issuing Bank upon prior written notice to Employer. Employer agrees to return damaged or unwanted Cards to INTERMEX at the address listed in this Agreement or as updated in writing from time to time. Returned Cards must be packed under dual control in tamper-resistant packaging and shipped using a traceable courier service.

2.10    Exclusivity. Employer will maintain INTERMEX as the exclusive provider of Employer's payroll debit card services for the duration of this Agreement.

2.11    Employee Consent. Employer is responsible for maintaining records indicating that it provided appropriate wage payment options and obtained each employee's written consent to authorize payment by payroll card, as required by law, and any other required authorizations, including but not limited to those described in Section 2.5 above. Employer is responsible for offering alternative methods of direct deposit to an account at a financial institution of each employee's own choosing as well as any other options required by law.

3.    Consideration. Employer agrees to use best efforts to fully deploy direct deposit via the Program throughout Employer's organization within ninety (90) days of the Effective Date of this Agreement, except where prohibited by law. Full deployment of direct deposit is estimated to include approximately 200 employees. As of the date of this Agreement, Employer issues _____ paper checks, which Employer agrees to use best efforts to convert to direct deposit no later than ninety (90) days from the Effective Date. Full deployment of direct deposit by (date): OCTOBER 20 , 20 23 .

4.    Cardholder Requirements. INTERMEX and the Issuing Bank will only issue Cards to Employer's employees who qualify for a Card under INTERMEX's and the Issuing Bank's pre-approval policies and requirements, which are subject to change from time to time in the sole and absolute discretion of INTERMEX and the Issuing Bank; and who agree and comply with the Cardholder Agreement that accompanies and applies to each Card. Employer acknowledges and agrees that issuance of Cards to Cardholders is in INTERMEX's and the Issuing Bank's sole and absolute discretion and is subject to industry and regulatory standards, and that Cardholders who do not satisfy initial or ongoing validation criteria may be denied a Card or may have an issued Card cancelled at any time. In such event, Employer acknowledges that it must promptly pay its employee via alternative method. If a Cardholder elects to receive wages through other means, then Employer agrees to immediately notify INTERMEX of such change.

5.    Employer Funding. On Employer's regularly scheduled paydays, Employer shall fund Cards by direct deposit of wages, salaries, bonuses, reimbursements, incentives and other funds payable to Cardholders by Employer through standard Automated Clearing House (ACH) to the Issuing Bank following INTERMEX's and The Issuing Bank's procedures or by such other method as approved or directed in writing by INTERMEX and The Issuing Bank. ACH funding errors made by Employer to a Card and all adjustments to ACH deposits shall be made using an offsetting ACH adjustment when possible. In the event funding errors cannot be corrected through an ACH adjustment, the correction shall be handled (adjusted) exclusively by Employer and Cardholder

4

SCSCGA-036894

outside of the Program. Employer shall make all reasonable efforts to contact the affected Cardholder to notify of the error and the impending resolution. Correcting ACH adjustments shall be originated through Employer's ACH service provider. Employer acknowledges and agrees that INTERMEX does not, by virtue of Cardholder's participation in the Program, hold Cardholder funds, although it may be licensed as a money transmitter as defined by the U.S. Department of the Treasury.

6.    **Representations, Warranties and Covenants of Employer.** Employer will be solely responsible for compliance with Card network rules and all federal, state and local laws, rules and regulations relating to payroll compensation and employment matters including without limitation withholding and timely remittance of all taxes related thereto and timely delivery of all payroll information to Cardholders.  INTERMEX and the Issuing Bank shall have no obligations whatsoever regarding such taxes.  Employer shall not distribute a Card to any person or party who is not an employee of Employer.  If Employer becomes aware that any Cardholder has resigned, is terminated, or otherwise ceases working for Employer for any other reason, Employer shall immediately notify INTERMEX of such occurrence and the date that such Cardholder will receive his/her final paycheck from Employer unless INTERMEX and Employer have mutually agreed otherwise in writing.

7.    **Term and Termination.**

7.1.    Term. This Agreement shall be for a term of two (2) years from the Effective Date (the "Initial Term"), and shall thereafter renew for consecutive one (1) year terms unless terminated by either Party in writing not less than thirty (30) days prior to expiration of the then-current term.

7.2.    Early Termination. This Agreement may be terminated by either Party: (a) if the Card networks prohibit the Program; (b) the Issuing Bank ceases to provide services to INTERMEX necessary for the continuation of the Program; (c) the other Party files a voluntary petition in bankruptcy or a petition seeking any reorganization, liquidation, dissolution or similar relief for debtors; (d) the entry by a court of competent jurisdiction of an order, judgment or decree approving a petition filed against the other Party seeking any reorganization, liquidation, dissolution or similar relief; (e) in the event of any breach or default by the other Party that remains uncured thirty (30) days after receipt of written notice thereof from the other Party; or (f) if, in the reasonable judgment of the other Party, applicable laws, rules or regulations prohibit the Program or materially increase the regulatory burden of continuing the Program.  Additionally, INTERMEX may terminate the Agreement upon the direction of the Issuing Bank with notice to Employer.

7.3.    Discontinuation. INTERMEX reserves the right to decline to commence a Program for Employer in its sole and absolute discretion, or discontinue the distribution of Cards if determined in its or the Issuing Bank's sole and absolute discretion to be inconsistent with safe and sound banking practices. If INTERMEX discontinues the distribution of Cards under this Agreement, Employer shall have the right to terminate this Agreement immediately upon written notice to INTERMEX.

Confidential

SCSCGA-036895

**7.4.** <u>Survival</u>. Termination of this Agreement shall not affect the rights and obligations of the Parties that have accrued prior to the date of termination. Upon termination of this Agreement, INTERMEX and the Issuing Bank shall maintain the right to service existing Cardholders under the terms and conditions of the Cardholder Agreement. Employer shall continue to maintain its obligations under <u>Section 2.4</u> hereof.

**8.**    **Fraud.** Either Party shall be entitled to terminate this Agreement immediately upon written notice to the other Party in the event the other Party engages in any illegal, fraudulent or unauthorized use of a Program or Cards.

**8.1**    <u>Losses Due to Fraud</u>. Each Party will be responsible for all Losses associated with fraudulent activities on the part of such Party and its employees, affiliates, representatives, agents, contractors or in connection with the Program, including, without limitation, (i) the transmission of Cardholder data; (ii) all losses arising out of theft of Cardholder data where such theft resulted from a breach of such Party's systems or facilities or a willful or negligent act or omission by such Party or any of its employees, affiliates, representatives, agents, contractors or subcontractors (collectively, "<u>Fraudulent Losses</u>").

**8.2**    <u>Fraud Alert/Recovery</u>. Immediately following a Party's discovery that a Card was approved in a fraudulent manner, the discovering Party will promptly notify the other Party, and in no event later than 48 hours.

**8.3**    <u>Emergency Suspension</u>. If INTERMEX or the Issuing Bank has reasonable suspicion to believe that fraudulent or other illegal activity is taking place with respect to any Card or in the conduct of the Program, INTERMEX will promptly notify Employer in reasonable detail as to the basis of such belief. In such an event, INTERMEX or the Issuing Bank may: (a) terminate or suspend the issuance of Cards by Employer, (b) freeze or suspend the suspicious Cards and prevent future transactions, (c) freeze or suspend any additional use of the remaining Cardholder funds on such Cards, all to the extent the foregoing actions are in compliance with applicable law.

**9.**    **Treatment of Confidential Information and Cardholder Data.**

**Section 9.1**    <u>Confidential Information</u>. The term "<u>Confidential Information</u>" will mean this Agreement and any schedule, exhibit, attachment or amendment hereto; any information concerning the Program and the objectives of the Program; any marketing plan for the Program and any marketing materials for the Program which are not publicly available; all documents and records required to be maintained pursuant to this Agreement or under applicable law; and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever which a Party ("<u>Discloser</u>") discloses, in writing, orally or visually, to any other Party ("<u>Recipient</u>") or to which Recipient obtains access in connection with the negotiation or performance of this Agreement. Confidential Information will not include information that: (i) is already rightfully known to the Recipient at the time it obtains such information from the Discloser; (ii) is or becomes generally available to the public other than as a result of disclosure in breach of this Agreement or any other confidentiality obligations; (iii) is lawfully received on a non-confidential basis from a third party authorized to disclose such information without restriction and without breach of this Agreement or other agreement by such third party; (iv) is

6

Confidential

contained in, or is capable of being discovered through examination of, publicly available records or materials; or (v) is developed by any Party, as supported by written documentation, without the use of any proprietary, non-public information provided by the Party claiming the information as confidential and proprietary.

**Section 9.2**    Use and Disclosure of Confidential Information.

(a)    Each Recipient will hold and maintain, and will cause its agents, employees and affiliates to hold and maintain in confidence the Confidential Information of the Discloser and will use and disclose such Confidential Information only for the purpose of performing its obligations or exercising or enforcing its rights with respect to the Program under this Agreement or as otherwise expressly permitted by this Agreement. Each Recipient may disclose Confidential Information to the extent such Confidential Information is required to be disclosed by applicable law, including in the course of an examination by a regulatory authority or the Issuing Bank; provided (i) that, except in connection with disclosure in the ordinary course of an examination by a regulatory authority or the Issuing Bank, the Party subject to such applicable law will immediately (but in no event more than 24 hours after discovery of the same) notify the Discloser of any such use or requirement prior to disclosure of any Confidential Information obtained from the Discloser in order to afford the Discloser an opportunity to seek a protective order to prevent or limit disclosure of the Confidential Information to third parties, and (ii) that the Party subject to such applicable law will disclose Confidential Information of the Discloser only to the extent required by such applicable law.

(b)    Each Recipient will (i) limit access to the Discloser's Confidential Information to those employees, agents and consultants who have a reasonable need to access such Confidential Information in connection with this Agreement, and (ii) ensure that any Person with access to the Confidential Information is bound to maintain the confidentiality of Confidential Information in accordance with the terms of this Agreement and applicable law.

(c)    Each Recipient agrees that any unauthorized use or unauthorized disclosure of Discloser's Confidential Information may cause immediate and irreparable harm to the Discloser for which money damages might not constitute an adequate remedy. In that event, the Recipient agrees that injunctive relief may be warranted in addition to any other remedies the Discloser may have.

(d)    Each Recipient agrees to notify the Discloser in writing immediately, and in no event later than 24 hours, after the initial discovery of an actual or suspected disclosure of Confidential Information or the loss of, unauthorized access to or the use or theft of personal Cardholder data. The Parties agree to cooperate and to coordinate with each other in advance of any and all external communication, including communications to media, regulators and impacted individuals before any such communication is made.

**Section 9.3**    Press Releases and other Statements. Neither Party will issue any press release (or make any other public announcement or respond to any interview request) related to

7

Confidential                                                                                    SCSCGA-036897

this Agreement or the Distributor Services without the prior written approval of the other Party, except as may be necessary to comply with applicable law.

Section 9.4    Communications with Regulatory Authorities.  Neither Party will respond to any inquiry from a regulatory authority concerning the Program without the prior written consent of the other Party, unless such communication is required by applicable law.  Each Party will notify the other Party immediately if it receives any communication from a regulatory authority pertaining to the Program, unless such disclosure is prohibited by applicable law.

Section 9.5    Confidentiality of Agreement Terms.  Neither Party will disclose to any Person (other than as expressly permitted pursuant to this Section 9, including the Party's counsel) the terms or conditions of this Agreement or any amendments, supplements or modifications hereto.

Section 9.6    Return of Confidential Materials.  Upon the expiration or earlier termination of this Agreement, or at any time upon the reasonable request of a Discloser, the Recipient will return (or destroy if so directed by the Discloser) all Confidential Information in the possession of the Recipient (and Cardholder Data in the possession of Distributor) or in the possession of any representative, contractor or third party of the Recipient and certify the foregoing to the other Party.

Section 9.7    Additional Confidentiality Obligations.    In the event of any conflict between this Article and any other agreement between the Parties, this Article will control.

10.    Intellectual Property.  During the Term of this Agreement, each Party (the "Licensing Party") hereby grants to the other Party a limited, non-exclusive, royalty-free, non-transferable, and restricted license to use (but not the right to sublicense) the trademarks, trade names, trade dress, service marks and logos (collectively, the "Marks") of the Licensing Party as mutually agreed to in writing by the Parties and only for such use as specifically approved in each instance for use on advertising and promotional and public relations materials, and any other item reasonably necessary to the establishment, operation or advancement of the Program.  Each limited license will terminate upon termination of this Agreement and that, following such termination, each Party who is not the Licensing Party will discontinue all use of Marks licensed to such Party pursuant to this Agreement; provided however that, if applicable, Employer's and/ or INTERMEX's Marks may remain on outstanding Cards for a reasonable period of time to allow for such Cards to be replaced.  Each Party acknowledges that the Licensing Party and/or its affiliates are the owners or licensees of the Licensing Party's Marks, and agrees that it has no right, title or interest in the Licensing Party's Marks other than the license specifically granted in this Section 10, and will do nothing inconsistent with such ownership.

11.    Claims and Liability.  IN NO EVENT SHALL INTERMEX BE LIABLE TO EMPLOYER, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR INDIRECT, CONSEQUENTIAL, ADDITIONAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OR ANY OTHER PERSON ARISING OUT OF PERFORMANCE OR NONPERFORMANCE UNDER, OR OTHERWISE ARISING IN CONNECTION WITH, THIS AGREEMENT OR ITS INDEMNIFICATION PROVISIONS, EVEN IF INTERMEX HAS KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING

8

SCSCGA-036898

ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. INTERMEX DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR THAT THE PROGRAM OR CARDS WILL BE UNINTERRUPTED OR ERROR-FREE.

**12.    Indemnification.** Employer agrees to indemnify and hold INTERMEX, its employees, representatives and agents harmless from any and all claims, damages, losses or liabilities (including attorneys' fees and costs) arising out of the acts or omissions of Employer and its employees, representatives and agents, including without limitation Employer's, its employees', representatives' and agents', failure to comply with all federal, state, and local laws and regulations applicable to its activities and shall indemnify and hold INTERMEX harmless against any and all breaches of this Agreement.

**13.    Miscellaneous.**

**Section 13.1**    Relationship of Parties.    INTERMEX and Employer are independent contractors to each other in performing their respective obligations hereunder.   Nothing in this Agreement or in the working relationship being established and developed hereunder will be deemed, nor will it cause, any of the Parties to be treated as partners, joint venturers, or otherwise as joint associates for profit.

**Section 13.2**    Force Majeure.   No Party will be liable for non-performance hereunder to the extent such performance is prevented by any of the following: fire, earthquake, tornado, flood, explosion, embargo, war, terrorism, riot, act of God, act of public enemy, or any other cause beyond such Party's reasonable control (each such event, a "Force Majeure Event").  Each Party's obligations to perform timely will be excused to the extent and for so long, but only to the extent and for so long, that such performance is prevented by a Force Majeure Event.

**Section 13.3**    Governing Law.  This Agreement will be construed in accordance with and governed by the laws of the State of Florida, without regard to its conflict of law principles.

**Section 13.4**    Arbitration.  Except with respect to disputes arising from a misappropriation or misuse of any Party's proprietary or intellectual property rights, disputes relating to the Confidential Information or intellectual property rights or the enforcement of any claims seeking equitable relief, the Parties agree that arbitration is the sole and exclusive remedy for each of them to resolve and redress any controversy or claim arising out of or relating to this Agreement, or the breach thereof.   Three arbitrators will be selected from panels maintained by the American Arbitration Association in the following manner: One shall be selected by the initiating Party in the request for arbitration, the second by the responding Party within thirty (30) days of receipt of the request for arbitration, and the third, who shall act as presiding arbitrator, by the two-Party appointed arbitrators within thirty (30) days of the selection of the second arbitrator.  The arbitral tribunal may award costs and expenses, including reasonable attorney's fees.  The decision of the arbitration tribunal shall be in writing and shall set forth in detail the facts of the dispute and the reasons for the decision. The arbitration award shall be binding on the Parties.  The existence and content of the arbitration proceedings and any ruling or award shall be kept confidential except (i)

9

SCSCGA-036899

to the extent that disclosure may be required of a Party to fulfill a legal duty, protect or pursue a legal right, or enforce or challenge an award in bona fide legal proceedings before a court or other judicial authority, or (ii) with the written consent of all Parties.

Section 13.5    Severability.  In the event that any part of this Agreement is deemed by a court of competent jurisdiction or regulatory authority to be invalid or unenforceable, such provision will be deemed to have been omitted from this Agreement.

Section 13.6    Notices.  All notices, requests and approvals required by this Agreement will be in writing and addressed/directed to both of the other Parties at the address and facsimile numbers set forth below, or at such other address of which the notifying Party hereafter receives notice in conformity with this Section.  All such notices, requests, and approvals will be deemed given on the date delivered or date of attempted delivery, if service is refused.  All such notices, requests and approvals will be addressed to the attention of:

| | |
|---|---|
| If to INTERMEX: | Intermex Wire Transfer, LLC<br>9480 South Dixie Hwy<br>Miami, FL 33156<br>Attn: _____ |
| With a copy to: | Brenner Kaprosy Mitchell, LLP<br>30050 Chagrin Blvd., Suite 100<br>Pepper Pike, OH 44124<br>Attn: _____ |
| If to Employer: | SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC. INC.<br>611 IRISH BEND ROAD<br>FRANKLIN, LA 70538<br>Attn: ASHLEE GARY |
| With a copy to: | STERLING SUGARS, LLC<br>611 IRISH BEND ROAD<br>FRANKLIN, LA 70538<br>Attn: DESIREE LANGE |

Section 13.7    Waivers.  No Party will be deemed to have waived any of its rights or remedies hereunder except in writing signed by an authorized agent or representative of such Party. The waiver by a Party of a breach of any term or provision of this Agreement will not be construed as a waiver of any other breach.

Section 13.8    Entire Agreement; Amendments.   This Agreement, together with all exhibits and the Program Schedule attached hereto, constitutes the entire Agreement between the Parties and supersedes all prior agreements, understandings, and arrangements, oral or written,

10

SCSCGA-036900

between the Parties with respect to the subject matter hereof.  Notwithstanding any contrary provision contained herein, this Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Parties.

**Section 13.9**  Counterparts.  This Agreement may be executed simultaneously in multiple counterparts, each of which is deemed an original, but all of which taken together constitute the same instrument.  For purposes of execution and delivery, each Party may rely upon the faxed or electronic signature of the other Party.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK-
SIGNATURES ON FOLLOWING PAGE]**

11

Confidential

SCSCGA-036901

*By signing this Agreement, Employer agrees to fully deploy direct deposit throughout Employer's organization within ninety (90) days of the Effective Date, except where prohibited by law.*

EMPLOYER:                                          INTERMEX:

SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC. INC.      INTERMEX WIRE TRANSFER, LLC

By: *Ashlee C Gary*                                By: _____

Print: ASHLEE GARY                                 Print: _____

Title: TREASURER                                   Title: _____

**IMPORTANT NOTE:** Please send a copy of the ID for the officer signing the Agreement.

12

                                         SCSCGA-036902

**EXHIBIT A**
Employer Application

## INTERMEX PAYROLL MASTERCARD® PROGRAM
### Employer Application
#### (for use with the H2A visa program)

**COMPANY INFORMATION – PLEASE PRINT ALL INFORMATION**

Today's Date _____ AUGUST 30, 2023

Name   SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC. INC.

DBA _____                                    TIN/EIN   ▮▮▮▮▮▮

Physical Address   611 IRISH BEND ROAD,        FRANKLIN          LA          70538
                          Street                    City            State         Zip

Phone Number   ( 337 ) 828-0620        Fax Number ( 337 )   282-1757

Company Website _____

Number of Years in Operation   2        Number of Employees Requiring Cards   APPROX. 200

**SERVICE LOCATIONS**
Please list any additional locations that will support the program.

1520 MAIN STREET                    FRANKLIN            LA           70538
Street                               City                State         Zip

Street                               City                State         Zip

**BUSINESS SERVICES**
Please provide a general description of your business services.

SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC. IS A HARVESTING AND

HAULING OPERATION THAT SUPPORTS THE SUGAR CANE INDUSTRY.

**DISCLOSURE OF ADMINISTRATIVE PROCEEDINGS**
Use the space below to provide information about any recently finalized, pending or threatened administrative, regulatory, or other governmental findings or any investigations, inquiries, orders, or proceedings by anybody or significant litigation involving your company, its owners, directors, and/or officers.

13

Confidential

SCSCGA-036903

**CONTACT INFORMATION**

Primary Contact     **ASHLEE GARY**

Title     **TREASURER**

Phone Number     ( 337 ) 276-4592          Email     AGARY@MAPATOUT.COM

I authorize investigation of all statements contained in this application. I understand that misrepresentation or omission of facts called for is cause for the application being declined.

Date     8/31/23          Signature     *Ashlee C Gary*

IMPORTANT NOTE: Please attach a copy of a recent ETA-790. The bank requires this to complete their review and approval process.

**APPLICANT - DO NOT WRITE BELOW THIS LINE**

Intermex Sponsor                                        Date:

REMARKS:

14

Confidential                                                                    SCSCGA-036904

**EXHIBIT B**
Required Employee Information

First Name
Middle Name
Last Name
Second Last Name
Physical Address
Physical Address City
Physical Address State
Physical Address ZIP Code
Mailing Address
Mailing Address City
Mailing Address State
Mailing Address ZIP Code
Social Security Number
Date of Birth
Passport Number
Passport Issuing Date
Passport Expiration Date
Certification Begin Date
Certification End Date
E-mail Address (optional)
Telephone Number

Image of Passport

15

Confidential                                                SCSCGA-036905

**EXHIBIT C**
Evidence of Participating Employee's Elections

## Intermex Payroll Mastercard® Employee's Election Form

**You do not have to accept this payroll card.**
**Ask your employer about other ways to receive your wages.**

Important Information about Procedures for Opening a New Card Account. To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who obtains a Card. What this means for you: when you apply for a Card, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

| | |
|---|---|
| **Participation in the Intermex Payroll Mastercard Program is Optional** The Intermex Payroll Mastercard Program consists of a payroll debit Mastercard account specially designed to facilitate the direct deposit of your payroll. Participating is not a condition for your employment. You may choose to receive your payroll by other means, including direct deposited onto a different account. Contact your employer for available options. By choosing to participate in the Intermex Payroll Mastercard Program, you acknowledging that you: (1) have received a copy of the program's Terms & Conditions and Fee Schedule, (2) that you are electing to participate, and (3) that you wish to have your pay directly deposited into your Intermex Payroll Mastercard account. You authorize your employer to initiate electronic transfer of funds and, if necessary, debit withdrawals to adjust for any credit transfers made in error to your account. This authority will remain in effect until you notify your employer in writing or as otherwise specified by your employer. You agree that only direct deposits in your name will be loaded to the Card. All other direct deposits in the name of anyone else may be declined and returned. If the issuing bank discovers that a direct deposit in the name of someone else was successfully loaded onto your Card, the issuing bank may deduct the amount of the deposit and return it. Further, you hereby authorize your employer to share your personal information with Intermex and the issuing bank for the purpose of setting up your Intermex Payroll Mastercard account. | I choose to participate in the Intermex Payroll Mastercard Program ☐YES ☐NO |
| **Short Message Service Text Message ("SMS")** We would like to send you Notifications about your Card Account. These Notifications can be for transactional or business purposes to provide you important information related to your Card or Card Account and/or for marketing or commercial purposes to let you know about services or features that may be of interest to you. At the time you apply for your Card, you will automatically be opted-in to Notifications for transactional or business purposes. You must opt-in for Notifications for marketing or commercial purposes. In order to receive SMS text messages, you must have text messaging enabled on your cellular telephone and subscribe to a participating cellular telephone carrier. We do not charge a fee for this service. Standard cellular service provider messaging and data fees may apply. Check with your cellular service provider for more details. At any time, if you wish to stop receiving ("opt-out" of) SMS Notifications you can do so by logging into your online account or Mobile App and updating your settings or following the opt-out instructions within the SMS text message. | I choose to participate (opt-in) marketing or commercial SMS Texts ☐YES ☐NO |
| **International Money Transfer Programs** The Intermex Payroll Mastercard Program was created by Intermex, a licensed U.S. money transmitter, and through Intermex, offers its cardholders additional benefits and conveniences related to international money transfers. These benefits are optional and independent from the card program. Their use will have no impact on the operation of the Intermex Payroll Mastercard Card and do not incur any additional or recurring account program fees or charges. Further, by agreeing to participate, you authorize your employer to share your personal and account information with Intermex and Intermex's processing partners for the purpose of pre-registering you for international money transfer benefits. | I choose to pre-register for Intermex money transfer benefits ☐YES ☐NO |

Name: _____     Date: _____

Signature: _____     Telephone: _____

16

Confidential

SCSCGA-036906