# EXCERPTS FROM DEPOSITION OF RICKY GONSOULIN

UNITED STATES DISTRICT COURT

WESTERN DISTRICT

STATE OF LOUISIANA

FELIPE DE JESUS                    NO. 6:24-cv-01392
AVILA-SOTO, FELIPE DE
JESUS SUAREZ-PALAFOX, ON
BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY
SITUATED,

        Plaintiffs,

VERSUS

South Central Sugar Cane
Growers' ASSOCIATION,
INC., AND STERLING
SUGARS, LLC,

        DEFENDANTS.


        Zoom deposition of RICKY GONSOULIN,

appearing remotely via videoconference from

Franklin, Louisiana, taken in connection with the

captioned cause, pursuant to the following

stipulation before Kristie Garrison, Certified Court

Reporter, appearing remotely from Baton Rouge,

Louisiana, on Wednesday, February 18, 2026,

commencing at 9:31 AM


REPORTED BY:
        KRISTIE GARRISON
        CERTIFIED COURT REPORTER

APPEARANCES:

          DAWSON MORTON LAW FIRM
          (BY:  JAMES M. KNOEPP, ESQUIRE)
          1612 Crestwood Drive
          Columbia, South Carolina  29205

          DAWSON MORTON LAW FIRM
          (BY:  DAWSON MORTON, ESQUIRE)
          1808 Sixth Street
          Berkeley, California  94710

                ATTORNEYS FOR THE PLAINTIFF


          PHELPS DUNBAR
          (BY:  MOLLY McDIARMID, ESQUIRE)
          400 Convention Street
          Suite 1100
          Baton Rouge, Louisiana  70802

                ATTORNEYS FOR THE DEFENDANT

ALSO PRESENT:  ASHLEE GARY

A.    Actually, that's incorrect.  So the processing facility, whatever processing facility you haul your raw sugarcane product to as a farmer, receives 37%.  And after the 37% is removed for processing, the remaining balance, 1/6 comes off to the landlord and the rest to the grower.

Q.    Okay.  So of the farmer's share, Gonsoulin Farms would provide 1/6?

A.    That's correct.  Or 1/5, depending on the -- yes, sir.

Q.    The deal?

Okay.  And you mentioned Sterling Sugars. Do you know what your arrangement is with Sterling Sugars?

A.    Yes.  I got a five-and-five-year lease at a 1/5 agreement.

Q.    Okay.  And is that a written lease?

A.    Yes.

Q.    All right.  And M.A. Patout, is that an individual or a company?

A.    It's a company.

Q.    Okay.  Is that the parent company of Sterling Sugars?

A.    It is.

Q.    Okay.  It's a large sugar cane processing

MR. DAVIS:

Objection.

THE WITNESS:

No, it's not.

BY MR. MORTON:

Q.    Can you tell me the name of the insurer?

A.    Farm Bureau Insurance Company.

Q.    Okay.  And the insured on that policy is Gonsoulin Farms?

A.    That is correct.

Q.    We started talking about South Central Sugar Cane Growers' Association.  Do you have a position in that association?

A.    Yes.  Current president.

Q.    Sir?

A.    I am the current president.  You need me to talk louder.

Q.    No, no.  I think I just spoke over you.

Okay.  When did you become president?

A.    2023.

Q.    Do you know what month?

A.    I do not.

Q.    And you said you're the current president.  Is there a term?  When will you not be president?

year?

A.    Annually.

Q.    Annually.

Okay.  What month do you meet?

A.    It varies in different scopes.  Sometime in the summer -- summer month -- summer month -- late summer month.

Q.    Okay.  Late summer months would be like July, August?

A.    Somewhere in there.  Yes, before August.

Q.    Before August.

Okay.  And where do you meet?

A.    Location has changed on different locations.

Q.    Can you name for me the locations where you've met?

A.    H2-A housing complex.

Q.    Okay.  T hat is kind of, like, a motel in Franklin?

A.    Central, yeah.  In the kitchen area, central area, yes.

Q.    Okay.  It's near the McDonald's?

A.    Yes, sir.

Q.    And you met there in the kitchen?

A.    Yes, sir.

Q.    Okay.  And other places that you've met?

A.    I don't recall any other places.

Q.    Okay.  And that motel is owned by Sterling Sugars; is that right?

A.    That is correct.

Q.    Okay.  And how do you refer -- do you just call it the H2-A housing complex?

A.    Yes.

Q.    And you mentioned that you are the current president.  Does anyone else have a title or position on the board of directors for South Central?

A.    Sure.

Q.    Can you tell me the other ones?

A.    So currently, Chris Patout is the vice president.  Ashlee Gary is the treasurer, and the secretary is -- can't recall her name right now.

Q.    It's a woman?

A.    Yes.

Q.    Okay.  Is it Desiree Lange?

A.    Yeah, I think so.  Yeah.

Q.    Okay.  She works in the office at Sterling Sugars?

A.    Correct.

Q.    And Ms. Gary, she's present here today,

Q.    Okay.  Do you know -- were there notes taken of the meeting?

A.    Yes, the minutes were taken.

Q.    Okay.  Do you have a copy of those minutes?

A.    Not with me.

Q.    When I say, "Do you have a copy," I guess I'm not asking just on your person, but just does Ricky Gonsoulin possess a copy of the minutes?

A.    I do not possess a copy of the minutes currently in my office.

Q.    Okay.  Do you know where a copy of those minutes would be located?

A.    They would be with South Central Growers' Association.

Q.    Okay.  Does South Central Growers' Association have an office?

A.    They do not.

Q.    Okay.  So when you say, "It'd be with them," what do you mean by that?

A.    The management firm that we hire possesses the documents for South Central Growers' Association.

Q.    Okay.  What management firm is that?

A.    That would be the management firm for

Sterling Sugars.

Q.    So when we say the "management firm," we're talking about the sugar mill, Sterling Sugars?

A.    The management firm that we hire to assist us in running South Central Growers' Association with the coordination of the trucking company for the growers.

Q.    Okay.  I'm just trying to understand when we say "management firm," what we're talking about?

MR. DAVIS:

Objection.  Asked and answered.

BY MR. MORTON:

Q.    Okay.  And we're talking about the sugar mill?

MR. DAVIS:

Objection.  Asked and answered.

MR. MORTON:

Beside that objection, Brandon, I think you know that, but --

MR. DAVIS:

I'm sorry, Counsel.  The witness did give an answer when you asked that question. Your follow-up question was a leading question to bind him to testimony that was different than his answer.  Would you mind posing a

RICKY GONSOULIN                                                                JOB NO. 2425460
FEBRUARY 18, 2026

BY MR. MORTON:

Q. Okay. And again, just to be clear, we're talking about South Central?

A. Correct.

Q. Okay. And we talked earlier about records for Gonsoulin Farms. You have those?

A. That is correct.

Q. Okay. So, for example, personnel files for South Central employees, you don't have those?

A. I do not.

Q. Do you know where those are located or if they exist?

A. That would be with the management firm that South Central Growers' Association hires -- Hired.

Q. Okay. Again, as I understand it, the management firm is the sugar mill, Sterling Sugars?

A. We hired a management firm, Yes, sir.

Q. Okay. And it's Sterling Sugars?

A. Correct.

Q. And bank records for South Central, are you in possession of those?

A. I am not.

Q. And would those also be located with the management firm, Sterling Sugars?

Central?

A.    I do not.

Q.    Do you know where purchase orders for South Central are kept?

A.    Repeat that question.

Q.    Do you know where purchase orders for South Central Sugar Cane Growers' Association are kept?

A.    That would be in the hands of the manager or the treasurer.

Q.    Okay.  And by the treasurer, you're saying Ashlee Gary at M.A. Patout?

A.    That's correct.

Q.    Are you aware of the bank balances for South Central?

MR. DAVIS:

Objection.

THE WITNESS:

I am not.

BY MR. MORTON:

Q.    Okay.  Do you have any way of checking those bank balances?

A.    I do not.

Q.    Do you know where the South Central bank account is located?

A.    I do recall it's a -- I don't remember the specific location, but I do recall seeing some of the information going to one of the local banks.

Q.    Okay.  Do you know which bank?

A.    I do not.

Q.    You mentioned, I think, having a hauling agreement.  Am I remembering your testimony correctly, Mr. Gonsoulin?

A.    South Central Growers, who is a farmer-owned association that hauls raw sugar cane, all its members have agreements that their cane will be hauled by the association.

Q.    Okay.  And so does Gonsoulin Farms have a hauling agreement with South Central?

A.    We do.

Q.    Okay.  And is that in a written document?

A.    As I recall, yes.

Q.    Okay.  And would you have a copy of that hauling agreement?

A.    I think those agreements are in possession of the association.

Q.    Okay.  And would they be in the possession of the management company then, Sterling Sugars?

MR. DAVIS:

                        Objection.

BY MR. MORTON:

     Q.    I didn't hear your answer.

     A.    The association, not Sterling Sugars.

The association, South Central Growers' Association.

     Q.    Okay.  Where does South Central Growers'

Association keep its records?

     A.    I'm not aware of that.

     Q.    Okay.  So when you're telling me that the

records are in the possession of South Central, I'm

wanting to know what that's based on?

     A.    I'm assuming that our treasurer has all

the records for the association.

     Q.    Okay.  South Central Sugar Cane Growers'

Association doesn't have any office, right?

     A.    It does not.

     Q.    Okay.  And it doesn't have any computers

or file systems?

     A.    I'm not aware of that.

     Q.    To your knowledge, it doesn't have

computers or file systems?

             MR. DAVIS:

                    Objection.  Asked and answered.

BY MR. MORTON:

     Q.    I just want to make sure I understood

your answer; is that right, Mr. Gonsoulin?

A.    I am not aware.

Q.    Of it having any computers or file systems?

MR. DAVIS:

Objection.  Asked and answered.

BY MR. MORTON:

Q.    Can you give me your answer, Mr. Gonsoulin?

MR. DAVIS:

Objection.  Asked and answered.

THE WITNESS:

I'm not aware of the specific filing system that they're using for South Central, no.

BY MR. MORTON:

Q.    Okay.  And you don't have, for example, a South Central computer or a South Central login?

A.    I do not.

Q.    Have you been asked as part of this lawsuit to look for a copy of the hauling agreements that you have at Gonsoulin Farms?

A.    I have not.

Q.    Have you been asked as part of this lawsuit to look for any hauling agreements that you

RICKY GONSOULIN                                                JOB NO. 2425460
FEBRUARY 18, 2026

e-mails?

    A.    I could look for the e-mails.

    Q.    Okay.  And you haven't been asked to do so?

    A.    I have not.

    Q.    And when you receive that list via e-mail, what do you do with that preliminary list?

    A.    That preliminary list is forwarded over to our management firm.

    Q.    Okay.  And anyone specifically?

    A.    Jamie Robinson.

    Q.    Okay.  And that forwarding would be by e-mail?

    A.    Correct.

    Q.    And when you said that you receive a copy of the list from Great Labor, does it come from a particular individual at Great Labor?

    A.    Yes, John Dees.

    Q.    How did you first get connected with Mr. Dees?

    A.    I don't recall.  He's been associated with South Central Sugar Cane Growers' since the inception.

    Q.    Does the South Central Growers' Association use an address on its job orders?

A.    The job orders has the address of the management firm.

Q.    Okay.  And do you know what that address is?

A.    611 Irish Bend Road, if I recall right.

Q.    Okay.  And that's in Franklin?

A.    Correct.

Q.    All right.  And that's the same address as the Sterling Sugars sugar mill?

A.    I would assume.

Q.    You don't have any knowledge that's different than that?

A.    I do not.

Q.    Are there any dues to be a member of the South Central Sugar Cane Growers' Association?

A.    Not that I'm aware of.

Q.    Okay.  Have you, Mr. Gonsoulin, or Gonsoulin Farms ever paid dues to South Central?

A.    No, we have not.

Q.    Has Gonsoulin Farms or you individually ever guaranteed any kind of loan to South Central?

MR. DAVIS:

Objection.

THE WITNESS:

No.

RICKY GONSOULIN                                             JOB NO. 2425460
FEBRUARY 18, 2026

conversations about wage rates or overtime pay as part of your role at South Central?

MR. DAVIS:

Objection.  Asked and answered.

THE WITNESS:

Repeat the question, Mr. Dawson.

BY MR. MORTON:

Q.    Sure.  I'm asking if you have participated in any conversations about wage rates or overtime pay as part of your role at South Central concerning truck drivers?

A.    So the Fair Labor Standards Act and AG exemption and our applications throughout attorney clearly states what we're required to pay to truck drivers and those rules are followed verbatim.

Q.    Okay.  So sounds like your answer is you have participated in some conversations?

A.    Not conversation.  I reviewed the applications and forwarded over to the association. The applications determine adverse wage effect that we are required to pay.

Q.    Okay.  To your knowledge, does South Central Sugar Cane Growers' Association grow sugar cane?

A.    No, it does not.  The growers grow the

sugar cane that are the members of the association.

Q.    Okay.  And just so that I'm understanding correctly, you, Mr. Gonsoulin, you talked earlier, you're part of Gonsoulin Farms, and we talked about how Gonsoulin Farms grow sugar cane?

A.    That is correct.

Q.    Okay.  But you, as president of the South Central Sugar Cane Growers' Association, do not grow sugar cane as part of the association.  It's the separate business of Gonsoulin Farms to grow sugar cane?

MR. DAVIS:

Objection.  Asked and answered.

BY MR. MORTON:

Q.    I still need your answer, Mr. Gonsoulin.

A.    It's the same question you applied previously.  South Central Growers' Association is represented by farmers who grow sugar cane as a commodity.

Q.    Okay.  And I'm just trying to clarify.  The farmers grow the sugar cane separately.  Nobody is growing sugar cane as South Central?

A.    That is correct.

BY MR. MORTON:

Q.    Have you -- so I'm in a different time

of it?

A.    The association would have a copy of it and the management firm.

Q.    Okay.  And who in the association would have a copy?

A.    The treasurer as well as the management firm.

Q.    Okay.  And is there anyone particular at the management firm that would have a copy?

A.    Jamie Robinson would have a copy of that.

Q.    Okay.  And is Jamie Robinson the person who's expected to enforce the code of conduct?

A.    I'm not aware of that answer.  No.

Q.    Okay.  Do you enforce the code of conduct?

A.    No, I do not.  The management team does.

Q.    Okay.  And do you know anyone in particular on the management team that enforces the code of conduct?

A.    I do not.

Q.    And do you know who prepared the code of conduct?

A.    I do not.

Q.    You didn't, for example, prepare it?

A.    I did not.

Are you directing us to a page number?

MR. MORTON:

All right.  Brandon, I got it.

Sorry for any confusion that I'm causing is

unintentional.  My apologies.

THE WITNESS:

I think some of the files are --

MR. DAVIS:

Hold on, Mr. Gonsoulin, Mr. Dawson

has not asked a question yet.

BY MR. MORTON:

Q.    I think I just got it.

Mr. Gonsoulin, I'm showing you a document

that's being marked as Exhibit 20.  I'm going to

show you that bottom number again just on the first

page.  It's sideways, which makes it a little

tricky.  It is kind of printed over stuff, but we

can see the 2328, and I'll just represent to you

that it's 23280.  Do you see at least the 2328 there

on the side?

A.    I do.

Q.    Have you seen a document like this

before, Mr. Gonsoulin?

A.    Scroll down.  Let me see the whole

document.  There was so many documents.  Let me

scroll down, see the whole document.

Q.    Sure.

MR. DAVIS:

Mr. Gonsoulin, while Dawson is scrolling down, I wanted to remind you that you can control the documents yourself by using the link in the chat box that Mr. Morton shared with us in case you wanted to read it and control it yourself.

BY MR. MORTON:

Q.    Okay.  If you want me to turn to any page, you just let me know.

A.    No.  No.  Okay.  All right.  I looked at it.  Yeah.

Q.    Okay.  Can you tell me what this is? Tell me if you have a recollection of it?

A.    I have recollection of this.

MR. DAVIS:

Counsel, are you referencing a particular Bates number, or you're identifying Exhibit 20 as a whole?

MR. MORTON:

We're just looking at the first page of Exhibit 20 right now and asking Mr. Gonsoulin if he has a recollection of it.

BY MR. MORTON:

Q.   Go ahead, Mr. Gonsoulin.  I think you got interrupted, but you were saying, "I have a recollection of it?"

A.   I have recollection of I signed that document.

Q.   Okay.  And do you know where you were when you signed it?

A.   I do not remember.

Q.   Okay.  And do you have an understanding of this document?

MR. DAVIS:

Objection.

THE WITNESS:

I do.

BY MR. MORTON:

Q.   Okay.  Can you tell me what your understanding of this document is?

A.   My understanding is that the promissory note was made to the South Central Growers Association to loan for capital funds to operate the association.

Q.   Okay.  So this document represents a loan to South Central; is that right?

MR. DAVIS:

Objection.

THE WITNESS:

Correct.

BY MR. MORTON:

Q.   And the loan is from Sterling Sugars; is that right?

MR. DAVIS:

Objection.

THE WITNESS:

That would be correct.

BY MR. MORTON:

Q.   Okay.  And on this document, the one that we're looking at, the first page of Exhibit 20, it shows $350,000.  Do you see that?

A.   I do.

Q.   And that was the loan amount?

A.   That would be correct.  For this particular document.

Q.   Okay.  For this particular document.  And is it fair to say there's other similar documents with different loan amounts?

A.   To my recollection, yeah, there would be other ones as well.  I'm not familiar with all of them, but yes.

Q.   Okay.  And this loan amount was to keep

South Central running, is that fair to say?

          MR. DAVIS:

               Objection.

          THE WITNESS:

               I'm not saying to keep it running.
It's just a loan for operating capital.

BY MR. MORTON:

     Q.    Okay.  It's a loan so that South Central
could pay its bills?

          Objection.

          THE WITNESS:

               Again, operating capital.

BY MR. MORTON:

     Q.    Okay.  Well, I guess I want to know what
operating capital means to you?

     A.    Operating capital is to operate the daily
function of South Central Growers Association and
whatever that entails.

     Q.    And that would include, like, paying
bills?

     A.    I would assume that would be correct.

     Q.    Okay.  And that would also include, like,
making payroll?

     A.    I would also assume that's correct.

     Q.    Okay.  And does this -- I didn't see it

marked here, but does this loan have any interest

rate?

A.    I see it at eight and a half at the

initial rate and adjusted thereafter.

Q.    Okay.  I saw that those paragraphs, it

says "not applicable unless marked."  Did you see

that?

A.    Yeah, I see that it's not marked.  That's

correct.

Q.    Okay.  As far as I understand it, this

loan doesn't have an interest rate.  Do you have any

understanding that's different?

A.    I'm not aware of anything different.

Q.    There's also a security provision.  Do

you see that?  It's kind of in the middle of the

screen right now, first page of Exhibit 20?

A.    I do.

Q.    Okay.  And nothing's filled out there,

correct?

A.    There's nothing on this document.

Q.    Okay.  My understanding is that nothing

was pledged as security for this loan.  Do you have

any understanding that's different than that?

A.    I do not.

Q.    And you don't remember where you were

when you signed this document, the second page of Exhibit 20?

A.    I do not remember the exact location.  I do not.  I remember signing the document, but I do not remember the exact location.

Q.    Okay.  And you see your signature here on the second page of Exhibit 20; is that right?

A.    I do.

Q.    And do you see this?  There's a signature here.  It says endorser?

A.    I do see it.

Q.    Do you know whose signature that is?

A.    I do not.

Q.    Was anyone else present when you signed this document?

A.    If I recall correctly, Jamie Robinson and Ashlee Gary were present when we signed it, but I don't remember where or when.

Q.    Okay.  I'm going to just look at the third page of Plaintiffs' Exhibit 20.  Can you see that page?

A.    Yes.

Q.    And we talked about this earlier, but this is a similar document but has a different amount; is that correct?

A.    Yes.

Q.    The amount for this third page of Exhibit 20 is $250,000; is that right?

A.    That is correct.

Q.    And that interest provision's not marked again, right?

A.    That would be correct.

Q.    Okay.  And the security provision, nothing's filled out for security; is that right?

A.    That would be correct.

Q.    Okay.  And again, on the -- now, we're on the fourth page of Exhibit 20.  Do you recognize your signature there?

A.    I do.

Q.    And do you recognize the endorser signature?

A.    I do not.

Q.    Okay.  And again, do you have a recollection of where you were when you signed this document that's the fourth page of Exhibit 20?

A.    I do not.

Q.    And you didn't personally pledge anything to receive these loans to South Central?

A.    I did not.

Q.    And to your knowledge, none of the other

farmers pledged anything to receive these loans to South Central either; is that right?

A.    Agreed.

Q.    And do you know who prepared this document that we're looking at, this Exhibit 20, either the first one we looked at or the other one?

A.    I do not offhand, no.

Q.    Okay.  Did you receive this document from Jamie Robinson?

A.    No.

Q.    Do you know who you received it from?

A.    I received it from the treasurer of South Central Growers Association.

Q.    Okay.  And that would be Ashlee Gary?

A.    Correct.

Q.    Okay.  But she wasn't present when you signed it?

A.    She was present when we signed them, yes.

Q.    Okay.  Ashlee Gary was there.  You didn't mention her earlier, but Ashlee Gary was there then and Jamie Robinson?

A.    Yes, several people, if I remember right, when we signed them.

Q.    Okay.  And who else?

A.    I don't remember exactly.

A.    Yes.

Q.    Do you receive wages from Gonsoulin Farms?

A.    I do.

Q.    And do you -- besides Gonsoulin Farms, do you receive wages from any other company or individual?

A.    I do.

Q.    What other wages do you receive?

A.    I get paid by the City of New Iberia for being the Mayor Pro Tem of the City of New Iberia.

Q.    Okay.  And is Mayor Pro Tem a little bit like Vice Mayor?

A.    That is correct.

Q.    Okay.  And you get sort of like a payment for each city council meeting, that kind of thing?

A.    Correct.

Q.    Okay.  Other than those two sources, Gonsoulin Farms and the City of New Iberia, do you get wages from any other location?

A.    I do not.

Q.    Okay.  And do you get any wages or payments from South Central for being the president of South Central?

A.    I do not.

Q.    Besides the H-2A workers, does South Central have any employees who receive wages?

A.    They do not.

Q.    And so your understanding, for example, would be that none of the members of the Board of Directors receive any payments from South Central?

A.    That would be a correct statement that I'm aware of.

Q.    Okay.  I'd like to show you an additional document, Mr. Gonsoulin.  It's going to get marked as Exhibit 25.  I'm going to pull it up now.  Let me know if you can see it.  Can you see that?

A.    I can.

Q.    Okay.  It says Management Services Contract at the top.  Do you see that?

A.    Yes, sir.

Q.    Okay.  And at the bottom, it has a stamp that's 23170.  Do you see that?

A.    I do.

Q.    Okay.  Have you seen this document before?

A.    I have.

Q.    Okay.  Can you tell me what this document I'm showing you that's Exhibit 25 is?

A.    This is the management agreement between

South Central Growers' Association, which is a farmer-owned association that grows sugar cane to be hauled to Sterling Sugars, to allow a management team that is employed by Sterling Sugars to operate and maintain our association based on the trucking concerns, transportation concerns.

Q.    Okay.  So managers from Sterling Sugars manage the trucking that South Central is performing, and that is also described in this agreement that we're looking at as Exhibit 25?

A.    Correct.

Q.    And turning to the last page of Exhibit 25, it's the eighth page.  Does this page have your signature?

A.    It does.

Q.    And do you recognize any of the other signatures on this page?

A.    I do.

Q.    Which other signatures do you recognize?

A.    Jamie Robinson, Desiree Lange, and Ricky Patout.

Q.    Okay.  And were they all present when you signed this document?

A.    I am almost 100% sure, yes.

Q.    Okay.  Do you know where you were when

Q.    Okay.  Do you recognize this document?

A.    Yes, I do.

Q.    And can you tell me what this document is?

A.    That is the Department of Labor application process for ETA-790A for H-2A employees.

Q.    Okay.  Did you fill out any portion of this document?

A.    I did not.  This document is filled out by our labor attorney.

Q.    Okay.  And that is -- was that Ashley Dees?

A.    That is correct.

Q.    Okay.  And is this phone number that's listed here, (337) 319-7515, is that your phone number?

A.    That is correct.

Q.    Okay.  And your Gmail address is listed as well?

A.    That is correct.

Q.    Okay.  And the mailing address that's listed here, 611 Irish Bend Road?

A.    That is correct.

Q.    Okay.  What address is that?

A.    611 Irish Bend Road.

Q.    Who's at that location?

A.    That would be the management team's location.

Q.    Okay.  Is that where the Sterling Sugars mill is located?

A.    It is located in that vicinity, but that's where the management team receives its mail. As does South Central Sugar Cane Growers' Association.

Q.    Okay.  I'm just -- Is 611 Irish Bend Road the address for Sterling Sugars?

A.    The sugar mill.  Yes.

Q.    Okay.  And do you know why that was put down here instead of an address for you, Mr. Gonsoulin?

MR. DAVIS:

Objection.

THE WITNESS:

I do not have the answer to that question.

BY MR. MORTON:

Q.    Okay.  And did you input this NAICS code here that I'm showing you?  It's in box 16.

A.    No, the labor attorney put that code in.

Q.    Okay.  And that code is for sugar cane

RICKY GONSOULIN                                          JOB NO. 2425460
FEBRUARY 18, 2026

farming.  Are you aware of that?

A.    Yes, I'm aware.  Innovation.  Yes.

Q.    Okay.  That's a code that you also use on your own H-2A job orders for Gonsoulin Farms?

A.    I'd have to go back to them applications, but it's very similar.

Q.    Okay.  Now, South Central Sugar Cane Growers' Association doesn't actually grow any sugar cane; isn't that right?

A.    South Central Growers' Association is a member-owned organization of farmers that grow sugar cane as an association.

Q.    Okay.  I just want to make sure I understand that South Central Sugar Cane Growers' don't grow sugar cane, only the members grow sugar cane?

A.    The name is not South Central Sugar Cane Growers'.  You're stating it wrong.  It's South Central Sugar Cane Growers' Association, and it's made up of sugar cane growing members, and the association is in place to haul its commodity for the growers.

Q.    Okay.  And the association isn't growing any sugar cane itself?

A.    It is not.

Q.    And did you sign the H-2A order?

A.    Yes, I did.

Q.    Okay.  And did you -- where were you when you signed the H-2A order?

A.    99.9% of the documents that are related to the application process are e-mailed to me and I sign them via DocuSign.  There are some requirements that decide a wet signature.

Q.    Right.  And did you ask for any changes to be made to the H-2A job order?

A.    I did not.

Q.    Okay.  And do you know who else spoke to either of the Deeses to complete the information on the H-2A job order?

A.    I'm not aware of any.

Q.    Okay.  You don't know who did?

A.    Part of the management team relayed information, the required information for the application process.

Q.    Okay.  And that could have been either to John Dees at Great Labor or to Ashley Dees?

A.    That would be correct.

Q.    Okay.  And are they husband and wife, to your knowledge?

A.    I think so.  As far as I'm concerned, I

THE WITNESS:

That's not a fair assumption.  It's at the discretion of the Sugar Mill if they want to pay additional dollars for transportation.

BY MR. MORTON:

Q.    Okay.  And do you know whether the Sugar Mill here, Sterling Sugars, has exercised that discretion?

A.    I'm not aware of it.  I am aware of different rates per ton at different distances.

Q.    Okay.  And is there any document in which those rates per ton are contained?

A.    I am not aware of any.

Q.    I'd like to show you an additional document, Mr. Gonsoulin.  It's going to be marked as Exhibit 28.  Let me know if you can see this document.  I'd like to ask you about this second page, but I'll show you the first page too.  It has like a deposit slip.  And then, do you see at the bottom?  Let me see if I can make it bigger.  It shows 23134 at the bottom right?

A.    Uh-hmm.

Q.    Have you seen this document that's been marked as Exhibit 28 before?

A.    I have not.

Q.    Okay.  I noticed it because of the check for 1.927 million.  Do you see that?

A.    I do.

Q.    Okay.  And it has that stamp for your name.  Do you see that?

A.    I do.

Q.    And it's from South Central to Sterling Sugars.  Do you see that?

A.    That is correct.

Q.    It's dated June 16, 2025?

A.    I see that as well.

Q.    Okay.  Are any of these notations, it has some handwritten notations just below the check, do you see those on the second page of Exhibit 28?

A.    I see.

Q.    Do you recognize any of those notations?

A.    I do not.

Q.    Okay.  Do you have any, like, some of them seem to me to be dollar amounts, and then some of them seem to be like 9, 7000, maybe some kind of code.  Do you have any understanding about any of these notations?

A.    Those fees are very familiar, and that seems to be account numbers on each side, but I

haven't seen this particular document.

Q.    Okay.  Did anyone tell you that South Central was writing a check for 1.9 million to Sterling Sugars?

A.    I was aware there was some payment that needed to be made on the part of South Central Association, but not in that particular amount.

Q.    Okay.  Do you know how South Central got the money to make this payment?

A.    I do not.

Q.    Okay.  I wanted to show you a promissory note that South Central has for that same day. Showing you another document that's marked as Exhibit 29.  Let me know if you can see it, and I'll try and make it bigger?

MR. DAVIS:

Counsel, will you publish Exhibit 29 to the feed.

MR. MORTON:

It should be there.  We're all looking at it, Mr. Davis, I think.  Can you see it, Mr. Gonsoulin?

MR. DAVIS:

Just so you know, this was also already marked as Exhibit 20.

MR. MORTON:

Oh, darn it.

THE WITNESS:

I was about to say the same, it's the same one you showed me as 20.

BY MR. MORTON:

Q.    Is that the case?  Well, if so -- well -- well, shoot.  Why don't we go back and I'll try and -- here, let me just -- let me go back for a second to Exhibit 20.  Okay.  We'll just keep it as Exhibit 20, if that's all right with you, Mr. Gonsoulin.

A.    That's fine.

Q.    Okay.  I was just going to go to page 5. It has a promissory note for $4,100,000.  Do you see that, Mr. Gonsoulin?

A.    I do see that.

Q.    Okay.  It's the same date, June 16, 2025, is that check for 1.9 million that we were just looking at?

MR. DAVIS:

Counsel, will you identify the Bates number that you're looking at?

MR. MORTON:

Yeah, we're looking at Exhibit 20,

and it starts with Bates number 23280.

Although the zero is a little hard to see.

It's stamped on the side.

BY MR. MORTON:

Q.    But do you see that, Mr. Gonsoulin?

A.    I do.

Q.    Okay.

MR. DAVIS:

Does 284 correlate with page 5?

MR. MORTON:

23284, I believe correlates -- is

the document that's stamped -- that's page 5

of this document.

MR. DAVIS:

Okay.

BY MR. MORTON:

Q.    And you see that stamp for 23284, Mr.

Gonsoulin?

A.    I do.

Q.    Okay.  And this document reflects that

Sterling Sugars provided 4,100,000 to South Central

on June 16, 2025; is that right?

A.    That would be correct.

MR. DAVIS:

Object to characterization.

RICKY GONSOULIN                                          JOB NO. 2425460
FEBRUARY 18, 2026

BY MR. MORTON:

Q.    And I think your answer was, that would be correct?

A.    That would be correct.

Q.    Okay.  And you signed this document; is that right, Mr. Gonsoulin?

A.    That would be my signature, yes, sir.

Q.    Okay.  And Chris, is that -- do you recognize the signature of Chris Patout or?

A.    I do not.

Q.    Okay.  Do you know whose signature that is below yours?

A.    I would assume it's Chris Patout, but I'm not familiar how he signs his name.

Q.    Okay.  And so my understanding here is Sterling Sugars gave South Central $4,100,000 and on the same day South Central then wrote back a check for 1.927.  Do you have any different understanding?

A.    I do not, but I think it'd be well worth it if you to address that with accounting personnel. But Obviously there was 4,100,000 that I signed for promissory note and the check was written for 1.9. So that is accurate of what you showed me.

Q.    Okay.  And you wouldn't have signed this promissory note if South Central wasn't receiving

the 4,100,000, right?

A.    I sign all the promissory notes that are reviewed for operating capital with the association.

Q.    Okay.  And operating -- by operating capital, we mean basically money in the bank for South Central?

A.    I would tend to agree with that statement.

Q.    Okay.  And you've mentioned earlier -- I stopped -- I just stopped presenting that exhibit because, going to ask you a separate question.

But you've mentioned earlier that the growers own South Central and I'm just trying to understand what it is that they own?

A.    The growers are grower membership of the association.  There's nothing to own with the association.

Q.    Okay.  It doesn't have --

A.    They don't have any hardcore assets.

Q.    Okay.  No land, no trucks?

A.    Nothing.  No.

Q.    And the bank accounts really just borrowed money from Sterling Sugars?

A.    I would tend to disagree with that.  It would be revenue or borrow money from Sterling, but