# EXCERPTS FROM DEPOSITION OF JAIME ROBISON

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

CASE NO. 6:24-cv-01392

_____

FELIPE DE JESUS AVILA-SOTO, et al. )

    Plaintiffs,                          )

v.                                 )

SOUTH CENTRAL SUGAR CANE GROWERS'  )

ASSOCIATION, INC., et al.        )

    Defendants                     )

_____ )

Remote deposition of

JAIME BERNARD ROBISON

Thursday, February 12, 2026

9:40 a.m. CT - 4:14 p.m. CT

Pages 1-213

REPORTED BY:  Ahuva Goldberger, Stenographic

Reporter & Notary Public

A P P E A R A N C E S

(VIA ZOOM)


ON BEHALF OF THE PLAINTIFF:

DAWSON MORTON, LLC

DAWSON MORTON, ESQUIRE

Admitted Pro Hac Vice

1808 Sixth Street

Berkeley, California 94710

(404) 590-1295

dawson@dawsonmorton.com

AND

JAMES M. KNOEPP, ESQUIRE

Admitted Pro Hac Vice

1612 Crestwood Drive

Columbia, South Carolina 29205

(828) 379-3169

jim@dawsonmorton.com

A P P E A R A N C E S   C O N T I N U E D

(VIA ZOOM)


ON BEHALF OF THE DEFENDANTS:

PHELPS DUNBAR, LLP

BRANDON DAVIS, ESQUIRE

365 Canal Street, Suite 2000

New Orleans, Louisiana 70130

(504) 584-9312

brandon.davis@phelps.com


ALSO PRESENT:

Ashlee Gary - Corporate Representative

with Mr. Robison.  We're going to step out of the room so I can call him.

MR. KNOEPP:  Okay.

MR. DAVIS:  Okay.

(A short break was taken.)

BY MR. KNOEPP:

Q.   Mr. Robison, did you have any questions about any of the instructions we went over?

A.   No, sir.

Q.   Are you represented by an attorney today?

A.   Mr. Davis.

Q.   And you're -- I see that you're in what looks like to be an office.

Is that at your home or is that at your work?

A.   At work.

Q.   And where is that office located?

A.   Franklin, Louisiana.

Q.   What's the address?

A.   611 Irish Bend.

Q.   611 Irish Bend Road?

A.   Yes, sir.

Q.   Is that the location of the Sterling Sugars sugar mill?

A.   Yes.

Q.   What did you do to prepare for today's deposition?

A.   What did I do to prepare for today's deposition?  Not a whole lot.

Q.   Did you meet with anybody?

A.   No, sir.

Q.   Did you meet with Mr. Davis or anybody from his office?

A.   No, sir, I did not meet with anyone.

Q.   Did you review any documents to prepare for today's deposition?

A.   I didn't particularly review, but I did see the documents yesterday were sent to me.

Q.   Somebody -- somebody sent you some documents yesterday?  Is that what you're saying?

A.   One of the girls in the office sent me a copy of the documents, yes.

Q.   What documents were those?

A.   I'm thinking it's the transcript of the lawsuit.

Q.   Maybe the complaints from the lawsuit?

A.   I think so.  I think so.

Q.   Anything else other than the complaints that you were sent?

Sterling Sugars?

A.   Yes, sir.

Q.   And what color is the truck?

A.   I guess you could say it's a gray pewter -- pewter gray color.

Q.   Like a dark gray?

A.   Sure.

Q.   And are you -- are you employed by Sterling Sugars?

A.   Yes, I am.

Q.   How long have you worked for Sterling Sugars?

A.   Since 2018.

Q.   That's when you were first hired, in 2018?

A.   Yes, sir.

Q.   Who hired you?

A.   Mr. Rivers Patout and Tim Soileau.

Q.   Prior to 2018, who -- where were you working?

A.   I was working for Sanders.

Q.   And what does -- is that a company name or a person?

A.   That is a company name.

Q.   Okay.  What does Sanders do?  What kind

sometimes the context gets lost whenever you look at it on paper.

A.   Yes, sir.

Q.   Do you work year-round?

A.   Yes, sir.

Q.   Do you have any other -- do you have any other paid employment, like part-time jobs or seasonal jobs?

A.   No, sir, other than city council.

Q.   That's what I was just going to ask you. Is that a volunteer position or do you --

A.   It's a paid position.

Q.   You get a W-2 at the end of the year with respect to your work at Sterling Sugars; is that right?

A.   Yes.

Q.   And I guess the name of the employer on that W-2 is Sterling Sugars, LLC; is that right?

A.   Yes, sir.

Q.   Do you get a W-2 from any other entities?

A.   The City of Franklin.

Q.   Other than the City of Franklin and Sterling Sugars, any other W-2s?

A.   No, sir.

Q.   Do you get a W-2 from South Central?

A.   No, sir.

Q.   Do you get any other tax forms related to your work at Sterling Sugars?

A.   No, sir.

Q.   For example, do you get a K-1 related to your work at Sterling Sugars?

A.   No, sir.

Q.   Do you get any type of tax documents from South Central?

A.   No, sir.

Q.   Did you ever work for the Sterling Sugars Sales Corporation?

A.   No, sir.

Q.   Do you know what I mean by the Sterling Sugar Sales Corporation?

A.   I believe so, yes.

Q.   What's your understanding of the work -- or the business that the Sterling Sugar Sales Corporation is involved in?

A.   I'm not sure about that.

Q.   Do you know whether the Sterling Sugar Sales Corporation employed H-2A truck drivers to haul sugar cane to the Sterling Sugars mill prior to that being done by South Central?

JAIME BERNARD ROBISON                                           JOB NO. 2405911
FEBRUARY 12, 2026

Q.    When you mentioned -- you said that you were the liaison between the factory and the farmers.  What factory --

A.    Sterling Sugars.

Q.    Thank you.

And I know -- I know that we all know this, but let's just get it for the record.  The farmers are growing sugar cane; is that right?

A.    Yes, sir.

Q.    And that raw sugar cane is then brought to the Sterling Sugars mill to be processed and turned into sugar; is that right?

A.    Correct.

Q.    And when you say that you have some job duties related to sugar inventory, what exactly do you mean by that?

A.    We have stored sugars.  We have stored sugar on the grounds on the premises here in warehouses that we have to manage to ship out.

Q.    And you're talking about refined sugar; is that right?

A.    Yes, sir.

Q.    Not -- not talking about raw sugar cane?

A.    No, sir.

Q.    And whenever you were referring to

oversee the loading of sugar on barges, again you're referring to processed sugar; is that right?

A.    Yes, sir.

Q.    Do you supervise the truck drivers who haul the sugar cane from the farms to Sterling Sugars?

A.    No, I do not.

Q.    Do you supervise people doing the harvesting work at the farms --

A.    No, I do not.

Q.    Well, let me ask this question:  Do you supervise any other people?

A.    No, I do not.

Q.    You don't do any supervision at all?

A.    Other than what I -- I've stated.

Q.    Do you set the schedule for any work to be performed?

A.    I do put the schedule together, yes, I do.

Q.    And what type of schedules do you put together?

A.    It's just a -- basically a logistics schedule of times of departure and a destination.

Q.    And you say the -- the time of

departure.  You mean the time for people to start work?

A.    It's the time -- yes, the time that they start work and the destination that they need to go to.

Q.    And you do that for the truck drivers who do the sugar cane hauling; is that right?

A.    Yes, sir.

Q.    And that tells them what time they should start in the morning, correct?

A.    Yes, sir.

Q.    And what location they should go to, to pick up a load of sugar cane; is that right?

A.    Yes, sir.

Q.    And we'll go over some of these lists later.  That's a list of the names of the truck drivers, correct?

A.    Yes, sir.

Q.    Has the truck number that they're assigned to; is that right?

A.    Yes, sir.

Q.    And the location that they're going to, like we already said, right?

A.    Yes, sir.

Q.    So is that -- that list also includes

some bus drivers that take the truck drivers from the housing to the location where the trucks are; is that right?

A.   Correct.

Q.   Do you schedule those bus drivers as well?

A.   They follow the same schedule, yes, sir.

Q.   And that's something that you list on the daily report?

A.   Yes, sir.

Q.   What about the -- there are some dispatchers that help with the truck driving work; is that right?

A.   Yes, sir.

Q.   And do you schedule the dispatchers as well?

A.   They follow the same schedule.

Q.   Whenever you say "the same schedule," what do you mean by that?

A.   The truck driver schedule.

Q.   And so are there -- they -- the schedule that you're preparing -- well, let me ask this: Do you prepare the schedule every day?

A.   Yes, sir.

Q.   That schedule you're preparing also

tells the dispatchers what time they need to be
starting their day of work?

A.    Yes, sir.

Q.    And also tells the van and bus drivers
what times they need to be starting as well?

A.    Yes, sir.

Q.    The truck driving work, the hauling of
the sugar cane, that's a 24-hour operation during
the season?

A.    No, sir.

Q.    What are the times that the truck
driving work happens during the season?

A.    It varies.  It depends on what work site
they're going to, what time that farmer wants them
there.

Q.    Maybe it will be helpful -- like I said,
we can look at a couple of those documents in a
moment, and might make it easier to follow.

As part of your job duties, do you
address any accidents involving the truck drivers?

A.    It depends.  Sometimes I may show up on
the scene.

Q.    What would it depend on?

A.    On whether Mr. Roddy Patout was
available or not.

Q.   And so if a truck driver had an accident, who -- it has happened in the past that truck drivers have had accidents, right?

A.   Yes, sir.

Q.   In fact, you talked about one in the beginning and where you were asked to testify involving a truck driver who had an accident, correct?

A.   Correct.

Q.   When that happens, who gets contacted?

A.   The truck driver contacts dispatch.

Q.   And after the truck driver contacts dispatch, does dispatch then contact somebody?

A.   Roddy Patout.

Q.   And it sounds like -- correct me if I'm wrong -- you were saying that if Mr. Patout is not available, then the dispatch might contact you?

A.   Correct.

Q.   What if you're not available?  Is there the next person in line that gets contacted?

A.   Mr. Tim Soileau.

Q.   And then anybody else that might be contacted about an accident?

A.   No, sir.

Q.   And so have there been times whenever

you've had to respond to an accident by a truck

driver?

          A.    Yes, sir.

          Q.    Do you typically go to the scene?

          A.    Yes, sir.

          Q.    Have you -- in your time as working at

Sterling Sugars, have you ever had to address any

misconduct by truck drivers?

          A.    Have I had to?

          Q.    Yes, sir.

          A.    No, sir.

          Q.    Have you ever disciplined a truck driver

for not following rules?

          A.    Let me retract that last statement.

Yes, I have, on behalf of the association.

          Q.    What do you mean by "on behalf of the

association"?

          A.    South Central.

          Q.    I know, but what do you mean you're

doing that on behalf of them?

          A.    They are employed by the South Central

association.

          Q.    Okay.  So then why are you addressing

misconduct by the truck drivers?

          A.    Because I am part of the association as

manager.

Q.   So in your role as the manager of the association, one of your jobs is to address misconduct by the truck drivers employed by the association; is that right?

A.   By South Central, yes, sir.

Q.   Is that something that your supervisors at Sterling Sugars asks you to handle?

A.   I'm not sure.

MR. DAVIS:  Objection.  Form.

BY MR. KNOEPP:

Q.   Who asked you to address misconduct by truck drivers employed by South Central?

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q.   You can answer.

A.   Mr. Soileau does it also.  I do it.

Q.   Let me ask this question:  Did anybody ask you to address misconduct by truck drivers?

A.   It's just policy.

Q.   Whose policy?

A.   Association's, South Central.

Q.   Who -- did anybody ask you, in your role as manager, to be the person who is in charge of addressing misconduct by truck drivers?

JAIME BERNARD ROBISON

JOB NO. 2405911

FEBRUARY 12, 2026

A.    I'm not the only one that addresses.

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q.    Well, did anyone ask you to be one of the people who could address misconduct by the truck drivers?

A.    No.

Q.    And why did you decide to do that, then?

A.    It's a necessary thing to do.  Myself, Mr. Soileau, and Ricky Gonsoulin, president of the association, South Central.

Q.    Those are the three people who would address misconduct committed by the truck drivers?

A.    Yes.

Q.    And you said before that that was just the policy.

What do you mean by that was just the policy?  What policy are you referring to?

A.    We have policies in place that if an occurrence happens, they will be warned with a reprimand letter signed by them and in their personal file.

Q.    Who created the policy?

A.    The association, South Central.

Q.    Who at the association created the

named; is that right?

A.   Yes, sir.

Q.   Who are the people who discussed those policies?

A.   Mr. Sandor Garcia, Mr. Greg Gravois. Who else was there?  I think that's it.

Q.   Were you present?

A.   I was not.

Q.   How do you know that these were the people who discussed that?

A.   Mr. Sandor Garcia told me.

Q.   Who does he work for?

A.   Raceland.  I'm sorry.  M.A. Patout.

Q.   It's M.A. Patout, correct?

A.   Yes, sir.

Q.   Is that the parent company of Sterling Sugars, LLC?

A.   Yes, sir.

Q.   And he told you that he was involved in those discussions regarding the policy?

A.   Yes, sir.

Q.   Have you had to suspend drivers for any issues related to violation of the policy?

A.   Yes, sir.

Q.   You've personally done that?

JAIME BERNARD ROBISON                                    JOB NO. 2405911
FEBRUARY 12, 2026

         A.   Myself or Mr. Soileau, yes, sir.

         Q.   So you're one of the people who's authorized to do that.  Is that fair to say?

         A.   Yes, sir.

         Q.   And Mr. Soileau is another person who's authorized --

         A.   Yes, sir.

         Q.   -- to do that?

              Anybody else authorized to do that?

         A.   I'm sure Mr. Gonsoulin is also.

              THE REPORTER:  I'm sorry.  Can you spell his last name.

              THE WITNESS:  G-O-N-S-O-U-L-I-N.

              THE REPORTER:  Thank you.

BY MR. KNOEPP:

         Q.   Anybody else other than the three of you?

         A.   For South Central, no.

         Q.   When you discipline a truck driver, sometimes you give them a warning; is that right?

         A.   Correct.

         Q.   That's in a written form; is that right?

         A.   Correct.

         Q.   And when you suspend somebody, same thing, it's a written warning; is that right?

A.   Correct.

Q.   If somebody gets terminated for a violation of the policy by you, you also do that in writing; is that right?

A.   Yes, sir.

Q.   Do you create those documents?

A.   We --

MR. DAVIS:  Objection.  Form.

BY MR. KNOEPP:

Q.   I'm sorry.  I didn't hear your answer. I think it came when Mr. Davis objected.  Did you provide an answer?

A.   Depending -- depending on the situation, yes.

Q.   Depending on the situation.  So let me try to ask it again.

The forms that get created to discipline a truck driver -- suspended truck driver or terminated truck driver, who creates those written documents?

A.   Myself or Mr. Tim Soileau.

Q.   And do you do that at your office whenever you do it?

A.   Yes, sir.

Q.   And is that kept in a personnel file --

A.   Yes.

Q.   -- for the worker?

A.   Yes, sir.

Q.   Where are those personnel files kept?

A.   In the file room.

Q.   Is that the Sterling Sugars office building that you're referring to?

A.   Yes.

Q.   And are those -- are those documents that you create stored on the computer server that Sterling Sugars has?

A.   It could be, yes, sir.  It could be. I'm not certain.

Q.   Do you save those in a particular folder?  Do you know?

A.   In the computer?

Q.   Yes, sir.

A.   Yes, those could be in a folder.

Q.   Do you know what it's called?

A.   Reprimand letters.

Q.   Is that a folder that's on your personal computer in your office or a folder that's on a shared server that Sterling Sugars has?

A.   It's on my computer in my office.

Q.   Is that backed up onto the server?  Do

a step back.

What's the typical harvest season there in Louisiana for -- I guess as far as what months?

A.   Latter September, October, November, December, early January.

Q.   During that time of the year, during the harvest season, who do you interact with on a daily basis?

A.   I interact with the office administration here, the farmers.  That's about it.

Q.   What about the dispatchers?

A.   Sometimes at times, yes.

Q.   And what about the truck drivers?

A.   Only if they flag me down through the parking lot.

Q.   What about the guys who drive the buses to get the workers to and from the housing?

A.   Yes.

Q.   And do you know the names of the bus drivers?

A.   Yes.

Q.   What are their names?

A.   Dean Deouren.

Q.   Can you spell that for us, for the court

reporter?

A.    D-E-O-U-R-E-N.  William Robinson, R-O-B-I-N-S-O-N; and Craig Merriweather.  I'm sorry.  Merriman.

Q.    So you have some daily interaction with them as well?

A.    Yes, sir.  I'll hand off the schedules to them in the afternoon.

Q.    What about Mr. Soileau?  Do you have daily interactions with Mr. Soileau?

A.    I do with the administrators here at the office, yes.

Q.    Whenever you mention -- you mentioned the first group of people was office administrators, you're including Mr. Soileau and Mr. Patout in that group?

A.    Yes, sir.

Q.    And the other people you mentioned that work in the office with you?

A.    Yes, sir.

Q.    I understand.

What kind of hours do you work during the harvest season?

A.    12, 14, 15 hours.

Q.    What time do you typically start in the

Q.   Truck schedule.  Thanks.

Do the -- you mentioned the interactions with the bus drivers.  Do the bus drivers work more than 40 hours in a week?

A.   Yes.  They also work -- they also work seven days a week.

Q.   Do you know if they're paid overtime?

A.   No, I do not know that.

Q.   Do you know who would know that?

MR. DAVIS:  Objection.

THE WITNESS:  That would be Ms. Jackson.

BY MR. KNOEPP:

Q.   Is she somebody who's in charge of payroll?

A.   That would be Ms. Jackson.

Q.   Do the bus drivers -- are the bus drivers employed by Sterling Sugars?

A.   Yes, they are.

Q.   And what about the payroll staff?  Do you know if the payroll staff works more than 40 hours a week?

A.   I'm not sure.  I'm sure they might stay over a little bit if need be, but normally, no, I wouldn't think so.

Q.   Do you know if the payroll staff is paid

the schedule for the trucks, correct?

A.    Correct.

Q.    And you coordinate with the farmers as well, right?

A.    Yes, that is correct.

Q.    The hauling of the raw sugar cane that happens, that's using tractor trailer trucks; is that right?

A.    Correct.

Q.    The semi-trucks that are towing a trailer that's used to haul the sugar cane, right?

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q.    You can answer unless you don't understand my question.  Then let me know.

A.    Repeat it, please.

Q.    Sure.  Let me strike it.  I'll ask it again.

The trucks that haul the sugar cane are semi-trucks; is that right?

A.    Correct.

Q.    And the semi-truck has a trailer attached to it where the sugar cane is located; is that right?

A.    Correct.

Q.   And those trailers, when they're full, they get taken to the Sterling Sugars mill; is that right?

A.   Correct.

Q.   And they're emptied there at the mill, yes?

A.   Correct.

Q.   And then the truck driver would go back to get another load unless it's the end of the day and they're done for the day.  But assuming there's more loads, they would then go back, repeat that process, pick up another load, bring it back to the mill; is that right?

MR. DAVIS:  Objection.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   The vehicles that the truck drivers are driving, they weigh more than 26,000 pounds.  Is that fair to say?

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q.   You can answer unless you don't understand the question.

A.   Yes.

Q.   Do you know how much one of the trucks

weighs with a full load of sugar cane?

A.   You're talking about weight-wise loaded?

Q.   Yes, sir.

A.   Yes, sir.  It could be anywhere from 90,000 to 100,000 pounds.

Q.   Each season for the last four years, how many truck drivers does South Central use to haul the sugar cane in the semi-trucks?

A.   Repeat the question, please.

Q.   Sure.

Each season during the last four years, from 2022 to 2025, how many truck drivers, approximately, are employed to haul the sugar cane?

A.   That varies on what the estimate of the crop is.

Q.   And during -- between 2022 and 2025, what does that number of truck drivers vary between?

A.   120 to 140.

Q.   So 120 to 140 truck drivers each season?

A.   Varies, yes.

Q.   You said that number varies based on the crop estimate; is that -- did I understand you correctly?

THE WITNESS:  I do not sign on them or approve them.  I may sign as a witness.

BY MR. KNOEPP:

Q.    What about the trailers that are attached to the trucks that haul the sugar cane?  Are those owned or leased by South Central?

A.    They are also leased by South Central.

Q.    Who are the trailers leased from?  Do you know?

A.    Sterling Sugars.

Q.    And how many trailers are leased from Sterling Sugars on an annual basis between 2022 and 2025?

A.    That, I'm not sure.  I don't have a number on that.

Q.    Do you -- do you need more trailers than you have trucks or is it the other way around?

MR. DAVIS:  Objection.

THE WITNESS:  We do use more trailers than truck.

BY MR. KNOEPP:

Q.    Are all the trailers leased from Sterling Sugars?

A.    No.

Q.    Who else are they leased from?

A.    Patout Equipment Company.

Q.    And what is Patout Equipment Company?  Do you know?

A.    It is Patout Equipment Company.

Q.    Do you know who owns it?

A.    I want to say M.A. Patout.

Q.    But you're not sure?

A.    I'm not sure.

Q.    Is it fair to say that South Central leases about 150 trailers each year?

          MR. DAVIS:  Objection.

          THE WITNESS:  I'm not certain on a total number.

BY MR. KNOEPP:

Q.    We talked before about the total number of trucks.  Do you remember that?

A.    Correct.

Q.    And you said that could vary from about 100 to 140.  Is that fair to say?

A.    Correct.

Q.    And you also testified that the number of trailers would be higher than the number of trucks; is that right?

A.    Correct.

Q.    So given those numbers, how many

trailers do you estimate are leased every year by

South Central?

        MR. DAVIS:  Objection.

        THE WITNESS:  I would have to say at

least -- at least 140.

BY MR. KNOEPP:

    Q.  Do you know how many of those are leased

from Sterling Sugars versus Patout Equipment

Company?

    A.  I could give you the Patout Equipment

number.  12 -- 13.  I'm sorry.  13.

    Q.  And the rest would be leased from

Sterling Sugars?

    A.  Correct.

    Q.  Do you handle any maintenance purchases

related to the trucks?

    A.  No, I do not.

    Q.  Do you handle the purchasing of any

tires related to the trucks?

    A.  No, I do not.

    Q.  Are the truck drivers all individuals

who have H-2A visas?

    A.  To my knowledge -- to my knowledge, yes.

    Q.  Are they all from Mexico?

        MR. DAVIS:  Objection.

THE WITNESS:  To my knowledge, yes.

BY MR. KNOEPP:

Q.  While you've worked at Sterling Sugars since 2018, have there ever been truck drivers who weren't from Mexico?

MR. DAVIS:  Objection.

THE WITNESS:  Not to my knowledge.

BY MR. KNOEPP:

Q.  Do you remember any truck drivers from Puerto Rico, for example?

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q.  What about any truck drivers who were local to the Louisiana area?

THE REPORTER:  I'm sorry.  I didn't hear the answer on the Puerto Rico because of the objection.

MR. KNOEPP:  Oh, okay.  Well, let me -- let me ask it again, then, just to make sure it's clear.

BY MR. KNOEPP:

Q.  Do you remember any truck drivers from Puerto Rico during -- since you started working at Sterling Sugars in 2018?

MR. DAVIS:  Objection.



Q.    Is it your understanding she handles the insurance policy related to the truck drivers who haul the sugar cane?

A.    To my knowledge, yes.

Q.    I want to go back to the truck schedule that you prepare every day.

Does that get posted somewhere after you prepare it?

A.    It does.

Q.    Where does it get posted?

A.    I make -- make a schedule, which goes to the hotel where the drivers are all housed, and it's posted there in the cafeteria.

Q.    And do you post that?

A.    Yes, I do.

Q.    How far is that away from your office?

A.    Maybe a quarter of a mile.

Q.    On a daily basis, you go over to the cafeteria housing and post that on a wall or bulletin board?  What do you do exactly?

A.    Yes.

Q.    Do you just -- do you usually drive over there in your truck?

A.    Yes, sir, I do.

Q.    Is that housing -- is it locked?

JOB NO. 2405911

A.    Be more specific.

Q.    Sure.

Whenever you go to that -- you said it's a hotel?  I'm sorry.  Take a couple steps back.

You said it's a hotel where the workers are housed?

A.    Correct.

Q.    Is that -- is there a central, like, common area?

A.    Correct.  I said the cafeteria.

Q.    Right.  Okay.  Great.  Thank you.

And is there a gate or any type of lock where that property is located?

A.    Yes.

Q.    And do you need a key to get in?

A.    No, sir.  Those gates are open 24/7 throughout the whole crop.

Q.    Do you -- is it a commercial hotel that the workers are staying in?

A.    No.

Q.    Who owns the hotel?  Do you know?

A.    Sterling Sugars.

Q.    Is it open to the public?

A.    No.  Can you be more specific about that?

Q.    Yeah.

If I wanted to rent a room at the Sterling-owned hotel, could I do that?

A.    No, sir.

Q.    That's what I mean by open to the public.  You know, could I go on, you know, the website and book a room, for example?

A.    No, sir.

Q.    Is it housing that's exclusively for the H-2A workers?

A.    Yes, sir.

Q.    And I was asking, there's a gate around it, but that's open 24/7; is that right?

A.    Correct.

Q.    What about when you go inside to post the -- the list at the cafeteria?  Is there any door that's locked that -- you know, for you to get into that area?

A.    No, sir.

Q.    Do truck drivers ever have any questions related to the schedule?

A.    From time to time, yes.

Q.    Do you answer those questions if they have them?

A.    I try to, yes.

know if a truck is out of service or needs to be taken out of service.

My question, I guess, is:  How do the dispatchers know that?  Are they the ones checking the trucks?

A.   No.  That would be communicated between the driver, knowing the issue with the vehicle, communicating to the dispatcher.

Q.   And so the driver would let a dispatcher know that they're having an issue with their truck?

A.   Correct.

Q.   And the dispatcher would let you know that so that you can adjust the schedule --

A.   Correct.

Q.   -- and assign a different truck.  Is that fair to say?

A.   Correct.

Q.   Is the driver supposed to notify anybody else other than the dispatcher that their truck needs service?

A.   To my knowledge, it would be the mechanic on duty.

Q.   And there are mechanics on duty to handle -- to handle trucks that need service?

A.    Yes.

Q.    Where are those mechanics located?

A.    They are stationed here at the yard and at the mechanic shop.

Q.    And when you say "at the yard," you're referring to the Sterling Sugars mill yard?

A.    The parking lot, yes, sir.

Q.    And you also said that there's -- the mechanics can also be located at the shop; is that right?

A.    That is correct.

Q.    Where is the shop located?

A.    Here at the factory, at the mill.

Q.    Are those mechanics employed by Sterling Sugars?

A.    I'm sorry.  Can you repeat the question?

Q.    Sure.

Are the mechanics employed by Sterling Sugars?

A.    Yes.

Q.    Has it happened over the last several years where a truck breaks down in the middle of a day and needs to be taken out of service during the day?

MR. DAVIS:  Objection.

Q.   And is that transportation using the bus drivers that transport people to and from work?

A.   Yes.

Q.   You would just ask one of them to handle the transportation for a truck driver who needed to go see a doctor or some other appointment?

A.   Correct.

MR. KNOEPP:  Why don't we go ahead and go off the record for a moment.

(A lunch break was taken.)

MR. DAVIS:  Mr. Robison, during the break, opposing counsel shared some documents with you on Steno Connect.  So make sure that you're linked in to the Steno Connect so that you can receive any documents that the plaintiffs want to show you and so that you can review them as you need.

THE WITNESS:  Yes, sir, I'm on Steno Connect.

BY MR. KNOEPP:

Q.   Great.  Well, Mr. Robison, we're back from a break.  You understand you're still under oath?

A.   Yes, sir.

Q.   I wanted to start after the break here

with going through one of -- some of the truck

schedules that you prepared and that we were

talking about before.  So I'm going to mark as

Exhibit 1 and put in the Steno Connect app what's

been marked as Exhibit 1 and present that on the

screen.

          (Deposition Exhibit 1 was marked for

purposes of identification.)

BY MR. KNOEPP:

     Q.   Are you able to access that document?

     A.   Yes, sir.

     Q.   Okay.  Do you recognize this document?

          MR. DAVIS:  Counsel, I'm looking at

SCSCGA 6916.  Is that the right document?

          MR. KNOEPP:  That's correct.  And that's

the start of the document.  And the last page of

the document is SCSCGA 007007.

BY MR. KNOEPP:

     Q.   And you said, Mr. Robison, you do

recognize this document?

     A.   Yes, sir.

     Q.   And what is it?

     A.   This is a schedule.

     Q.   Is this one of the truck schedules that

we were talking about earlier?

A.   Yes, sir.

Q.   And this particular one, at the very top of the first page, it says "2024-25 crop."

Do you see that?

A.   Yes, sir.

Q.   And this -- I realize this seems pretty self-explanatory, but we're going to go through it anyway.

Is this -- is this a truck schedule that was created for the 2024 sugar cane season?

A.   Yes, sir.

Q.   And it says "crop day one."

Do you see that?

A.   Yes, sir.

Q.   I assume that means this is the first day of the season?

A.   Correct.

Q.   And then it has a -- it has a -- says date there, but it doesn't have a particular date on there on this particular one, right?

A.   Correct.

Q.   And then the first column, there's a heading that says "truck number."  And then within that column, there are a bunch of different numbers, the first one being 148.

What does that refer to?

A.   Actually, that is 14B.

Q.   Oh, I'm sorry.  Thank you.  I'll make it bigger so that I can see it as well.  My mistake.

So that first truck says 14B, as in boy, right?

A.   Yes.

Q.   And what does that refer to?

A.   That is a specific truck.

Q.   And that truck number, would that appear on a truck somewhere in the yard with a sticker or something like that?

A.   Yes.

Q.   And then there's a -- the second column says "scale number."  The first entry says "2476."

What does that mean?

A.   That is a four-digit number that coincides with the -- the truck number so that the -- the scale house that weighs in the sugar cane knows who the cane belongs to as they come in.  It coincides with the cards you were referring to earlier.

Q.   So those -- those laminated cards that the drivers have with the barcodes on them, that has a scale number on it that is specific to a

certain farmer; is that right?

            MR. DAVIS:  Objection.

            THE WITNESS:  Yes.

BY MR. KNOEPP:

        Q.   I'm sorry.  You answered at the same time that counsel was stating objection.  Could you restate your answer, please?

        A.   That references to a truck.

        Q.   The scale number references to a truck?

        A.   Yes, sir.

        Q.   Okay.  Doesn't have anything to do with the specific farmer?

        A.   No, sir.

        Q.   Okay.  And then the driver that come -- is that the driver who's hauling the sugar cane?

        A.   Yes, that is correct.

        Q.   These are the H-2A workers that we were discussing before; is that right?

        A.   Yes.

        Q.   The number there that says -- in the first entry, for example, it says No. 5110.

            Is that an employee identification number for that driver?

        A.   Yes.

        Q.   Who assigns that number to that

particular driver?

A.   That would be payroll.

Q.   The people at the Sterling Sugars' office who work in the payroll department?

A.   Correct.

Q.   Is that Kellie Jackson?

A.   Yes, that would be one of them.

Q.   And then the farmer column, is that the location where the worker is going to be picking up the loads of sugar cane for the day?

A.   Yes, that would be the name of the farm he is going to.

Q.   This first entry, for example, says "Northside."  Is that the name of a farm?

A.   Yes.

Q.   I apologize.  I realize these questions are very easy and self-explanatory, but I do just want to get them on the record so they're clear what the document means, so I apologize.

Is that -- that's the farm that actually grew the sugar cane; is that right?

A.   Yes.

Q.   Then the next column says "salida," which in Spanish means leave --

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q.   Do you know what the column for "salida" means?

A.   That column would be the start time of the day.

Q.   And the time of last load, that's the time for the last load of the day?

A.   That is correct, but that's not always used.

Q.   Got it.

The "salida," is that the time that the person is leaving the truck yard for the start of the day?

A.   Yes.

Q.   Is it the time that they're supposed to arrive at the truck yard to pick up their truck or they should have done that before the time that would be entered for "salida"?

MR. DAVIS:  Objection.

THE WITNESS:  They are allowed enough time to clock in before their leave time in order for them to check out their vehicle before they get on the road.

BY MR. KNOEPP:

Q.   Okay.  Is the -- I'm sorry to go back to

correct?

A.    Yes, sir.

Q.    Do you see there's some handwritten notations on here that -- that looks like they changed at least the number of one farm's quota for the day?

Do you see that?

A.    Correct.

Q.    Why would that happen?

A.    There could be -- there could be various reasons that could happen.  It could be issues with the farmer having trouble harvesting.  It could be issues here at the factory.

Q.    What kind of issues at the factory would impact the amount of the quota that's coming in on a given day?

A.    The mule could possibly have an issue where it has to slow down to make a repair or we could have a power outage that would shut us down.

Q.    When that happens, does -- that then would impact the number of loads that would get delivered on a particular day?

A.    Yes, it would.

Q.    And if that's the case, that gets communicated from the mill to the dispatchers?

A.    That would get communicated from the factory to Mr. Soileau and then to the dispatchers.

Q.    By Mr. Soileau?

A.    Or Mr. Patout or myself, whoever Mr. Soileau tells first.

Q.    You mentioned that you kept your dispatch -- or the -- sorry -- the truck schedule list for the last two years.

Do you know how long Mr. Roddy Patout has kept his list for?

MR. DAVIS:  Objection.

THE WITNESS:  No, sir, I do not know that answer.

BY MR. KNOEPP:

Q.    All right.  And in looking through this document that we had marked as Exhibit 3, can you just confirm that this is the quota sheet followed by the schedule that you prepared for each successive crop day for the 2024 season?

A.    Yes.

Q.    And this particular one, if you go to the last page of the document which is labeled 7185, ends with crop day 38, right?

A.    Correct.

A.    Yes, sir.

MR. KNOEPP:  Why don't we go ahead and take a brief break.  Go off the record.

(A short break was taken.)

BY MR. KNOEPP:

Q.    Mr. Robison, we're back on the record now.

So we just spent a good amount of time going through the 2024 quota sheets and the truck schedules.

Did you do the same -- did you prepare truck schedules for the 2025 season as well?

A.    Yes, sir.

Q.    And they had the same information in them as the ones we just looked at for the 2024 season?

A.    Yes, sir.

Q.    And those schedules were also based off of quota sheets that were prepared by Mr. Soileau for the 2025 season that were similar to the ones that we looked at for the 2024 season?

A.    That is correct.

Q.    We have those.  I'm going to save us some time and not go through them right now so that we can move on to other things.  I know that

you said that you don't have the truck schedules

that you prepared for the 2023 season.

The schedules that you did prepare for the 2023 season, were they similar to the ones that we looked at for the 2024 season?

A.    That is correct.

Q.    They contain the same information as the 2024 season, such as the truck number, the scale number, the worker's name, and the location where they were going to be picking up for the day?

A.    Yes, sir.

Q.    And then it would also contain the start time that they were going to start driving the truck for the day?

A.    That is correct.

Q.    And were those also based off of quota sheets that were prepared by Mr. Soileau in 2023?

A.    Yes.

Q.    And they have the name of the farmer on them that was growing the crop where the worker was going to be picking up the crop on the particular day?

A.    Yes, sir.

Q.    And similarly for 2022, did you prepare truck schedules for that season that were similar

to the ones that we reviewed for the 2024 season?

A.   Yes, sir.

Q.   It contained the same information, such as the truck number, the scale number, the name of the truck driver, and the farmer who was growing the crop where they were going to be picking that up?

A.   Yes, sir.

Q.   And it would have a start time for the worker to start that day, correct?

A.   That is correct.

Q.   And, again, in 2022, was Mr. Soileau also the person who created the quota sheets that year that would let you know the farms and the number of tons and loads that were anticipated for that particular crop day?

A.   Yes, sir.

Q.   And that's what you would use in 2022 to create the truck schedule, just like you did in 2024, correct?

A.   Yes.

Q.   Do the truck drivers who are hauling the sugar cane need to refuel their trucks during the day from time to time?

A.   Yes, sir.

Q.   How do they do that?

A.   We have on-site fuel tanks.  Pumps.

Q.   And when you say "we" --

A.   The association -- the association, South Central, has fuel tanks on-site.

Q.   And when you say "on-site," are you referring to the Sterling Sugars mill?

A.   The premises, yes, sir.

Q.   That's the property owned by Sterling Sugars.  That's where the gas tanks are located?

A.   Correct.

Q.   And do the truck drivers -- is there, like, a card lock system that's -- they need to use to unlock the fuel tank in order to refuel their trucks?

A.   Yes, sir.  They are issued a fuel card.

Q.   Who issues that?

A.   I do.

Q.   And how do you -- do you have, like, a computer program that helps you with that or some sort of system that issues the cards?

A.   We have a vendor.

Q.   What's the name of the vendor?

A.   Dugas Oil.

Q.   Dugas, D-U-G-A-S; is that right?

Q.    Did you approve any in your role as manager?

A.    No, sir.

Q.    What are the cameras monitoring?  You say they point in both directions; is that right?

A.    Correct.

Q.    And so what are they monitoring?

A.    The forward traffic and the driver.

Q.    And why do you have the cameras?

A.    As an instrument of protecting ourselves and our drivers in the event of an accident or being accused of something in an -- on the road.

Q.    Is there a live feed for the cameras that's monitored by anybody?

A.    No, sir.

Q.    Is it just recording for purposes of future playback if there's an issue that needs to be examined?

A.    Yes, sir.

Q.    Do you know whose idea it was to install the cameras?

A.    I do not.

Q.    It wasn't something you were involved in?

A.    Installing the cameras?

Q.   I'm sorry.  The decision to have the cameras, that wasn't a decision you were involved in?

A.   No, sir.

Q.   Do you know if the camera is a part of a driver software package that also monitors things like GPS and location of the truck and speed and things like that?

A.   Cameras don't, no, sir.  No, cameras don't.  To my knowledge, they don't.

Q.   Are they connected to any other kind of software package installed in the truck, like Samsara or anything like that?

A.   No, sir.  No, sir.

Q.   Do you access camera footage if something has occurred, like an accident?

A.   Yes, sir.

Q.   Have you done that yourself?

A.   I have retrieved a card, but I have not accessed a card.

Q.   So if somebody -- if somebody has an accident, is the first -- one of the first steps to retrieve the camera and the card that recorded what the camera saw?

A.   Yes, sir, that's one of the first steps.

Q.    Who does that?  Who collects those?

A.    Either myself, Mr. Roddy Patout, or Mr. Tim Soileau, whoever -- whoever is on the scene.

Q.    And then what do you do -- you said that you never reviewed any of that camera footage before?

A.    Me personally plugging it into a card reader and doing it, no, sir.  Mr. Soileau does it and Mr. Patout does it, Mr. Roddy Patout.

Q.    Have you ever reviewed footage from a camera as part of disciplinary action against any of the truck drivers?

A.    Yes, I have.

Q.    Can you explain the situation -- the situation involved in the disciplinary action?

A.    Can you be more specific?

Q.    Sure.

How many times have you reviewed camera footage as part of taking disciplinary action against a truck driver?

A.    I'm not sure.  I can't answer that question.

Q.    More than once?

A.    Yes.

Q.    More than ten times?

A.    Probably no.  No.

Q.    And what caused you to need to access the camera footage in order to determine whether disciplinary action against the truck driver was appropriate?

A.    It's our sole footage of something that happened, whether it was right or wrong.  It was -- it was evidence of a broken policy or the driver was definitely in the wrong of an accident.

Q.    And is that something that you were responsible for looking into in your role as the manager to determine whether disciplinary action was appropriate?

A.    As a manager, yes.

Q.    What were you looking for?  Are you thinking of a specific incident?

A.    No, sir.  We've had --

Q.    What are -- sorry.

A.    We've had more scenarios of our drivers being accused of doing something and camera footage has actually proved otherwise.  So it's for the good of the driver, as well as it's good for us.

Q.    Have there been times when you received

complaints of a driver from a third party?

A.    Yes.

Q.    Something related to accidents or other complaints?

A.    Both.

Q.    Both.  Okay.  Sure.

Well, have you ever suspended a driver if they broke a policy based on your review of the video?

A.    Yes, depending on the severity of the policy --

Q.    Can you give me an example -- sorry.  I didn't mean to interrupt you.  Go ahead and finish.

A.    Depending on the severity of the incident.

Q.    Can you give me an example of a time where you reviewed some footage based on a complaint you received and you -- you ended up disciplining a truck driver?

A.    School bus driver calls.  One of the truck drivers is passing -- the bus is stopped, has yellow lights and red lights, about to exit children off the bus.  Children actually had to exit off and pass in front of the bus and cross

the oncoming lane.  And the driver never stopped.

Q.   And so did you receive -- in that instance, did you receive a complaint from the school bus driver?

A.   And the school board, yes.

Q.   And so then that caused you -- and you could tell which -- strike that.  Let's try again.

How were you able to know which truck driver it was that they were complaining about?

A.   From the location of where the incident happened.

Q.   And then you were able to identify which truck that person was driving and pulled the camera footage from their camera?

A.   Correct.

Q.   And did you -- you did this personally yourself?

A.   I pulled the card.  Mr. Soileau did the -- the footage.

Q.   Did you watch the footage with Mr. Soileau?

A.   Yes, I did.

Q.   And what did you see with respect to the school bus incident?

A.   The driver never stopped.  Never

stopped.

Q.    And so did you and Mr. Soileau discuss that and discuss what steps should be taken with respect to that driver?

A.    Yes, sir.  Yes, we did.

Q.    And what did you determine?

A.    That was grounds for termination.

Q.    And was the truck driver terminated?

A.    Yes, he was.

Q.    How long ago did this happen?

A.    This past crop.

Q.    Do you remember the name of the truck driver?

A.    I think his first name was Baldemar. That's all I can remember.

MR. DAVIS:  Counsel, on this line of questioning concerning disciplinary review, I had lodged objections.  I realized then that my microphone was muted.  So I just wanted to make a record that you're taking this portion of the testimony subject to the objections.

BY MR. KNOEPP:

Q.    Is it you and Mr. Soileau who made the decision to terminate the gentleman you referred to as Baldemar?

MR. DAVIS:  Objection.

THE WITNESS:  No, sir, without -- not without the consultation of Mr. Sandor Garcia, who is, like, over our safety stuff.

BY MR. KNOEPP:

Q.   And who -- who does Sandor Garcia work for?

A.   M.A. Patout.

Q.   And so you and Mr. Soileau consulted with Mr. Garcia about the incident?

A.   Yes, sir.

Q.   And did the three of you make a decision together about the disciplinary action that should be taken with respect to this truck driver?

A.   It was recommended by Mr. Garcia, and we concurred.

Q.   And I'm sorry.  You said Sandor.  Is it S-A-N-D-O-R?

A.   Yes, sir.

Q.   And did -- when Mr. -- when the person you were referring to as Baldemar was --

MR. KNOEPP:  And I'm going to spell that just for the court reporter, B-A-L-D-E-M-A-R.

BY MR. KNOEPP:

Q.   -- was terminated, how did you -- who

delivered that message to Mr. Baldemar?

MR. DAVIS:  Objection.

THE WITNESS:  Mr. Garcia.

BY MR. KNOEPP:

Q.  Did you ask him to do that?

MR. DAVIS:  Objection.

THE WITNESS:  He is fluent in Spanish.
Yes, I did.

BY MR. KNOEPP:

Q.  Was there a written record of the
termination created for Mr. Baldemar's personnel
file?

A.  Yes, there was.

Q.  And where would that have been saved,
the written notice?

MR. DAVIS:  Objection.

THE WITNESS:  That would be in his
personal file.

BY MR. KNOEPP:

Q.  That's located in the administrative
office there at Sterling Sugars?

A.  Yes, sir.

Q.  Who maintains those personnel files?  Is
that Ms. Jackson?

A.  That's Ms. Jackson.

Q.   Was it a typed or a handwritten termination notice?

A.   Typed.

Q.   Did you prepare that?

A.   No, sir, I did not.

Q.   Did you ask somebody to prepare it for you?

A.   No, I did not.

Q.   Who prepared it?

A.   Mr. Soileau.

Q.   Can you remember any other incidents in which you checked camera footage in the trucks to determine whether disciplinary action was appropriate?

MR. DAVIS:  Objection.

THE WITNESS:  I'm trying to think.  I can't remember.

BY MR. KNOEPP:

Q.   When we talked before, you mentioned that there was at least more than one time in which you had access to camera footage to determine whether disciplinary action was necessary, correct?

A.   Sure.  Yes.

Q.   So we talked about one time.  You just

don't remember any specific other instances in which you checked the camera?

A.    I've checked the camera.  I've pulled the card to be read on mostly accidents.  And I guess disciplinary action is included with that, but -- yes.  So I have, yes.

Q.    Whatever accidents occur -- have occurred, has that always resulted in disciplinary action being taken against the driver?

MR. DAVIS:  Objection.

THE WITNESS:  No, sir.

BY MR. KNOEPP:

Q.    Are there sometimes whenever you find that the driver isn't at fault and so no disciplinary action is necessary?

MR. DAVIS:  Objection.

THE WITNESS:  No, sir.  If -- if the driver is not at fault, no disciplinary action is taken.

BY MR. KNOEPP:

Q.    And who determines whether the driver is at fault?

MR. DAVIS:  Objection.

THE WITNESS:  That is conversed between Mr. Soileau, myself, and Mr. Sandor Garcia.

BY MR. KNOEPP:

Q.   Short of terminating the employment of a driver through his -- well, strike that.  Let me try again.

You mentioned one consequence of violating work rules by a truck driver can result in termination, correct?

A.   Correct.

Q.   Short of termination, what are some of the other disciplinary measures that you've taken with respect to truck drivers who have violated work rules?

MR. DAVIS:  Objection.

THE WITNESS:  Written -- written warnings.  We've sent them -- we've given them a day off without pay.

BY MR. KNOEPP:

Q.   Any other disciplinary actions you can think of?

A.   That's -- that's it.

Q.   What about multiple days off without pay?  Have you ever done that?

A.   Depending -- depending on the severity of the -- well, code of conduct, that's it.

Q.   And whenever that -- whenever those

written warnings or a day off without pay or multiple days off without pay -- whenever that's done, is it again you, Mr. Soileau, and Mr. Sandor Garcia who make those determinations?

MR. DAVIS:  Objection.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Sorry.  I think that your answer came on top of Mr. Davis's objection.  Was your answer to that question yes?

A.   Yes, it was.

Q.   How do you typically communicate with Mr. Sandor Garcia?

A.   Telephone.

Q.   Just a voice phone call?

A.   Yes, sir.

Q.   You don't send him text messages or anything like that?

A.   No, sir.

Q.   I'm going to introduce what's been marked Exhibit 8 and ask you to pull that document up on your screen.  I'm going to present it as well.  And let me know whenever you see it, see if you recognize it.

(Deposition Exhibit 8 was marked for

purposes of identification.)

THE WITNESS:  It's in Spanish.

BY MR. KNOEPP:

Q.   Do you recognize the document?

A.   It's in Spanish.  Yes, I think so.

Q.   Do you recognize -- is that your signature on the document?

A.   Yes, it is.

Q.   And do you read Spanish?

A.   I do not.

Q.   Did you sign this document in Spanish?

A.   Yes, but I had the English version to go with it.

Q.   Do you know where the English version is of this document?

A.   It should have been with his files.

Q.   This document is a letter of reprimand to Felip de Jesus Suarez Palafox, correct?

MR. DAVIS:  Objection.

THE WITNESS:  Yes.

MR. KNOEPP:  I'm sorry.  Objection?

MR. DAVIS:  Objection.

MR. KNOEPP:  Okay.

MR. DAVIS:  Counsel, it's -- I certainly am managing discipline without speaking

objections, but I sense from you that you wanted some context of the objection.

MR. KNOEPP:  Well, no, just -- it's fine.  You can -- I just -- it's a -- yeah, okay.

BY MR. KNOEPP:

Q.   This is from 2022; is that right?

A.   Yes.

Q.   And did you -- did you type out a letter of reprimand regarding Mr. Suarez Palafox in English and have it translated?

A.   Mr. Soileau did that, I didn't.

Q.   You just signed it?

A.   Yes, sir.

Q.   Mr. Soileau prepared it?

A.   Yes, sir.

Q.   Do you remember why Mr. Suarez Palafox was being reprimanded?

A.   Apparently, it was a violation.  To be exact, I do not know.

Q.   And do you know whether he was suspended without pay for two days as a result?

A.   I do not know.  Cannot answer that.

Q.   Because you're not able to read the Spanish version of this?

A.   That is correct.

Q.   Would it depend on whether Mr. Soileau saved it since he was the one who drafted it?

A.   Yes.

Q.   I'm marking as Exhibit 9 another document and ask you if you could pull that up. I'll also pull it up on the screen.  Let me know whenever you see it.

(Deposition Exhibit 9 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   Are you able to see the document?

A.   I'm reading it now.  I see --

Q.   Do you recognize Exhibit 9?

A.   I do.

Q.   This is a letter of reprimand issued to Felipe de Jesus Avila, A-V-I-L-A, correct?

A.   Correct.

Q.   This is from November of 2022?

A.   Yes.

Q.   And it has your name on the bottom of the document with a signature.

Do you see that?

A.   Yes, sir.

Q.   Is that your signature?

A.   Yes.

Q.    Your title is general manager.

Do you see that?

A.    Yes, sir.

Q.    Is that the correct title?

A.    Yes.

Q.    Is this a document that you prepared?

A.    I'm not sure.

Q.    Is it possible that Mr. Soileau prepared this similar to the previous exhibit we looked at?

MR. DAVIS:  Objection.

THE WITNESS:  It is possible.

BY MR. KNOEPP:

Q.    I'm sorry.  You said, "It is possible"?

A.    It's possible.

Q.    Were you involved in the decision to reprimand Mr. Avila?

A.    Yes.

Q.    Why was he reprimanded?

MR. DAVIS:  Objection.

THE WITNESS:  He was involved in an accident.

BY MR. KNOEPP:

Q.    And did you look at the camera footage from the accident to determine whether he was at fault?

A.    I don't remember.  I can't answer that.

Q.    Did you make the decision to suspend him for three days?

A.    I don't remember.  I can't remember.  I can't answer that.

Q.    You signed off on the letter of reprimand, though, correct?

A.    Yes, sir, I did.

Q.    You approved the suspension of the three days?

MR. DAVIS:  Objection.

THE WITNESS:  If I signed off on it, I did.

BY MR. KNOEPP:

Q.    And Mr. Avila was later terminated shortly after this, correct?

A.    I don't remember.

Q.    Do you remember being involved in any decision to terminate his employment?

A.    I don't remember.

Q.    Do you remember notifying the insurance company with respect to Mr. Avila's accident?

A.    That was so long ago.  I don't remember.

Q.    Do you know whether you have to report accidents to the insurance company?

MR. DAVIS:  Objection.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Do you do that?

A.   A couple of us do it here, yes.  Myself, Mr. Soileau, and Mr. Patout -- Roddy Patout.

Q.   It would be one of the three of you that would be responsible for reporting any accidents by the truck drivers to the insurance carrier?

A.   Yes, sir.

MR. KNOEPP:  Why don't we take another comfort break and go off the record.

(A short break was taken.)

BY MR. KNOEPP:

Q.   Mr. Robison, do you provide any input into which truck drivers get hired to do the hauling work each season?

A.   No, I do not.

Q.   Do you know who is involved in any of that?

A.   No, I do not.

Q.   Do you review a list of truck drivers who are going to be hired for the season at all?

A.   No, sir, I do not.

Q.   Do you review a list of workers to see

who's eligible for rehire from season to season?

A.   No, I do not.

Q.   Are you familiar with the company called Great Labor?

A.   I am.

Q.   And what do you know about Great Labor?

A.   They are a recruiting company.

Q.   And is that a company that's been used in the past to recruit H-2A truck drivers to work for South Central?

MR. DAVIS:  Objection.

THE WITNESS:  Yes, they are.

BY MR. KNOEPP:

Q.   Does anybody at South Central provide Great Labor a list of truck drivers that could be hired for the season?

A.   Not to my knowledge.  I'm not certain.

Q.   Not something you're involved in, at least?

A.   No, sir.

Q.   I'm going to mark as Exhibit 10 a new exhibit and present that.  And you should see that on your screen as well, Mr. Robison.  Let me know when you're able to pull that up.

(Deposition Exhibit 10 was marked for

purposes of identification.)

BY MR. KNOEPP:

Q.   Are you able to see Exhibit 10?

A.   Yes, sir.

Q.   The first page is -- has a label with numbers ending in 1578.

Do you see that?

A.   No, I do not.

Q.   In the bottom right-hand corner, do you see a label -- a number that says 1578?

A.   I see it now.  You're showing it to me.

Q.   Sorry.  I zoomed in.  It's a little hard to see if you don't zoom in, so --

Is this an e-mail that you received from Mr. Gonsoulin in December 2023?

A.   Yes, sir.

Q.   And subject is new payment request from Great Labor, LLC, correct?

A.   Correct.

Q.   And it was sent to you, to Desiree Lange, Kimberly Broussard, Rivers Patout, and Tim Soileau, right?

A.   That's what it says.  Yes, sir.

Q.   And the people this was sent to, those are all people who worked at Sterling Sugars,

correct?

        A.    Correct.

        Q.    Are they all people who work in the office with you?

        A.    Yes, sir.

        Q.    It looks like based on the -- did you print out this document?

        A.    I'm not certain.  I could have.

        Q.    Just judging from the heading at the top of the document that has your name on it, that's typically how something looks when it's printed out.

              Are you familiar with that?

        A.    Okay.  Yes, then I printed it out.

        Q.    Do you know who you may have given this to -- sorry.  Strike that.

              Do you know what you did with this information in the e-mail when you received it?

        A.    I do.  I believe I handed that off to accounts payable.

        Q.    And who was accounts payable at that time, in 2023?

        A.    Michelle Prados.

        Q.    Michelle Prados; is that right?

        A.    That's correct.

Q.   That was somebody we talked about before, correct?

A.   Yes, sir.

Q.   And does she handle accounts payable for Sterling Sugars?

A.   Yes, sir.

Q.   Does she also handle accounts payable for South Central?

A.   Yes, sir.

Q.   And why would you have given it to Ms. Prados?

A.   To pay it.

Q.   I realize some of these questions are very simple, but --

Did you approve the payment of the invoice?

A.   I'm not certain.

Q.   I guess let me ask a different question.

Who is authorized to approve payments of invoices like this from Great Labor?

A.   I'm not certain.

Q.   In your role as the general manager, is it something that you have authority to approve?

A.   I'm not certain.

Q.   Have you ever approved invoices before

BY MR. KNOEPP:

Q.   Have you ever heard any discussions in which overtime pay for truck drivers was being discussed?

A.   I'm not certain.

Q.   Do you know that this lawsuit is about the payment of overtime wages?

A.   I do now since I read some of the documents from yesterday.

Q.   Have you reviewed any documents related to overtime pay for truck drivers?

A.   No, I have not.

Q.   Have you, in the past, delivered paychecks to the truck drivers on payday?

A.   Yes, I have.

Q.   Do you -- is that something you do on a weekly or -- sorry.  Strike that.

My understanding is that the truck drivers are paid every two weeks.  Is that your understanding as well?

A.   Correct.

Q.   And whenever you deliver paychecks to the truck drivers, have you -- is that something you've done on a regular basis every two weeks?

A.   They get paid every two weeks.  Their

checks are dropped off, yes, sir.

Q.    And they're dropped off at the housing?

A.    Yes, sir.

Q.    Is that something that you do?

A.    Sometimes, yes.

Q.    And if you don't do it, who does it?

A.    It could be Mr. Soileau.  Could be Mr. Patout.  Could be the dispatchers.

Q.    And do workers still get paid by paycheck or are they paid by some other method?

A.    They are paid -- they are paid on a card.

Q.    When did that system start?

A.    Two or three years ago.  I'm not certain.  Two or three years ago.

Q.    Prior to that, people were paid with a paycheck?

A.    That is correct.

Q.    When you delivered those, did you personally hand those out to the truck drivers?

A.    Yes, we did.

Q.    Like, individually to each truck driver?

A.    Correct.  And they would sign off -- they would sign off on them receiving the check.

Q.    What -- what did they sign?

the payments to the workers are processed through that system?

A.   No, I do not.

Q.   Do you have any idea who was involved in the decision to go to the card payment?

A.   I'm not certain.

Q.   With the card payment system, there's no more physical checks; is that right?

A.   That is correct.

Q.   Do workers still get a paycheck stub every pay period with information on it?

A.   Yes, they do.

Q.   Is that still delivered to them at the housing location?

A.   Yes, it is.

Q.   Is that something that you continued to do?

A.   Yes, sir.  It's shared between the three of us, yes, sir.

Q.   Between you and Mr. Soileau and Mr. Patout?

A.   Yes.

Q.   And do you still get workers to sign some sort of timesheets whenever you give them the check stub?

A.    We did touch on that somewhat, yes.

Q.    Do you remember what you spoke about?

A.    Just doing the best job we can on having trucks moved in and out and being where they need to be on a timely fashion.

Q.    And when you were making these quarterly reports, you were doing them on behalf of Sterling; is that right?

A.    I'm not certain.

Q.    The board meetings that you have attended, are those annual board meetings?

A.    We try to hold two board meetings a year.

Q.    Do you have specific times whenever those occur?

A.    No, sir.

Q.    Who calls the board meetings?

A.    I do.

Q.    How do you do that?

A.    I notify the board and the growers of the association, South Central, and let them know of a date and time and have them there.  If not, whoever shows up, shows up.

Q.    How do you -- how do you do that as far as -- how do you notify people?  Do you call

everybody on the phone?  Do you send them an e-mail?  What do you do?

A.    I call them on the phone.

Q.    Do you call each individual board member and grower on the phone?

A.    I do.

Q.    Do you send out any written materials, like an agenda?

A.    No, sir.

Q.    And you said that there was --

A.    That's provided -- that's provided when they get to the meeting.

Q.    Do you make those calls using your cell phone?

A.    Yes.

Q.    That's the cell phone we talked about earlier that is provided to you by Sterling Sugars?

A.    Yes.

Q.    I'm sorry.  You said the agenda is prepared by somebody else?

A.    No, sir.  I said the agenda is at the -- is provided at the meeting.

Q.    And who provides that agenda?

A.    I do.

Q.   So do you prepare the agenda?

A.   I do.

Q.   And do you prepare that in written form?

A.   Yes.

Q.   How do you -- do you give that to people in advance or only at the meeting?

A.   Only at the meeting.

Q.   So you prepare that on your Sterling Sugars computer?

A.   I do.

Q.   Do you save copies of the agendas?

A.   I'm not certain.

Q.   Have you looked to see if they're on your Sterling Sugars computer?

A.   I have not.

Q.   If you saved them anywhere, is that where they would be saved?

A.   Yes, sir.

Q.   What about hard copies of the agendas? Do those get saved?

A.   Yes, sir, with the minutes.

Q.   And where do those get saved?

A.   Here at the office.

Q.   The office -- the Sterling Sugars office?

A.   Yes, sir.

Q.   Is there a file related to the Sterling -- or to the South Central board meetings at the Sterling Sugars office?

A.   It's called board meetings, yes, sir.

Q.   And where is that located?  Whose office is that located in?

A.   In my office.

Q.   And has anybody asked you to look for those agendas or the minutes as part of collecting documents for this lawsuit?

A.   I think they were submitted, yes, sir.

Q.   Okay.  Do you remember pulling them out of the -- out of the file cabinet and submitting them to somebody?

A.   Yes, sir.

Q.   Who did you provide those to?

A.   Ms. Desiree Lange.

Q.   And is that something she asked of you?

A.   Yes, sir.

Q.   Did Ms. Lange give those back to you?

A.   Yes, sir.

Q.   So you could find them again if you needed to?

A.   Yes, sir.

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary will be made on the Errata Sheet.

_____

JAIME BERNARD ROBISON

_____

DATE

(If needed, make additional copies of the Errata Sheet on the next page or use a blank piece of paper.)

ERRATA SHEET

Case:  Felipe de Jesus Avila-Soto, et al. v. South Central Sugar Cane Growers' Association, Inc., et al.

Witness:  Jaime Bernard Robison

Date:  February 12, 2026

PAGE/LINE          SHOULD READ     REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Steno Job 2405911

CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Notary Public of the State of Maryland, City of Baltimore, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

        IN WITNESS WHEREOF, I have this date

subscribed my name.


DATED: March 3, 2026


                    _____

                    Ahuva Goldberger

                    Notary Public


My Commission Expires:

May 21, 2027