# EXCERPTS FROM DEPOSITION OF RIVERS PATOUT



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA


Case No. 6:24-cv-01392


FELIPE DE JESUS AVILA-SOTO, et al,

Plaintiffs,

v.

SOUTH CENTRAL SUGAR CANE
GROWERS' ASSOCIATIONS, INC., et al.

Defendants.

_____/


REMOTE VIDEO TELECONFERENCE DEPOSITION OF
RIVERS PATOUT

April 27, 2026
10:00 a.m. - 1:15 p.m.


-------------------------------------

Stenographically Reported by:
Daly Ocana
Court Reporter

APPEARANCES:


On Behalf of the Plaintiffs:

           DAWSON MORTON, LLC
           DAWSON MORTON, ESQUIRE
           Admitted Pro Hac Vice
           1808 Sixth Street
           Berkeley, California 94710
           404-590-1295
           dawson@dawsonmorton.com

           JAMES M. KNOEPP, ESQUIRE
           Admitted Pro Hac Vice
           1612 Crestwood Drive
           Columbia, South Carolina 29205
           828-379-3169
           jim@dawsonmorton.com


On Behalf of the Defendant:

           BRANDON DAVIS, ESQUIRE
           ANDREW ALBRITTON, ESQUIRE
           364 Canal Street
           Suite 2000
           New Orleans, Louisiana 70130
           504-584-9312
           brandon.davis@phelps.com
           andrew.albritton@phelps.com


ALSO PRESENT:  ASHLEE GARY

like petroleum, was Sterling a plaintiff in those lawsuits, a defendant?

A    We were a defendant.

Q    Okay.  And was it concerning like oil payments?

A    No, it was concerning the damages.

Q    And were you called as a representative of Sterling in those cases?

A    Yes.

Q    And do you know where those cases were filed?

A    I was called as a representative of Sterling and Raceland Sugars.

Q    Okay.  And about how long ago was that?

A    Oh, 20 years.

Q    Okay.

A    Fifteen to 20 years.

Q    Okay.  Can you tell me your present roles at Sterling Sugars and like any titles you hold?

A    I'm the general manager of Sterling Sugars --

Q    Okay.

A    -- and the president of Sterling.

Q    Okay.  And -- and do you have any other titles at Sterling Sugars?

A    I'm a board member of Sterling Sugars.

Q    Okay.  And do you have a particular position

on the board or you're just a director and member of the board?

A    I'm just a director and member of the board.

Q    Okay.  And are you also an employee who's like paid by Sterling Sugars?

A    Yes.

Q    And apart from your work at Sterling Sugars, are you paid wages by any other company?

A    No, other than director fees.

Q    Okay.  And --

A    That would come from M.A. Patout and Raceland Sugars, which I'm a board member of also.

Q    Okay.  So you're a board member of Sterling Sugars, of Raceland -- is it Raceland Sugars?

A    Yes.

Q    And of M.A. Patout & Son, Limited?

A    Yes.

Q    All right.  And just so I understand that other kind of payment you were talking about, it's sort of like -- it's not like a salary or a wage, is it?

A    No, it's not a salary or a wage.  It's a director fee.

Q    Like -- so you get a certain payment for like attending board meetings?

A    Yes.

Q    And how long have you worked at Sterling Sugars?

A    Oh, 25 years.

Q    And how long have you been in the position of president and general manager?

A    Look, I'm going by memory, 15 years, 20 years, maybe.

Q    Okay.  And before you were president and general manager, do you remember what position you held?

A    Where, here?

Q    At -- at Sterling Sugars.

A    Operations -- in charge of operations.

Q    And are you also a shareholder in the parent company M.A. Patout & Sons?

A    Yes.

Q    And apart from you, are any other -- well, maybe let me just start -- I just would like to get information on your immediate family, and then I'd also like to know if any of them are shareholders.

Are you married, Mr. Patout?

A    No.

Q    Do you have any children?

A    A son and a daughter.

Q    Okay.  And can you give me their names and whether they work and where?

you were also on the Raceland Sugars board?

A    Yes.

Q    Is it the case that you and the other members of the Raceland Sugars board are also the same individuals you just named as board members of M.A. Patout?

A    Yes.

Q    I'd like to talk to you about trucking at Sterling Sugars in terms of harvesting cane hauling -- harvest season cane hauling, Mr. Patout.

A    Sure.

Q    I wanted to just go through, like, a timeline of the workers that have been employed, you know, as truck drivers in Sterling Sugars operations for the cane harvest.

A    What years are you talking about?

Q    Well, I'd like to -- could we start around 2016 and move to the present?

A    Okay.  What would you want to know?

Q    I guess I'd like to know what the makeup of the workforce was each year, or a couple of years, and then I might have follow-up questions.

A    My -- I'll give you my recollection.  It -- going back, you know, my years may not be spot on, be that accurate.  But going -- it went on to where, I

guess, prior to '16 and into '16 that farmers were hauling their cane and contractors were hauling the farmers' cane.  And then Sterling started hauling a little bit of cane.  I don't recall what year it was.  I don't recall what year it was.

And, you know, it got to be expensive for the farmers.  And Sterling started hauling more and more of the farmers' cane.  And then using local drivers, U.S. drivers.  And then I don't know what year it was we went -- Sterling went to the H-2A program to haul cane.  Probably up until from '20 to '21 maybe, '22 -- '19 to '21.  And then in '22, the farmers started hauling all their own cane.  They formed, I think it was '22, they formed an association in hauling all their cane.

Q    Okay.  In terms of -- was there a time period where the majority of the workers were from Puerto Rico?

A    Yes, there were U.S. workers.  That was -- I don't recall what year, but they were affected by Hurricane Maria, I think it was.  And that following year, we got H-2A workers.

Q    Okay.  And was there --

A    It wasn't only Puerto Rican workers.  We had -- you know, Puerto Ricans, I hate to use that term. They're U.S. citizens, I would say.  They can come and go as they like.  And we had U.S. workers -- not U.S.

workers -- U.S. citizens also driving with the Puerto Ricans. So it wasn't just Puerto Ricans.

Q Okay. And was there -- did you travel to Puerto Rico as part of a process of seeking truck drivers?

A Yes.

Q And do you remember what years you did so?

A No. No, it was -- it was prior to '20, I guess. Those years prior to '20.

Q Okay. And I think I understand what you're saying. But --

A It was -- you know, it was '16, '17, '18, '19, or '20. I went two or three years. I don't remember what years it was exactly.

Q Okay. And -- and when we say, '16, '17, we're talking about like 2016, 2017?

A Yes.

Q And when you say '20, we're talking about like 2020?

A 2020, yes.

Q Okay. And did you go other places as well to seek truck drivers or just Puerto Rico?

A We went to -- I ran ads in South Texas papers for truck drivers. And we got some -- in conjunction with the guys we got from Puerto Rico, we got some

drivers out of South Texas.

Q    Okay.  That would be places like McAllen, Texas?

A    Yes.

Q    And then those truck drivers came, hauled sugar cane to the mill and worked like whatever the time period was that was necessary to bring in all the sugar cane?

A    Yes.  And they hauled -- they hauled sugar, bagasse, limestone, scrap iron, you know, equipment, whatever else we needed around the mill at the time.

Q    Okay.  And do you remember the wages paid at the time?

A    No, I do not.

Q    Okay.  And were they paid by Sterling Sugars, LLC?

A    Yes.

Q    And do you remember whether they received overtime wages?

A    Yes, they did.

Q    And in terms of things like overtime wages at Sterling Sugars, is that a policy that you set?

A    It's industry.  Overtime wages are set by the industry.  You know, it's after 40 hours, you're entitled to overtime and off-season.

been to any formal trainings?

A    No.

Q    And -- and when you say, you've done some
reading online, anything specific?

A    Nothing in particular, no.

Q    Okay.

A    Just general.

Q    Just things that you ran across?

A    Yes.

Q    Okay.  Not anything that we would be able to
say is like definitive or, you know --

A    Correct.

Q    Okay.  I want to go back for just a minute.
You were talking about McAllen, Texas and Puerto Rico.
And then you mentioned that at some point that Sterling
got H-2A workers.

A    Yes.

Q    And I think you were saying you thought that
was around like 2020?

A    '19, '20, '21, maybe.

Q    Okay.  And you were involved in that decision?

A    Yes.

Q    Was that something that was happening at the
other -- M.A. Patout mills as well?

A    It was happening throughout the industry.

JOB NO. 2663483

Q    Okay.  And -- and I guess I just want to know still about the M.A. Patout mills.

A    What was your question again?

Q    Was --

A    Was it happening there?

Q    Yes.

A    They were doing it through PEC, Patout Equipment Company, which is separate from M.A. Patout, a different entity.

Q    Okay.  And is Patout Equipment Company like a wholly owned subsidiary of M.A. Patout?

A    Yes.

Q    And -- and Patout Equipment Company was -- was using the H-2A visa program to obtain truck drivers?

A    As far as I know.  I haven't seen it physically, but as far as I know.

Q    Okay.

A    I was not involved in it, but as far as I know.

Q    And was -- I guess, the reason I'm asking about M.A. Patout and H-2A workers that I was trying to understand, was it -- was it -- was the H-2A visa program for truck drivers, like, recommended to you from someone at M.A. Patout?

A    Randy Romero and I discussed it.

Q    Okay.  And do you remember what was involved in your discussion?

A    No, I do not.  That was -- that was years ago. I don't remember the details of the discussion.

Q    Okay.  And following that discussion, did Sterling Sugars begin to use the H-2A program to obtain truck drivers?

A    Yes, Sterling Sugars Sales Corporation.

Q    Okay.  And --

A    Sterling Sugars Sales Corporation.

Q    Can you just explain to me the difference between Sterling Sugars and Sterling Sugars Sales Corporation?

A    Sales Corporation is another type of company name that we were using at the time.

Q    Okay.  It's not used anymore?

A    No, it's still out there.  But we haven't been using it, no.

Q    Okay.  Does it have any employees presently?

A    I'm not sure.  I'd have to go look at the payroll.

Q    Okay.  And it wasn't in use previously, for example, when we were talking about the U.S. citizens that came from other places like Puerto Rico and Texas?

A    Yes, it was.

Q    Okay.  Explain that to me.

A    What do you want me to explain about that?  It was used for the truck drivers and the sugar barge loading.

Q    Okay.  And so truck drivers coming to work at Sterling Sugars would have received paychecks from Sterling Sugars Sales Corp?

A    Yes.  They should have, yes.  That was my understanding.

Q    Okay.  At times, did they receive paychecks from Sterling Sugars, LLC?

A    Without going into the payroll, I'm not sure.

Q    Okay.  And is there a reason that, for example, truck drivers from Puerto Rico would have received paychecks from Sterling Sugars Sales instead of Sterling Sugars, LLC?

A    Yes.  For insurance purposes and the liability, we would have put them on the sales corp.

Q    Okay.

A    Just like loading barges and working over the water would have been the sales corp.

Q    Okay.  Because there's -- just like transportation has a lot of liability issues?

A    Yes.

Q    And the policies in effect for all this would

be those ones you talked about that are obtained for all of the companies by people at M.A. Patout & Sons?

A    Yes.

Q    And you mentioned -- you mentioned earlier that, I think it's Mr. Burke is involved in H-2B applications?

A    Yes.

Q    And that's another like seasonal visa program; is that right?

A    Yes.

Q    And what types of positions are those individuals coming to perform under the H-2B program?

A    They're coming to perform factory positions, bagasse burners, sugar boilers, things to that extent.

Q    Okay.  And do they receive overtime?

A    Yes.

Q    And did you and Mr. Romero discuss whether to bring truck drivers under the H-2A or the H-2B visa program?

A    When?

Q    Well, I guess I'll start with in that first discussion that you had, where you remember the discussion but you're not sure when it was.

A    Yes.  In the first, when we brought the H-2A drivers in, Mr. Romero and I discussed it.

A    At that time, I was signing the H-2Bs, and I reviewed them how I reviewed the H-2As.

Q    Okay.  So presently, Mr. Burke is reviewing them, but in the past, you reviewed them?

A    Mr. Burke is reviewing the H-2Bs.

Q    Okay.  And -- and in the past, you reviewed the H-2As and the H-2Bs?

A    Yes, for those years that we all came.

Q    Okay.  Does -- do the -- do the job orders state the business that -- that that's involved, like the type of business?

A    Which job order are you talking about?

Q    I'm just -- I'm just talking -- I guess I'm talking about generally.  Do they include information about the business?

A    Yes.

MR. DAVIS:  Objection, foundation.

BY MR. MORTON:

Q    And how do you -- how have you described the Sterling Sugars business on the job orders?

MR. DAVIS:  Objection, foundation.

A    Look, it's been several years since I've done that.  I'll have to look at that.

BY MR. MORTON:

Q    Okay.  Do you have any current recollection of

how it's been described?

A    No.

MR. DAVIS:  Objection, asked and answered.

BY MR. MORTON:

Q    Do you think it's fair to describe the business as sugar cane manufacturing?

MR. DAVIS:  Objection --

BY MR. MORTON:

Q    Or sugar manufacturing?

MR. DAVIS:  Objection, foundation, vague.

A    I would say processing.

BY MR. MORTON:

Q    Okay.  Sugar processing?

A    Yes.

Q    And when I was talking about your responsibilities earlier in terms of, you know, as President and General Manager of Sterling Sugars, are you involved with Mr. Garcia in sugar sales or he handles that?

A    He handles that.

Q    Okay.  And does -- the sugar is sold and then transported to basically like companies that are going to market it to consumers or to bakers?

A    It's sold to a refinery.

Q    Okay.  Because the sugar is sort of -- is the

Q    Okay.  You signed this document, you just don't remember where it came from?

A    Yes.

Q    Okay.  Did Ms. Gary give it to you?

A    I'm not sure where it came from.

Q    Okay.

A    No.  Tim Soeleau may have put it on my desk. I can't tell you where it came from.

Q    Okay.  Someone at Sterling Sugars or M.A. Patout provided it to you?

A    Yes.

Q    Did you also sign promissory notes with Mr. Gonsoulin on behalf -- you signed on behalf of Sterling Sugars?

A    Yes.

Q    And the purpose of those promissory notes was to fund the operations of South Central Sugarcane Growers' Association?

A    Yes.

MR. DAVIS:  Objection, foundation.

BY MR. MORTON:

Q    I didn't quite hear your answer, Mr. Patout.

A    Yes.

Q    And do you where you, like --

A    We subsidized.  We were subsidizing it.

Q    Okay.  Subsidizing the association's operations --

MR. DAVIS:  Objection to the characterization.

BY MR. MORTON:

Q    -- is that right, Mr. Patout?

A    We were subsidizing the inflow of money.

Q    For the association?

A    For the association.

Q    And I'm just asking about the document, I guess.  Do you have an understanding of -- like did someone provide you the promissory note?  Do you know where you got it from?  Did you prepare it?

A    I did not prepare it.  That was prepared by our accounting department.

Q    Okay.  And would that be, like, the accounting department, like, Ms. Lange or like Ms. Gary?

A    It would -- it would be through Ms. Lange and Ashley Gary.

Q    Okay.  And do you know whether those promissory notes were repaid?

A    I'm not sure.

Q    Okay.  And do you know whether they were forgiven?

A    I'm not sure.

Q    Okay.  And do you know whether interest was

A      Rivers Patout or Desiree Lange, one of us.

Q      Okay.  And how long has Mr. Burke been at Sterling Sugars?

A      Oh, maybe five years.  Maybe five years.

Q      When individuals are going to be terminated from Sterling Sugars, is that something where it needs to be recommended to you or the managers can make that decision?

A      The managers can make that decision.

Q      Okay.  And do you report -- for example, with drivers, do you report terminations to the insurer?

A      I do not.  Desiree would do that.

Q      Okay.  And does she prepare something -- I had seen some letters with your signature.  So I guess what I was trying to understand is that, does she sort of prepare a document that, where, like, she's actually doing it, but she puts your name on the --

A      Yes.

Q      -- sort of letter recording it?

A      Yes.

Q      And that's to let the insurer know that, like, Sterling Sugars has taken action about, for example, an accident or a misconduct issue?

MR. DAVIS:  Objection, foundation.

A      Are you talking -- are you taking -- who are

you talking for?  Sterling Sugars?  Sterling Sugars Sales Corp?  Who are you talking for?

BY MR. MORTON:

Q    Any of the above.

A    Is it from the association?

Q    Well, let me show you one.

A    Okay.

Q    Okay.  I'm going to show you a document, Mr. Rivers, and it has a Bates stamp that ends 000015.

MR. MORTON:  It's going to be marked as Exhibit 107.

(Document was marked as Plaintiffs' Exhibit No. 107 for identification.)

BY MR. MORTON:

Q    Let me know if you can see this.

A    Okay.

Q    Is this an example of the kind of document that Ms. Lange would prepare?

A    Yes.  That went to our insurance consultant, to the insurance consultant.  I assume that was for an association driver, and that came -- that went to our insurance consultant.

Q    Okay.  And can you -- does the insurance consultant then pass it along to the insurer?

MR. DAVIS:  Objection to form.

A    I would assume they did, but I'm not -- I'm not sure.

BY MR. MORTON:

Q    Okay.  And is this a document that you signed?

A    I did in that instance, yes.

Q    Okay.  And it would also be the case that, from what I understood from you earlier, Ms. Lange could also send these documents herself?

A    I would assume.

Q    Okay.  I'm going to show you another document, Mr. Patout, that just concerns, like, the relationship that you were just talking about, like with, you know, what Ms. Lange could do.  It's been previously marked as Exhibit 72.  And it has a Bates stamp that ends 36921.

Let me know if you can see that, Mr. Patout.

A    Okay.

Q    As I understood it, you had talked earlier about how Sandor Garcia could set safety rules.

MR. DAVIS:  Objection.

BY MR. MORTON:

Q    Is that a yes, Mr. Patout?

A    Yes.

Q    And I just -- it seemed to me what was going on here was that Mr. Garcia was sending some safety rules to people at the different Patout -- managers at

the different Patout sugar mills, and then you were forwarding this on to Ms. Lange so that she knew it and could distribute it?

MR. DAVIS:  Objection.

A    I don't know if these are safety rules or safety suggestions.  Scroll -- scroll down a little bit.

Let me read this.

Okay.

BY MR. MORTON:

Q    Mr. Garcia is asking that it be passed on to every driver, right, with their check stub?

A    Yes.

MR. DAVIS:  Objection, document speaks for itself.

BY MR. MORTON:

Q    And -- and you were forwarding it to Ms. Lange so that she could do so?

A    Yes.

Q    And that would have included the drivers for South Central Sugarcane Growers' Association?

A    Yes.

Q    You talked about, you know, like the start of work, the start of the harvest season is important because the mill needs to get up and running and you want to make sure that the cane is going to arrive in

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE

     I, DALY OCANA, Court Reporter, Notary Public, State of Florida, certify that RIVERS PATOUT, remotely appeared before me on April 27, 2026, and was duly sworn.

     Signed this 15th day of May, 2026.

_____
DALY OCANA, STENOGRAPHIC REPORTER
  Notary Public, State of Florida
  Comm. No. HH306440
  Commission Expires:  12/28/2026

CERTIFICATE

I, Daly Ocana, Court Stenographer, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition, Rivers Patout, was by me duly sworn remotely to testify to the truth.

That said deposition was taken before me at the time and place therein set forth and was taken down by me in shorthand and thereafter was transcribed into typewriting under my direction and supervision, and I hereby certify the foregoing transcript is a full, true and correct transcript of my shorthand notes so taken.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal case, before completion of the proceedings, review of the transcript was requested.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 15th day of May, 2026.

_____

DALY OCANA, COURT STENOGRAPHER

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES ON THIS PAGE

              IN RE:  Felipe de Jesus Aviloa-Soto, et al vs.
        South Central Sugar Cane Growers' Association, Inc.,
                           et al
                    WITNESS:  Rivers Patout
                      April 27, 2026
                      Job No. 2663483

PAGE No.              LINE No.        CHANGE      REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated are true.

_____

Date        Rivers Patout

RIVERS PATOUT                                                JOB NO. 2663483
APRIL 27, 2026

I, RIVERS PATOUT, do hereby declare under penalty

of perjury that I have read the foregoing transcript;

that I have made any corrections as appear noted, in

ink, initialed by me, or attached hereto; that my

testimony as contained herein, as corrected, is true and

correct.

EXECUTED this_____day of _____,

20_____, at_____, _____,

                     (City)                          (State)