# EXCERPTS FROM DEPOSITION OF
# TIM SOILEAU

UNITED STATES DISTRICT COURT

WESTERN DISTRICT

STATE OF LOUISIANA

FELIPE DE JESUS                    NO. 6:24-cv-01392
AVILA-SOTO, FELIPE DE
JESUS SUAREZ-PALAFOX, ON
BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY
SITUATED,

      Plaintiffs,

VERSUS

SOUTH CENTRAL SUGAR CANE
GROWERS' ASSOCIATION,
INC., AND STERLING
SUGARS, LLC,

      Defendants.

Zoom deposition of TIM SOILEAU, appearing remotely via videoconference from Franklin, Louisiana, taken in connection with the captioned cause, pursuant to the following stipulation before Kristie Garrison, Certified Court Reporter, appearing remotely from Baton Rouge, Louisiana, on Tuesday, Febraury 17, 2026, commencing at 9:35 AM.

REPORTED BY:
     KRISTIE GARRISON
     CERTIFIED COURT REPORTER

APPEARANCES:

    DAWSON MORTON LAW FIRM
    (BY:  JAMES M. KNOEPP, ESQUIRE)
    1612 Crestwood Drive
    Columbia, South Carolina  29205

    DAWSON MORTON LAW FIRM
    (BY:  DAWSON MORTON, ESQUIRE)
    1808 Sixth Street
    Berkeley, California  94710

        ATTORNEYS FOR THE PLAINTIFF


    PHELPS DUNBAR
    (BY:  MOLLY McDIARMID, ESQUIRE)
    400 Convention Street
    Suite 1100
    Baton Rouge, Louisiana  70802

        ATTORNEYS FOR THE DEFENDANT

ALSO PRESENT:  ASHLEE GARY

TIM SOILEAU,

after being first duly sworn by the above-mentioned court reporter, did testify as follows:


EXAMINATION

BY MR. KNOEPP:

Q.    Good morning, Mr. Soileau.

A.    Good morning.

Q.    We met before we started.  My name is Jim Knoepp.  I'm an attorney representing the plaintiffs in this case.

Can you state your full legal name for the record?

A.    Timothy Paul Soileau.

Q.    And what's your address?

A.    7319 Sugar Hill Road, New Iberia, Louisiana 70560.

Q.    And are you located at that address right now, or are you somewhere else?

A.    I'm not.  I'm at Sterling Sugars.

Q.    And is that your -- are you in your office at Sterling Sugars?

A.    I am.

Q.    And what's the address there?

A.    611 Irish Bend Road, Franklin, Louisiana

A.    I can.

Q.    Can you listen to the drivers -- the truck drivers that haul the sugar cane through that PTT app?

A.    I can.

Q.    Do you use that radio dispatch app to communicate during the course of your work?

A.    When I use it, it's strictly for the GPS function.  I mute the transmissions because it's entirely in Spanish and I can't understand that, so I mute the transmission part -- the transmission.  I use it strictly for GPS purposes.

Q.    What are you using the GPS for?

A.    Just to see where the trucks are located.

Q.    And so you can see on the app the location of the different trucks that are hauling sugar cane?

A.    Yes.

Q.    And why would you want to check that?

A.    Just to make sure people are where they're supposed to be.

Q.    And this is for the truck drivers who are hauling the sugar cane?

A.    Yes.

Q.    And do you check that on a daily basis to

monitor where people are at any given time?

A.    It is randomly.  Just whenever I think about it sometimes, I'll check it.

Q.    Are you checking -- I'm sorry, I may have cut you off before you were finished.

A.    For information purposes, just for my information.

Q.    Do you check to see if the truck drivers are following the schedule and going to the right locations?

A.    No, I don't check for that.

Q.    If you see something on the app that -- have you ever seen anything on the app that causes you concern about the location of a driver?

A.    No.

Q.    Does it provide live location information?

A.    I'm not certain.  I don't think it does. I think they might call it live, but there's a delay there.  It's not truly live, in my opinion.

Q.    Does it provide a map that shows you a dot or something like that where all the different trucks are located?

A.    Yes.

Q.    And would it show if a truck is not

I'll -- sure.  Let's just see how we can do.

BY MR. KNOEPP:

Q.    You mentioned before that you're at your office at Sterling Sugars.  Where on the property is that building that you're in located?

A.    It's on the far eastern side of the property.

Q.    Is the building -- does it have a name or anything like that?  Like, the office building or the main office or anything like that?

A.    It's not labeled, no.

Q.    And who else works in that office there with you?

A.    Jamie Robinson, Roddy Patout, Kellie Jackson, Desiree Lange, Michelle Prados, and Rivers Patout.

Q.    And whose property is that where the office is located?

A.    Sterling Sugars, LLC.

Q.    Is the sugar mill operated -- let me ask you this.

      Is the sugar mill also located at that location?

A.    It is.

Q.    And is that the sugar mill operated by

Sterling Sugars, LLC?

A.    It is.

Q.    How far are you from where the factory itself is?

A.    Probably 300 yards.

Q.    Is there also a what's referred to as a truck yard on the property?

A.    It's referred to as a parking lot.

Q.    How far are you from where the parking lot is?

A.    It's right next door.

Q.    And what about -- are there some diesel pumps on the property?

A.    Yes.

Q.    And where are those located in relation to where you are?

A.    In the front of the main office where I'm located.

Q.    Is that right outside of your office then?

A.    Well, I'd say probably 100 feet, 150 feet.

Q.    There in your office, is that your assigned office at Sterling Sugars?

A.    It is.

Q.    Do you, for example, pay for insurance?

A.    No, I do not.

Q.    What about gas?

A.    No.

Q.    And what do you use that truck for for work?

A.    We have properties.  Sterling Sugars has properties.  For instance, we have the wastewater ponds that I look over from time to time.  Sterling Sugars actually owns farmland, and I do visit that farm property from time to time as well.

Q.    Is Sterling Sugars actively engaged in farming on that farmland?

A.    No.

Q.    You just -- I believe in the prior deposition you mentioned that you sometimes go to those properties to deal with things related to oil; is that true?

A.    Yes.

Q.    I wasn't sure if I remembered it properly, but that's the reason why you would be going to that farmland is to check on issues related to the oil industry?

A.    That's one reason, yes.

            MS. McDIARMID:

Objection to form.  Go ahead and give your answer, if you don't mind.

BY MR. KNOEPP:

Q.    What's another reason?

A.    That I use the truck for.

Q.    No, why you would go to the farmland that's owned by Sterling Sugars?

A.    Just to visit it and make sure no one's accessing property without the proper authority. Located in South Louisiana, there's a lot of hunters that may access the property from time to time without authority, so we patrol it.

Q.    When was the last time there was any farming that was taking place on any of that lands? Do you know?

A.    Just this past January.

Q.    Okay.  And is there -- are there crops that are growing on that land?

A.    There are sugar cane crops, yes.

Q.    Are those farmlands active from year to year?

A.    Yes.

Q.    Are they harvested?

A.    Yes.

Q.    Is that farmland farmed by Sterling

Sugars or is it leased to somebody else to farm?

A.    It is farmed by tenant farmers who lease the property for farming from Sterling Sugars, LLC.

Q.    Who are those farmers that lease the land to do the farming?

A.    Champagne Farms.

Q.    I'm sorry.  Could you say that name again?

A.    Champagne.

Q.    Okay.

MS. McDIARMID:

It's spelled like champagne, probably?

THE WITNESS:

Mm-hmm.

BY MR. KNOEPP:

Q.    All right.  You mentioned Champagne Farms and you said -- did you say Irish Bend Planting?

A.    Irish Bend Planting.  The farmer on that property is Kevin Breaux.

Q.    And that's B-R-E-A-U-X, I'm sorry?

A.    That's correct.

Q.    Any other tenant farmers on the land owned by Sterling Sugars?

A.    Yes.

if there's anything worth purchasing.  We have property at the Port of Iberia that needs maintaining as well.

Q.    Any other activities you use the truck for?

A.    Not really.

Q.    From time to time, are there accidents involving the trucks that are used to haul sugar cane?

A.    Yes.

Q.    When that happens, do you use your truck to visit any accident sites involving the trucks?

A.    I do.

Q.    And from time to time, do the trucks break down?  The trucks that are used to haul the sugar cane, do they break down?

A.    Yes.

Q.    Do you use your work truck to go to the locations of any breakdowns?

A.    Nope.

Q.    Is that something that you ever do, or does somebody else deal with that kind of thing?

A.    Somebody else does it.  I don't do it.

Q.    Who does that?

A.    Roddy Patout will go there from time to

time as well, depending on if it's a Sterling truck or a Danny West truck.

Q.    And so some of the trucks that are used to haul sugar cane are owned by Sterling Sugars; is that right?

A.    Yes.

Q.    And some of the trucks that are used to haul sugar cane are owned by a company called Danny West; is that right?

A.    Yes.

Q.    Well, those are leased trucks from Danny West?

A.    Yes.

Q.    And the trucks that belong to Sterling Sugars, are those leased to somebody else to do the hauling work?

A.    Leased to the South Central Sugar Cane Growers' Association.

Q.    And so during the course of the deposition, I'm going to refer to the association as South Central.  If I do that to avoid us having to say the full name every time, will you understand what I'm referring to if I say South Central?

A.    I will.

Q.    So South Central leases trucks that are

owned by Sterling Sugars to do some of the hauling work; is that right?

A.    Yes.

Q.    And when those -- have some of those trucks broken down from time to time?

A.    Yes.

Q.    When that happens, who fixes the trucks?

A.    You're talking about Sterling's trucks or Danny West's trucks?

Q.    I'm talking specifically about the Sterling trucks.

A.    Okay.  Our mechanic, Monty Taylor, is in charge of repairing any Sterling trucks that are broken down.

Q.    And when you say "our mechanic," are you referring to the Sterling Sugars, LLC, mechanic, Mr. Taylor?

A.    I am.

Q.    Does he work on the Sterling Sugars mill property?

A.    Yes, he does.

Q.    Is there a mechanic shop on the Sterling mill property?

A.    There is.

Q.    Is that where -- if a truck broke down

and could be moved somewhere for repair; is that where it would go?

A.    Yes.

Q.    And then Mr. Taylor would try to repair that truck and get it back on the road.  Is that fair to say?

A.    Yes.

Q.    If a truck that is owned by Danny West breaks down, what happens in that situation?  Do you know?

A.    Danny West has his own mechanics that we contact for those repairs.

Q.    And does somebody get in touch with Mr. West to let him know that one of his trucks broke down?

A.    We don't contact Mr. West.  We'll contact the mechanics.

Q.    Somebody would contact the mechanics at Mr. West's shop?

A.    Yes.

Q.    Who does that whenever one of Mr. West's trucks break down?

A.    Normally, that's Roddy Patout.

Q.    And do you know who Mr. Patout works for?

A.    Roddy Patout?

Q.    Yes, sir.

A.    He works for Sterling Sugars, LLC.

Q.    And thank you for saying that.  I need to be careful with my use of the last name Patout without using a first name because I understand there's also his father, Rivers Patout, does some work related to the sugar mill; is that right?

A.    That's correct.

Q.    So I'll try -- and whenever I use that, I'll try and specify between Roddy and Rivers.  But yeah, thank you for catching that.

Mr. Soileau, who is your current employer?

A.    My current employer is Sterling Sugars, LLC.

Q.    And how long have you worked for Sterling Sugars, LLC?

A.    It'll be 25 years in May.

Q.    Is that your only employer, Sterling Sugars, LLC?

A.    Yes.

Q.    When you get tax documents at the end of the year related to your employment, do you get a W-2 form?

A.    Yes.

BY MR. KNOEPP:

Q.    Okay.  And did the other people who work with you also transition over to the LLC at that time?

A.    Yes.

Q.    Do you have a job title at Sterling Sugars?

A.    I do.

Q.    I'm sorry, I couldn't hear you?

A.    I do.

Q.    Okay.  What is that job title?

A.    Office manager.

Q.    How long has that been your title?

A.    Probably 20 years.  I'm not certain exactly when I took that title.  But I also do the purchasing for the company as well, so I'm also known as the purchasing agent for Sterling Sugars, LLC.

Q.    Okay.  And what kind of purchasing are you involved in?

A.    All kinds.

Q.    Purchasing related to the hauling of sugar cane?

A.    That goes through the association, no.

Q.    Can you give me an example of the kind of

things that you would be in charge of purchasing?

A.    Everything from steel, chemicals, everyday rope, soap, and dope, if you want to call it that.  Bearings, sheaves, chain, sprockets, anything that would go into a sugar mill.

Q.    What about -- you mentioned that there were some -- there are some trucks that Sterling Sugars owns that are used in the hauling.  Are you involved in the purchase of those trucks?

A.    Yes, I am involved.  Everything that is purchased for Sterling Sugars, LLC, comes through my purchasing office.

Q.    So any type of equipment that is used goes through your office?

A.    Yes.

Q.    Including the trucks; is that right?

A.    Yes.

Q.    What about the trailers that are used to haul the sugar cane?  Is that also something that goes through your purchasing office?

A.    Yes.

Q.    What about -- we were talking before about trucks that break down.  Are you also responsible for purchasing any equipment that's needed to repair the trucks?

A.    Yes.

Q.    What about things like tires for the trucks?

A.    Yes.

Q.    Those are all things that go through the Sterling Sugars purchasing office?

A.    Yes.

Q.    Things like brake pads and oil and things like that for the trucks also go through the purchasing office at Sterling Sugars?

A.    Yes.

Q.    Do you know how many miles are put on the trucks during the course of a season?

A.    No, I do not.

Q.    Is there a maintenance schedule at all for the trucks during the course of the season?

A.    I assume there is, yes.

Q.    Is that something the mechanic's office handles?

A.    Yes.

Q.    So do you know, for example, if they do regular oil changes on the trucks?

A.    Yes, they do.

Q.    During the course of the season?

A.    Yes.

walk over to that other office and handle it over there?

A.    I use my company truck.  I'm not walking that far.

Q.    Okay.  So you drive over there and handle that purchasing, and then you might drive back to your office in the main office building?

A.    Every day, all day.  Back and forth.

Q.    You're going back and forth?

A.    Yes.

Q.    Okay.

A.    Can I clarify something here?

Q.    Sure, of course.  Yes.

A.    Anything that I purchase for harvesting and hauling of sugar cane, I purchase through the association.  That is part of our management contract there.  I do the purchasing for the association as well, but it goes through the association.

Q.    And can you explain how that works?

A.    I'm not sure how I can explain it.  I just know that's how that's how it works.  I can't really explain it, but that's the purchasing I do. We have a separate database for Sterling, LLC, and for the association.

Q.    Okay.  And so when you're purchasing things for the South Central Association, are you the purchasing agent for that entity?

A.    Nope.

Q.    You're the purchasing agent for Sterling Sugars, LLC?

A.    Yes, sir.

Q.    And has somebody asked you, in your role as the purchasing agent at Sterling Sugars, to handle the purchasing for South Central?

A.    Yes.

Q.    Who who did that?

A.    What's that?

Q.    Who asked you to handle that?

A.    No, I'm sorry.  I misunderstood that question.

Q.    Okay.  You said that you handle the purchasing of things -- you handle the purchasing for South Central, correct?

A.    Yes.

Q.    And who asked you to do that?

A.    I'm not sure anyone asked me.  I just -- it fell in my lap as far as -- I don't recall anyone asking me to do that.  It was assumed I would do that since I'm the purchasing agent.  I didn't think

they would hire another purchasing agent just for

the hauling for the association.  So I assumed that

duty.

Q.    Okay.  Was there anybody else who could

have done that?  Do you know?

A.    I'm sure there's a lot of people that

could have done it.

Q.    But it fell on you; is that fair to say?

A.    It did, yes.

Q.    All right.  How do you -- and so you

mentioned a separate accounting system.  What do you

mean by that?

          MS. McDIARMID:

                    Object to the form.

          THE WITNESS:

                    I didn't say accounting system.  I

     said there's two different databases.

BY MR. KNOEPP:

Q.    Okay.  Separate, sorry.

          So there's a separate accounting

database.  What do you mean by a separate accounting

database?

          MS. McDIARMID:

                    Object to the form.

          THE WITNESS:

Again, I didn't say accounting database.  I said database.

BY MR. KNOEPP:

Q.    Okay.  What do you mean by that?

A.    There's a separate database for purchasing for Sterling Sugars, LLC, and for the association, South Central.

Q.    Okay.  Is this something that you log into the database?

A.    Well, once I log into the computer, it's there.  I simply have to click a button between Sterling database and the association's database.

Q.    You're talking about the computer at the mill purchasing office?

A.    At the purchasing office, yes, sir.

Q.    And so at the Sterling Sugars, LLC, purchasing office, you can access a computer that allows you to access either a Sterling Sugars, LLC, database or a South Central database?

A.    That is correct.

Q.    Do you have a login for that?

A.    I have a password, yes.

Q.    Do you have a password for each one of the databases?

A.    No.  I have a password for the computer.

Q.    And you don't -- do you need a separate password to get into the database?

A.    For purchasing, no.

Q.    And what program are you opening up when you say the database?

A.    I don't know what it's called.  I'm sorry.  I just use it.  I don't know what it's called.

Q.    Is there -- how do you open it up?  Is there, like, an icon that you click on or something like that?

A.    Yes.

Q.    Do you know what that's called?

A.    I think it's called CBM, Computers for Business Management.

Q.    And whenever you do that, you can -- can you then select between one of the two different entities?

A.    That's correct.

Q.    And so whenever you're actually purchasing something associated with South Central, what do you do?

A.    I change the database to the South Central Sugar Cane Growers' database.  And I do -- it's the same purchasing software.  It's just a

different database.  I do exactly the same thing as if I was purchasing for the association or for Sterling.  It's just in a different database.

Q.    And do you know when that started, using the South Central database?

        MS. McDIARMID:

              You had a little bit of audio feedback for me.  Do you mind repeating the question?

BY MR. KNOEPP:

Q.    Sure.

        Do you know when you started using that South Central database?  For example, do you think it might have been 2022?

A.    I think that sounds right, yes.

Q.    And did somebody notify you that you needed to start using that database for purchases related to South Central?

A.    Yes.

Q.    Who did that?

A.    The person at CBM, the company CBM.  His name is Chad Theriot.

Q.    And he told you that you should use the South Central database?

A.    He's the one who set it up.  He sets up

in and put in quantities and descriptions and pricing for whatever you're purchasing.

Q.    And the vendor list that you pick from, is that vendor list the same for either one of the databases, whether you're accessing the Sterling Sugars database or the South Central database?

A.    It is the same, yes.

Q.    Once you fill out the purchase order, what happens next?

A.    I normally e-mail.  I like to e-mail my purchase orders, and that purchase order would be e-mailed to whatever company we're purchasing from.

Q.    And you send those e-mails from your Sterling Sugars e-mail address that you told me about earlier in the deposition?

A.    Well, at the purchasing office, I have a different e-mail address.  It is simply purchasing@sterlingsugars.com.

Q.    And is that the same e-mail address whether you're doing a purchase order for Sterling Sugars or a purchase order for South Central?

A.    It is.

Q.    Have you searched that e-mail address for any documents that might be responsive to the plaintiffs' requests in this case?

A.    No.

Q.    Has anybody asked you to do that?

A.    No.

Q.    Is Dugas Fuel one of the vendors that you can pick from on the list?

A.    It is.

Q.    Is that a place that you purchase fuel from during the course of the harvest season?

A.    It is.

Q.    And whenever after you e-mail the purchase order to the vendor, what happens next?

A.    Okay.  All the purchase orders are held, and when delivery actually takes place, those delivery tickets are attached to that purchase order.  And then when the invoice arrives, all that paperwork is processed and sent to the main office.

MS. McDIARMID:

Jim, whenever you're ready to take a short break, I just need, like, five minutes if that's okay.

MR. KNOEPP:

Sure.

BY MR. KNOEPP:

Q.    And do you send -- are you the person who sends those to the main office?

A.    Yes.

Q.    And does that go to the accounts payable department?

A.    Yes.

Q.    Who is in charge of accounts payable at Sterling Sugars?

A.    Well, the accounts payable clerk is Michelle Prados.

Q.    Whenever you have an invoice and you send it for processing and it's something related to South Central, do you also send that to Ms. Prados at accounts payable?

A.    Yes.

Q.    Do you send it to anybody else?

A.    No.

Q.    Do you know what happens after it gets to Ms. Michelle Prados?

A.    I do not.

Q.    Has anybody ever called you and said, "Hey, I sent you this invoice, it hasn't been paid"?

A.    Yes, I do get those calls.

Q.    Whenever you get those calls, what do you do?

A.    I transfer them to Ms. Michelle Prados.

Q.    Do you know what -- how long has Ms.

Prados worked in the accounts payable department?
Do you know?

A.    I'm not certain of the years.  She was here when I got to Sterling in 2001.

Q.    So longer than you've been there?

A.    Yes.

Q.    Okay.  And does she have an e-mail address at Sterling Sugars?  Do you know?

A.    Yes.

Q.    Do you think it's mprados@sterlingsugars.com?

A.    It is.

MR. KNOEPP:

All right.  Let's go off the record.

(Recess taken.)

BY MR. KNOEPP:

Q.    All right.  So back from just a quick break.

We were talking about the invoices that are sent for processing related to the purchase orders the purchasing department makes.  And I just wanted to confirm, are the invoices that are generated from purchases made by the purchasing department for South Central, do those also get sent to Ms. Prados?

A.    Yes.

Q.    And is it your understanding that Ms. Prados then handles the payment of those invoices?

A.    Yes.

Q.    And if somebody calls you related to a purchase that you've made on behalf of South Central saying, for example, they haven't been paid, do you then get in touch with Ms. Prados to get that handled?

A.    Yes.

Q.    And you do the same thing if it's a purchase that you made on behalf of Sterling Sugars; is that right?

A.    Yes.

Q.    Do you work year round, Mr. Soileau?

A.    Yes.

Q.    You don't just work during the harvest season, right?

A.    That's correct.

Q.    Do you have any other job title during the non-harvest season?

A.    No.

Q.    Do you do the same type of work or different work during the non-harvest season?

A.    During the non-harvest season, I also

that?

A.    No.

Q.    And I asked you about tax documents before, but I think I asked you, do you get any tax documents from South Central?

A.    No.

Q.    Did you ever work for the Sterling Sugars Sales Corporation?

A.    No.

Q.    The Sterling Sugars Sales Corporation employed H-2A truck drivers to haul sugar cane to the Sterling Sugars mill; is that right?

A.    Yes.

MS. McDIARMID:

Object to the form.

BY MR. KNOEPP:

Q.    And that was the subject of the earlier deposition that you provided that we talked about before; is that right?

A.    Yes.

Q.    And what role did you play in your job at Sterling Sugars, LLC, with respect to the sales corporation's employment of the truck drivers?

MS. McDIARMID:

Object to the form.  You can answer,

act of watching them do their job.

Q.    And whenever the truck drivers work for the sales corporation, you used to watch the truck drivers do their job?

A.    From time to time.

Q.    And you don't watch the truck drivers do their job anymore?

A.    No.

Q.    Anything else in your understanding of what supervision means with respect to the truck drivers?

A.    No, I don't think there's anything else.

Q.    What about -- do you know what the current status of the sales corporation is?

A.    I do not.

Q.    Do you know why the sales corporation is no longer doing the hauling of the sugar cane?

A.    I do not.

Q.    Have you been involved in disciplining truck drivers who haul sugar cane for South Central?

A.    I write the disciplinary reprimand letters.  That's my involvement.

Q.    You've done that, yes?

A.    Done what.

Q.    Written disciplinary letters related to

truck drivers who were hauling sugar cane for South Central?

A.   I have.

Q.   And how many do you think you've done over the last four years?

A.   Ballpark figure, a dozen.

Q.   And whenever that happens, do they get put in the individual employees' files?

A.   They do.

Q.   And what kind of things would cause a disciplinary letter to be put in a person's file related to the hauling of sugar cane for South Central?

A.   It could be minor traffic violations or speeding, running a traffic light, reports from citizens with specific truck numbers saying that these trucks were not -- they were not driving correctly.  They may be maybe speeding, maybe passing vehicles when they shouldn't be, things of that nature.

Q.   And when you hear about those things -- well, scratch that.

So those are some examples of -- are those examples of things that have happened in the last four years in which you had to write a

disciplinary letter to somebody's employee file?

A.    Yes.

Q.    How does that come about as far as your involvement?  How do you get involved?

A.    Those reports come through the dispatchers.  The dispatchers, in turn, report to myself or Roddy Patout or Jamie Robinson with those violations.

Q.    And why do the dispatchers report to the three of you those type of problems?

A.    Because we're the three that take care of those problems.

Q.    And so the dispatchers have been told that or trained to know that if there's an issue like that with respect to, for example, a traffic violation, they contact you, Mr. Roddy Patout, or Jamie Robinson?

            MS. McDIARMID:

                  Object to the form.

            THE WITNESS:

                  Yes, that's correct.

BY MR. KNOEPP:

Q.    Do you speak Spanish, Mr. Soileau?

A.    Some.

Q.    Do you sometimes communicate with the

truck drivers in Spanish?

A.    No.

Q.    Do you communicate with anybody in Spanish?

A.    The factory workers here.

Q.    There are some people who work at the mill who speak Spanish?

A.    That's correct.

Q.    And you speak with them in Spanish?

A.    Sometimes, yes.

Q.    What about the dispatchers?  Do you speak with them in Spanish or English?

A.    No, they're both fluent in English.

Q.    And have you ever terminated, in the last four years, have you ever had to terminate a truck driver?

A.    I don't terminate anyone.  I simply write the letters.

Q.    Who do you write the letters for?

A.    For Ricky Gonsoulin or for Rivers Patout.

Q.    And so, when you write the letters, who do you provide the letters to?

A.    Ricky Gonsoulin or Rivers Patout.

Q.    Have you been present during the termination of any truck drivers?

A.    I have.

Q.    Okay.  How many times have you been present during the termination of truck drivers in the last four years?

A.    I can recall two.

Q.    Do you remember the names of the truck drivers?

A.    Not off the top of my head, no, sir.

Q.    And during those two terminations, who else was present at the termination meetings?

A.    Myself and Sandor Garcia, possibly Jamie Robinson and Roddy Patout as well.

Q.    Anyone else you can remember?

A.    No.

Q.    Who is Sandor Garcia?  Who does he work for?

A.    He works for M.A. Patout.

Q.    And why would he be present at the termination meeting of a truck driver employed by South Central?

A.    Because he is very fluent in English and Spanish.

Q.    Was he just used as an interpreter during the termination meetings?

A.    Yes.

Q.    Did he have any decision-making authority with respect to the termination?

MS. McDIARMID:

Object to the form.

THE WITNESS:

Partially, yes.

BY MR. KNOEPP:

Q.    How so?

A.    Sandor Garcia and Rivers Patout both come to an agreement on termination.

Q.    And both of those, Rivers Patout and Sandor Garcia, are both employed by M.A. Patout; is that right?

A.    No.

Q.    Who are they employed by?

A.    Sandor Garcia is employed by M.A. Patout. Rivers Patout is employed by Sterling Sugars, LLC.

Q.    Neither one of them are employed by South Central; is that right?

A.    That's correct.

Q.    And is M.A. Patout the parent company of Sterling Sugars, LLC?

MS. McDIARMID:

Object to the form.

THE WITNESS:

driver do is they call dispatch and put dispatch on the line with the police officers.  And there are times when citizens report incidents on the street.  And if those citizens have a truck number that they can identify that it is our truck, then we take that citizen's word for it and we reprimand them.

Q.    When we took Mr. Robinson's deposition last week, he talked about an incident in which somebody was accused of not stopping behind a school bus.  Are you familiar with this incident?

A.    I am.

Q.    He said that you and he pulled camera footage from the truck camera and reviewed that camera footage together.  Was Mr. Robinson correct?

A.    That is correct.

Q.    So you have in the past, with respect to truck drivers who are hauling the sugar cane, reviewed whether or not the person did, in fact, engage in the violation they were accused of.  Is that fair to say?

A.    Yes, it is.

        MS. McDIARMID:

                Object to the form.

BY MR. KNOEPP:

Q.    And so in that instance, that complaint

didn't come through the dispatcher; is that right?

A.    That's correct.

Q.    It came through a member of the public, right?

A.    Yes.

Q.    And you investigated whether or not what the member of the public was saying was accurate; is that right?

MS. McDIARMID:

Object to the form.

THE WITNESS:

I wouldn't call that investigation.

BY MR. KNOEPP:

Q.    Well, you pulled the camera footage, right?

A.    That's correct.

Q.    And you watched the camera footage on your computer?

A.    Yeah, I did.

Q.    And you assessed that camera footage and determined whether or not somebody should be reprimanded; is that right?

A.    Yes.

Q.    And ultimately, you decided to terminate that truck driver; is that right?

A.    No, I did not.

Q.    Did you recommend that that truck driver be terminated?

A.    No, I did not.

Q.    Did you inform somebody that you reviewed the camera footage and what it showed?

A.    I did.

Q.    Who did you tell about that?

A.    Rivers Patout.

Q.    And did Mr. Patout make a decision to terminate that truck driver?

A.    He did.

MR. KNOEPP:

Let's go off for just a second.

(Discussion held off the record.)

BY MR. KNOEPP:

Q.    Mr. Soileau, I want to show you what's been previously marked as Exhibit 9.  And you should be able to see it in the marked exhibits on the Steno Connect app.  Do you see that on the right-hand side of the Zoom?

A.    I see something that says exhibit.  Do you want me to hit preview or present or.

Q.    You can hit preview.  I'll hit present and present it for everybody, but you can hit

preview and you should be able to see the document

on your screen.  Can you see it?

A.    Yes, there it is.

Q.    Okay.  And so I'm presenting what's been

previously marked as Exhibit 9.  Do you recognize

this as one of the letter reprimands that we were

talking about before?

A.    I'm going to have to zoom in a bit if

that's okay.

Q.    Sure.  No, that's why I let you do it.

A.    Okay.  That makes it too big.  Oh, yes,

this is it, yeah.

Q.    Is this the letter of reprimand that you

typed up?

A.    Yes, it is.

Q.    And it's signed -- this is from 2022,

correct?

A.    Yes.

Q.    And it says that there was a violation of

company policy.  Do you see that?

A.    Yes.

Q.    Okay.  And are there certain company

policies that relate to the truck driving work?

A.    I'm sorry, could you repeat that

question, please.

Q.    Yeah.

Are there certain company policies that relate to the truck driving work, the hauling work?

A.    Yes, there's policies, yes.

Q.    And whose policies are those?  What company has the policies?

MS. McDIARMID:

Object to the form.

THE WITNESS:

I'm not certain, but I think it's South Central.

BY MR. KNOEPP:

Q.    And so did you -- whenever you create these letters of reprimand, do you save them on your computer?

A.    Yes.

Q.    Do you have a specific file that you save them in or anything?

A.    No, they're probably in deleted files.

Q.    You would save it to the deleted files, or you think they're now in the deleted files?

A.    I think.  I don't particularly save them. Some of them I put on my desktop if they're current. If not, I delete them because I know I can always go back in the deleted files and pick them up if I need

them.

Q.    And so you don't clear out your deleted files, you keep them on the computer?

A.    No, no, never.

Q.    I'm sorry, just so that it's clear for the record, when you say no, no, never, you mean that you never delete the deleted items off your computer; is that right?

A.    That's correct.

Q.    So they would still be there if we looked at your computer right now, yes?

A.    Yes.  I think they would, yes.

Q.    This was signed by Mr. Robinson.  Is there a reason why he signs these instead of you since you created them?

A.    He's the manager of the association.

Q.    He's also an employee of South Central or Sterling Sugars; is that right?

A.    Yes.

Q.    Is he somebody who reports to you?

A.    Yes.

Q.    Are you his supervisor, in other words?

A.    Through Sterling Sugars, LLC, yes.

Q.    And so this particular letter reprimands that the driver -- well, first of all, this involved

an accident; is that right?

A.    Yes.

Q.    And the letter of reprimand says that the person would be suspended for three days; is that right?

A.    Yes.

Q.    Is that something that you determined?

A.    This is policy.  This is company policy. I didn't create the company policy.  I just write the reprimand letters.  All of the decisions for reprimanding or terminating does not come from me.

Q.    Who do those come from?

A.    Rivers Patout.

Q.    And so did you create this letter of reprimand and provide it to Rivers Patout for his review?

A.    I did not present it to Rivers Patout for review.

Q.    Did you not need to do that because you knew that the reprimand that was typed up in here was consistent with company policy?

A.    Yes.

Q.    Now, this particular individual is a plaintiff in this lawsuit.  Are you aware of that?

A.    I am.

Q.    And he was actually terminated shortly after this.  Are you aware of that?

A.    Yes, I am.

Q.    Did you attend his termination meeting?

A.    I did not.

Q.    Do you know who did?

A.    No, I do not.

Q.    Do you know why he was terminated?

A.    Yes, I do.

Q.    Why was he terminated?

A.    He tampered with the dash camera.

Q.    How do you know that?

A.    I reviewed the footage.

Q.    And so you reviewed the footage and determined that he tampered with the dash camera; is that right?

A.    No, the footage made me aware that he tampered with it.  I didn't determine it.

Q.    And did you do that before or after this letter of reprimand was -- you prepared the letter of reprimand?

A.    This was prepared before.

Q.    So you prepared the letter of reprimand, and then you reviewed the camera footage?

A.    That's correct.

Q.    And after reviewing the camera footage, you believed that Mr. Avila had tampered with the camera; is that right?

A.    That's correct.

Q.    And who did you inform about that, if any?

A.    Rivers Patout.

Q.    And then the decision was made by Mr. Rivers Patout to terminate Mr. Avila?

A.    Yes.

Q.    Based on the information you supplied to him about tampering with the camera, correct?

MS. McDIARMID:

Object to the form.

THE WITNESS:

Correct.

BY MR. KNOEPP:

Q.    Yeah, I'm going to stop sharing that.  I think that for you to get back to the camera view instead of the document, you have to exit preview on the screen.  Do you see that?

A.    It exited for me.  It's back to where it says I have to preview it if I want to preview it.

Q.    Okay.  Great.  You were probably looking at what I presented then.

A.    Okay.

Q.    Do you know who created the company policies that were referenced in the reprimand letter?

A.    I think it was a group effort between everyone who works in this office.

Q.    The Sterling Sugars office?

A.    Yes, sir.

Q.    Was anybody else involved in creating the company policies related to the truck driving other than the people you identified who work in the office?

MS. McDIARMID:

Object to the form.

THE WITNESS:

I assume Mr. Ricky Gonsoulin was involved.

BY MR. KNOEPP:

Q.    Do you know that for sure?

A.    I do not know for sure, no.

Q.    Do you know if the company policies in place at Sterling Sugars, LLC, are the same as those in place at South Central?

A.    I'm not certain about that.

Q.    Have you ever compared the policies?

other one is Arthur Marcotte.

Q.    How do you spell Mr. Marcotte's last name?

A.    M-A-R-C-O-T-T-E, I believe.  And also in the purchasing department is Jonah Cerna and Sarah Martin.

Q.    And I just want to ask just a couple of questions about what type of work different people -- I already know what Mr. -- well, what does Mr. Patout do?  What is he responsible for?

A.    Is that Mr. Roddy Patout?

Q.    Sorry, yes.  Thank you again for clarifying.  Mr. Roddy Patout, who you mentioned was one of the people you supervise.  What are his job duties?

A.    Well, he assists with the sugar loading and molasses loading, grounds maintenance, wastewater pond maintenance, things of that nature.

Q.    And what about Mr. Abraham?  What is his job?

A.    He is actually a CDL truck driver that hauls sugar from warehouse to warehouse for us and also assists in loading duties with molasses and sugar and grounds maintenance as well.

Everyone that I've mentioned -- can I

elaborate here?  Everyone that I've mentioned that I supervise, Jonah Cerna and Sarah Martin work in the purchasing department for me.  Jonah Cerna is my warehouse clerk.  Sarah Martin is the secretary clerk, purchasing assistant.  All the other gentlemen that I've mentioned are involved in the same duties as Mr. Abraham and Mr. Roddy Patout is assisting in loading of sugar, molasses, and grounds maintenance.

Q.    Is Mr. Abraham the only CDL truck driver in that group that you mentioned?

A.    No.  Arthur Marcotte is a CDL truck driver as well.

Q.    Does he do CDL truck driving work for Sterling Sugars?

A.    He hauls sugar for us, yes.

Q.    From farms or?

A.    No.

Q.    So Mr. Abraham and Mr. Marcotte haul sugar cane between warehouses; is that right?

A.    Not sugar cane.

Q.    I'm sorry?

A.    Not sugar cane, no.

Q.    They haul sugar?

A.    The sugar that we produce -- we do not

have conveyors that go to all of the warehouses.  So it has to be hauled from one warehouse to the next on the company property.

Q.    They're not going out on the public roads, is that what you're saying?

A.    They do have to access a short public road to get from one warehouse, yes, but it's only about a quarter of a mile.

Q.    And they're hauling processed sugar cane, right?

A.    No, they're hauling processed sugar.

Q.    Sorry, yes.  They're hauling processed sugar that has been run through the mill; is that right?

A.    That's correct.  The commodity that we do not need H-2A drivers for.

Q.    Got it.

Do you know if Mr. Abraham and Mr. Marcotte are paid overtime pay whenever they do that hauling work?

A.    Yes.

Q.    Are they paid overtime?

A.    Yes.

Q.    All of these individuals that you mentioned, they all are employed by Sterling Sugars

the office.  The office is closed, but I can hear the phone ringing down the hallway.  If you allow me to close my door, maybe I can stop that.

Q.    Okay, sir.

A.    Okay.  Is that better?

Q.    Yeah, that sounds better.  Thank you.

My understanding is that there are some bus drivers employed by Sterling Sugars who take the H-2A workers to and from their housing to where the trucks are located; is that right?

A.    Yes.

Q.    Do you have any responsibility for supervising those bus drivers?

A.    No.

Q.    Do you know who does?

A.    That would be Mr. Jamie Robinson.

Q.    Are you an hourly employee at Sterling Sugars or a salaried employee?

A.    I'm salaried.

Q.    And what's your annual salary?

A.    It's about $130,000.

Q.    And do you get a bonus on top of that?

A.    That would be including bonuses.

Q.    I see.  Your base salary is a little bit lower?

A.    No.

Q.    Other types of any other job duties as office manager that you can think of that we haven't discussed already?

A.    Not that I can think of, no.

MR. KNOEPP:

Let's take a break.  Off the record for a second.

(Recess taken.)

BY MR. KNOEPP:

Q.    All right, Mr. Soileau, we're back from lunch break.  You understand you're still under oath?

A.    Yes, sir.

Q.    I wanted to talk about the hauling work that happens from the farms to the sugar mill.  Okay?  That work is done using tractor-trailer trucks; is that right?

A.    Yes.

Q.    And has that been the case for each of the last four years?

A.    Yes.

Q.    And those are, like, semi-trucks, 18-wheelers; is that right?

A.    Yes.

Q.    And they have attached to them a trailer, correct?

A.    That's correct.

Q.    And that's where the sugarcane is put into the trailer?

A.    Yes.

Q.    Do you know approximately how many pounds a full load, the tractor-trailer and the sugar cane, weighs?

A.    Yes.

Q.    How much?

A.    It's 90 to 100,000 pounds.

Q.    And I believe we talked earlier that the tractor-trailers that are used to haul the sugar cane to the Sterling Sugars mill are, some of them are owned by Sterling Sugars, LLC, correct?

A.    Yes.

Q.    And some of those are owned by Danny West Trucking, correct?

A.    Yes.

Q.    What about the trailers that are used with those trucks?  Do you know who owns the trailers?

A.    Trailers are owned by Sterling Sugars, LLC.

Q.    Are those leased to South Central?

A.    Yes.

Q.    So I understand that some of these questions may be very basic, but just want to make sure we get it on the record.  Are you familiar with what happens out in the field when a truck driver goes to pick up a load of sugar cane?

A.    Yes.

Q.    The truck driver arrives at the field and the sugar cane is loaded into the back of the truck in the trailer; is that right?

A.    Yes.

Q.    And how is that done?

A.    The sugar cane comes out of the field by tractor and trailer, which are receiving that cane from a combine harvester.  He cuts that cane and puts it in that wagon that the tractor is hauling.  That tractor then hauls it to what we call the loading site, which is where the trucks and trailers are located.  And that trailer that the tractor is hauling is what we call a high-dump wagon.  It hydraulically lifts up and pours that cane into the trailer.

Q.    And -- go ahead.

A.    And while that's being done, the driver

will assist in that loading because he needs to make sure that that cane is going into the proper location in the trailer.

Q.    Who is operating the harvester that's harvesting the sugar cane?

A.    An H-2A worker.

Q.    Not the guy who's hauling the sugar cane back to the mill.  It's a different person, right?

A.    Yes.

Q.    But there are H-2A workers employed by South Central who operate the harvesters at some of the farm locations; is that right?

A.    That is correct.

Q.    And then who operates the -- I believe you referred to it as the high-dump wagon.  Maybe I used the wrong term.

A.    No, that's correct.  That's H-2A workers as well.

Q.    And again, those are different H-2A workers than the H-2A workers who are driving the sugar cane from the field to the sugar mill, right?

A.    Well, they're all under the H-2A application.  It's different job orders.

Q.    Different people, right?

A.    Correct.  Yes.

Q.    For example, if you have an H-2A truck driver who is driving the 90 to 100,000-pound truck to and from the farm, he's not getting out of that truck and getting into the dump wagon and operating the dump wagon, right?

A.    Correct.

Q.    Somebody else is doing that part of the job, correct?

A.    That's correct.

Q.    But as you say, they're all H-2A workers who are coming to the United States from another country, yes?

A.    Yes.

Q.    So, once the person who is driving the truck that hauls the sugar cane from the field to the mill is completely loaded up at the field, what does he do?

A.    He proceeds back to the factory.

Q.    And by the factory, you're talking about the Sterling Sugars mill?

A.    Sterling Sugar mill, yes.

Q.    Operated by Sterling Sugars, LLC?

A.    That's correct.

Q.    And he's doing that driving on public highways?

A.    Yes.

Q.    And when he gets to the factory, what does he do when he arrives at the factory?

A.    Well, there's a couple different options he can do.  The dispatchers, as I mentioned, they are watching these trucks on the computer by GPS and they can see when the truck arrives to Sterling Sugars.  If they need to send it directly to the factory to get unloaded, they'll send it through there, through the scale house.  If that particular section has traffic there, has more vehicles there, then they'll ask that truck driver to proceed to the parking lot.  And there, we have empty trailers. And what the driver will do, he'll go into the parking lot, he will disconnect that loaded trailer and he will obtain an empty trailer and proceed.

Q.    And the parking lot where somebody might disconnect their trailer and get an empty trailer, is that the same parking lot where the truck driver started his day?

A.    It is.

Q.    So, as I understand, the H-2A truck drivers live in a location that's off-site from where the factory is; is that right?

A.    Yes.

TIM SOILEAU                                             JOB NO. 2425459
FEBRUARY 17, 2026

Q.    And we talked before, there's some bus drivers who operate buses that take them back and forth between their housing and where the sugar factory is, correct?

MS. McDIARMID:

Object to the form.

THE WITNESS:

Correct.

BY MR. KNOEPP:

Q.    And where do the truck drivers who are in charge of hauling the cane, where do they start their day of work?

A.    At the parking lot.

Q.    That's where the trucks are parked overnight?

A.    Yes.

Q.    And the parking lot is located on the Sterling Sugars, LLC, mill location?

A.    Yes.

Q.    And do the workers arrive at the -- they get dropped off by the bus at the parking lot?

A.    Yes.

Q.    Is there a time clock there where they have to clock in for the day when they arrive?

A.    Yes.

Q.    Where is the time clock located?

A.    At the mechanic shop right next to the parking lot.

Q.    And do you know what kind of time clock it is?

A.    They've been recently updated.  They are now face recognition.

Q.    How long ago did that happen?

A.    It just happened this past year.

Q.    And before that, was it a hand recognition system?

A.    That's correct.

Q.    And how long ago had the hand recognition system been in place?

A.    That was in place when I got here.

Q.    In 2001?

A.    Yes.

Q.    Now, is this time clock a Sterling Sugars, LLC, time clock?

A.    It's owned by Sterling Sugars, LLC, yes.

Q.    And you say the mechanic shop, is that inside of a building at the property?

A.    Yes.

Q.    I guess you said that the hand recognition system was in place before you arrived;

A.    Yes.

Q.    Do the trucks already have trailers attached to them at that point in the morning?

A.    Most of them do, yes.  Some of them may or may not.

Q.    And the truck schedule that tells people what truck they're supposed to use also tells them the farmer that they're supposed to go to to pick up the first load of sugar cane; is that right?

MS. McDIARMID:

        Object to the form.

THE WITNESS:

        Yes.

BY MR. KNOEPP:

Q.    Approximately, how many truck drivers are there each season who haul the sugar cane using these tractor-trailer trucks?

A.    Each season may vary a little bit, but it's approximately 140.

Q.    And are there sufficient number of trucks for everybody?  Are there more trucks than 140?  Less trucks?  How does the truck number compare to the number of truck drivers?

A.    We have spare vehicles for Sterling Sugars.  The Sterling Sugars trucks that are owned

with Danny West?  Are you involved in those at all?

A.    No.

Q.    Do you know who is?

A.    No, I'm not sure.

Q.    How many of the trailers are on hand each season in comparison to the number of truck drivers we were talking about, 140 truck drivers approximately, more trucks than that, how many trailers do you have on hand?

A.    There's 200 plus trailers on hand every day.

Q.    And those trailers, I believe you said before, those are owned by Sterling Sugars, LLC, right?

A.    Yes.

Q.    And are you sometimes involved in the purchasing of new trailers?

A.    Yes.

Q.    Do the trailers need to be a special type of trailer that's compatible with any of the mill equipment?

A.    The trailer has to be compatible with the truck that's pulling it, yes.

Q.    So it needs to be something that fits the tractor-trailer truck that's pulling it behind,

right?

    A.    Yes.

    Q.    What about when the trailer arrives at the factory to be unloaded?  Is there any kind of requirement with respect to the trailer as it relates to the equipment that's used to unload it at the factory?

    A.    No, it's pretty simple.

    Q.    Is it sort of standard size equipment that you could use at any factory or something?

    A.    There's no extra equipment needed to hook or unhook a trailer from a truck.

    Q.    My understanding is that you said sometimes that people will go directly to the scale at the scale house.  Whenever people go to the scale house as opposed to the parking lot, what happens at the scale house?

    A.    He arrives to the scale, he is weighed. Sometimes the cane is sampled from that trailer. After he's weighed, he proceeds to the unloading station.

    Q.    And what happens at the unloading station?

    A.    He moves into position and the trailers are unloaded.  When he's empty, he simply returns to

the outbound scale, which is the same scale, it's just inbound and outbound.  He returns to the outbound scale, then he's weighed empty and he proceeds.

Q.    Is the sugar cane unloaded from the trailer using some sort of mechanical system?

A.    It's what we call a stiff leg.  It's a crane-type system, cables and pulleys.

Q.    And that unloads the cane from the trailer; is that right?

A.    The trailers are two compartments.  Each compartment has what we call a manifold which, when it gets to the stiff leg that I mentioned, there's a grab hook that hooks into that manifold, raises it and dumps it over a wall -- an iron wall into what we call the cane yard.

Q.    And once that's done, then the trailer disengages from that equipment and the driver can proceed to be weighed empty, correct?

A.    Yes.

Q.    And then what does that driver do next?  Does he go back to the farm to repeat the process?

A.    If need be, yes.

Q.    When you say if need be, it could be that he might not be needed for the rest of the day?

A.    That's correct.

Q.    At some point, he's going to make his last load for the day, right?

A.    Sure.

Q.    And how does the truck driver know what to do after he either dumps his load at the scale house or disconnects his trailer at the parking lot?

A.    He gets his instruction from the dispatch.

Q.    And does that happen over the radio system that we talked about before?

A.    Yes.

Q.    Do you monitor that to see -- during the course of the day?

A.    I don't monitor it.  I'm aware it's happening, but I don't monitor it, no.

Q.    And how does the dispatcher know -- well, let me ask you this.  What are the different things that could happen at that point after the truck driver finishes dumping the load at the factory?

A.    He either dispatches from the factory again for another load, or he parks his empty truck and trailer in the parking lot, proceeds to the time clock, punches out, and the bus will take him back to his quarters.

Q.    And if he gets dispatched for another load, that could be to a new farm; is that right?

A.    That's right, yes.

Q.    He could go back to the same farm he just came from as well, correct?

A.    Yes.

Q.    And he would find out that information from the dispatchers?

A.    Yes.

Q.    The truck drivers who do the hauling work from the farms to the sugar factory are all people with H-2A visas, correct?

A.    From South Central, yes.

Q.    And did they all come from Mexico?

A.    To my knowledge, yes.

Q.    During the time that you've worked at Sterling Sugars, have there been truck drivers that weren't from Mexico who did the hauling work?

A.    Yes.

Q.    At one point in time, there were some truck drivers from Puerto Rico, right?

A.    Yes.

Q.    Were there also some local workers who did that hauling work?

A.    Yes.

Q.    When the Puerto Rican workers did the hauling work, do you know if they were paid overtime?

A.    Yes.

Q.    Were they paid overtime?

A.    To my knowledge, yes.

Q.    And what about the local workers?  When the local workers did the hauling work, were they paid overtime?

A.    Yes.

Q.    How long ago was it that the Puerto Rican workers did the hauling work?

A.    Prior to 2018.

Q.    In 2017, were there some Puerto Rican workers who did the truck driving work?

A.    Yes.

Q.    Do you know what hourly wages those workers were paid at that time?

A.    I can't recall that.

Q.    And in 2017, were the truck drivers employed by Sterling Sugars, LLC?

A.    Repeat the question, please.  I'm sorry.

Q.    Sure, sorry.

      In 2017, the Puerto Rican truck drivers we were talking about, were they employed by

Sterling Sugars, LLC?

A.    Yes.

Q.    They weren't employed by South Central,
for example, were they?

A.    Not in 2017, no.

Q.    Did the truck drivers who were doing that
hauling work in 2017, were they using the same
trucks that are still being used today?

A.    Some of them -- some were, yeah.

Q.    They were using the same hand scanner to
clock in at that time?

A.    Yes.

Q.    And did you supervise the work of those
truck drivers at that time?

A.    Yes.

Q.    Did they stay in the same housing that's
currently being used for the South Central H-2A
workers?

MS. McDIARMID:

Are you talking about in 2017 or a
longer range than that?

MR. KNOEPP:

Yeah, I'm still talking about the
2017.

BY MR. KNOEPP:

overtime since that time?

MS. McDIARMID:

Object to the form.

THE WITNESS:

I think they were not paid overtime.

BY MR. KNOEPP:

Q.    The truck drivers that hauled the sugar cane in this past season, do you know if they were paid overtime?

A.    They were not.

Q.    And what about in 2024?  Do you know if the truck drivers were paid overtime?

A.    I need some clarification here.  They were paid for overtime hours that they worked.  Are we talking about an overtime rate?

Q.    Yes, sir.  I was specifically referring to an overtime rate.  Were they paid an overtime rate when they worked overtime hours?

A.    No.

Q.    Is that true for the 2022 and 2023 seasons as well, that the truck drivers were not paid overtime rates when they worked overtime hours?

A.    That's correct.

Q.    Do you know why the truck drivers have not been paid overtime when they work overtime

Q.    During the course of a day, a truck driver hauling sugar cane could be told to go to multiple farms in order to pick up that sugar cane; is that right?

A.    Yes.

Q.    What about during the course of a season? Would a truck driver hauling sugar cane expect to go to multiple farms during the course of a season to pick up sugar cane?

A.    I can't say what a truck driver is going to expect.

Q.    But it does happen that truck drivers get assigned to go to multiple farms to pick up sugar cane; is that right?

A.    It does happen, yes.

Q.    Do you have any involvement in the information that appears here on page six of Exhibit 3, that has the driver's name and the farmer?

A.    I do not.

Q.    Okay.  Do you understand what the information is?

A.    I do.

Q.    On the first line here that we're looking at, which again is page 6 of Exhibit 3, it has a document identification number of 7093.  The first

entry says the farmer is Accardo.  Do you see that?

A.    Yes.

Q.    And do you know what the 5:30 AM in the next column means?

A.    Yes.

Q.    What does that mean?

A.    That's the time he's going to leave the factory.

Q.    That's the time that he needs to be at the factory to pick up his truck, or he needs to be there earlier because he needs to leave at 5:30?

A.    We like them -- Association likes them to report about a half an hour before that leave time to make sure everything's okay with their truck before they leave for that cane.

Q.    And so these schedules are prepared by Mr. Robinson the day before, right?

A.    That's correct.

Q.    And they get posted at the employee housing?

A.    Yes.

Q.    And so if somebody sees that their leave time is 5:30 AM, they would understand that they need to be at the truck yard by 5:00 AM in order to check their truck; is that right?

A.    Yes.

Q.    And so the 5:30 AM that appears on this document is the time that they should be leaving, driving in their truck away from the sugar factory; is that right?

A.    Yes.

Q.    If you look at their time clock, they presumably would have clocked in before 5:30 AM; is that right?

A.    Yes.

Q.    And the first line here has a number on here.  It says number 5181 next to the driver's name.  Do you see that?

A.    Yes.

Q.    Do you know what that is?

A.    That is his employee identification number.

Q.    Is that something that's issued by South Central?

A.    It is.

Q.    It's the same number -- if this employee was previously employed by Sterling Sugar Sales Corporation, it's actually the same number that he had at Sterling Sugar Sales Corporation; isn't it?

MS. McDIARMID:

the truck drivers in that Erath group are going to several different farms to pick up the sugar cane from that group; is that right?

A.    Not necessarily.  In the groups, they haul from a specific grower in that group.  The only way they'll haul from a multiple grower in that group is if they finish on one farm in the middle of the day and have to switch farms from that day.  They don't go to multiple farmers in the groups every day.

Q.    Do you understand or do you have any knowledge as to how the drivers are assigned to the different farmers on the truck schedule?

A.    No, I don't have any knowledge of that.

Q.    That's not something that you do?

A.    No, it is not.

MR. KNOEPP:

Why don't we go off the record and take a break for a minute.

(Recess taken.)

BY MR. KNOEPP:

Q.    Mr. Soileau, you were talking -- I was asking before about the buses that take the H-2A workers from their housing to where the trucks are located in the morning.  Do you remember us talking

about that?

A.    Yes.

Q.    The bus drivers who drive those buses, those are employees of Sterling Sugars, LLC?

A.    Yes.

Q.    And I think one's name is Dean; is that right?

A.    Yes.

Q.    There's somebody named William; is that right?

A.    Yes.

Q.    I think William Robinson?

A.    I think that's correct, yes.

Q.    And a Greg Merriman; is that right?

A.    Yes.

Q.    Do you know if those individuals who drive the buses are paid any overtime wage rates if they work more than 40 hours in a week?

A.    If they work for Sterling Sugars, LLC, I presume they do.

Q.    And why do you say that?

A.    Because they work for Sterling Sugars, LLC.  I would -- I would assume they get overtime pay.

Q.    I asked you before whether anybody had

ever asked for your opinion about whether the H-2A truck drivers who do the sugar cane hauling should get overtime pay.  And you said nobody ever asked you for your opinion about that, right?

A.    Not that I can recall, no.

Q.    Okay.  Well, I'm going to ask.  Do you have an opinion about that?

A.    No, I don't.

MS. McDIARMID:

You mean just like generally in life, or can you be more specific?

MR. KNOEPP:

I mean, I just wanted to know whether Mr. Soileau has an opinion about whether the truck drivers who haul the sugar cane should get overtime pay.

MS. McDIARMID:

Object to the form.

BY MR. KNOEPP:

Q.    You don't have any opinion about that?

A.    I do not.

Q.    You would agree with me that the truck drivers work long hours on a weekly basis, right?

A.    They work -- I'll ask you, if you want to call it long hours, yes.  They work on average

probably 10 to 12 hours a day.

Q.    And they work seven days a week; is that right?

A.    Yes.

Q.    And there are no days off for the truck drivers during the hauling season; is that right?

A.    Not unless they request one.

Q.    If they request a day off, who do they request that of?

A.    They go through the dispatchers.

Q.    And do the dispatchers then need to let somebody know that the workers requested a day off?

A.    They may -- yeah, they have to let someone know that they're requesting this day off. In fact, Mr. Jamie Robinson would be the one to receive that information so he could -- so he could know whether to put them on that day's list or not.

Q.    Right.

Mr. Robinson needs to know who's available to do the hauling work before he creates the schedule for the next day.  Is that fair to say?

A.    It's fair to say, yes.  There's some days that that doesn't get reported.  The drivers sometimes don't report that until the day of -- the, the day of the work day, which he may feel ill and

have to, have to leave that day's work.  It doesn't necessarily have to be done the day before for Mr. Robinson to provide that list.

Q.    And then -- but ideally, Mr. Robinson would get that information in advance so he can adjust the schedule if necessary?

A.    That is correct.

Q.    Why does Sterling Sugars employ bus drivers to take the H-2A truck drivers to and from their housing?

MS. McDIARMID:

Object to the form.

THE WITNESS:

Otherwise they'd have to walk.

BY MR. KNOEPP:

Q.    How far is it from the housing to where the trucks are parked?

A.    I'd say a good quarter of a mile.

Q.    Is there no place for them to park the trucks where the housing is?

A.    No, no, no, there's no space for that there, no.

Q.    How big is the parking lot where the trucks are parked?

A.    You could probably place two to three

football fields there.

Q.    Okay.  And all the trucks, there's more than maybe 150 trucks parked there?

A.    Yes.

Q.    Plus a couple hundred trailers as well?

A.    Yes.

Q.    So not something that could fit where the housing is?

A.    No, sir.

Q.    The quota sheets -- sorry, the buses that take the workers to and from the housing, do you know who owns those buses?

A.    Sterling Sugar, LLC.

Q.    The bus drivers who drive the buses, do they also clock in at that same time clock that the -- at the mechanic shop that we talked about earlier?

A.    Yes.

Q.    The Exhibit 3 that we were looking at earlier that was the quota sheet and the truck schedules.  I can pull that up again.  These are created for every season; is that right?

A.    Yes.

Q.    And are there -- we were provided the list for 2024 and 2025.  Would there be similar

Q.    Do you know if she issues checks to the farmers for the sugar cane that's received at the mill?

MS. McDIARMID:

Object to the form.

THE WITNESS:

She prints those checks, yeah.

BY MR. KNOEPP:

Q.    Sometimes when the truck drivers who are hauling the cane come back to the sugar mill, do they need to refuel their trucks?

A.    Yes.

Q.    Do they do that there at the sugar mill property?

A.    Yes.

Q.    Are there pumps there that contain diesel fuel for over-the-road trucks?

A.    We have -- we have three diesel stations.

Q.    And are those diesel stations owned by Sterling Sugars?

A.    Yes.

Q.    Those are the ones that are outside of your office, right?

A.    That's correct.

Q.    Is there a card lock system that the

truck drivers need to use to operate those pumps?

A.    Yes.

Q.    And how long has that card lock system been in place?

A.    Ever since the fuel pumps were installed there.  That goes from probably 2017, prior -- maybe even prior to 2017.

Q.    Did you, in your role as the purchasing agent, purchase the pumps?

A.    Yeah.  That came through purchasing, yes.

Q.    And did you purchase those -- strike that.

Did Sterling Sugars, LLC, purchase those pumps?

A.    Yes.

Q.    And did Sterling Sugars, LLC, pay to have those pumps installed on the property?

A.    Yes.

Q.    Was that all something that you coordinated through your role as the purchasing agent?

A.    Yes.

Q.    And what about the card lock system?  Was that something that's been in place since the pumps were installed in 2017?

A.    Yes.

Q.    Is that something that came with the package of purchasing the pumps?  It also came with the card lock system as part of that?

A.    Yes.

Q.    How does the card lock system work to operate the pumps?  Well, and just maybe to guide our discussion, does each individual truck driver, for example, have a card that they use assigned to them to operate the pump?  Is that how it works?

A.    The diesel fuel cards are issued to the truck, not to the driver.  It's a specific truck number on that card.  It doesn't leave the truck. The driver may go to another truck, but the card remains.  There's a card in each truck assigned to that truck.  The fuel -- the fuel that is purchased through the association is in those diesel pumps.

Q.    And so the card lock that's -- the card that's in the truck, the driver would take that and put it into the pump in order to activate the pump; is that right?

A.    That's correct.  There's two pumps at each station.

Q.    Okay.  And is there a reason why that gets tracked?

to John Dees at Great Labor, what the requirements are -- what the needs are -- what the farmers' needs are.

Q.    Do you know if Mr. Gonsoulin was involved in setting the rules for the driving of the trucks?

A.    I don't know for certain if he was involved, no.

Q.    You do believe you have some e-mails from Mr. Gonsoulin related to the truck drivers who would be coming on H-2A visas for particular seasons; is that right?

A.    That's correct.

Q.    Mr. Gonsoulin is also -- he also e-mails you invoices received from Great Labor; is that right?

A.    That is correct.

Q.    And do you know why he would send you invoices related to Great Labor's work?

A.    Yes.  Sterling Sugars pays those through the association on behalf of South Central Sugar Cane Growers.

Q.    I'm going to show you what -- and, I guess, you would have some e-mails in your e-mail inbox or other folders from Mr. Gonsoulin about the invoices?

Q.    And again, if I understood what you said before, Mr. Gonsoulin is sending this to the employees at Sterling Sugars, LLC, listed here so that this invoice could be paid by Sterling Sugars on behalf of South Central?

MS. McDIARMID:

Object to the form.

THE WITNESS:

It's paid by South Central.

BY MR. KNOEPP:

Q.    And the Sterling Sugars, LLC, employees have access to the South Central accounts in order to pay these invoices for them?

A.    Yes.

Q.    Mr. Gonsoulin isn't -- he's not directly asking somebody to pay this bill, but is that your understanding when he forwards an e-mail like this that he's sending it to be paid?

A.    That is correct.

Q.    Mr. Gonsoulin doesn't handle the payment of these bills himself; is that right?

A.    He does not.

Q.    He's relying on the Sterling Sugars accounts payable department to do that?

MS. McDIARMID:

                    Object to the form.

            THE WITNESS:

                    Yes.

BY MR. KNOEPP:

    Q.    I'm sorry.  I just took that exhibit down.  But that e-mail was also sent to Kimberly Broussard, and you mentioned her before.  Is Ms. Broussard still working at Sterling Sugars, LLC?

    A.    No.

    Q.    Do you know how long ago she left her employment at Sterling Sugars?

    A.    I think it was -- it was either late 2023 or early 2024.  I'm not certain.

    Q.    And do you know where she's working now?

    A.    I do not.

    Q.    Do you know where she lives?

    A.    I do not.

    Q.    Do you know if she left Sterling Sugars on good terms?

    A.    I can't answer to that.

    Q.    Okay.  Do you have any involvement in the process by which South Central applies for H-2A visa workers?

    A.    I'm not sure I understand that question.  Can you repeat it, please?

A.    I can't recall reading where it stated that this was agricultural work.  It's an agricultural visa that's issued for agricultural work.  I know that.

Q.    Do you have any input into whether the applications that are being submitted are H-2A applications or H-2B applications?

A.    No, I have no dealings with that.

Q.    Do you know what an H-2B visa is?

A.    I do.

Q.    Does Sterling Sugars, LLC, employ some H-2B workers in the sugar factory?

A.    Yes.

Q.    What kind of work do the H-2B workers in the sugar factory do?

A.    Some are pump mechanics, turbine mechanics.  Some are process, what we call process, which is the actual processing of the cane.  Those types of work.

Q.    Do you have any involvement in assisting with the applications for those H-2B visas?

A.    None whatsoever.

Q.    Do you know who does that at Sterling Sugars?

A.    Desiree Lange is involved with that and

so is the chief engineer, Jason Burke.

Q.    Do you know if the H-2B workers who are employed at Sterling Sugars, LLC, receive overtime pay?

A.    Well, yeah, I think I'm aware that they do receive overtime pay.

MR. KNOEPP:

We've been going for about an hour. Let's go ahead and take another break if that's okay with everybody.

THE WITNESS:

Sure.

(Recess taken.)

BY MR. KNOEPP:

Q.    Okay.  Let's go back on the record, Mr. Soileau.

The trucks that are used to haul the sugar cane from the fields to the sugar factory are equipped with cameras; is that right?

A.    Dash cameras, yes.

Q.    Were you involved in any purchasing of the dash cameras in your role as the purchasing agent?

A.    Yes.

Q.    Do you know when the dash cameras were

of memory?

A.    It's a looping system.

Q.    So it just overrides after a certain number of days?

A.    Correct.  And it's capable of when an accident occurs, it's an emergency recording that kicks in.

Q.    Is it not recording all the time?  I mean, only all the time?

A.    All the time.

Q.    Okay.  I see.

Do the drivers have to do anything to turn it on or off in the morning or at the end of their shift?

A.    No, they do not.  They do not touch the cameras, adjust the cameras whatsoever.  If there's a problem with the camera, it's reported to dispatch and they are to stop.  Do not continue unless someone goes and checks that camera to see why it's not working.  If it can't be fixed, a lot of times it's just a reformat of that SD card.  Sometimes there's so much vibration in these trucks that it's just a simple cord that has come loose, vibration loose, whatever.  But if it can't be fixed, then it's replaced.  But these trucks are not supposed to

move unless those cameras are operating.

Q.    And is that something that's communicated to the truck drivers, that they, if they have a problem with their camera, they should wait until somebody comes to fix it?

A.    Yes.

Q.    And so they would notify dispatch of that if they had a problem with their camera, right?

A.    Yes.

Q.    And then what is dispatch -- what is dispatch supposed to do with that information?  Who do they get in contact with to say there's a problem with truck Number 15's camera?

A.    They can either contact Roddy Patout, Jamie Robinson, or Tim Soileau.

Q.    So they would contact one of the three of you to let you know there's a problem with a particular truck driver's camera that needs to be addressed?

A.    Yes.

Q.    And then what steps do you or Mr. Roddy Patout or Mr. Robinson take to address the camera issues?

A.    It depends on where the truck is located at the time.  If it's at the farm, then dispatch

one of the reasons why you have a spare in your

office there, I take it, right?

A.    Myself, Mr. Robinson, and Roddy Patout

have spares in our trucks -- in our company trucks.

We have spare parts in our company trucks.

Q.    For the cameras?

A.    Yes.

Q.    Okay.  And so, I guess, it sounds like

it's an important thing that you emphasize with

everybody, that you want to have the camera footage

uninterrupted.  If there's any issues with it, you

need to be notified immediately so it can be fixed?

A.    It is the one -- it is probably the most

vital piece of information we can give them.

Q.    The cameras would also capture any

instances in which a truck driver has an accident in

their truck.  Is that fair to say?

A.    Yes.

Q.    Have there been any -- in the last four

years, have there been any accidents involving truck

drivers who are hauling sugar cane?

A.    Yes.

Q.    When that happens, do you get notified

about the accident?

A.    Yes.

Q.    And what do you do if there's an accident, you personally?

A.    First thing I do is call the insurance adjuster.

Q.    And who's that?

A.    The current one that I deal with, his name is Paul Restner.

Q.    How's the— what's the last name?  How's it spelled?

A.    R-E-S-T-N-E-R.

Q.    And why do you call the insurance adjuster?

A.    It is vital that they get to that scene of that accident as soon as possible to gather any information they can about that accident.  And if they -- it's whoever gets there first, if it's me or if it's the adjuster, that's what I do.

Q.    In addition to contacting the adjuster, do you also get in your truck and go to the scene?

A.    Yes.

Q.    And what do you do whenever you get to the scene?

A.    I start gathering information.  If our truck -- if South Central's truck, it must -- It must remain there until I get there or until the

adjuster gets there.  It's not an option because this day and time, the other parties involved a lot of times do not stay.  They leave the scene.  It's happened more and more now.  So the dispatchers instruct our drivers to take pictures immediately of whatever they can and relay that information to the dispatchers.  They relay that information to me.  I relay that information to the adjuster as soon as possible.

Q.    And do you contact anybody else other than the adjuster?

A.    I can't -- most of the time I'll contact Sandor Garcia.

Q.    That's the person who works at the M.A. Patout?

A.    That's correct.

Q.    And why do you contact Sandor?

A.    So someone else in management will know what's going on.  And Sandor is kind of the point man between us -- between Sterling Sugars, LLC's employees, and the insurance company as well.

Q.    And do you talk to the driver when you get to the scene?

A.    I can't speak to the driver because I do know some Spanish, but unfortunately, I can -- I can

have any input into the amounts that appear on any
promissory notes between South Central and Sterling
Sugars, LLC?

A.    No.

Q.    Do you know who would?

A.    No.

Q.    It's not something that runs through the
purchasing department?

A.    No, it is not.

MR. KNOEPP:

Let's take another quick break while
I check my notes.

(Recess taken.)

BY MR. KNOEPP:

Q.    Mr. Soileau, in your role as a purchasing
agent, do you check the bank balances for South
Central before making purchases on behalf of South
Central?

A.    No.

Q.    Do you have access to the bank accounts
of South Central to do that?

A.    No.

Q.    Do you check with anybody before making
purchases on behalf of South Central?

A.    It would have to be an extremely large

purchase.  A dollar amount that I wouldn't feel comfortable with ordering on my without someone else knowing.

Q.    And who would you get in contact with if that was the case?

A.    Probably Ms. Desiree Lange and Rivers Patout as well.

Q.    How do you know if South Central has enough money to cover any purchases that you're making as part of your role in the purchasing department?

A.    I'm not obliged to know that information.

Q.    You just make the purchases and pass it on to accounts payable?

A.    Yes.

MR. KNOEPP:

I don't have any other questions. If Ms. McDiarmid does, then maybe I might have some follow-up.  But otherwise, thank you for your time today.

MS. McDIARMID:

I don't have any questions.

Tim, you have the opportunity to receive a copy of your deposition and to review it -- review the transcript to make