# EXCERPTS FROM 30(B)(6) DEPOSITION OF SOUTH CENTRAL SUGAR CANE GROWERS' ASSOCIATION, INC. BY AND THROUGH RICKY GONSOULIN

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

FELIPE DE JESUS AVILA-SOTO,    )
et al.,                        )    CASE NO.:  6:24-CV-01392
PLAINTIFF,                     )
                               )
VS.                            )
                               )
SOUTH CENTRAL SUGAR CANE       )
GROWERS' ASSOCIATION, INC.,    )
et al.                         )
DEFENDANTS.                    )
                               _

VOLUME I, PART I

REMOTE DEPOSITION OF RICKY GONSOULIN, 30(b)(6) witness of SOUTH

CENTRAL SUGAR CANE GROWERS' ASSOCIATION, INC., et al. taken

REMOTELY, commencing at 9:30 a.m. CST on Thursday, April 9th,

2026, before Wendy L. Figueroa, Certified Verbatim Reporter

#8847, in and for the State of New Jersey.

                        A P P E A R A N C E S

VIA ZOOM:

ON BEHALF OF THE PLAINTIFFS:

            JAMES M. KNOEPP, ESQUIRE
            DAWSON MORTON
            1612 Crestwood Drive
            Columbia, SC 29205
            828-379-3169
            jim@dawsonmorton.com


            DAWSON MORTON, ESQUIRE
            DAWSON MORTON
            1808 Sixth Street
            Berkeley, California  94710
            404-590-1295
            dawson@dawsonmorton.com


ON BEHALF OF THE DEFENDANTS:

            BRANDON DAVIS, ESQUIRE
            ANDREW ALBRITTON, ESQUIRE
            MOLLY MCDIARMID, ESQUIRE
            PHELPS
            365 Canal Street, Suite 2000
            New Orleans, Louisiana 70130
            504-584-9312
            brandon.davis@phelps.com
            molly.mcdiarmid@phelps.com
            Andrew.albritton@phelps.com




ALSO PRESENT:  SASHA BROOKS, COURT REPORTER

A    No.  Sterling Sugar was hauling my crop to the mill prior to the association.

Q    And so Gonsoulin Farms when -- during that time didn't have any equipment that it was using to haul any sugarcane to the sugar mill, right?

A    No, it did not.

Q    And then after South Central was formed, Gonsoulin Farms didn't have any equipment that it was using to haul its sugarcane to the sugar mill; is that right?

A    No, it did not.

Q    And so whether there was an association formed or not, the amount of equipment being used by Gonsoulin Farms to get its sugarcane to the sugar mill was the same; is that right?

A    No, it was not.  We reduced the number of equipment after the association was formed, because it was done more efficiently.

Q    And I understand you're saying related to the association, I'm talking about Gonsoulin Farms, a member of the association, used the same amount of equipment that it used before which was zero; is that fair to say?

        MR. DAVIS:  Objection, exceeds scope and foundation.

A    Yes, still zero.

BY MR. KNOEPP:

Q    What was the work that South Central was formed to engage in starting in 2022?

A    South Central was engaged to haul perishable sugarcane properly for a farmer-owned association to the designated processing facility efficiently as possible.

Q    And that processing facility was Sterling Sugars, right?

A    That would be correct.

Q    Did anyone tell you that's what's South Central was going to do whenever it was formed in 2020 -- in 2022?

A    Yes.  That was the mission statement that the growers agreed to form an association for.

Q    Who came up with that mission statement?

A    The growers.

Q    Everybody together?

A    Yes.

        MR. DAVIS:  Object to characterization.

BY MR. KNOEPP:

Q    All the growers together came up with the mission statement?

        MR. DAVIS:  Objection.

A    Yeah, all the growers in an effort together decided to form an association, that is correct.

BY MR. KNOEPP:

Q    And when was that mission statement of hauling sugarcane to the Sterling Sugars' mill when was that discussed?

        MR. DAVIS:  Objection, misstates testimony.  Mischaracterization.

formed.

BY MR. KNOEPP:

Q    But there had been some paperwork that was prepared before that meeting; is that fair to say?

A    Not -- no, it's not, that I recall.

          MR. DAVIS:  Objection, asked and answered.

BY MR. KNOEPP:

Q    Were you aware of any paperwork that was prepared to start the corporation?

A    Not that I recall.

Q    Were you involved in preparation of any paperwork to get the corporation started?

A    Not that I recall.

Q    Do you know who handled that on behalf of the corporation?

A    I do not recall.

Q    Do you know -- I may have misspoke when I say corporations, I just want to make sure it's clear.  Do you know who handled the preparation of the paperwork to start South Central?

A    I do not.

Q    You mentioned it was formed to engage in hauling of the sugarcane crop; is that right?

A    Correct.

Q    And was it formed to engage in any other activities?

          MR. DAVIS:  Objection.

A    No, not that I'm aware of.

BY MR. KNOEPP:

Q    Between 2022 and 2025, has South Central engaged in the hauling of the sugarcane crop of its members?

A    It has, yes.

Q    And has all of that sugarcane been hauled to the Sterling Sugars mill?

A    Yes, it has.

Q    Has -- between 2022 and 2025, has South Central engaged in any other activities other than the hauling of sugarcane?

A    Not that I'm aware of.

Q    South Central itself does not engage in any farming activities; is that right?

A    That would be correct.

Q    And that's true for all of the years between 2022 and 2025?

A    That would be correct.

Q    And South Central doesn't have any ownership interest in any of the member farms; is that right?

A    Absolutely correct.

Q    Has that been the case for all of the time between 2022 and 2025?

A    That would be correct.

Q    Talking about prior to the formation of South Central, your particular farm's sugarcane was hauled to the

A    That would be correct.

BY MR. KNOEPP:

Q    Do you know if the information you provided to Mr. Soileau had any impact with respect to the formation of South Central?

MR. DAVIS:  Objection foundation.  Scope.

A    I would assume any information collected would have an impact in the formation of an association.

BY MR. KNOEPP:

Q    Okay.  Do you know whether information about the dates that your H2A workers would be at your farm impacted how the association was formed?

A    I wouldn't think so.

Q    I'm going to show you what's been marked as Exhibit 31. Do you see that on your screen?

(WHEREUPON, the document was marked for identification as Exhibit No. 31 and is attached hereto.)

A    Yes, I do.

BY MR. KNOEPP:

Q    Do you -- so this is an e-mail string involving Randy Romero and others at M.A. Patout and that was forward by Rivers Patout to Tim Soileau and contains an attachment it's titled, 'Summary of Association Formation Documents and Agreement.  Do you see that?

A    I see it.

Q    Have you ever seen this document before?

A    I reviewed multiple documents, but I don't recall.

Q    I'm just scrolling through it.  And you can scroll through it as well at your leisure.  Does the document look familiar to you at all?

A    Not -- not that I am aware of.

Q    You're not on the e-mail chain, correct?

A    I did -- no, I'm not.  Not on this e-mail.

Q    The subject line of the e-mail is Association Key Point Guide.  Do you see that?

A    Yes.

Q    And do you know who Katie Ramagoes [phonetically pronounced] is?

A    Repeat that.

Q    Do you know who Katie Ramagoes [phonetically pronounced] or Ramagos is?

        MR. DAVIS:  Excuse me, counsel.  Mr. Gonsoulin, I believe that Jim is identifying Katie Ramagos.

        MR. KNOEPP:  Thank you, Brandon.  I'm mispronouncing her name, I'm sorry.

        MR. DAVIS:  Listen, I did not want to run the risk of that being mischaracterized as a speaking objection, but sometimes South Louisiana dialect matters.  It's Katie Ramagos, Mr. Gonsoulin.

        THE WITNESS:  She's a sugarcane grower in part of

Louisiana that deals with H2A laborer's like we all do.

BY MR. KNOEPP:

Q    Have you ever spoken with her?

A    I speak to her all the time at different events.

Q    And what have you spoken with her about?

A    General farming practices.

Q    Did you ever speak with her about setting up South Central?

A    I did not.

Q    Did you ever e-mail with her about setting up South Central?

A    Not that I recall.

Q    What about after the formation of South Central, do you remember speaking with her at all about how the association operates?

A    No, sir.

Q    Were you able to read the e-mail from Mr. Romero that he sent to others at M.A Patout and Sterling Sugars?

A    I haven't read it all in entirety; I glanced at it.

Q    He says, [as read:]  "All, attached is a summary of association formation documents and agreements.  Katie Ramagos has compiled from her involvement with the other mills that have set up Associations. I thought it would be a general guide for us moving forward.  Thanks, Randy."

        Do you see that?

A    Yes, sir.

Q    Does that e-mail refresh your recollection at all about anything related to the formation of South Central?

A    I'm almost certain that the fact gathering to form the association was being done that this is being part of the fact gathering method.

Q    The type of documents that would be needed to form the association?

        MR. DAVIS:  Objection.

A    I would assume that that was used as some of the guidelines.

BY MR. KNOEPP:

Q    When the association was formed, did people from South Central or from Sterling Sugars or M.A. Patout said to the members of the association some formation documents that they could use?

A    Yes, we -- there was some documents that circulated from the initial formation of the association.

Q    And do you know if those came from Sterling Sugars personnel or M.A. Patout personnel?

A    It was a group effort amongst the farmers, Sterling, and M.A. Patout that put the information together for the association.

Q    We were looking previously, at the e-mail from Mr. Soileau from Sterling Sugars, and which he was asking some of the

farmers for some information, right?

A    Correct.

Q    Was there any other fact gathering that was being done prior to the formation of South Central that was being done by either Sterling Sugars or M.A. Patout?

          MR. DAVIS:  Objection, foundation.  Exceeds scope.

A    Currently I'm sure there were other fact gathering methods, but I recall possibly, but I don't recall exactly which ones as it takes a lot of information to form the association from all its membership.

BY MR. KNOEPP:

Q    Looking at the document that Ms. Ramagos provided to the people at Sterling Sugars and M.A. Patout, you see the first -- excuse me, the first document she mentions here is articles of incorporation.  Do you see that?

A    Yes, sir.

Q    Did South Central have articles of incorporation when it was formed?

A    It did.

Q    And do you know if the -- the articles of incorporation that were used were provided by anybody at Sterling Sugars or M.A. Patout?

A    Like I said previously, it was a joint effort between farmers, M.A. Patout, and Sterling to come up with agreement that would fit the association.

JOB NO. 2592804

Q    I'm referring specifically to articles of incorporation, did the articles of incorporation was that a group effort between --

A    Yes.

Q    -- the members, Sterling Sugars, and M.A. Patout?

A    Yes.  We had to review all documentation before the association was formed.

Q    And what about the next item here is bylaws.  Do you see that?

A    I do.

Q    South Central did establish bylaws when it was formed in 2022; is that right?

A    Correct.

Q    Was the creation of the bylaws also a joint effort between the members of South Central, Sterling Sugars, and M.A. Patout?

A    As I recall, correct.

Q    Then the next item on the list is application for admission.  Do you see that?

A    Yes, sir.

Q    Did South Central have an application for admission for people to become members of the association?

A    As I recall.

Q    As you recall meaning, yes?

A    Yes.

Q    Okay.  Sorry, I just want to make sure it's clear on the

JOB NO. 2592804

record.  I understood that you were saying yes, but I want to make sure it's clear.

And was the application for admission document something that was prepared jointly between the members, Sterling Sugars, and M.A. Patout?

A    Yes, sir.

Q    I'm just going to scroll down to a couple other things. I'm not sure do you -- the assignment and assumption agreement. Do you know if South Central had an assignment and assumption agreement -- had a assignment and assumption agreement? [as spoken.]

A    I do not recall.

Q    The next item says a use of equipment agreement. Sterling -- or sorry, South Central does have some use of equipment agreement; is that correct?

A    We.

Q    And those are entered into -- with Sterling Sugars; is that right?

A    That would be correct.

Q    And the -- those agreements were they also something that were jointly arrived at between the members of the association and Sterling Sugars?

A    That would be an accurate statement.

Q    Are you familiar with who started other sugarcane farming associations in Louisiana?

BY MR. KNOEPP:

Q    Like, when you start a new corporation, there's a fair amount of work involved; is that fair to say, Mr. Gonsoulin?

            MR. DAVIS:  Objection.  I'm sorry, we did not identify it as a hypothetical, but go ahead, Mr. Gonsoulin, and answer.  Subject to objection.

A    Generalized that would be a correct statement.  There is a lot of work.

BY MR. KNOEPP:

Q    We went over some of the paperwork that needs to be created, such as, articles of incorporation, bylaws, things that need to be filed with the state, is that your understanding as well?

A    Yes, sir.

Q    Who handled all of that for South Central when it was formed?

A    Well, the membership and Sterling Sugars and M.A. Patout in a conglomerate effort handled the paperwork to establish the association.

Q    Do you know whose office they used to, like, prepare that?

A    Both offices.

Q    Whose computers were used to create the paperwork, for example?

A    I do not know that answer.

Q    Were you personally involved in creating the paperwork?

A    I was not.

Q    Did you see any of the work that was being done?

A    The work was shared amongst all active membership and participants as a review process before we established an association.

Q    And who reviewed those -- that paperwork?

A    Potential farmer owned members and potential employees of the factories that the product was being shipped to.

Q    And that was Sterling Sugars, right?

A    That would be correct.

Q    And so it's your understanding that the paperwork was reviewed by people at Sterling Sugars?

A    Correct.

Q    You don't know whether they created the paperwork?

A    I'm not -- I couldn't that would be an open ended question.  No, I do not.

Q    Do you know which farms are members of South Central?

A    Yes, there's a total of -- if I can recall correctly, 57 or 56 currently.  I can't recall each individual name, but I recognize all the membership.

Q    There's a list; is that fair to say?

A    Yes, there's a list.

Q    Do you have to do anything to join as a member?

        MR. DAVIS:  Objection.

A    We had to sign an agreement with the association to join.

formed.  And it would be a membership driven, farmer-owned association.  So they opted in to join and then as communication developed with the processor, we got involved with communicating with all growers associated with Sterling to offer this opportunity to join the association that was farmer owned.

Q    And were you only invited to join if you were going to haul your sugarcane to Sterling Sugars?

A    I wouldn't say it was an invitation, but it was an opportunity to join if you were a Sterling haul member -- hauling commodity to Sterling Sugars.

Q    But only if you were going to have your sugarcane hauled to Sterling Sugars, right?

A    This Association --

        MR. DAVIS:  Objection vague.  Ms. Figueroa, I'm sorry, Ms. Figueroa will you please repeat that last question?

        COURT REPORTER:  Sure.

        (WHEREUPON, The last question was read back for the record.)

        MR. DAVIS:  Objection, vague.  Objection, vague, but, Mr. Gonsoulin, you can proceed.

A    Repeat the previous question, Mr. Jim.

BY MR. KNOEPP:

Q    The opportunity to join was only available to people who were hauling -- going to haul -- have their sugarcane hauled to

RICKY GONSOULIN - 30(B)(6)                                    JOB NO. 2592804
APRIL 09, 2026

Sterling Sugars; is that correct?

A    Correct.  That associations being established to haul farmer-owned product to Sterling Sugars, that's correct.

Q    Did anybody refuse to join?

A    Currently as I recall --

        MR. DAVIS:  Objection form.

BY MR. KNOEPP:

Q    And I'm talking at the time, just to clarify, at the time that the association was formed in 2022, did anybody refuse the opportunity to join.

A    As best as I can recall there was a couple that chose not to join the association.

Q    And who were those farms that decided not to join?

A    I don't currently recall.  Currently I know there's one that I recall A&F Farms, but back then I don't remember which ones.

Q    And you said, A&F; is that right?

A    Yes.

Q    Do you know who owns A&F farms?

A    I do.

Q    Who is that?

A    Aiken Bejoune French.

Q    And do you know why they decided not to join South Central?

        MR. DAVIS:  Objection foundation.  Calls for

Q    But why was it that you could only be a member if your commodity was being haunted to Sterling Sugars?

MR. DAVIS:  Object to the characterization.

A    I don't -- I don't know the answer to that question.

BY MR. KNOEPP:

Q    Is -- is that something that you came up with?

A    No, I did not.

Q    The purpose of the association was to arrange for transportation of sugarcane to Sterling Sugars; is that right?

MR. DAVIS:  Objection.

A    The purpose was to haul the farmer-owned commodity for the farmers to Sterling Sugars in a more efficient and safely manner. [as spoken.]

BY MR. KNOEPP:

Q    The purpose wasn't to haul the sugarcane to some other sugar mill, right?

A    That's correct.

Q    Were there times when Sterling Sugars or its parent company, M.A. Patout, directed farms to become new members of South Central?

A    I'm not aware of that.

Q    Do you -- do you know whether that happened at all?

A    I do not recall.

Q    This is going to be marked as Exhibit 32.  And ask you to look at that.  Do you see that document on your screen?

Q     And do you know Ms. Lang?

A     I do.

Q     And this e-mail is -- says, [as read.] "This is a new grower that will be in the Chenneyville Group.  South Central will be cutting and hauling his cane.  Let me know if you need more information."

      Do you see that?

A     I see it.

Q     I know you're not on this e-mail, but does this refresh your recollection about what we were discussing with respect to how people became new members of South Central?

A     Sure.  Every year new members become part of the association depending on which direction their cane will be processed -- which factory their cane would be processed at. So we can only haul cane from a member that is associated with Sterling Sugars.  So they have to be an association member for us to haul their cane to Sterling.  So we do pick up new members occasionally.

Q     And how are those new members picked up?  Is it that somebody at Sterling Sugars or M.A. Patout refers them to South Central?

A     Well, that's based on how much crop or commodity we have to grind, and as they divvy up the quota system to each processor, some of them to be more efficient we'll pick up growers so that we can haul to different mills to be more

A    Correct.

Q    And if they have a new grower, they're doing business with who's going to provide them sugarcane that's -- they would tell South Central that there's a new grower that they're working with and they need to become a member of the association; is that correct?

A    That's inaccurate.  If the grower that becomes a new commodity shipper to Sterling Sugars, they informed that there is an association that they can join that is farmer-owned that will haul their commodity if they do so, wish so.

Q    And they're informed that by Sterling Sugars?

A    Yes.

Q    And then if somebody wants to become a member, are they told by Sterling Sugars how they can contact South Central to do that?

A    That would be correct.

Q    This Exhibit 32 that we were looking at before, is it -- does it sometimes happen where South Central is informed by somebody at Sterling Sugars or M.A. Patout that a new member is going to be joining?

A    Sure.

Q    Who maintains the list of members?

         MR. DAVIS:  Objection foundation.

A    The association has a list of the memberships.

BY MR. KNOEPP:

RICKY GONSOULIN - 30(B)(6)                                          JOB NO. 2592804
APRIL 09, 2026

Q    But who is the person who keeps that membership list?

A    We have a general membership agreement with Sterling Sugars to -- that we pay a management firm to retain those documents.

Q    And who's the management firm?

A    Jamie.

Q    Jamie Robison?

A    That's correct.

Q    And he's not the management firm, is he?

A    No, he's just a designee.

Q    Right.  And the management firm is Sterling Sugars, LLC; is that right?

A    That's -- the association --

        MR. DAVIS:  Objection.  Objection asked and answered.

A    Want me to answer it?

BY MR. KNOEPP:

Q    Yes.

A    Okay.  Yes, the Association has contracted Sterling Sugar as the management firm.  That would be correct.

Q    And so Sterling Sugars maintains the member list; is that right?

A    The association maintains the membership list.

Q    I thought you just said that the management firm maintains the membership list?

        MR. DAVIS:  Objection.  That was the basis of that

objection, because what you said mischaracterized the testimony.

A     Go ahead and answer it?

        MR. DAVIS:  Yes.

A     So the association has a manage-ship [sic] -- manage-ship [sic.] agreement with Sterling Sugars for the management task of the association.  So technically, the Association and Sterling have a list of the membership.

Q     And that list, where is that list physically maintained?

A     In the offices of Sterling Sugars.

Q     And whenever that list needs to be updated, who physically updates that list?

A     That would be Mr. Jamie Robison.

Q     He's an employee of Sterling Sugars?

A     He is.

Q     Is he employed by South Central?

A     He is not.

Q     And so if a member needed to be added to the list, would you contact Mr. Robison at Sterling Sugars to do that?

A     He can contact Mr. Robison or myself and we will put him in contact with the management contact which would be Mr. Robison to fill out the necessary documentation to be among a member of the association.

Q     And would Mr. Robison be the person who would send that new grower the membership agreement documents?

A     That would be correct.

Q     And the grower would return those documents to Mr. Robison?

A     That would be correct.

Q     And those membership agreements are then maintained at the Sterling Sugars offices, correct?

A     That would be correct.

        MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q     Have you ever seen the list of the members?

A     Yes, sir.

Q     What form is that in?  Is it...

A     A Word doc.

Q     And have you -- how have you seen the word documents?

A     At the meetings and circulated via e-mail of the membership.

Q     And circulated by somebody at Sterling Sugars?

A     The management, Jamie Robison.

Q     Mr. Gonsoulin, I'm going to show you what's being marked as Exhibit 33.

        (WHEREUPON, the document was marked for identification as Exhibit No. 33 and is attached hereto.)

BY MR. KNOEPP:

Q     Do you see that on your screen?

Q    There wasn't a vice president, or at least at this time; is that right?

A    Correct.

Q    And then it says that Ashlee Gary, A-S-H-L-E-E, Gary, G-A-R-Y, served as the treasurer.  Do you see that?

A    That's correct.

Q    Now both you and Mr. Christopher Patout operate farms that were member of South Central; is that right?

A    Correct.

Q    Do you know if Ms. Gary operated a farm that was a member of South Central?

A    She did not.

Q    And she's the chief financial officer of M.A. Patout; is that right?

A    That would be correct.

Q    And M.A. Patout is Sterling Sugars' parent company; is that right?

A    That is correct.

Q    Do you know why she was selected to be the treasurer?

A    I do not.

Q    Do you know whose idea was to have Ms. Gary serve as the treasurer?

A    I do not.

Q    Are you aware that she's also an officer of the other growers; associations whose members haul their sugarcane to

A    Yes, I did.

Q    Who -- who typically organizes the meetings for the meetings of the members?

A    Jamie Robison.

Q    And does Mr. Robison select the date -- does he select the date for the meetings?

A    I set multiple dates and offer it to the membership.

Q    So what does Mr. Robison do with respect to the meetings of the members?

A    He contacts memberships on the date that it was selected for the meeting to be held.

Q    Anything else?

A    No, just get's a quorum to make sure the membership shows up and we have a quorum for the meeting.

Q    And does Mr. Robison prepare an agenda for the meeting?

A    He does.

Q    And does who -- who runs the meeting?

A    I run the meeting.

Q    And so you can see here in item one, it says that you called the meeting to order at 11:00 a.m.  Do you see that?

A    Correct.

Q    And then there was approval an of the meeting minutes from the previous meeting; is that right?

A    Correct.

Q    That was from September of 2024; is that right?

A    Correct.

Q    Was this member meeting on September 9th of 2025, the only meeting of the members between that date and the prior meeting in September of 2024?

A    As I recall.

Q    How often does the membership meet in these type of formal meetings?

A    Once a year.  Once a year in person.

Q    And going down to the last page of the exhibit, do you see that last page?

A    Uh-huh.

Q    Is that a yes?

A    Yes, yes, sorry, about that.

Q    This is an attendance sign in sheet; is that right?

A    Yes, sir.

Q    And do you recognize the first person there as Jamie Robison?

A    That would be correct.

Q    And then two people down from him that's Ashlee Gary; is that right?

A    Correct.

Q    Do you also see the name Ashley Lopez?

A    I do.

Q    And Ms. Lopez is an employee of M.A. Patout; is that right?

A    As I recall.

Q    Does she handle the typing up of the meeting minutes for the membership meetings?

A    Yes, she does.

Q    There's also the name Sandra Garcia.  Do you see that?

A    Yes, I do.

Q    And Sandra Garcia is an employee of M.A. Patout; is that right?

A    Correct.

Q    Sorry, up above under Mr. Robison that's Randy Romero; is that correct?

A    Right.

Q    And Mr. Romero is an employee of M.A. Patout; is that right?

A    That would be correct.

Q    Your name is on here.  Do you see your signature there?

A    Correct.

Q    And underneath your signature, Tim Soileau is there; is that right?

A    Correct.

Q    And Mr. Soileau is an employee of Sterling Sugars; is that right?

A    That would be correct.

Q    And underneath that it says Roddy, do you see that?

A    Yes.

Q    Do you understand that to be Roddy Patout who was in attendance at the meeting?

A    Yes.

Q    And Mr. Roddy Patout is an employee of Sterling Sugars; is that right?

A    Correct.

Q    So the sugar mill and its managers were -- there were several of them at this meeting of the members; is that right?

A    That would be accurate.

Q    Why are they attending a South Central membership meeting?

        MR. DAVIS:  Objection foundation.  Calls for speculation.

A    As I said before that association directly reflects the responsibility of hauling farmer-owned commodity sugarcane to Sterling Sugar, a processing facility, that is the managing partner of M.A. Patout.

BY MR. KNOEPP

Q    And so why is it important to have them at the membership meetings?

A    Repeat that question.

Q    So why is it important for South Central to have those people at the -- at the membership meetings?

A    To undertake the vast harvest -- harvesting situation that we accomplished in the harvest season, all communications effort need to be openly and know exactly what the obligation

BY MR. KNOEPP:

Q    And did you -- well, did you approve of the draft of the 2022 clearance order, do you know?

MR. DAVIS:  Objection.

THE WITNESS:  Go ahead, Brandon.

MR. DAVIS:  Form.

A    Scroll down some more.

BY MR. KNOEPP:

Q    You're also welcome to, you know, scroll through it yourself.

A    Right.  I didn't know I can scroll down myself.  Yeah, this would be one that I would have approved.

Q    The line -- there's a line here, like, line 16.  Do you see that, NAICS, description?

A    Under national description, correct.

Q    Yeah, do you understand what NAICS stands for?

A    Yeah, that's the federal government description, yes.

Q    The North American Industry Classification System; is that right?

A    That's correct.

Q    Okay.  This lists the industry for South Central as sugarcane farming, field production.  Do you see that?

A    I do.

Q    Does that accurately reflect the work that South Central is engaged in?

objecting.

THE WITNESS:  Repeat the question.

BY MR. KNOEPP:

Q    Did South Central consider filing H2B application for the truck drivers that it was employing to haul sugarcane?

A    Absolutely not.  South Central Association is farmer-owned, producing of farming perishable commodity, which is one of the stipulations for H2A.  So H2A was only -- the only thing we considered in hauling our commodities.

Q    Each year between 2020 -- so we're looking at the -- at the draft of the clearance order that you reviewed for the 2022 season, correct?

MR. DAVIS:  Object to the --

MR. KNOEPP:  Exhibit 38.

MR. DAVIS:  Object to the characterization.

A    That's what's in front of us.  That's what's on the screen.

BY MR. KNOEPP:

Q    And the clearance order that was submitted for the 2022 season contained this NAICS code for sugarcane farming field production; is that right?

A    That would be correct, yes.

Q    And that was true for each of the seasons between 2022 and 2025, the clearance orders contained the same NAICS code for sugarcane farming, field production, right?

A    As best I recall that's accurate, yes.

Q    Even though between 2022 and 2025, South Central did not engage in any sugarcane farming, right?

        MR. DAVIS:  Objection argumentative.

A    As I stated before, the association is farmer-owned producing sugarcane which is a perishable crop, that needs to be transported to mill.  So the association is engaged in all aspects of the sugarcane transportation of a perishable commodity, which is part of the farming operations.

BY MR. KNOEPP:

Q    Did you believe that because South Central was farmer owned that the hauling became agricultural?

        MR. DAVIS:  Objection form.

A    As I stated before, Jim, if we cannot transport our commodities then we do not cease to exist as farmers.  So transportation is under the umbrella of sugarcane farming and field production.

BY MR. KNOEPP:

Q    Did you check that understanding with anybody before filing the -- before signing the clearance orders each year for South Central?

        MR. DAVIS:  Object to form, understanding.

A    As the applications are being filed in communication with my contract labor attorney, we have checked those descriptions and found them to be very accurate .

Q    And did somebody at Sterling Sugars or M.A. Patout make any edits to the job descriptions for the cooks and the dispatchers?

A    To the best of my recollection, I think our contract attorney suggested the edits and the corrections to move forward on.

Q    You don't remember for sure?

A    I do not.

Q    Did you edit the job descriptions at all?

A    I did not.

Q    I'm showing you what's been marked as Exhibit 40.

Do you see that on your screen?

(WHEREUPON, the document was marked for identification as Exhibit No. 40 and is attached hereto.)

BY MR. KNOEPP:

Q    This is marked with Bates stamp 106352.  Do you see that?

A    Yes, I do.

Q    Do you recognize this e-mail?  These e-mails?

A    Multiple e-mails I've gone through, but this is one that would have passed through me, absolutely.

Q    And, in fact, the first e-mail on this string is Desiree Lange e-mailing Rivers Patout, Tim Soileau, and Jamie Robison and saying, [as read:] "attached includes Randy's edits.  If in agreement, Tim, can you please foreword to

Ricky."

    Do you see that?

A   I do.

Q   And who do you understand to be Randy in this e-mail, do you know?

A   That would be Randy Romero.

Q   Who works at M.A. Patout; is that right?

A   That would be correct.

Q   And the attachments in the document has some edits in redline to the job descriptions for the cooks and dispatchers; is that fair to say?

A   That would be fair to say, yes.

Q   And the e-mail says that those edits include Randy's edits; is that right?

A   That would be correct.

Q   And then Tim Soileau sent these to you and said, "Revised job duties for cooks and dispatchers are attached, please forward."

    Do you see that?

A   I see that.

Q   Sterling Sugars and M.A. Patout revised these job duties after you sent them the e-mail from the workforce commission; is that right?

A   Repeat the question.

Q   Sterling Sugars employees and M.A. Patout employees

revised the job descriptions of the cooks and the dispatchers after you sent them the e-mail from the Louisiana Workforce Commission; is that right?

A     That would be incorrect.  These edits were sent to our contract labor attorney for review before the job descriptions were changed.

Q     How do you know that?

A     Our contracting attorney would have reviewed these edits to make sure they were accurate enough to change the job description.

Q     I understand that, but the edits were made by Sterling Sugars and M.A. Patout employees, right?

A     Edits were made by the management firm that the association hired from Sterling Sugars to recommend the edits and forwarded to our attorney for change -- for edits in the job description.

Q     And the management firm you're referring to is Sterling Sugars, LLC, correct?

A     That is correct.

Q     And the job descriptions were, in fact, revised; is that right?

A     To the best of my knowledge, they were revised, yes.

Q     And the application for cooks and dispatchers to come work at South Central pursuant to H2A visas instead of H2B visas was approved, correct?

RICKY GONSOULIN - 30(B)(6)                                    JOB NO. 2592804
APRIL 09, 2026

A    That would be correct.

Q    And you did not have any input into these edits that we're looking at on Exhibits 40, right?

A    I reviewed the interpretation of the changes and forwarded them over to our representative attorney.

Q    And Mr. Soileau asked you to forward it on, right?

A    He asked me to forward it on after my reviews.

Q    And you did that?

A    I did review them and forward it on, yes I did.

Q    Well, with respect to the number of truck drivers that were being requested each year, that information was provided by Sterling Sugars employees, right?

A    That information was provided by the management firm that we hired, which is, Sterling Sugars.

Q    No one at South Central decided the number truck drivers that were needed, right?

A    It comes in a communication effort of all the farmers that own the association, come up with a amount of product that needs to be shipped and we back in the number of truck drivers that's needed, and communicate with the processing facility that's going to process that amount of cane, and come up with a number that would effectively and efficiently haul that commodity in a given state of time.

Q    And Sterling Sugars employees do those calculations to determine the number of truck drivers that are needed, right?

A    The management firm determines how much the mill can grind per day, and how much the farmer-owned association will produce and back those numbers into the number of trucks that is a full estimate on the number of truck drivers that will be needed.

Q    Whenever you say the management firm, you're referring to Sterling Sugars, correct?

A    We have hired Sterling Sugars for the management of the association, correct.

Q    Sorry, Mr. Gonsoulin, I have a lot of exhibits and I'm trying to get to the --

        THE WITNESS:  Jim, I'm going to take a quick trip to the restroom.  Give me a minute.

        MR. KNOEPP:  All right let's take a -- let's go off the record and take a 5-minute break.

        THE WITNESS:  That's perfect.

        COURT REPORTER:  We are now off the record.  The time is 1:36 a.m. Central Standard Time.

            (Off the record at 1:36 p.m. CST.)

            (On the record at 1:41 p.m. CST.)

        COURT REPORTER:  We are now on the record.  The time is 1:41 p.m. Central Standard Time.

BY MR. KNOEPP:

Q    Before the break, Mr. Gonsoulin, you were talking about the number of truck drivers that will be needed for each season.  Do you remember when we were talking about that?

A    Yes, sir.

Q    All right.  I'm showing you what's been marked as Exhibit 41.  And it's -- the first page is labeled with Bates stamp 78445.  Do you see that?

(WHEREUPON, the document was marked for identification as Exhibit No. 41 and is attached hereto.)

A    Yes, I do.

BY MR. KNOEPP:

Q    Sorry, I'm not sure where the echo came from, but hopefully it doesn't come back.

Do you see that the first e-mail -- well, the first substantive e-mail, looks like there was an e-mail from a scanner first that was sent to Mr. Robison, but do you see the e-mail that Mr. Robison sent you an e-mail, yes?

A    Correct.

Q    And it's Mr. Robison asking you to forward some information to Karen Hand.  Do you see that?

A    Correct.

Q    Who's Karen Hand?

A    Karen Hand is Ms. Ashley Dees, our contracting labor's assistant.

Q    This is the person who helps with the H2A applications; is that right?

A    That is the person -- the contact person between myself

and Ms. Dees, when Ms. Dees is not available.

Q    And this was sent on June 1st of 2023, right?

A    That would be the date on the screen, yes.

Q    And the attachments to the e-mail that Mr. Robison sent you shows the number of truck drivers that were supposed to be applied for; is that right?

A    That's the estimated number that was going to be applied for, correct, with the communication between the association and the processor, we have to come up with a number of total employees that we need to accommodate the processing of that year's crop.

Q    And this list -- this number showed that 130 truck drivers to be applied for; is that right?

A    Yes, sir.

Q    And Mr. Robison provided you this PDF and it said that the totals in red is the totals of people we need to apply for; is that right?

A    That's what's stated in the e-mail.

Q    And you forwarded this on -- this information that Mr. Robison provided to you, you forwarded that on to Karen Hand like Mr. Robison asked you to, right?

A    I did.

Q    This was a document that was prepared by Mr. Robison?

A    As part of the management firm for the association and communication with the association, it was.

Q    And again, the management firm -- when you say management firm, you're referring to Sterling Sugars, right?

A    That is correct.

Q    Mr. Gonsoulin, I'm showing what's been marked as Exhibit 42, has a Bates label starting with 61591.

     Do you see that?

          (WHEREUPON, the document was marked for
          identification as Exhibit No. 42 and is attached
          hereto.)

A    Yes, sir.

BY MR. KNOEPP:

Q    And again this is an e-mail from Mr. Robin- -- the first e-mail is a scan that Mr. Robison made of the attachment; is that right?

A    Yes.

Q    And then he sends you an e-mail with the attachment and asks you to forward it to Karen Hand, correct?

A    Correct.

Q    It says, please let her know that everything else that was sent to us was reviewed and it's good to go.

     Do you see that?

A    That's right.

Q    Do you know what he was referring to there?

A    Well, I forward all the applications for review for the management firm and myself to review before we forward it back.

Q   All right.  And, so, and again the management firm is Sterling Sugars, correct?

A   Again, yes, it is.

Q   And so you're saying that the H2A applications, you forwarded those to Sterling Sugars to review along with your review, correct?

A   I reviewed as well as the management firm reviewed, yes.

Q   And this attachment, again, has the -- has the list of the growers and then the truck drivers in a total of 130.  The same number looked at in a previous exhibit; is that right?

A   That would be accurate.

Q   This particular one is just broken down by individual farm and the number of truck drivers that might be needed at each individual farm; is that accurate?

A   That is a total estimation of what we think will be used, but; yes that is accurate.

Q   Something that was prepared by Mr. Robison, correct?

A   Prepared by Jamie Robison who is on the management firm for the association.

Q   I'm showing you what's being marked as Exhibit 43, it starts with Bates number 39523.  Do you see that?

        (WHEREUPON, the document was marked for

        identification as Exhibit No. 43 and is attached

        hereto.)

A   I do.

BY MR. KNOEPP:

Q    And this is an e-mail from 2024.  Do you see that?

A    I do.

Q    And the subject line is, "H2A job orders for 2024."

Do you see that in the e-mail?

A    I do.

Q    And this is just a one-page exhibit.  This is an e-mail that Tim Soileau sent to you on June 7th of 2024, correct?

A    Correct.

Q    And Mr. Soileau was somebody who works at Sterling Sugars, right?

A    He works at Sterling Sugars.  He's part of the management team that we hired.

Q    Okay.  And he says, "In 2023 we applied for 130 heavy and tractor-trailer truck drivers.  This year we want to apply for 135."  Do you see that?

A    I do.

Q    All right.  And Mr. Soileau is providing you information about the number of truck drivers that will be needed for the season; is that fair to say?

A    Mr. Soileau as part of the management team for South Central Association which is a farmer-owned association, gets the estimate of tonnages that the association will produce and backs into the number of truck drivers that he thinks available, forwards it back to me, to turn into our contract

labor attorney.

Q    And he does that in his role as an employee at Sterling Sugars, correct?

A    He does that as an employee of the management firm, and relies on information from Sterling Sugars, the processor, how much processing they can do on a daily basis.

Q    Mr. Soileau is not employed by South Central, is he?

A    He's not.  He's part of the management team.

Q    And when you say management team, you're referring to Sterling Sugars?

A    The management team -- the association hired Sterling Sugar as the management team, correct.

Q    And he's also -- he's also noting that you need to respond to all of -- at Karen's e-mails.  He's referring to Karen who works at Ms. Dees' office?

A    That's correct.

Q    And she's the one -- they're the ones handling the H2A applications?

A    That would be correct.

Q    And by the five e-mails, there's -- were there five separate e-mails related to each one of the H2A orders that was being applied for, for the different positions that South Central had that year?

A    That's correct.

Q    And did you follow Mr. Soileau's instructions in the

e-mail and reply appropriately to Karen at Ms. Dees' office?

A    To the best --

MR. Allbritten:  Object to the form.

THE WITNESS:  Go ahead and answer?

MR. Allbritten:  You can.  Just a form objection.

A    To the best of my recollection, I responded to Ms. Hand, and got the applications verified for processing.

Q    And you told -- did you tell her about the increase in the number of truck drivers that were needed from the 130 to the 135 to the 2024 season?

A    I did.

Q    All right.  Mr. Gonsoulin, I'm showing you what's been marked as Exhibit 44.

(WHEREUPON, the document was marked for identification as Exhibit No. 44 and is attached hereto.)

BY MR. KNOEPP:

Q    It starts with Bates number -- or it has -- yeah, the first Bates number on the first page is 61763.

Do you see that?

A    I do.

Q    And so the first e-mail in this string is from Great Labor to you.  Do you see that?

A    That would be correct.

Q    And first of all, who is Great Labor or what is Great

management team and we double touch [sic.] the number of people we need at a certain time.  And we forward that to Mr. Dees for processing.

Q    And Mr. Robison replied to your e-mail the same day, correct?

A    Correct.

Q    And he says that with respect with the drivers that there were 130, quote, that we are requesting, right?

A    Correct.

Q    And then he says, [as read:] "As far as the list of people, everyone that was here at SCSCA last year is welcomed back this year, with the exception of the ones that are on the do not return list."  Do you see that?

A    I see that.

Q    Is that referring to the people who could be hired into these positions for the 2024 season?

A    He's referring to the people that have worked previously and the ones that may have issues from the previous year that will not be returning.

Q    Is there a do not return list that's maintained?

A    I'm not aware of one.

Q    Have you ever seen a do not return list?

A    I am not.  I have not.

Q    Do you know if the management team at Sterling Sugars maintain a do not return list?

A    I know they have a list of employees and I'm sure some of the employees that had to leave on different issues may not be returned back so.  But, yes, I'm sure there is a list.

Q    Who maintains that list, do you know?

A    The manage --

MR. Allbritten:  Object to the form.  He testified that he doesn't even know about a list.

THE WITNESS:  Can I answer it?

MR. Allbritten:  If you can.

A    The management firm for the association monitors that list.

BY MR. KNOEPP:

Q    Do you know of any truck drivers who have been asked not to return because they had an issue in a prior season?

A    I do not recall specific individuals.  There are some, but I don't recall any names.

MR. Allbritten:  Counsel, I'm going to object to the scope to the extent that this is not covered by the topics on the notice of deposition.

BY MR. KNOEPP:

Q    Mr. Gonsoulin, I'm showing you what's been marked as Exhibit 45.  It has a Bates label that starts with 79207.

Do you see that?

(WHEREUPON, the document was marked for identification as Exhibit No. 45 and is attached

and it starts with Bates number 104793.  Do you see that?

(WHEREUPON, the document was marked for

identification as Exhibit No. 46 and is attached

hereto.)

A    I do.

BY MR. KNOEPP:

Q    And this is an e-mail string from 2025 related to truck drivers; is that right?

A    That's what it seems to be.  Yes, sir.

Q    And the first e-mail in this string is from Great Labor; is that right?

A    That would be correct.

MR. KNOEPP:  There's some strange feedback.  I think it's coming from something in your office there, Andrew.  There is like a -- there's something -- looks like it's Brandon Davis device that is not muted.  That might be whenever the feedback comes up that's the box that's --

MR. Allbritten:  I see it.

MR. KNOEPP:  Okay. I think that fixed it.

MR. DAVIS:  Got it.

BY MR. KNOEPP:

Q    So Great Labor sends you an e-mail in July of 2025, asking you to confirm the number of truck drivers that would be needed for the upcoming season, right?

A    Correct.

RICKY GONSOULIN - 30(B)(6)                                        JOB NO. 2592804
APRIL 09, 2026

Q    And an approximate date, you know, for employment in September, right?

A    Correct.

Q    And you forwarded that e-mail on to several people at Sterling Sugars, right?

A    That would be accurate.

Q    And you say for full review, what do you mean by, for full review?

A    Again as I stated, a lot of communication goes into the harvesting of the crop.  The association and the farmer-owned association of this product has to determine how many tons of cane and relay that information to the processing facility, and get the number of truck drivers that are required to haul that product.

     So that's where the communication, so both parties have to look at information to agree on a number to effectively and efficiently and safely haul our product to the mill.

Q    And Sterling Sugars provides the number of truck drivers that are needed for the season, correct?

A    As stated before, in conjunction with the farmers that own the association and the amount of cane that they haul, conveyed to the management firm at Sterling, they both agree on a number of truck drivers that are needed to haul that annual crop.

Q    And Mr. Soileau responds to your e-mail with a number of truck drivers that should be requested, correct?

RICKY GONSOULIN - 30(B)(6)                                    JOB NO. 2592804
APRIL 09, 2026

A    That would be accurate.

Q    And he says, [as read:]  "Below are the exact number -- numbers we want on the ground at Sterling for each contract." Do you see that?

A    Yes, I do.

Q    That's the number of workers that they want -- with respect to the truck drivers, that's the number of workers that they want hauling sugarcane, correct?

A    That would be correct.

Q    And he says, [as read:] "We want the following workers to arrive at Sterling Sugars between September 19th to 22nd."
     Do you see that?

A    That's correct.

Q    So Mr. Soileau is telling you the dates that they want the truck drivers to arrive so that hauling can begin; is that right?

A    That would be accurate.

Q    And you forwarded that e-mail on to Great Labor, right?

A    That is a correct chain of command.

Q    And so that arrival date that's listed here between September 19th to 22nd, that's the start date for the season or the anticipated start date for the season; is that right?

A    Correct.

Q    During the -- for the 2023 -- I'm sorry, before we leave that exhibit.  You didn't make any modifications to the numbers

that Mr. Soileau provided to you with respect to the number of truck drivers that should be requested, did you?

A    I don't recall if I did.

Q    You just forwarded on his e-mail to the people at Great Labor, right?

A    I forwarded on to John Dees and let them process the number of visas that were requested.

Q    Whenever you forwarded that on, you didn't change the number of truck drivers that Mr. Soileau had identified, did you?

A    Not that I recall.  You know, sometimes we change the numbers, but not very often.  If the need arises that we don't need as many.

Q    But in this case, the e-mail doesn't reflect you changing any of the numbers that Mr. Soileau has specified his e-mail, right?

A    I do not believe on that particular e-mail.  No, sir.

Q    In 2023, South Central received a notice of deficiency from the Department Of Labor related to the number of workers being requested and whether there was sufficient transportation for the truck drivers to get to and from work.

Do you recall that?

A    I do.

Q    And as a result, South Central filed a supplement to the job order, they explained how the transportation worked for the

MR. KNOEPP:  Yeah, just make your objection to the form.

MR. DAVIS:  I did.

MR. KNOEPP:  If the witness has a problem, he can let us know.  He didn't.

MR. DAVIS:  Correct.

MR. KNOEPP:  You gave a speaking objection again. You just came back after one break, and you immediately did a speaking objection.

MR. DAVIS:  I objected because it was vague.  If you asked me, then I'll tell you why.

MR. KNOEPP:  I'm not asking you.  I just want you -- I'm asking you to just state objection to the form and let the deposition proceed.  Instead of trying --

MR. DAVIS:  Well, Jim.

MR. KNOEPP:  Trying to coach your witness.

MR. DAVIS:  I said.  I said that objection, vague, and I've explained as you've asked.

BY MR. KNOEPP:

Q    Mr. Gonsoulin, did other farmers who are members of South Central 1have to sign I-120 -- I-129 forms each season as part of the H2A application process?

A    I'm not aware of any others that had to sign.

Q    Did you do anything to obtain signatures from other south Central farmers on I-129 forms?

A    I did not; the management firm would have done that.

Q    So Sterling Sugars -- do you know if Sterling Sugars collected signature forms from other farmers who are members of South Central on I-129 forms?

A    That would be Mr. Jamie Robison who would collect those signatures who was hired by the association.

Q    Jamie Robison who -- was Jamie Robison hired by the association?

A    No.  We hired a manager -- he's a representative the management firm.

Q    Okay.  I just want to make sure before you said that Jamie Robison never worked at South Central, right?

A    He does not work -- he's part of the management team that we hired.

Q    Okay.  He works for Sterling Sugars, correct?

A    That would be correct.

Q    Okay.  So Jamie Robison as an employee of Sterling Sugars collected the signatures from the farmers that were needed on the I-129 forms, is that right?

           MR. DAVIS:  Ms. Figueroa, please repeat that question.

           COURT REPORTER:  Sure.

           Q:  So Jamie Robison as an employee of Sterling Sugars collected the signatures from the farmers that were needed on the I-129 forms, is that right?

BY MR. KNOEPP:

Q    You can answer, Mr. Gonsoulin.

A    That would be inaccurate.  Jamie Robison as part of the management team that is hired by the farmer-owned association collected signatures.

Q    Right, but Jamie Robison did it, correct?

A    He did collect the signatures as part of the management duties that the association hired him for, correct.

Q    And when he did that, he was being employed by Sterling Sugars at the time; is that right?

A    That would be correct.

Q    I'm going to show you what's being marked as Exhibit 48.  It starts with Bates number 68004.  Do you see that on your screen?

          (WHEREUPON, the document was marked for
          identification as Exhibit No. 48 and is attached
          hereto.)

A    Yes.

BY MR. KNOEPP:

Q    I'm sorry, I didn't catch your answer?

A    Yes.

Q    Thank you.  I'm sorry, it was my audio's fault.  And this exhibit, is this an example of an I-129 form that was wet signed by a member of South Central?

A    Scroll down to the top.  No too far, too far.

Q    I'm sorry.

A    No.  No.  Just come on down to the top of the application.

Q    I'm not sure what you mean.  The top of the application I thought you meant the top of the exhibit, I'm sorry.

A    No.  That would be part of the I-129.

Q    Do you know who -- is it -- I'm not sure if I can pronounce his name right, Chad Judas?  [as pronounced.]

A    That would be correct.

Q    J-U-D-I-C-E?

        MR. DAVIS:  Judice.  Judice.

        THE WITNESS:  Judice.

        MR. DAVIS:  Judice.

BY MR. KNOEPP:

Q    And do you know who Mr. Judice is?

A    I do.

Q    And he's a member -- is -- does he own a farm that's a member of the -- of South Central?

A    Absolutely.  Northside Planting.

Q    And Mr. Robison scanned this document and forwarded it to you; is that right?

A    That would be --

Q    I'm sorry, forwarded it to -- I'm sorry, he forwarded it to Ms. Hand at Ashley Dees' office; is that right?

A    That would be correct.

Q    Whenever these signatures on the I-129 are collected by

Mr. Robison, are they sent to you at all?

A    I do review them, but Karen Hand, myself, and Jamie Robison coordinate and communicate to get them signed and back into Karen hands for processing.

Q    And do you know how Mr. Robison goes about getting those signatures from the different farmers?

A    He either drives to their farm, meets them personally or the farmer goes to the location.

COURT REPORTER:  I'm sorry, that broke up.  Can I get that answer back?

MR. KNOEPP:  Let's go off the record for a second.  I think Mr. Gonsoulin's connection is going bad.

MR. DAVIS:  All right.

COURT REPORTER:  If there are no objections.  We are now off the record.  The time is 2:22 p.m. Central Time.

(Off the record at 2:22 p.m. CST.)

(On the record at 2:27 p.m. CST.)

COURT REPORTER:  We are now on the record.  The time is 2:27 p.m. Central Standard Time.

BY MR. KNOEPP:

Q    Mr. Gonsoulin, we took a break there because we had some audio issues, couldn't hear last answer.  I was asking you how Mr. Robison went about getting the signatures, the wet signatures, from the farmers on the I-129 forms.

Do you remember the question?

A    I do.

Q    And I thought I heard you say that he drives around to the different farms to get those signatures, but I think you also added something else, another thing that Mr. Robison did.  Can you just tell us what that was from your last answer?

A    No.  In coordination with the farmer they just determine a location to sign the I-29 and most of the times it's at their farms.

Q    Okay.  Thank you.

MR. DAVIS:  Did we lose Jim everybody?

MR. KNOEPP:  I'm sorry, I didn't realize my camera wasn't on, sorry.

MR. DAVIS:  No.  It depends on, you know, when speaking, but we lost the box altogether for a moment.

MR. KNOEPP:  Okay.  Sorry.

BY MR. KNOEPP:

Q    There are employer fees associated with the H2A application process that are paid to the government; is that right, Mr. Gonsoulin?

A    As best as I recall, yes.

Q    And did you -- you personally, Mr. Gonsoulin, handle the payment of those fees when they were due?

A    I did not.

Q    Who did that?

A    Those invoices are forwarded to our management team.

Q    That's the people at Sterling Sugars?

A    Yes.

Q    And so you would sometimes get invoices for the payment of fees associated with the H2A visa process for the truck drivers, correct?

A    That would be correct.

Q    And do you forward those invoices to people at Sterling Sugars to process those?

A    I forward them to our management team.

Q    Those are -- that's the people at Sterling Sugars, right?

A    Yes.

Q    And would those Sterling's Sugars employees the processing of the payment of those fees?

A    Our management team will handle the processing of the payment, yes.

Q    And again the management team is Sterling Sugars; is that right?

A    That would be accurate.

        MR. DAVIS:  It's been asked and answered.

BY MR. KNOEPP:

Q    Yeah, anyone in particular that would handle that, do you know?

A    Everything, I go to Jamie Robison as the liaison to the management team.

Q    Was there ever any time when those fees weren't paid and

the H2A process was halted because South Central hadn't paid its fees?

A    Not that I'm aware of.

Q    Where did the money come from for the payment of those fees?

A    Where did the money come from for the payment of the fees? Through the association.

Q    Well, through, like, an association bank account, for example?

A    Correct.

Q    Well, in 2022 when the association was first formed, did it have any money in the bank accounts at the time that the H2A applications were filed?

A    It did not.

Q    And so, how did it pay the fees that were required by the government to process the H2A applications during that first season in 2022?

A    We had a capital loan from Sterling Sugars that was charged with prime interest and repaid back in full.

Q    So the money for the H2A process to move forward was provided by Sterling Sugars?

A    In a loan and charged at prime rate and paid back in full.

Q    Is that a yes, it was a loan?

A    Yes.

Q    And, yes, the money was provided by Sterling Sugars?

A    Yes.

Q    So staying with that first 2022 season, that was the first season that South Central operated, right?  That harvest season that started in the fall of 2022?

A    Yes.

Q    It hadn't employed any H2A truck drivers prior to the 2022; is that right?

A    You're referring to the association?

Q    South Central.  I'm sorry, I should have said -- been more specific.  Yeah, whenever I said, it, I meant South Central. So let me try again.  Okay?

     South Central hadn't employed any truck drivers prior to 2022; is that right?

A    That is correct.

Q    In fact, they hadn't employed anybody prior to 2022, right?

A    That is correct.

Q    During the 2022 season, the majority of the truck drivers who were employed were individuals who had previously worked as H2A truck drivers for Sterling Sugars Sales Corporation; is that right?

A    I would not be aware of that.

Q    Who would know that information?

A    I would think Jamie Robison would know that information.

Q    Did Sterling Sugars' employees, like, Mr. Robison or

Mr. Soileau, select the truck drivers who would be employed by South Central during that initial 2022 season?

A    I do not recall.

Q    It's something that Mr. Soileau will be better suited to answer?

A    We hired a management firm and the management firm provided the names to hire as truck drivers.

Q    And by the manager firm, you referring to Sterling Sugars?

A    Yes, sir.

        MR. DAVIS:  Asked and answered.  Asked and answered.

BY MR. KNOEPP:

Q    And did you ask the people at Sterling Sugars where they got the names of the truck drivers?

A    I do not recall.

Q    Mr. Gonsoulin, I'm going to show you what's being marked as Exhibit 49 and it starts with Bates number 71962.

     Do you see that?  The Bates number, I mean.

        (WHEREUPON, the document was marked for
        identification as Exhibit No. 49 and is attached
        hereto.)

A    I do.

BY MR. KNOEPP:

Q    Okay.  And do you see the document now that's an e-mail from Mr. Soileau to Ashlee Gary.  Do you see that?

A    I do.

designated the right witness for that.  And I think you're going to talk to them, but if you want to continue go ahead.

A    I would think Jamie Robison could obtain that information for you.

BY MR. KNOEPP:

Q    Do you know whether -- there are personal files that are kept on all of the truck drivers, right?

A    I would agree with that statement.

Q    Do you keep the personnel records?

A    I do not.

Q    Who keeps the personnel records?

A    Our management firm.

        MR. DAVIS:  Objection foundation.

BY MR. KNOEPP:

Q    Do you know whether or not those personnel records identify the name of the person and what their job duty was?

        MR. DAVIS:  Objection foundation.

A    I do not.

BY MR. KNOEPP:

Q    Have you ever seen any of the personnel files for the truck drivers?

A    I do not.  [as spoken.]

Q    You have not seen any of the personnel files for the truck drivers?

A    I did not.

RICKY GONSOULIN - 30(B)(6)                                           JOB NO. 2592804
APRIL 09, 2026

Q    He's saying here that in the e-mail to you, he's attaching his fee schedule for reference.  Do you believe that a contract had been entered into prior to him sending you this e-mail?

A    I would believe so.  When the association formed we entered into a contract agreement with both parties.

Q    But were you involved in entering into that contract?

A    The association was, absolutely.

Q    No, but, I mean, you at the time you were the secretary of the -- of South Central were you involved in entering into a contract with Great Labor?

A    Not the original contract.  No, sir.

Q    Do you know who was?

A    I don't recall.

Q    Okay.  So you forwarded this e-mail to Mr. Soileau and Mr. Robison, Rivers Patout, and Desiree Lange, right?

A    Correct.

Q    And it says, [as read:] "For your information, please review and let me know how you would like to proceed."  Right?

A    Correct.

Q    Why did you forward this e-mail to those people at Sterling Sugars?

A    Because they are the management team of the association and that's what we hired them to do.  To coordinate the number of drivers and dates of workers to be entered into the country to process our -- to haul our sugarcane and harvest it.

RICKY GONSOULIN - 30(B)(6)                                    JOB NO. 2592804
APRIL 09, 2026

Q    And so they were in a better position than you to deal with the things that Mr. Dees was asking about; is that fair to say?

          MR. DAVIS:  Object to the characterization.

A    That's what the management firm was hired to do.

BY MR. KNOEPP:

Q    By management firm, you're referring to Sterling Sugars, right?

          MR. DAVIS:  Objection asked and answered.

A    Correct.

BY MR. KNOEPP:

Q    And Mr. Soileau responds to you saying, [as read:] "I'll get back to you after lunch."  Right?

A    That's exactly what the e-mail says.

Q    Okay.  Did Mr. Soileau get back to you after lunch?

A    I don't recall.

Q    Do you remember communicating with Mr. Soileau at all about this e-mail from Great Labor?

A    I'm sure we did.

Q    Do you remember what you discussed?

A    I do not.

Q    Do you know whether employees at Sterling Sugars were already in contact with Great Labor with respect to the H2A process for the 2022 season?

A    I do not.

Q    With respect to the coordination work that Great Labor was doing for South Central in 2022, did you have any involvement in that process after receiving this e-mail from Great Labor?

A    Can you repeat the question again, Jim?

Q    Sure.  With respect to the coordination work that Great Labor was doing for the 2022 season, did you have any involvement in the work that Great Labor was doing after you received this e-mail in August of 2022?

A    Not that I recall.

Q    Do you know who was working with Great Labor to handle that coordination work?

A    That would be our management firm.

Q    Sterling Sugars?

        MR. DAVIS:  Asked and answered.

A    Yes.

BY MR. KNOEPP:

Q    At some point during -- at some point during the 2022 season, again, the first season that South Central was operating just to orient ourselves, it was decided that visa extensions for the truck drivers needed to be applied for; is that right?

A    As I recall.

Q    As you recall, yes?

A    Yes.

Q    Okay.  Thank you.  And that was so that truck drivers

would be able to work hauling sugarcane for a longer period

than what was permitted under the terms of their existing

visas; is that right?

A     Yes.

Q     And that was handled by Mr. Soileau; is that right?

A     It was handled by our management firm.

Q     And the management firm, again, you're referring to

individuals who work at Sterling Sugars, right?

A     That would be correct.

Q     And was Mr. Soileau the person who was employed at

Sterling Sugars who work on the visa extension process?

A     I would assume he was one of them.

Q     Well, was he the one who informed you that the extensions

were needed?

A     As I recall, yes.

Q     Did you have any objection to getting extensions for the

visa?

A     No, I did not.

Q     I'm showing what's going to be marked as Exhibit 52.

            (WHEREUPON, the document was marked for

            identification as Exhibit No. 52 and is attached

            hereto.)

BY MR. KNOEPP:

Q     And this starts with Bates number 77931.

            MR. DAVIS:  Excuse me.

correct.

BY MR. KNOEPP:

Q    And did you tell Karen that people at Sterling Sugars have been talking to John about the extensions, like, Mr. Soileau asked you to do in his e-mail?

A    It was a joint communication between all parties involved to apply for these extensions, correct.

Q    My question was Mr. Soileau was asking you to tell Karen that, you know, that we had been talking to John about this, the extensions, did you do as Mr. Soileau asked you to do and tell Karen about that?

A    Yes, I did.

Q    And at some point people at Sterling inform you that some of the truck drivers shouldn't get extensions because they were no longer working at South Central; is that right?

A    I don't recall.

Q    Do you recall people at Sterling telling you that some had left their employment and had been terminated?

A    I do recall vaguely that some were terminated.

Q    Do you recall people at Sterling telling you that some of the truck drivers had been terminated and were no longer eligible for visa extensions?

A    I do -- I do recall some communication to that respect.

Q    The people at Sterling prepared a list of which drivers were working and which ones -- and who needed the extension; is

that right?

A    The management firm provide a list that who were working or not, that's correct.

Q    Those were people working at Sterling Sugars, right?

        MR. DAVIS:  Objection asked and answered.

BY THE WITNESS:

Q    I'm sorry, I didn't get your answer was that yes?

A    Yes, the management firm.  I'm in communications with the management firm.  That's correct.

BY MR. KNOEPP:

Q    My question was did people at Sterling Sugars tell you -- did people at Sterling Sugars prepare a list of which drivers were working and needed the extensions?

A    The management firm prepared a list.

Q    And that's Sterling Sugars, right?

        MR. DAVIS:  Objection asked and answered.

A    Those are employees at Sterling Sugars, correct.

BY MR. KNOEPP:

Q    Without Sterling Sugars providing you such a list, would you have known which truck drivers should get the extensions of their H2A visas?

        MR. DAVIS:  Objection foundation.  Form.

A    No, I would not have.  That's the duties of the management firm.  That's what we hire them to do.

BY MR. KNOEPP:

that.  All right.  My question is, the e-mail refers to sharing of a no return list to avoid unwanted workers.  Do you see that?

A    I see that statement, yes.

Q    Have you ever seen a no return list, such as, what is being referred to in this e-mail from Mr. Romero?

A    I do not recall that I've seen one.

Q    Do you as the president of South Central share Mr. Romero's view that it's in the best interest to share no return list to avoid unwanted workers?

        MR. DAVIS:  Objection foundation.

A    Repeat the question.

        MR. KNOEPP:  Could you read that back, Wendy?

        COURT REPORTER:  Sure.

        Q:  Do you as the president of South Central share

        Mr. Romero's view that it is in the best interest to

        share no return list to avoid unwanted workers?

        MR. DAVIS:  Objection foundation.  Scope.

A    I would agree that the management firm has the right to determine which employees that we issue visas to on a yearly basis.

BY MR. KNOEPP:

Q    A large number of the H2A truck drivers who worked between 2022 and 2025 were people who returned every year; is that fair to say?

          MR. DAVIS:  Object to the characterization.

A     That is an accurate statement.

BY MR. KNOEPP:

Q     And they were requested back year after year because they're good truck drivers; is that also fair to say?

          MR. DAVIS:  Object to the characterization.

A     I would assume that could be one of the criterias established.

BY MR. KNOEPP:

Q     Well, what are some of the other criteria that are used to determine whether somebody should come back from year to year?

          MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q     Do you know?

          MR. DAVIS:  Objection foundation and exceed scope.

A     General experience in hauling sugarcane is one of the common looked at practices for hiring.

BY MR. KNOEPP:

Q     Is whether somebody has experience as a truck driver doing that type of work, correct?

A     That would be correct.

          MR. DAVIS:  Object to the characterization.

BY MR. KNOEPP:

Q     And you don't have any personal knowledge about which truck drivers should be rehired from season to season based on

their performance in a prior year, do you?

MR. DAVIS:  Object to form.

A    Nope.  That's the job of the management firm.  We hired the management firm to determine the list that I can apply for visas.

BY MR. KNOEPP:

Q    Does the -- does the same statement hold true for termination of truck drivers who --

MR. DAVIS:  Objection.

BY MR. KNOEPP:

Q    Who aren't preforming -- who you believe aren't performing their job well?

MR. DAVIS:  Objection vague.  Foundation.  Exceeds scope.

THE WITNESS:  Brandon, I'm going to need clarification on that question.

BY MR. KNOEPP:

Q    Sure.  The management firm makes those assessments on whether or not certain truck drivers should be terminated?

A    Yes.

Q    And there were times when Sterling Sugars' employees specifically requested that certain truck drivers be returned to South Central who had been assigned to work at one of the other sugar mills.  Is that -- do you recall that?

MR. DAVIS:  Objection form.

A    I do.

Q    All right.  And the attachment here is for a gentleman name Gonzalo Valdivia Matla.  Do you see that?

A    I do.

Q    And so did you forward this to Great Labor like Mr. Robison requested so that this truck driver could be returned to work at South Central?

A    I did.

Q    And did the person in fact return to work at South Central for the 2024 season?

A    I don't recall.

Q    We could find that out by looking at his personnel file?

        MR. DAVIS:  Objection foundation.  Exceeds scope.

A    I would agree.

BY MR. KNOEPP:

Q    Did you ever assign, you Mr. Gonsoulin, as president of South Central, did you ever assign specific workers to be agricultural equipment operators as opposed to truck drivers?

A    I did not.

Q    The management company made those decisions; is that right?

A    Yes.

Q    And sometimes the management company would deny requests from H2A workers who wanted to switch from being an agricultural equipment operator to being a truck driver; is

that right?

A     That is my recollection.

Q     And that was a decision that they made; and not a decision that you made, correct?

A     That would be correct.

Q     I want to show you what's being marked as Exhibit 56 and -- and it starts with Bates number 38924.  It's an e-mail from August of 2024.  Do you see that?

          (WHEREUPON, the document was marked for

          identification as Exhibit No. 56 and is attached

          hereto.)

A     I do.

BY MR. KNOEPP:

Q     And the -- let's go to the first e-mail in the string here.  There's an e-mail from Great Labor that's sent to you that is asking for the number of workers that are going to be needed for each position and the start time, right?  And you replied to Mr. Dees -- or, I'm sorry, you replied to the person at Great Labor who sent this that you'll get that information to them, right?

A     Correct.

Q     And then there's another e-mail that says that Great Labor had received a request from somebody named Saul Gonzales Vasquez.  Do you see that?

A     I do.

Q    It says, [as read:] "Last season he was swapped from truck drivers to ag equipment operators and is requesting if it is possible to return back to truck driver this year as he is five years experience prior years in this position."

Do you see that?

A    I do.

Q    And you -- you don't respond to this request from Great Labor; you forward it on to several people at Sterling Sugars, right?

A    I forwarded it to the management team that is hired by the association.

Q    Because it was -- they're the ones who input was necessary in order to determine whether this request could be honored, that was being made by this H2A worker; is that right?

MR. DAVIS:  Objection foundation.  Exceeds scope.

A    That would be correct.

BY MR. KNOEPP:

Q    And Mr. Robison responds to you saying, [as read:] "Ricky he is to stay as a tractor driver."  Meaning an agriculture equipment operator; is that right?

A    Yes.

Q    And the management team at Sterling Sugars denied the workers request to be transferred to a different position available to H2A workers; is that right?

MR. DAVIS:  Objection characterization.  The document

RICKY GONSOULIN - 30(B)(6)                                                  JOB NO. 2592804
APRIL 09, 2026

speaks for itself.

THE WITNESS:  Answer it?

MR. DAVIS:  Yes, sir.

A    That would be accurate.

BY MR. KNOEPP:

Q    Did you, Mr. Gonsoulin, ever decide that a worker in Mexico waiting to get his visa should not be hired and should instead be denied the visa?

MR. DAVIS:  Objection form it's vague.  It's unfair, we don't have proper notice.

A    No I'm not.

BY MR. KNOEPP:

Q    Do you know if Sterling Sugars' employees made those decisions?

MR. DAVIS:  Objection foundation.  Exceeds scope.

A    Our management firm would have that determination.

BY MR. KNOEPP:

Q    That's the type of determination that they would handle; is that right?

A    Yes, sir.

Q    I'm going to show you what's being marked as Exhibit 57, and it starts with Bates number 105130.  Do you see that?

(WHEREUPON, the document was marked for identification as Exhibit No. 57 and is attached hereto.)

A     I do.

BY MR. KNOEPP:

Q     And this is a two-page exhibit.  The very first e-mail is from someone at Great Labor from October of 2024 to you, correct?

A     That would be correct.

Q     And the e-mail is notifying you of an update related to truck drivers and agriculture equipment operators, right?

A     That would be correct.

Q     And it's identifying a couple of names that are currently in admin processing.  Do you see that?

A     I do.

Q     Two truck drivers and an ag equipment driver who are in admin processing; is that right?

A     That would be correct.

Q     And you forwarded this e-mail on to people at Sterling Sugars, right?

A     I forwarded it on to our management team.

Q     The people who work at Sterling Sugars?

MR. DAVIS:  Objection.  Objection the witness answered.  Was that a question?

BY MR. KNOEPP:

Q     Did you forward it on to people who work at Sterling Sugars?

MR. DAVIS:  Objection asked and answered.

RICKY GONSOULIN - 30(B)(6)                                    JOB NO. 2592804
APRIL 09, 2026

A    I forwarded it to our management team.

BY MR. KNOEPP:

Q    And when you say the management team -- when ever you say management team, you're referring to Sterling Sugars, right?

          MR. DAVIS:  Objection asked and answered.

A    Yes.

BY MR. KNOEPP:

Q    And the management team response to you saying, [as read:] "Ricky please forward to Great Labor.  John, these three workers that are awaiting admin processing in Mexico, will not be needed here at SCSCA this season we have enough --"

          MR. DAVIS:  Object.

          MR. KNOEPP:  I'm just reading the -- the e-mail.

BY MR. KNOEPP:

Q    "We have enough employees for this crop season, but we can revisit them for next year's season."  Did I read that correctly?

          MR. DAVIS:  Objection mischaracterizes the testimony.  The document speaks for itself.

          MR. KNOEPP:  I'm sorry.

          MR. DAVIS:  Counsel, I understand that you believe that my objection was misplaced.  Your last question asked whether the management team made that statement.  And so, objection mischaracterizes.  The document speaks for itself.

BY MR. KNOEPP:

Q    Mr. Robison -- Mr. Robison responded to your e-mail, Mr. Gonsoulin; is that right?

A    That is correct.

Q    And he said that the workers who were waiting admin processing including two truck drivers would not be needed for this crop season; is that right?

A    That would be accurate.

Q    And so those people would not be hired for South Central or that crop season; is that right?

        MR. DAVIS:  Objection calls for speculation.

A    Yes.

BY MR. KNOEPP:

Q    And he asked you to forward that on to Mr. Dees at Great Labor, right?

A    Yes.

Q    And you did that, yes?

A    I did.

Q    The subject line of the e-mail was, "Labor request not needed."  Yes?

A    That is what's on the e-mail, correct.

        MR. KNOEPP:  All right.  Why don't we take a break and go off the record.  I think we've been going for a little while.

        MR. DAVIS:  All right.

        COURT REPORTER:  We are now off the record.  The time

I have read the foregoing deposition transcript and by signing hereafter, subject to any changes I have made, approve same.

Dated _____.

_____

RICKY GONSOULIN

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF RICKY GONSOULIN
Thursday, April 9th, 2026

I, Wendy L. Figueroa, Certified Verbatim Court Reporter #8847, in and for the state of New Jersey, hereby certify to the following:

That the witness, RICKY GONSOULIN, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the facts stated by me in the caption on the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto;

That pursuant to information given to the deposition officer at the time said testimony was taken;

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.
Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [xx] was [] was not requested.

Certified to by me on this 22nd day of April, 2026.

_____

Wendy L. Figueroa

Certified Verbatim Reporter #8847

RICKY GONSOULIN - 30(B)(6)                                          JOB NO. 2592804
APRIL 09, 2026

ERRATA SHEET
CHANGES IN TESTIMONY
AVILA-SOTO, et al. v SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC., INC., et al.
RICKY GONSOULIN - 30(b)(6)
April 09, 2026

Page  Line   From                    To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____

          RICKY GONSOULIN - 30(b)(6)

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
VOLUME I, PART II

FELIPE DE JESUS              )
AVILA-SOTO, et al.          )
Plaintiffs,                 )
                            ) CASE NO. 6:24-cv-01392
vs.                         )
                            ) JUDGE ROBERT R. SUMMERHAYS
SOUTH CENTRAL SUGAR CANE     )
GROWERS' ASSOCIATION,       ) MAGISTRATE JUDGE CAROL B.
INC., et al.                ) WHITEHURST
Defendants.                 )

ORAL DEPOSITION OF 30(B)(6) WITNESS

RICKY GONSOULIN

April 9, 2026

ORAL DEPOSITION OF RICKY GONSOULIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on April 9, 2026, from 3:57 p.m. to 4:55 p.m., before Sasha S. Brooks, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine via Zoom video conferencing, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES


REPRESENTING THE PLAINTIFFS:

          JAMES M. KNOEPP, ESQUIRE
          DAWSON MORTON
          1612 Crestwood Drive
          Columbia, SC 29205
          Telephone: 828.379.3169
          E-mail: jim@dawsonmorton.com

          DAWSON MORTON, ESQUIRE
          DAWSON MORTON
          1808 Sixth Street
          Berkeley, California 94710
          Telephone: 404.590.1295
          E-mail: dawson@dawsonmorton.com


REPRESENTING THE DEFENDANTS:

          BRANDON DAVIS, ESQUIRE
          365 CANAL STREET
          Suite 2000
          New Orleans, Louisiana 70130
          Telephone: 504-584-9312
          E-mail: brandon.davis@phelps.com

WEDNESDAY, APRIL 9, 2026, 3:57 P.M., CST

THE REPORTER:  On the record 3:57 p.m.

DIRECT EXAMINATION (CONTINUED)

BY MR. KNOEPP:

Q.    All right.  Mr. Gonsoulin, we're back on the record.  I wanted to talk -- sorry.  There was some feedback there.  Okay, better now.

I want to talk about the management tasks that are handled by employees of Sterling Sugars for South Central, okay?

And to avoid what we were doing earlier with me constantly asking you about what you mean when you say "the management team," and I ask you whether that's Sterling Sugars, is it okay for me to refer to the people at Sterling Sugars who handle some of these management tasks as "the management team," or is there a different term that you've been using?

MR. DAVIS:  There is a different term that's appropriate.  We believe that you should have referred to those -- these people as the association.

MR. KNOEPP:  Okay.  Well, I'm not going to use that term.  I don't believe that's the proper term, but --

MR. DAVIS:  Okay.

MR. KNOEPP:  Yeah.

Q   (By Mr. Knoepp) So -- well, there -- the people at Sterling Sugars, who handle these management tasks, Mr. Gonsoulin, you refer to those people as the management team; is that right?

MR. DAVIS:  Objection.  Asked and answered.

A.   The management team for the association, correct.

Q   (By Mr. Knoepp) So the -- whenever I say the management team, you'll understand what I mean?

MR. DAVIS:  Objection.  Asked and answered.

A.   Yes.

Q   (By Mr. Knoepp) So I want to go through some of the tasks that the management team handles for South Central, okay?

When truck drivers arrive each year, the management team handles getting them to fill out various onboarding documents; is that right?

MR. DAVIS:  Objection.  Foundation.

A.   That would be correct.

Q   (By Mr. Knoepp) Do you know what I mean by onboarding documents?

A.   I'm a little bit familiar with them.  Yes.

Q.    Okay.  So --

MR. DAVIS:  Objection, foundation.

MR. KNOEPP:  A lack of foundation on whether he knows what I mean by onboarding documents? I'm sorry, I didn't understand that one.  Could you explain that one, Brandon?

MR. DAVIS:  Sure.  We object to the foundation.  You're asking this witness about onboarding documents, and you know, and you've said, that you're going to take that examination from the designee, I think, on Monday or Tuesday.

MR. KNOEPP:  I'm asking about management and what the responsibilities of management is, so --

MR. DAVIS:  Ms. Brooks, good afternoon.  Thanks for joining us.  Will you please read the last question back?

MR. KNOEPP:  You're muted, Sasha, if you're trying to speak.  Can't hear you.

THE REPORTER:  Yes. I'm just trying to make sure we're -- it was a couple of objections, so, I don't know if it's the "whenever I say management team, you'll understand what I mean?"

MR. DAVIS:  I believe there's a question on the table from the plaintiff asking about

onboarding documents.

THE REPORTER:  When truck drivers arrive each year, the management team handles getting them to fill out various onboarding documents; is that right?

MR. DAVIS:  I believe that -- yes, ma'am, I think that's what I heard.  Yes, Jim, same objection.

Q    (By Mr. Knoepp) You can answer, Mr. Gonsoulin.

A.    I'm vaguely familiar with onboarding documents.

Q.    Do you know -- for example, I-9 forms need to be filled out for workers to make sure they're eligible to work in the United States; is that right?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    Yes.

Q    (By Mr. Knoepp) That's something that the management team handles?

A.    Yes.

Q.    There are work rules that have been established for the truck drivers, that are -- the truck drivers need to review and sign; is that right?

A.    That would be correct.

Q.   That the management team handles in getting that taken care of?

A.   That is also correct.

Q.   The management team handles, like, getting people to fill out any tax forms that are needed from the truck drivers?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.   That also would be correct.

Q   (By Mr. Knoepp) The management team maintains the personnel files for the truck drivers; is that right?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.   That's accurate.

Q   (By Mr. Knoepp) And so the management team stores those truck driver personnel files at the Sterling Sugars offices?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.   Yes.

Q   (By Mr. Knoepp) The management team gets copies of the truck driver's licenses and medical exams that go along with those licenses and keep them in the personnel files?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    As far as I recollect, yes.

Q    (By Mr. Knoepp) The management team handles setting up drug testing that's done of the truck drivers at the beginning of each season, yes?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    Drug testing is done in some way or form prior to hiring of the employee, yes.

Q    (By Mr. Knoepp) The management team sets that up?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    I think the management team sets it up. Not sure who handles it, but they do set it up.  Yes.

Q    (By Mr. Knoepp) The management team also organizes a safety training meeting for the truck drivers at the beginning of the season; is that right?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    That would be an accurate statement.

Q    (By Mr. Knoepp) The management team handles issues related to the renewal of auto insurance for

the trucks that are being driven by the truck drivers, correct?

A.    Yes.

Q.    And that includes adding and removing truck drivers from the insurance?

A.    Yes.

Q.    The management team handles registration of the hauling trucks with the Louisiana Department of Transportation, yes?

MR. DAVIS:  Ms. Brooks, will you please repeat that question?  I did not hear it.

THE REPORTER:  The management team handles registration of the hauling trucks with the Louisiana Department of Transportation, yes?

MR. DAVIS:  Ma'am, I'm sorry.  Will you please repeat that?

THE REPORTER:  Okay.  So, are you able to hear me?

MR. DAVIS:  Yes, ma'am.  I heard you. When you started repeating the question on the front end, I didn't get it on the front end.  And when Jim said it, I didn't get it on the back end, so all I have is the middle, and I don't like it.

THE REPORTER:  The management team handles registration of the hauling of the trucks

with the Louisiana Department of Transportation?

MR. DAVIS:  Thank you.  Please go ahead, Mr. Gonsoulin.

A.     That would be a yes.

Q    (By Mr. Knoepp) The management team provides time clocks to record the hours worked of the truck drivers?

A.     That is correct.  Yes.

Q.     The management team creates the work schedules for the truck drivers and the locations where they go to pick up the sugar cane every day, right?

A.     That would be correct.

Q.     The management team provides transportation for the truck drivers to get from their housing to the truck parking area each day and then back to the housing at the end of the workday?

A.     Yes.

Q.     The management team handles preparing and processing payroll of the truck drivers every two weeks, yes?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.     Yes.

Q    (By Mr. Knoepp) The management team handles

any issues related to the payroll of the truck

drivers?

          MR. DAVIS:  Objection.  Foundation.

Exceeds scope.

    A.    That is correct.

    Q   (By Mr. Knoepp) The management team set up

the payroll card system that's used to pay the truck

drivers their wages; is that right?

          MR. DAVIS:  Objection.  Foundation.

Exceeds scope.

    A.    Yes.

    Q   (By Mr. Knoepp) The management team also

handles any issues brought to their attention by

truck drivers with those payroll cards; is that

right?

          MR. DAVIS:  Objection.  Foundation.

Exceeds scope.

    A.    Jim, repeat that question, please, sir.

    Q   (By Mr. Knoepp) Sure.  The management team

deals -- handles any issues brought to their

attention by the truck drivers with respect to their

payroll cards?

    A.    Yes.

    Q.    The management team provides cash advances

to the truck drivers at the beginning of the season?

A.    I am not aware of that.

Q.    The management team prepares and sends out the W-2 tax forms at the end of each year for the truck drivers?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    That would be accurate.

Q    (By Mr. Knoepp) With respect to -- I'm sorry, I should ask you, with respect to the cash advances that I asked you about for the truck drivers at the beginning of the season, is it -- you don't know whether that happens, is that what you were testifying?

MR. DAVIS:  Objection.  Ms. Brooks, please read back Mr. Gonsoulin's response to that question.

THE REPORTER:  I'm guessing his answer was before the objection?

MR. DAVIS:  It was.  I heard this question before there was a definitive answer, I believe.  The witness was asked something about cash advances, and he answered.

THE REPORTER:  Was it, "the management team set up payroll card system?"

MR. DAVIS:  It was around there.  And

then, there was something about a cash advance.

MR. KNOEPP:  It's fine.  I'll withdraw the question and move on.

MR. DAVIS:  Oh, okay.

MR. KNOEPP:  Thank you, Ms. Brooks.

Q    (By Mr. Knoepp) Mr. Gonsoulin, do you know if the management team provides cash advances to truck drivers?

MR. DAVIS:  Objection.  Asked and answered.

A.    I'm not aware of that happening.

Q    (By Mr. Knoepp) The management team handles issues related to violations of work rules by the truck drivers; is that right?

A.    That is correct.

Q.    The management team handles issues related to truck drivers who are involved in accidents; is that right?

A.    That is correct.

Q.    And the management team goes to the scene of accidents to investigate and gather information when accidents involving the truck drivers occur; is that right?

A.    That would be an accurate statement.

Q.    The management team purchased cameras and

installed them in the trucks so that any issues

related to accidents or unsafe driving by the truck

drivers can be reviewed?

MR. DAVIS:  Objection.  Foundation.

Exceeds scope.

A.    That is correct.

Q    (By Mr. Knoepp) The management team handles

issues related to truck breakdowns, flat tires,

things of that nature?

A.    Correct.

Q.    The management team handles issues with

respect to reporting truck drivers, who have been

terminated, to the U.S. Government?

MR. DAVIS:  Objection.  Vague.

Foundation.

A.    Yes, I am aware of that.

Q    (By Mr. Knoepp) The management team reports

to the insurance company regarding any insurance

claims that have been lodged related to truck driver

accidents?

A.    Yes, that is accurate.

Q.    The management team handles -- well,

reports to -- strike that.

The management team handles reporting

truck drivers who have temporarily left their

employment due to medical issues?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

A.    Repeat the question, Mr. Jim.

Q.    Sure.  Let me see if I can ask it again. The management team handles the reporting of truck drivers who have temporarily left their employment due to medical reasons?

MR. DAVIS:  Objection, form. Foundation.  Exceeds scope.  Assumes facts not in, as well as improper legal conclusion.

THE WITNESS:  You want me to answer that?

MR. DAVIS:  Yes, sir, subject to that objection.

A.    Yes, I'm aware of that.

Q    (By Mr. Knoepp) The management team handles getting truck drivers to sign paperwork for their personnel files related to their early departure from employment, correct?

A.    That's accurate.

Q.    The management team coordinates with Great Labor for the return transportation at the end of the season for the truck drivers from Mexico, so they can return to their homes; is that right?

A.    Excuse me one minute.  My son's walking in. I'm giving him the payroll checks.

(Pause in proceedings.)

A.    Okay.  Repeat the question.

Q    (By Mr. Knoepp) Sure.  The management team coordinates with Great Labor for the return transportation at the end of the season for the truck drivers from Mexico, so they can return to their homes?

A.    They do.

Q.    That includes notifying Great Labor of what dates they need to provide the buses for the workers?

A.    That would be accurate.

Q.    The management team handles issues related to workers' compensation claims related to the truck drivers?

MR. DAVIS:  Objection, foundation.

A.    That's accurate.

Q    (By Mr. Knoepp) The management team handles purchasing of supplies needed to operate the trucks, such as fuel, oil, brake pads, tires?

THE WITNESS:  You want me to answer that, Brandon?

MR. DAVIS:  Yes, Mr. Gonsoulin.  Yes. You are required to answer every single question

posed to you.  And, of course, I've made objections throughout the day, and I think only twice I've instructed that you not answer a question.  Please proceed.

A.    Yes, that's accurate.

Q    (By Mr. Knoepp) The management team provided fuel cards for the trucks that are used to operate the fuel pumps, so that the truck drivers can refuel their trucks when needed; is that right?

A.    That's accurate.

Q.    The pumps that are used to refuel the trucks are located at the Sterling Sugar's mill property; is that right?

A.    Yes.

Q.    The management team handles the maintenance -- or scheduling the maintenance on trucks that are used for hauling, such as oil changes and brake jobs; is that right?

A.    That would be correct.

Q.    And the management team handles any repairs of the trucks that are leased by South Central from Sterling Sugars; is that right?

A.    That is an accurate statement.

Q.    I'm sorry.  Did you say that is an accurate statement?

A.    Yes.  Yes.

Q.    Okay.  Sorry.  The management team deals with any issues related to stickers needed on both sides of the truck that lists the company name, since South Central is an intrastate carrier?

A.    Yes, that would be correct.

Q.    The management team handles the payment of invoices for South Central; is that right?

A.    Yes.

Q.    And the management team handles all -- all the accounting for South Central; is that right?

MR. DAVIS:  Objection.  Foundation. Exceeds the scope.

A.    Yes, that is correct.

Q    (By Mr. Knoepp) The management team reviews contracts with -- between South Central and West Truck Lease and advises South Central on whether to sign those contracts; is that right?

MR. DAVIS:  Objection, form.

A.    Repeat that question, Mr. Jim.

Q    (By Mr. Knoepp) Sure.  The management team reviews contracts between South Central and West Truck Lease and advises South Central on whether to sign those contracts?

MR. DAVIS:  Objection, form.

A.    Yes.

Q    (By Mr. Knoepp) The management team monitors account balances in South Central's bank accounts; is that right?

A.    Yes.

MR. DAVIS:  Objection, foundation, scope.

Q    (By Mr. Knoepp) The management team drafts promissory notes for any infusions of cash from Sterling Sugars to South Central; is that right?

MR. DAVIS:  Objection, foundation. Exceeds scope.

A.    That would be accurate.

Q    (By Mr. Knoepp) The management team handles the scheduling of member and board meetings for South Central; is that right?

A.    Repeat the question.

Q.    The management team handles the scheduling of member and board meetings for South Central; is that right?

A.    Yes.

Q.    The management team handles typing up of meeting minutes from the member and board meetings of South Central; is that right?

A.    No, that would be the association board

secretary or -- handle that.

Q.    I believe we looked at some exhibits before in which the meeting minutes were typed up by Ashley Lopez.  Do you remember that?

A.    Yes, they did change -- you're correct.  That's correct.

Q.    And Ashley Lopez is an employee?  I'm sorry?

A.    She's not a board member; you're correct.

Q.    All right.  Thank you.  And the management team handles maintaining those member and board meeting minute files for South Central; is that right?

A.    Yes.

Q.    Is part of the H-2A application process that -- that we discussed earlier related to the submission of the job orders, you didn't make the government aware of all of these things that we just discussed that the management team is doing to manage the operations of South Central, did you?

MR. DAVIS:  Objection, form.  Mischaracterization.

A.    Our attorney that does applications did all the documentation for the association.

Q    (By Mr. Knoepp) With respect to the H-2A

applications that were filed, did you mention anywhere in those applications about all of the things that we just discussed that the management team is doing on behalf of South Central?

MR. DAVIS:  Objection.  Form.

A.    Again, we hired a contract attorney to fill out the applications, and we reviewed them to send for our application process.

Q    (By Mr. Knoepp) Did any of those forms mention anything about the management team and the work that it's doing on behalf of South Central?

MR. DAVIS:  Objection.  The document speaks for itself.  Go ahead, Mr. Gonsoulin.

A.    I don't recall.

Q    (By Mr. Knoepp) Do you think that the clearance orders may have mentioned some of the things that the management team is doing on behalf of South Central?

MR. DAVIS:  Objection.  Speculative.

A.    No, I do not think the clearance order referenced the association.

Q    (By Mr. Knoepp) I'm sorry?

A.    The clearance or request referenced the association.

Q.    Right.  Does it mention anything about the

management team in the clearance orders?

MR. DAVIS:  Objection.  The document speaks for itself.

A.    I'm not aware of that being mentioned.

Q    (By Mr. Knoepp) In any other documents, did South Central ever inform the U.S. Department of Labor about the management team and the work it does for South Central?

MR. DAVIS:  Objection, form.  The document speaks for itself.

A.    Not that I'm aware of.

(Pause in proceedings.)

Q    (By Mr. Knoepp) Mr. Gonsoulin, I'm showing you what's been marked as Exhibit 58, and it starts with Bates number 90255.  Do you see that in the bottom right corner?

A.    I do.

Q.    And this is an email from Desiree Lange at Sterling Sugars to somebody at Hancock Whitney Bank. Do you see that?

A.    Yes.

Q.    And Hancock Whitney Bank is where South Central has a bank account; is that right?

A.    That would be correct.

Q.    And Ms. Lange is emailing the bank to let

her know that Jamie Robison is coming by to cash the check drawn on South Central's account; is that right?

A.    That's what the email would say.

Q.    A check for $17,700, right?

A.    That is what it says.

Q.    And she's asking for the bank to, if possible, provide Mr. Robison with $100 bills when he cashes that check, right?

A.    That's what the email refers to.

Q.    And the email says that the check represents advances given to 177 H-2A employees upon their arrival at Sterling, right?

A.    That's what it says.

Q.    Were you aware that the management team was providing advances to the H-2A employees through cashing a check on South Central's bank accounts?

MR. DAVIS:  Objection.  That question has been asked and it hasn't been answered.

A.    I was not.

Q    (By Mr. Knoepp) And I assume that if this happened in prior years -- this email is from 2025; is that right?

MR. DAVIS:  Objection.  The document speaks for itself.

A.    I guess your assumption is correct, but I only can assume what I see in front of me.

Q    (By Mr. Knoepp) Yeah.  The email is dated September of 2025, right?

A.    Correct.

MR. DAVIS:  Objection.  The document speaks for itself.

Q    (By Mr. Knoepp) And if advances that were handled by the management team for -- that were provided to H-2A truck drivers in prior years -- it's something that you would be unaware of; is that right?

MR. DAVIS:  Objection.  This question has been asked and answered.

A.    That would be a task of the management team.  Correct.

Q    (By Mr. Knoepp) It's something that they handle without consulting with you; is that right?

MR. DAVIS:  Objection.  Mischaracterization.

A.    That would be correct.

MR. KNOEPP:  Can we go off the record for 10 minutes, please?

MR. DAVIS:  Sure.

(Recess taken.)

RICKY GONSOULIN - 30(B)(6) - PART II                    JOB NO. 2592804
APRIL 09, 2026

THE REPORTER:  On the record.  Time is 4:41 p.m.

DIRECT EXAMINATION (CONTINUED)

BY MR. KNOEPP:

Q.    Mr. Gonsoulin, did the management team also handle any communications with the truck drivers about their wage rates?

A.    Those wage rates were stated on the contract, and yes.

Q.    The management team handled any communications with the truck drivers about the wage rates that they would be paid?

A.    Correct.

Q.    And whether there would be any reductions in their wage rates?

A.    That would be correct.

Q.    I wanted to ask about South Central's policy with respect to reimbursing truck drivers for any costs that they incurred to obtain their driver's licenses.

Did South Central reimburse any of the H-2A truck drivers for expenses associated with their commercial driver's licenses?

A.    I am not aware of that.

Q.    So you don't -- this is one of the topics I

RICKY GONSOULIN - 30(B)(6) - PART II                                    JOB NO. 2592804
APRIL 09, 2026

CHANGES AND SIGNATURE

PAGE LINE   CHANGE                                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, RICKY GONSOULIN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.



                                    RICKY GONSOULIN


THE STATE OF                      )

COUNTY OF                         )


     Before me,                              , on this day personally appeared RICKY GONSOULIN, known to me or proved to me on the oath of                      or through                              (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

     Given under my hand and seal of office on this      day of                      ,      .



                                    NOTARY PUBLIC IN AND FOR

                                    THE STATE OF

My Commission Expires:

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA


FELIPE DE JESUS                     )
AVILA-SOTO, et al.                  )
Plaintiffs,                         )
                                    ) Case No. 6:24-cv-01392
vs.                                 )
                                    ) JUDGE ROBERT R. SUMMERHAYS
SOUTH CENTRAL SUGAR CANE            )
GROWERS' ASSOCIATION,               ) MAGISTRATE JUDGE CAROL B.
IN., et al.                         ) WHITEHURST
Defendants.                         )


REPORTER'S CERTIFICATE

ORAL DEPOSITION OF

RICKY GONSOULIN

April 9, 2026


     I, Sasha S. Brooks, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
following:

     That the witness, RICKY GONSOULIN, was duly
sworn and that the transcript of the deposition is a
true record of the testimony given by the witness;

     That the deposition transcript was duly
submitted on                          to the witness or to
the attorney for the witness for examination,

signature, and return to me by                          .

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

      Mr. Knoepp (0h56m)
          Attorney for Plaintiff
      Mr. Davis (0h0m)
          Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

Further certification requirements pursuant to Rule 203 of the Texas Code of Civil Procedure will be complied with after they have occurred.

Certified to by me on this 23rd day of April, 2026.

Sasha S. Brooks, Texas CSR 8997
Expiration: 7/31/2026

FURTHER CERTIFICATION UNDER TRCP RULE 203

The original deposition was/was not returned to the deposition officer on                           .

If returned, the attached Changes and Signature page(s) contain(s) any changes and the reasons therefor.

If returned, the original deposition was delivered to Mr. Knoepp, Custodial Attorney.

$        is the deposition officer's charges to the Plaintiffs for preparing the original deposition and any copies of exhibits;

The deposition was delivered in accordance with Rule 203.3, and a copy of this certificate, served on all parties shown herein, was filed with the Clerk.

Certified to by me on this        day of

                    ,        .

                              Sasha S. Brooks, Texas CSR 8997
                              Expiration: 7/31/2026

 2026-04-09 – errata RICKY GONSOULIN – 30(B)(6) – FILLABLE.pdf

RICKY GONSOULIN - 30(B)(6)
APRIL 09, 2026

Job No. 2592804

Date: April 09, 2026

Witness Name: RICKY GONSOULIN - 30(b)(6)

Case: AVILA-SOTO, et al. v SOUTH CENTRAL SUGAR CANE GROWER

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury

that I have read the entire transcript of

my Deposition taken in the captioned matter

or the same has been read to me, and

the same is true and accurate, save and

except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION

ERRATA SHEET hereof, with the understanding

that I offer these changes as if still under

oath.

1 of 3

Page No.           Line No. _____

Change:   _____

Reason for change:  _____ ____

Page No. _____ Line No. _____

Change:   _____

Reason for change:  _____  _____

Page No.        Line No.

Change:   _____

Reason for change:  ____ _____

Signed on the $^{19}$ ____ day of

may

_____, 20 $^{26}$ ____.

_____

Signature    RICKY GONSOULIN – 30(b)

PAGE 3 OF 3

STENO.COM
(888) 707-8366

Q                  − 125% +

Items in "All Downloads" ∧

 

2026-04-09 – errata RICKY GONSOULIN – 30(B)(6) – PART II – FI... .pdf

RICKY GONSOULIN - 30(B)(6) - PART II
APRIL 09, 2026

Job No. 2592804

Date: April 09, 2026

Witness Name: RICKY GONSOULIN - 30(b)(6) - PART II

Case: AVILA-SOTO, et al. v SOUTH CENTRAL SUGAR CANE GROWEF

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Items in "All Downloads"    —  125%  +

2026-04-09 – errata RICKY GONSOULIN – 30(B)(6) – PART II – FI... .pdf



ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ___19___ day of ___May___, 20_26_.

_____

Signature   RICKY GONSOULIN - 30(b)(6) - PART II

PAGE 1 OF 3

STENO.COM
(888) 707-8366

RICKY GONSOULIN - 30(B)(6) - PART II
APRIL 09, 2026

DEPOSITION ERRATA SHEET

1 of 3

125%

Items in "All Downloads"