EXCERPTS FROM 30(B)(6) DEPOSITION
OF SOUTH CENTRAL SUGAR CANE
GROWERS' ASSOCIATION, INC.
BY AND THROUGH ASHLEE GARY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

_____
                                )
FELIPE DE JESUS AVILA-SOTO,     )
et al.,                         )    CASE NO. 6:24-cv-01392
                                )
          Plaintiffs,           )    JUDGE ROBERT R. SUMMERHAYS
                                )
v.                              )    MAGISTRATE JUDGE CAROL B.
                                )    WHITEHURST
SOUTH CENTRAL SUGAR CANE        )
GROWERS' ASSOCIATION, INC.,     )
et al.                          )
                                )
          Defendants.           )
_____)


     CONTINUED DEPOSITION OF DEFENDANT SOUTH CENTRAL
   SUGAR CANE GROWERS' ASSOCIATION, INC. (ASHLEE GARY)
    APPEARING REMOTELY FROM ST. MARY PARISH, LOUISIANA

            (Vol. III - Page 232 to 479)

          Taken on Behalf of the Plaintiffs


          DEPONENT:  Ashlee Gary

        DATE TAKEN:  April 13, 2026

             TIME:  9:11 a.m. CDT to 5:22 p.m. CDT




           Stenographically Reported by:
             Jennifer Lynn Harris, RPR
           Registered Professional Reporter
    (Appearing Remotely from Volusia County, Florida)

ASHLEE GARY - VOL. III                                                    JOB NO. 2592817
APRIL 13, 2026

REMOTE APPEARANCES:

Counsel for Plaintiffs:

JAMES M. KNOEPP, ESQUIRE
South Carolina Bar No. 102757
Admitted Pro Hac Vice
1612 Crestwood Drive
Columbia, South Carolina  29205
(828)379-3169 - Telephone
jim@dawsonmorton.com

DAWSON M. MORTON, ESQUIRE
California Bar No. 320811
Admitted Pro Hac Vice
1808 Sixth Street
Berkeley, California  94710
(404)590-1295 - Telephone
dawson@dawsonmorton.com


Counsel for Defendants:

BRANDON DAVIS, ESQUIRE
ANDREW M. ALBRITTON, ESQUIRE
Phelps Dunbar, LLP
365 Canal Street, Suite 2000
New Orleans, Louisiana  70130-6534
(504)584-9312 - Telephone
brandon.davis@phelps.com
andrew.albritton@phelps.com




ALSO PRESENT REMOTELY:

Mr. Randall Romero, Sterling Sugars Representative

Mr. Jared Hoffman, Steno Tech Assistant

Q.   And what kinds of documents were -- did you review in order to prepare for today?

A.   The -- the documents that were leases, payroll records, management contract, insurance for -- insurance documents, the minutes of the South Central meeting.

Q.   Okay.  Anything else?

A.   Not that I recall -- that I remember.

Q.   Ms. Gary, who is your employer currently?

A.   M.A. Patout & Son Limited, LLC.

Q.   And is that your only employer?

A.   Yes.

Q.   How long have you worked for M.A. Patout -- I'm sorry.  I know that it's a longer -- similar to South Central, there's a longer official corporate name.  If I refer to M.A. Patout, will you understand that I'm referring to the longer corporate name?

A.   Yes.

Q.   How long have you worked for M.A. Patout?

A.   Since November of 2014.

Q.   And in November of 2014, who hired you at M.A. Patout?

A.   Randy Romero.

Q.   Is Mr. Romero your supervisor?

A.   Yes.

Q.   Is he your only supervisor or do you have other

supervisors?

A.   He is my only supervisor.

Q.   And what is your job title currently?

A.   With respect to M.A. Patout, I am the chief financial officer.

Q.   And is that the position you were hired into in November of 2014 when you started?

A.   Yes.

Q.   Do you have any other job titles?

A.   With the South Central Association, I am the treasurer.

Q.   And how long have you been the treasurer for South Central?

A.   Since 2022.

Q.   And South Central started operations in 2022; is that right?

A.   Yes.

Q.   And you've been the treasurer at South Central during the entire time it's been in operation; is that right?

A.   Yes.

Q.   Is that a paid position by South Central?

A.   No.

Q.   And do you do that --

A.   No.

A.   Directly, yes.

Q.   Do you indirectly supervise anybody else in your work on behalf of South Central?

A.   Yes.

Q.   Who's that?

A.   Michelle Prados and Kellie Jackson.

Q.   And all three of those people are employees of Sterling Sugars; is that right?

A.   Yes.

Q.   And what type work do they do that you supervise? We can go one by one, perhaps is the easier way. So, with respect to Ms. Lange -- I'm sorry if I'm mispronouncing her name. I'm trying to -- you know, my Louisiana accent needs some work. But, with respect to Ms. Lange, what -- what do you super -- what kind of work does she do that you supervise?

A.   She is the bookkeeper.

Q.   So whenever you say "bookkeeper," what do you mean by that?

A.   She is -- she's the office manager here over the other accounting functions. She handles the general ledger and oversees the work of -- of her staff.

Q.   And does her staff include Michelle Prados and Kellie Jackson?

A.   Yes.

Q.   And so, I guess that's why you -- so you indirectly supervise them because Ms. Lange is their direct supervisor; is that fair to say?

A.   Yes.

Q.   And what type of work does Michelle Prados do?

A.   She is the accounts payable clerk.

Q.   And does she handle accounts payable for Sterling Sugars?

A.   Yes.

Q.   Does she also handle accounts payable for South Central?

A.   Yes.

Q.   And with respect to Ms. Lange, you mentioned that she is the office manager over the accounting functions and works on the general ledger.  Does she do that for Sterling Sugars?

A.   Yes.

Q.   Does she also do that work for South Central?

A.   Yes.

Q.   And other than accounts payable, does Michelle Prados do any other work on behalf of either South Central or Sterling Sugars?

A.   That's her main -- her main job function.  She may do some other incidental things, but I -- I believe that's her -- her main job title, her main focus.  She may --

Q.   Okay.

A.   -- do some bank reconciliations or, you know, other small things like that.

Q.   What about Kellie Jackson?  What type of work does she do?

A.   She is the front door secretary, the receptionist, and she is also the payroll clerk.

Q.   And does she do -- is she is the payroll clerk for Sterling Sugars?

A.   Yes.

Q.   And does she also serve as the payroll clerk for South Central?

A.   Yes.

Q.   What are your job duties as the CFO of M.A. Patout?

A.   It is my job to make sure that our financial statements are free of material misstatement and are filed with according to generally accepted accounting principles. I also oversee the accounting staff.  I meet with our auditors on a regular basis.  I make sure that our tax returns are filed.

Q.   And in your role as the treasurer of South Central, what are your -- what duties do you perform in that role?

A.   I'm responsible for making sure that income is

MR. KNOEPP: Does South Central -- Ms. Lange --

MR. DAVIS: Ms. --

MR. KNOEPP: Oh, sorry.

MR. DAVIS: I did want to ask whether that was a question. Thank you for telling me that it was.

Ms. Harris, will you please read that last question back?

THE REPORTER: "QUESTION: I was thinking of specialized accounting software. And" -- and the answer was, "With respect to South Central?" And then an objection.

MR. DAVIS: Objection to form.

Q. (BY MR. KNOEPP) Ms. Gary, I'm going to try and reask the question.

With respect to the work that's done on the general ledger related to South Central, does Ms. Lange use any other specialized accounting software, other than Sage BuisnessWorks?

A. No.

Q. Is -- you mentioned that Kellie Jackson is the payroll clerk who handled South Central's payroll; is that right?

A. Yes.

Q. And what -- does Ms. Jackson use the Sage BuisnessWorks software to manage the payroll for South

Central?

A.    Yes.

Q.    Does she use any other specialized payroll program, other than Sage BuisnessWorks, to run the payroll for South Central?

A.    Yes.

Q.    What does she use?

A.    Attendance Enterprise.

Q.    I -- is it Attendance?

A.    Attendance Enterprise.

Q.    Thank you.  And is that a program that South Central purchased?

A.    No.

Q.    Who -- who purchased that program?

A.    Sterling Sugars.

Q.    And what functions does Attendance Enterprise handle with respect to the payroll processing?

A.    It's the timekeeper.

Q.    And so that's a -- a timekeeping software that's connected to some time clocks that people would clock in and clock out at; is that -- is that right?

A.    Yes.

Q.    And the -- the time clocks that -- you're familiar -- South Central employs a number of truck drivers who haul sugarcane to the sugar mill; is that right?  You

know that?

A.    I'm sorry.  Can you ask that question again?

Q.    Sure.  You're aware that South Central employs a number of truck drivers that haul sugarcane to the Sterling Sugars mill, yes?

A.    Am I aware that -- I'm sorry.  I'm confused with the question.  Am I aware --

MR. DAVIS:  Objection.

A.    -- that they --

MR. DAVIS:  Vague.

A.    -- use the time clock?

Q.    (BY MR. KNOEPP) Not yet, no.  I was just trying to establish a -- so thank you for letting me know that the question was confusing.  I'll try and, you know, take a step back.

Do you know that South Central employs truck drivers?

A.    Do I know the South Cent -- I do not know the truck drivers.

Q.    No, that's not what I'm asking.  It just -- it may sound like a very basic question.  So I apologize.  It may be very simple.

I'm just asking:  Do you know that South Central employs truck drivers?

A.    Do I know they employ them?  Yes, I do know that

they employ them.

Q.   And those truck drivers haul sugarcane from farms to the Sterling Sugars mill, right?

A.   Yes.

Q.   Do those truck drivers use a time clock system to record their time that they work every day?

A.   Yes.

Q.   Is that the timekeeping system that you're referring to, called Attendance Enterprise, that they use?

A.   Yes.

Q.   And are those time clocks located at the Sterling Sugars mill property?

A.   Yes.

Q.   And I think -- are you familiar with the system, how it works?

A.   Yes, sir.

Q.   It -- I think it used -- maybe it used to be a facial recognition system.  Is that your understanding?

A.   It is now -- it used to be a -- a hand punch.  Now it is a facial recognition system.

Q.   Is there a monthly fee associated with that Attendance Enterprise system that's used for the timekeeping?

A.   Yes.  It's a month -- a monthly subscription.

Q.   Do you know how much the subscription is offhand?

A.    No, I do not.

Q.    And who pays for the monthly subscription?

A.    Sterling Sugars.

Q.    Do you know how many -- strike that.

Do you know whether the truck drivers all clock in at the same time clock?

A.    Not for certain.

Q.    Do you know how many time clocks there are available for the truck drivers to use?

A.    I believe there is one.

Q.    And it's the one that's located at the Sterling Sugars mill?

A.    Yes.  I believe that's the one that's been designated.  There are, I believe, other time clocks, but there's only one that is designated to them.

Q.    Do you know where that's located on the property at Sterling Sugars, where you're lo -- where you are right now?

A.    In the mechanic shop.

Q.    And the -- does the Attendance Enterprise timekeeping system then -- does that data get imported, in some way, into the Sage BuisnessWorks system?

A.    Yes.

Q.    And does anybody need to do anything for that to happen?  Like, Ms. Jack -- does Ms. Jackson, for example, as

A.   I do not know the answer to that.

Q.   And so the import that has to happen of the -- the timekeeping records that Ms. Jackson does on a biweekly basis, is that -- well, strike that.  Once the . . .

The -- the timekeeping data in the Attendance Enterprise system, is that stored at Sterling Sugars' offices?

A.   Prior to -- no, it's not.  It's part of a cloud-based system.

Q.   What about the Sage accounting software that that timekeeping information gets imported into?  Is that Sage accounting data stored at the Sterling Sugars offices?

A.   Yes, it is.

Q.   Is there a specific server that's dedicated to -- to that data?

A.   Yes.

Q.   Excuse me.  I'm sorry.  The time clock itself that you -- has the facial reignition, is that called Attendance Enterprise or does it have a different name?

A.   I believe it's now called Attendance on Demand. Same company.

Q.   Do other people at Sterling Sugars use the time clock that's designated for the truck drivers?

A.   I do not know the answer to that.

Q.   Does someone have to go into the system for

Attendance Enterprise to add a new employee who is working as a truck driver for South Central?

A.    Yes.

Q.    And I assume that that also requires the employee to stand in front of the time clock to recognize their face; is that right?

A.    Yes.

Q.    Do you --

A.    I -- I'm going to assume, yes.

Q.    Okay.  Do you know who handles that, the setting up of the new employee and making sure that their face will be recognized by the timekeeping system?

A.    Kellie Jackson.

Q.    When a new truck driver is added to the timekeeping system used by South Central, do they also get added to the payroll system, the Sage BuisnessWorks system?

A.    Yes.

Q.    And who does -- who does that?  Who adds the new truck driver to the Sage BuisnessWorks system?

A.    Kellie Jackson.

Q.    And do you -- what kind of information needs to be entered into the payroll system with respect to a truck driver who works for South Central?

A.    They would need an employee number, name, address, and any tax information.  They would need a tax

identification number and information that would have been filled out on a W-4 or an L-4.

Q.    And does South Central use some forms that the workers -- the truck drivers fill out in order to gather that information from them?

A.    Yes.

Q.    And who works with the truck drivers to get those forms filled out?

A.    Kellie Jackson and the dispatchers.

Q.    And those --

MR. DAVIS:  Counsel --

Q.    (BY MR. KNOEPP) -- the forms that -- I'm sorry.

MR. DAVIS:  I'm sorry, Counsel.  Go ahead.

Q.    (BY MR. KNOEPP) Those forms that contain that information about the truck drivers and their tax information, do those get stored in a personnel file for those truck drivers?

A.    Yes.

Q.    And who maintains those personnel files?

A.    Kellie Jackson.

Q.    And where do those personnel files get stored?

A.    In a filing cabinet.

Q.    And where is the filing cabinet located?

A.    In the Sterling Sugars office.

MR. DAVIS:  Counsel, we're right at about 90

that we notify you properly and identify the basis of our objection and to remind you, again, that we're prepared to approach for relief on this issue.

Subject to that, we'd like to continue and like to do so in a manner that does not require us to seek assistance from the Court concerning topics that were not noticed.

Q.   (BY MR. KNOEPP) Ms. Gary, all of the truck drivers who hauled sugarcane for South Central between 2022 and 2025 were H-2A visa workers; is that right?

A.   To my knowledge.

Q.   And are you aware of whether employers are required to pay any FICA tax related to H-2A visa workers?

A.   Am I aware?  Yes.

Q.   And do you know whether or not employers are required to pay FICA tax with respect to H-2A workers?

A.   Yes.

Q.   And in your role as the treasurer of South Central, I believe you said that you handle some -- the tax filings related to South Central.  Am I -- is that right?

A.   The federal income tax returns and the state tax returns.

Q.   Did you ever prepare any tax filings related to -- that show that no FICA taxes were paid by South Central because the workers are exempt from FICA tax?

ASHLEE GARY - VOL. III                                            JOB NO. 2592817
APRIL 13, 2026

A.    No, I did --

MR. DAVIS:  Objection; form.

A.    I did not file those payroll tax returns.

Q.    (BY MR. KNOEPP) Do you know if anybody at South Central filed any documents that showed that no FICA taxes were paid with respect to anybody who was employed by South Central?

A.    No one at South Central did.  I believe Desiree Lange files the payroll tax turns on behalf of South Central.

Q.    And she does that in her role as an employee of Sterling Sugars?

A.    She -- no.  She does that as the management company of South Central.

Q.    But she's employed by Sterling Sugars, right?

A.    Yes, she is.

MR. DAVIS:  Objection; asked and answered.

Q.    (BY MR. KNOEPP) Does she work for South Central? Do you know?  Is she an employee of South Central?

A.    She is not.

MR. DAVIS:  Objection; asked and answered.

Q.    (BY MR. KNOEPP) And you believe that she filed some payroll tax information related to whether or not South Central paid any FICA tax with respect to any employees?

A.    To my knowledge.

ASHLEE GARY - VOL. III                                          JOB NO. 2592817
APRIL 13, 2026

Q.   To your knowledge, yes, she did or to your knowledge, no, she did not?  Sorry.

A.   I'm sorry.  To my knowledge, yes, she did.

Q.   Ms. Gary, I'm going to show you what we're marking as Exhibit 59, ask you to look at that.  Do you see it on the screen, first of all?

(Exhibit 59 subsequently marked.)

A.   Yes, sir.

Q.   (BY MR. KNOEPP) It starts with a number, a -- a control number.  We call those Bates number in the legal world.  In the bottom right-hand corner, it's a document that starts with 3345.  Do you see that?

A.   Yes, I do.

Q.   Okay.  So that's a Bates number.  It's -- and so this documents start with a Bates number of 3345.  And it's -- it's a Form 943.  Do you see that?

A.   Yes, I do.

Q.   Have you ever seen this type of document before, related to South Central?

A.   This type?  Yes.

Q.   Okay.  And this document shows in Line 2 the wages -- wages subject to social security tax.  Do you see that?

A.   Yes.

Q.   And it says $0, right?

ASHLEE GARY - VOL. III                                          JOB NO. 2592817
APRIL 13, 2026

A.   Yes.

Q.   Do you know why it says $0?

A.   Because those wages are exempt from social security tax.

Q.   Does this document confirm that South Central only employed H-2A workers during this tax year of 2024?

A.   It says a number of agricultural workers in Line 1.  Employees paid, 197.

Q.   All right.  And would all of those workers have been H-2A workers since the document says that there were no social security taxes paid?

A.   To my knowledge.

Q.   To your knowledge, yes?

A.   Yes.  Sorry.

Q.   That's fine.  I understand.  This is your first time, you know, doing a deposition like this.  So --

A.   Yes.

Q.   -- there's no need to apologize.  I'm just asking the follow-up to make sure it's clear on the record.  That's all.  Okay?

A.   Okay.

Q.   In the other years, 2022, 2023, and 2025, was it also the case that all of the South Central employees were H-2A workers exempt from social security tax?

A.   To my knowledge, yes.  But I would need to see

ASHLEE GARY - VOL. III                                                JOB NO. 2592817
APRIL 13, 2026

another -- another form.  But, yeah, to my knowledge.

Q.   Now, not all of the -- like, this particular document shows 197 employees.  Not all of the employees of South Central are truck drivers; is that right?

A.   Correct.

Q.   South Central employs some other H-2A workers who do other jobs besides truck driver; is that right?

A.   To my knowledge, yes.

Q.   And each year South Central employs somewhere between 120 and 140 truck drivers with H-2A visas; is that right?

A.   Yes.

Q.   And are all of those truck drivers paid by the hour?

A.   Yes.

Q.   And each year is each H-2A truck driver paid the same wage rates?

A.   Yes.  Well, no.

Q.   Maybe I -- might have been a confusing question as well.  So let me try again.

So in 2020 and 20 -- in 2000 -- strike that. Start again.

2022, all of the truck drivers who worked at South Central with H-2A visas would have been paid the same wage rate; is that right?

thing as this morning.  So every single time that you ask for communications from counsel in any form, written or oral, we're -- we can't answer that because I think that you're asking the witness to tell you what the lawyers may have said.  So I've been clear.

MR. KNOEPP:  I just -- okay.  I'm not asking, again --

MR. DAVIS:  I want --

MR. KNOEPP:  I'm not asking about any communications or anything that was said between anybody and any lawyers.  I'm just asking --

MR. DAVIS:  See --

MR. KNOEPP:  -- "Do you know who paid the bill for any lawyers who helped form the association?"

MR. DAVIS:  The -- we're not answering that question.  I've been clear.  And we will make ourselves available, and we have been willing to do that while you actually have the witness here.

Q.   (BY MR. KNOEPP) Prior to the formation of -- or -- sorry.  Strike that.

Well, what type of business does South Central engage in?

A.   They are a group of growers that harvest and haul a sugarcane.

Q.   South Central does not grow any crops; is that

right?

A.   No.

Q.   I'm sorry.  That was maybe a poorly worded question.  Does South Central grow any crops?

MR. DAVIS:  Objection; asked and answered.

Ms. Harris, will you please read the last question and answer back?

THE REPORTER:  "QUESTION: South Central does not grow any crops; is that right?

"ANSWER: No.

"QUESTION: I'm sorry.  That was maybe a poorly worded question.  Does South Central grow any crops?

"Objection; asked and answered."

Q.   (BY MR. KNOEPP) You can answer, Ms. Gary.

A.   Oh, I'm sorry.  Repeat the question.  That was a bit confusing.

Q.   Does South Central grow any crops?

A.   No.

Q.   Ms. Gary, I'm showing you what's being marked as Exhibit 60.  Do you see that on your screen?  It has a Bates label that starts with 90763.  Do you see that?

(Exhibit 60 subsequently marked.)

A.   Yes, sir.

Q.   (BY MR. KNOEPP) Sorry.

A.   I do.

was formed.  So, based on the desig -- based on me being the designee, I would say that Chris Patout was involved in that in 2022, and after that would have been Ricky Gonsoulin.

Q.   But you don't know for sure whether -- you're saying probably Chris Patout, but you don't know whether it was him or not, right?

A.   Are you asking me as just the designee of the corporation or are you asking me as my personal knowledge? I just want to make sure I hear --

Q.   I'm asking you as the des -- sure.  No, I understand.  I'm asking you as the designee of the corporation.  One of the topics for the deposition is, you know, what wage rates were paid and how those wage rates were determined.

A.   Then Chris --

Q.   That's what I'm asking you about.

A.   Okay.  I'm sorry.  Chris Patout would have been the president to work with the attorneys to set that up in 2022.

Q.   And it's your understanding that the -- that South Central determ -- that South Central believed that all of its operations, including the truck driving operations, were farming operations; is that right?

A.   Yes.

Q.   Was there -- that -- was that decision

memorialized anywhere?  A memo or a email?

MR. DAVIS:  Object to form and assumes facts not in.

A.    There were lots of conversations and information going back and forth during that time period.  I can't confirm or deny.

Q.    (BY MR. KNOEPP) Well, I'm just -- I'm just asking you about conversations and information going back and forth about wage rates in particular.

Was -- were -- was a decision about wage rates and which wage rates should apply to different workers at South Central -- was that decision memorialized anywhere?

MR. DAVIS:  Objection; asked and answered.

A.    The wage rate came from the federal registry of H-2A workers.  We didn't determine the rate.  The rate was given to us.

Q.    (BY MR. KNOEPP) And that rate was given based on the decision that all of the work was part of farming operations; is that right?

MR. DAVIS:  Objection.

A.    To my knowledge, yes.

Q.    (BY MR. KNOEPP) What were South Central's pay policies with respect to reimbursement of truck drivers for expenses they may have incurred to obtain driver's license to drive the hauling trucks?

A.   Yes.

Q.   I wanted to turn to some of the financial aspects of the business and at least start by asking you:  What are the sources of income from South Central?

A.   Okay.  Sources of income to South Central or from South Central?

Q.   What are the sources of income, like, to -- I said "for South Central."  But what are the sources of income, you know, to South Central, if that's -- makes more sense to you?

A.   They -- yes.  Sorry.  Those words can be specific. So South Central gets income from harvesting activities and hauling activities.

Q.   Any other sources of income for South Central?

A.   Cane shuttle.

Q.   I'm sorry.  Can you say that again?

A.   Cane shuttle.

Q.   Cane shuttle.  What is -- what is that?

A.   That is -- once the cane is here on the yard, it is delivered in, like, a container but it's not quite ready to go into the -- into the table yet.  So it would just be the shuttle around the yard to get the cane from the cane yard to the mill.

Q.   And that's a separate source of income that's paid differently than the hauling from the farms to the mill; is

that right?

A.   Yes, because we don't take possession of the cane. The cane does not belong to Sterling until it goes into the table.  It's still -- it's still the owners' commodity before then.

Q.   And are you -- those are typically done by what are -- moved around by what are referred to as mule trucks. Is that your understanding?

A.   Yes.

Q.   And whenever that income comes in to South Central, is it referred to as "cane shuttle income" or something else?

A.   Cane shuttle income.

Q.   Okay.  Great.  Thanks.  It -- you were -- you were mentioning the word "we" there.  Whenever you say "we," what were you referring to?

A.   South Central.

Q.   And so harvesting, hauling, and cane shuttle are the three sources of income; is that right?

A.   From activities, yes.

Q.   Is there a source of income from something other than activities?

A.   There's a revenue balance -- income from a revenue balance agreement.

Q.   And what is the source of that income or -- or who

ASHLEE GARY - VOL. III                                           JOB NO. 2592817
APRIL 13, 2026

is the source of that income?

A.   Sterling Sugars is -- Sterling Sugars,
Incorporated is the source of that income.

Q.   And I'm going to get into each one of these in a
little bit more detail specifically, but I just want to make
sure that I get all the categories first.  Is there any
other non-activity source of income for South Central?

A.   No, not that I can -- not that I recall, no.

Q.   Whenever you say "Sterling Sugars," are you
referring to Sterling Sugars, LLC?

A.   Yes.

MR. DAVIS:  And, Counsel, just -- I'll use this
brief pause to reiterate that Ms. Gary is appearing for
South Central on the matters designated.

Q.   (BY MR. KNOEPP) With respect to the harvesting
income, what is the annual income from harvesting activities
at South Central?

MR. DAVIS:  Objection.

Q.   (BY MR. KNOEPP) And I'm not looking for -- I'm
looking for just a ballpark figure, if you have it.

MR. DAVIS:  Objection.

A.   Roughly, 3 to $4 million.

Q.   (BY MR. KNOEPP) And what is the source of that
harvesting income?  Where's it -- where's the harvesting
income coming from?

ahead.

A.   Oh, yes.

Q.   And with respect to the harvesting income, how -- how is the amount of money that South Central would receive determined?  Is it based on the number of tons, for example?

MR. DAVIS:  Object to form.

A.   No.

Q.   (BY MR. KNOEPP) What is -- how is the harvesting amount determined?

A.   It's determined by the number of acres.  We -- they pay per acre.

Q.   And so the -- a grower who is a member of South Central and has South Central harvesting its crop pays South Central based on the number of acres that they're farming?

A.   No.

Q.   Or they're harvested -- I'm sorry.  The number of acres that are harvested?

A.   Yes.

Q.   And is that a set amount per acre?

A.   Yes.  There's --

Q.   Who --

A.   -- a minimum, but yes.

Q.   And what is the amount per acre?  Is it the same for every grower?

A.   It is the same for every grower, but it will

change from year to year.

Q.   And who determines -- how's that amount determined?

A.   It has a base rate.  And then, based on fuel prices and labor rates, the rate may go up or down each year based on the increase of those rates.  But that is set by Randy Romero.

Q.   Mr. Romero who works as the -- Mr. Romero is your boss, right, who works at M.A. Patout?

A.   Yes.

Q.   Okay.  And he sets the amount of money that will be paid for the harvesting activities?

A.   He sets the -- the amount of the per-acre cost that we will charge.

Q.   When you say "we will charge," you're --

A.   Oh, I'm sorry.  South Central.

Q.   So Mr. Romero of M.A. Patout sets the amount per acre that South Central would charge for harvesting its member's crop; is that right?

A.   Yes, per the -- per the harvest agreement.

Q.   And so the -- the next category that I wanted to talk about with respect to sources of income is the hauling work.  When we're talking about hauling work, we're talking about the hauling of sugarcane from farms to the Sterling Sugar mill, right?

A.   Yes.

Q.   And that work is done by the H-2A truck drivers who are brought in every year to do that work; is that right?

A.   Yes.

Q.   The plaintiffs in this lawsuit, right?  You understand that?

A.   Yes.

Q.   Okay.  So the -- just, first of all, ballpark figure, what is the annual income associated with the hauling activities done by South Central?

MR. DAVIS:  Objection.

A.   I'm sorry.  Five -- five to 6 million.

Q.   (BY MR. KNOEPP) And has that amount been consistent over the years between 2022 and 2025?

A.   That's a --

MR. DAVIS:  Objection.

A.   That's about the average.

Q.   (BY MR. KNOEPP) And what is the source of the payment for the hauling work?  Who's paying for the hauling work?

A.   Sterling Sugars pays the hauling to the hauler.

Q.   And how -- is that -- the amount of money that's paid for the hauling, is that also determined on a per-acre basis or -- or some other basis?

A.    That's determined on the distance from the mill.

Q.    And is it fair to say that -- well, why don't you tell me?  How does the distance from the mill determine what the amount will be paid for hauling?

A.    Shorter cane -- shorter distance cane around the mill may have one rate versus cane that is further away from the mill would have a higher rate.

Q.    And how was the -- the rate determined, the amount?

MR. DAVIS:  Objection; foundation; exceeds scope.

A.    Those rates were determined long before I came here.  With respect to the association, I'm sure it has to do with the geographical distance from the mill.  I'm not -- I do not know how those rates were exactly determined.

Q.    (BY MR. KNOEPP) But who determined the rates that would be paid for the hauling?

MR. DAVIS:  Objection; foundation; exceeds scope.

A.    I do not know who determined the rate.

Q.    (BY MR. KNOEPP) Well, as the designee for South Central, do you know whether South Central negotiated with anybody with respect to what rate they would be paid for their hauling activities?

MR. DAVIS:  Objection.  This is asked and answered and this question exceeds scope.

Q.    (BY MR. KNOEPP) You can answer, Ms. Gary.

Sugars can let other haulers use that fuel that's in the --
that's put in the tank by South Central?

A.    I don't know of that specific language.

Q.    And whenever you say that's part of the -- the
lease agreement, which lease agreement are you referring to?

A.    The equipment lease agreement.

Q.    And the equipment lease agreement that's between
Sterling Sugars -- the Sterling Sugars Sales Corporation and
South Central?

A.    No, the equipment -- the equipment -- yes.  I'm
sorry.  Yes.

Q.    There's also an equipment lease agreement between
Patout Equipment Company and South Central; is -- is that
right?

A.    Yes.

Q.    And so where -- what you're talking about, with
respect to the fuel, is the -- the one with Sterling Sugars
and Sterling Sugars Sales Corporation; is that right?

A.    Yes.

Q.    The expenses for South Central in each year
between 2022 and 2025 exceeded South Central's income; is
that right?

A.    Yes.

Q.    In other, South Central hasn't earned enough
income from its harvesting, hauling, and cane shuttle

activities to meet its expenses in years 2022 to 2025; is that right?

A.   Yes.

Q.   What are the major expenses that South Central has as part of its operations?  We already talked about fuel, right?  That they're buying fuel, right?

A.   Labor.

Q.   And that would be the labor of the H-2A workers --

A.   Yes.

Q.   -- that do the hauling or the harvesting activities, right?

A.   Yes.  The equipment lease to use all of the equipment, insurance, auto insurance.  Those are probably the four -- four or five major.  There's also some repairs and maintenance.  There's the management fee that they pay to Sterling.  And there's also a housing fee that they pay to Sterling to house the H-2A workers.

There are kitchen supplies and food in order for us to prepare meals.  There's a cane yard lease.  The parking lot where the cane is held until it's ready to go into the mill, there is expense for that.

Q.   If I could stop you there for just a second.  When you say "the cane yard lease," is that the parking lot lease that you're referring to?

A.   Yes.  I'm sorry.

purchasing system with the purchase orders, I believe Mr. Soileau testified, at his earlier deposition, that he's the purchasing agent for South Central.  Was that your understanding?

A.   Yes.

Q.   And sometimes Mr. Robison can also sign off on purchase orders; is that right?

A.   Mr. Robison would sign off on those things that are not through the purchasing system.  He would sign off on the expenses that would not go through the purchasing system.

Q.   Okay.  Understood.  So only Mr. Soileau with respect to the purchasing system that has, like, a computer program and everything that he uses; is that right?

A.   Yes.

Q.   And, again, just for the record, Mr. Soileau, he is an employee of Sterling Sugars, right?

A.   Yes.

Q.   And then, with respect to things that don't go through the purchasing system -- you mentioned things like leases.  So South Central has a lease agreement with West Truck Lease; is that right?

A.   Yes.

Q.   West Truck Lease charges South Central $3,000 a month per truck that is leased from West Truck Lease; is

that right?

A.   Yes.

Q.   And every month West Truck Lease sends an invoice to South Central for the costs associated with that lease, right?

A.   Yes.

Q.   And so that invoice, whenever that comes into the office at South Central, how does that get processed for payment?  Like, who approves it and things like that?

A.   It should get approved by someone at operations and then turned in to accounts payable for processing.

Q.   And by "somebody in operations," who -- who can approve that?  What do you mean by "operations"?

A.   That would be either Jaime Robison, Roddy Patout, or -- or Tim Soileau.

Q.   Okay.  Anybody else who would approve those?

A.   I don't think so.

Q.   And whenever I say, like, to you "West Truck Lease sends the invoice to South Central," does West Truck Lease send -- send that by mail or by email?  Do you know?

A.   Either one.  Both are acceptable forms of invoice.

Q.   And when they send it by mail, that goes to -- the address that South Central uses is the address for the Sterling Sugars administrative office, where you're located right now; is that right?

A.   Yes.

Q.   Does South Central have any other mailing address that it uses for its business purposes?

A.   Not to my knowledge.  I think their address is the address here.

Q.   And that's the 611 Irish Bend in Franklin, Louisiana; is that right?

A.   Yes.

Q.   And so the in -- the invoice comes in.  It's -- does it get put into a box or something like that by somebody in the office for somebody in operations to review?

A.   The mail gets separated according to the company that is being invoiced and then it awaits approval. Michelle would have to let one of the operations people know that she had received the invoice and that it needed to be approved for payment.

Q.   And so, then is there, like, some kind of mail slot type of setup in the administrative office there where somebody can go by and look and see if they have a stack of invoices they need to, like, go through and review?

A.   No.  I believe Michelle has a box in her office, like a --

Q.   Okay.

A.   -- just a paper box-type organizer of -- of things that she's waiting on approvals for.

Q.   And so then Mr. Robison, Mr. Roddy Patout, or Mr. Soileau will review that invoice and authorize it to be paid; is that right?

A.   That's the process.

Q.   And then where does it go from there?

A.   Michelle would enter the accounts payable into Sage BusinessWorks in the sales database.

Q.   And -- and then -- then it gets -- it gets paid, either by check or some sort of electronic transfer or something?

A.   Yes.

Q.   I see -- seen sometimes those invoices are paid with checks, right?  Actual physical checks that get paid out to people; is that right?

A.   Yes.

Q.   And those checks have a signature of Mr. Christopher Patout and Ricky Gonsoulin on them.  Are you familiar with these checks?

A.   Yes.

Q.   Are those checks that are preprinted with their signatures on them?

A.   It's called an auto stamp.  It's -- it's in the accounting program.  And so, when it prints the check, it prints the -- the signature at the same time.

Q.   And that's in the accounting software that the

Sterling Sugars employees are using to pay the South Central invoices; is that right?

A.    As part of the management agreement, yes.

Q.    And so the checks aren't taken over to Mr. Patout or Mr. Gonsoulin and they have to, like, put a wet signature on them, right?

A.    No.

Q.    They -- and does anybody check with them first before printing out the checks with their auto -- I don't want to say autopen but I'm going to say autopen -- with --

MR. DAVIS:  I knew it was going to happen.  Now, listen --

MR. KNOEPP:  I couldn't remember the term you used, Ms. Gary.

MR. DAVIS:  I knew you couldn't -- I knew you couldn't resist, Jim.

MR. KNOEPP:  No, I couldn't --

MR. DAVIS:  I was waiting on that.

MR. KNOEPP:  I couldn't remember the term that Ms. Gary used.

THE WITNESS:  We call it -- we call it auto stamp.

MR. KNOEPP:  Auto stamp.  Okay.  Thank you.  Sorry.  Okay.  I'm going to start over.  So strike that last part.

Q.    (BY MR. KNOEPP) So do -- does anybody contact

Mr. Patout or Mr. Gonsoulin before using the checks that have their auto stamp on them to pay these invoices?

A.   No.   The process is I approve the purchases.   I receive a report once a week with a listing.   We call it the approve-to-pay report.   I receive -- Michelle emails me the approve-to-pay report.   And I select the checks for payment that week and then send those back to her for the approved payments.

Q.   And so that -- you look at them, you approve them, and then send it back to Michelle.   And then she does the -- the generation of the checks with the auto stamp?

A.   Yes.

Q.   Okay.   And you -- you get that approve-to-pay report from Ms. Prados by email?

A.   By email, yes.

Q.   And do you send it back -- do you send back your approvals or your denials by email as well?

A.   Yes.   I'll highlight the checks -- the items that are going to be paid, and then I send that back to her.

Q.   Before those invoices are paid by Ms. Prados, I will -- let me ask this question first.

Is Ms. Prados the only one who handles the payment of the invoices after you approve them?

A.   Yes.

Q.   She's the accounts payable clerk, right?

A.   Yes.

Q.   Okay.  And so does Ms. Prados have to -- before issuing a check or making an electronic transfer, does she do anything to make sure there's enough money in South Central's bank account to cover those invoices?

A.   Yes.  Once I send her the approve-to-pay, she would submit to Desiree her -- what we call a cash needs for the week.  Desiree would check the bank account or the cash ledger to see where the funds -- you know, where -- how much funds were in the account to determine the payment.

Q.   Okay.  And so Ms. -- so Desiree Lange would -- has access to the South Central bank accounts such that she can check online to see what the account balances are?

A.   Yes.

Q.   Does anybody else have access to those South Central bank accounts to check to see what the balances are?

A.   Michelle Prados does.

Q.   So Michelle could check it herself but it's something that Ms. Lange does?

A.   For internal control purposes, yes, for segregation of duties.

Q.   Okay.  Understood.  And that -- they use -- is the -- the application within the Hancock Whitney Bank system called Treasury Manager that they look at --

A.   Yes.

ASHLEE GARY - VOL. III                                          JOB NO. 2592817
APRIL 13, 2026

Q.   -- to determine what the balances are?

A.   Yes.

Q.   Okay.  And that Treasury Manager also allows them to transfer funds between accounts; is that right?

A.   Yes.

Q.   And so -- so Desiree Lange would receive a cash needs for the week amount from Ms. Prados, would check the account to see if there's enough cash in it to cover the needs, and if there's -- have there been times whenever there's not enough cash in the account to cover the needs?

A.   Yes.

Q.   What happens then in order to make sure that you don't bounce checks?

A.   A loan would be taken from Sterling Sugars.  There would be a loan from Sterling Sugars to South Central.

Q.   And does somebody -- if that happens or when that happens, does somebody need to approve that?

A.   Usually, Desiree would call me to let me know. Sometimes she calls; sometimes she doesn't.  It depends on where we are in the season.  But when a draw is made, she contacts Ricky Gonsoulin to let him know that there's a loan document that needs to be signed because we're taking a draw from Sterling Sugars.

Q.   And so does anybody from Sterling Sugars need to approve the loan?  Do you know?

A.    It's part of -- Rivers -- I believe Rivers or Tim would be the approver on -- on that side.  I'm not sure but I could check on that.

Q.    Without a loan from Sterling Sugars to cover any shortfall in the bank account to cover the expenses, is there any other source of money that South Central could tap into to -- to -- to get money into the account to -- to cover what's needed?

MR. DAVIS:  Objection; speculative.

A.    No.  I believe that, according to the resolutions that were filed by the board when there was inception, that the only source of what we would call a loan would be by Sterling Sugars.  I -- I do not have the authority to go out to another source to borrow money or behalf of the association.

Q.    (BY MR. KNOEPP) Yeah.  And that -- that's my question.  Was it -- you know, could you go to -- as the treasurer of South Central, could you go to Hancock Whitney bank and say, "Hey," you know, "we're short and we need," you know, "a million dollars in cash"?  Like, could you do that?

MR. DAVIS:  Object to form.

A.    Not -- not under the way things are designed right now.  The -- I do not have the authority to do that based on the resolutions.

ASHLEE GARY - VOL. III                                                      JOB NO. 2592817
APRIL 13, 2026

Q.    (BY MR. KNOEPP) And so the current system is that if -- if cash is needed to cover expenses, that South Central contacts Sterling Sugars to provide that; is that right?

A.    Yeah.  It's a loan that they pay back at prime interest.

Q.    And so the -- there's a promissory note that gets created related to this loan that you're talking about, right?

A.    Yes.

Q.    And that's signed by somebody from Sterling Sugars, right?

A.    It should be.

Q.    And then signed by somebody at South Central, Mr. Gonsoulin, right?

A.    Yes.

        MR. DAVIS:  Objection.  The "it" is a note?

        MR. KNOEPP:  The promissory note.  I'm sorry if it wasn't clear.

        MR. DAVIS:  Is that -- is that in evidence?

        MR. KNOEPP:  We were just talking about that a promissory note gets prepared, and I was asking who signs the promissory notes to get prepared.

        MR. DAVIS:  Object to the form.  And I think it's 701 is the rule.

A.   Yes.

Q.   And how is South Central able to do that if -- you know, we discussed before how its expenses exceed its income.  How is it able to pay back the loans from Sterling Sugars when its income doesn't exceed its expenses?

MR. DAVIS:  Object to form and the temporal scope.

A.   I'm sorry.  I --

Q.   (BY MR. KNOEPP) You can go ahead and answer, Ms. Gary.

A.   Okay.  There is -- we have a rev -- it's called a revenue balance agreement where the association, at the end of its fiscal year, needs to have net -- a net income of zero for tax purposes.  So there's an agreement with Sterling Sugars that Sterling Sugars can give money to the association to balance their books to zero.

Q.   And is it fair to say that the money that Cent -- South Central receives from Sterling Sugars, pursuant to that revenue balancing agreement, is then written off so that South Central doesn't have to pay it back?

MR. DAVIS:  Object to characterization.

A.   I think it's a little more complicated than that.

Q.   (BY MR. KNOEPP) Yeah, I'm -- and I'm not -- I'm not a, you know, certified public accountant.  So, you know, I apologize.

MR. DAVIS:  Don't worry.  Don't worry.  We know

ASHLEE GARY - VOL. III                                            JOB NO. 2592817
APRIL 13, 2026

that you can catch on.  We -- we'll answer the question.

A.    So there are -- there are entries that are made where the amount of income is determined.  There's an entry to income for -- to get the books to zero and then there is a debit.  There's -- in accounting, you know, it's -- it has to be balanced.  So where there's a credit, there has to be a debit.  The debit on the other side is for -- it's a -- called a due-to/due-from account.  From there the -- in the due-to/due-from account, it is netted with the interest payable and the note payable to come to just one account on the balance sheet for the amount of money that either South Central owes to Sterling Sugars or that Sterling Sugars would owe to South Central once all of the entries have been completed.

Q.    (BY MR. KNOEPP) And are these -- these are referred to as intercompany transactions; is that right?

A.    That would be the accounting term for that, yes.

Q.    Okay.  And so, basically, the loan balance every year is zeroed out through an intercompany transaction; is that right?

A.    Yeah.  That's what the agreement says, yes.

Q.    And so let's look at that.  I -- you mentioned the revenue balancing agreement.  So we've looked at that before in a prior deposition.  It was marked as Exhibit 24.  And so

Q.   When you say your "organization," what are you referring to?

A.   Oh, I'm sorry.  South -- South Central Sugar Cane Growers' Association.

Q.   And was Mr. Riviere asked to draft this agreement by South Central or by Sterling Sugars?

A.   He's an attorney for all of our -- he's also attorney for the Patout -- who we refer to as the Patout Group.  Let me think about this for a second.

It would have been done on behalf of Sterling Sugars for South Central in order for us to provide the money to South Central -- in order for Sterling Sugar -- sorry, "us" -- in order for South -- stop, Ashlee.

In order for Sterling Sugars to provide money to South Central, he would have had to do this agreement.

Q.   Do you know whose idea was the agreement?

A.   Oh, that's a good question.

Q.   Well, I hadn't got one today.  You can't take it -- yeah.

MR. DAVIS:  You may not have knowledge of that, Ashlee.

A.   I don't know that I do.  I think that there were just several conversations with -- with people about the association's books needed to be zero.  So I don't know that there was -- I don't know that -- I don't know who the

specific person was.  I think it was just through

conversations about the understanding of how the -- the ins

and the outs flowed.

Q.   (BY MR. KNOEPP) And how does this agreement assist

South Central in continuing to operate?

A.   They need to be able to have a financially stable

environment in order to be able to bring in workers to

harvest and haul cane.  They need to be able to lease

equipment and pay for expenses in order for them to

successfully get their crop from the field, cut, and to the

market.  So this -- this agreement allows them to do this to

keep their -- their books stable and balanced.

Q.   The agreement references that the -- that South

Central will receive sufficient funding to balance the

revenue and expenses.  Do you see that?

A.   Yes.

Q.   And it says that that will provide for financial

stability and continued operation of the association.  Do

you see that?

A.   Yes.

Q.   As the treasurer of South Central, do you agree

that -- that this agreement has helped to do that for South

Central?

MR. DAVIS:  Objection.

A.   Are you asking my -- it sounded like you were

Sterling -- or for South Central; is that right?

A.   No.  That happens before the consolidated financial report.

Q.   Is there an intercompany reconciliation that happens before the audited financial report gets done?

A.   That -- that was what I described earlier in the revenue balance agreement, that, once we determine what the shortfall is, that there is an entry that is posted.  The money -- the revenue is given over to South Central to balance those books to zero.  That happens way before the consolidated financial statement happens.

Q.   And so, in the end, for financial reporting purposes, South Central is a disregarded entity; is that right?

A.   Yes.

MR. DAVIS:  Objection.

Q.   (BY MR. KNOEPP) So -- and the -- the intercompany transfers are removed and the expenses are reported on the financial statements of the M.A. Patout entities; is that right?

MR. DAVIS:  Objection; foundation and all of this
    does exceed the scope.  We -- we're trying to cooperate
    but you didn't notice an examination of the financial
    condition of South Central.  So subject to that
    objection, we'll try to answer.  But you're off notice.

ASHLEE GARY - VOL. III                                        JOB NO. 2592817
APRIL 13, 2026

A.    I'm sorry.  Do I answer that?

MR. DAVIS:  Yes, ma'am.

A.    Okay.  I'm sorry.  Can you repeat the question?

MR. KNOEPP:  Sure.  I'm going to ask Ms. Harris to read that one back, if she doesn't mind.

THE REPORTER:  "QUESTION: So -- and the intercompany transfers are removed and the expenses are reported on the financial statements of the M.A. Patout entities; is that right?"

A.    This is -- this is not the individ -- you're not asking about the individual books of South Central?  You're asking me about the M.A. Patout books -- about the M.A. Patout accounting records?

Q.    (BY MR. KNOEPP) Well, my understanding is that there's consolidated reports.  And so the South Central transactions that -- get moved off of South Central's books and get moved onto Sterling Sugars books or M.A. Patout's books.  Is that right?

MR. DAVIS:  Same objection.

A.    We file eliminations for intercompany transactions happen with all of our -- with all of our companies.  All intercompany transactions -- our -- the -- the CPA -- our auditing firm does what's called an elimination entry of all intercompany transactions.

Q.    (BY MR. KNOEPP) And that includes -- South Central

is considered an intercompany transaction with Sterling

Sugars and M.A. Patout, right?

    A.   Yes, I believe, per our audit report, that would

be correct.

    Q.   And so -- so I'm asking on the -- for the books of

South Central, the effect of being a disregarded entity

means that any expenses that South Central had that remain

unpaid go onto the books of Sterling Sugars or M.A. Patout,

right?

    A.   Yes.

         MR. DAVIS:  Same objection.

    A.   In the consolidation.

    Q.   (BY MR. KNOEPP) For the -- and I guess the reason,

from the accounting standpoint -- the reason for doing that

is to make sure that the financial condition of all of the

entities is accurately reflected so there's no double

counting; is that right?

    A.   Yes, that is correct.

         MR. DAVIS:  Same objection.

    A.   Wherever the -- wherever the transaction

originated is where it gets eliminated from.

    Q.   (BY MR. KNOEPP) And that's important because the

audited financials get provided to insurance companies in

order for them make decisions about providing insurance to

South Central and other entities within the Patout Group,

This term -- this topic was not noticed.

A.    I'm sorry.  Can you repeat that the question?

        MR. KNOEPP:  Sure.  Would you mind reading it back, Ms. Harris?

        THE REPORTER:  "QUESTION: Do you know what the amount of the operating loss was for South Central for the 2023 crop season?"

A.    I know that on average we have provided the revenue balance agreement that was roughly $5 million.

Q.    (BY MR. KNOEPP) Per -- is that -- are you saying that, over the course of a year, $5 million is provided by Sterling Sugars to South Central pursuant to the revenue balancing agreement?

A.    Yes.

Q.    Okay.  And so for 2020 through -- 2022 through 2025, the total amount provided pursuant to the revenue balancing agreement would be approximately $20 million?

A.    So '22 -- yes.  I'm sorry.  Did you say the end of -- what was that -- that last year you just -- you just quoted?

Q.    This is just -- just this past year.

A.    Yes.

Q.    So 2022 through 2025.

A.    Yes, yes.

Q.    A total for those four years of approximately

$20 million provided by Sterling Sugars to South Central pursuant to the revenue balancing agreement?

A.   Yes.  I have fiscal years, crop years, and calendar years.  So I have to make sure that I'm answering the correct question.

Q.   Got it.  Appreciate that.  Thanks.

We were talking before about South Central has bank accounts at Hancock Whitney Bank, right?

A.   Yes.

Q.   Does it have accounts at any other banks?

A.   No.

Q.   Has it had any accounts at any other banks between 2022 and the present?

A.   No.

Q.   What accounts does South Central have at Hancock Whitney Bank?

A.   There is --

MR. DAVIS:  Objection.  Objection.  Counsel, I'm sorry.  I'm lost.  Will you please direct me to the place on the notice where you're examining?

MR. KNOEPP:  Your objection is -- is it scope?

MR. DAVIS:  It's -- yes, I -- I believe so.  I think maybe this is just confusing, because I'm really trying to figure out what you're talking about.  So if -- if you're -- if you're courteous enough to answer

Q.   And who can access the accounts?

A.   Physically at the bank or treasury services?  Can be you a little more clear about that?

Q.   Sure.  Thanks for the clarification.  The -- if somebody goes physically into the bank, who is able to access the South Central accounts?

A.   Chris Patout, Ricky Gonsoulin, and myself.

Q.   And if somebody's using the -- the -- I want to say Treasury Direct, but that's -- that's the government system.  The -- what is the system called, again, that the bank has for being able to monitor the -- the balances?

A.   Treasury Manager.

Q.   Treasury Manager.  Thank you.  Who has access to the Treasury Manager?

A.   Desiree Lange and Michelle Prados.

Q.   And do you also have access to that?

A.   No.  For internal control purposes, I do not.

Q.   I'm going to show you what's being marked as Exhibit 64 and -- and this starts with Bates No. 109390.  It's a -- an email from Ms. Lange to somebody at Hancock Whitney Bank.  Do you see that?

        (Exhibit 64 subsequently marked.)

A.   Yes.

Q.   (BY MR. KNOEPP) And Ms. Lange is emailing the bank to get somebody added to the Treasury Manager accounts.  Do

you -- is -- do you -- are you familiar with Ms. Lange needing to do this?

A.   I don't see where you're saying someone's being added.  Can you point that to me?

Q.   Sure.

A.   Because that --

Q.   The bank response is Ms. Lange saying, "We'd be glad to add an additional user and token for Treasury Manager."  Do you see that?

A.   Can you scroll down to the bottom of that email? Because I don't see the one -- the association.

Okay.  So Kellie -- Kellie does have access -- I'm sorry -- because of payroll.  I forgot about that.  She has to be able to process the direct deposits for payroll.  I was thinking about regular accounts payable awhile ago.

Q.   No, you're fine.  That's why I was asking is --

A.   Okay.

Q.   -- is whether or not --

A.   Thank you for pointing that out.

Q.   -- is whether or not Ms. Jackson had -- oh, I'm sorry.

A.   Yes, yes.  No, thank you for pointing that out.  I forgot about that.

Q.   So Ms. Jackson, as the payroll clerk who processes the payroll, also has access to the Treasury Manager

account; is that right?

A.   So she can process the direct deposits.

Q.   What do you mean by "the direct deposits"?

A.   So right here you have listed Intermex.  All of our H-2A workers are paid through what's called -- it's the Intermex program.  From -- from the Sage BusinessWorks program, we have to pay -- like, direct deposit the funds for the Inter -- for the workers on Intermex.  And she would need online access with the bank to be able to do that.

Q.   And so she's able to -- the Intermex card system is a -- it's a payroll card that the truck drivers and other agency workers get that has their pay on it; is that right?

A.   Yes.

Q.   And so whenever it's, you know, end of the pay period and they're getting paid, Ms. Jackson will transfer money from the South Central account to Intermex in order to fund those cards; is that right?

A.   Yes.

Q.   And so she needs to access the accounts to be able to do that; is that right?

A.   Yes.

Q.   Does she also access the Treasury Manager account to make sure that there's enough money in the payroll accounts to process that Intermex transaction?

A.   I do not believe so.  I would need to check her

permissions set up with the bank to verify that.  But she should also -- just like before, we spoke about Michelle turning in her cash needs for accounts payable.  Kellie would turn in what her cash needs are for payroll to Desiree and Desiree would be the one to check the accounts for the funding.

Q.   If -- and if there's insufficient funds in the payroll account, then they could, using the Treasury Manager account, transfer funds; is that right?

A.   Can you clarify that?

Q.   Sure.  If the -- if -- if Michelle or Desiree looked at the payroll account and determined there's not enough money in the payroll account to cover the payroll, they can transfer money from a different account into the payroll account to make sure there's enough money there before Ms. Jackson sends the money to Intermex?

A.   It would be transferred from the operating account to the payroll account.

Q.   And there are times when -- there have been times when -- when funds have to be transferred from the operating account to the payroll account, right?

A.   Yes.

Q.   And who at --

A.   It happens every --

Q.   I'm sorry?

A.    That happens every week -- or every other week. Every biweekly payroll we transfer money from the operating account to the payroll account.

Q.    And who handles that transfer of the funds from the operating account to the payroll account?

A.    Desiree Lange.

Q.    How does she know how much money to transfer from the operating account to the payroll account?

A.    Kellie give -- Kellie would tell her what the value of the payroll would be whenever she's finished running payroll.

Q.    And then does Ms. Lange then transfer that exact amount to the payroll account?

A.    I believe it's rounded.

Q.    And are there times when Michelle Prados or Desiree Lange review the South Central operating accounts and see that there's not enough money in that account to cover the payroll that's going to need to be paid?

A.    Yes.

Q.    And when that happens, do they get money from Sterling Sugars transferred to the operating account of South Central to be able to cover that expense?

MR. DAVIS:  Objection; asked and answered.

A.    They'll request a loan from Sterling Sugars for the amount that's needed to bring the operating account to

a -- a zero or to give additional money into the account to operate.

Q.   (BY MR. KNOEPP) And that's the process we talked about before where a promissory note's generated and signed by both Sterling Sugars and South Central, right?

A.   Yes.

Q.   And then, do either Ms. Prados or -- or Ms. Lange then transfer the money from the Sterling Sugars bank account to the South Central operating account?

A.   Yes.

Q.   Is that also done through Treasury Manager?

A.   There are different logins because we're different companies.  They would have to log in to Treasury Manager as an employee of Sterling Sugars in order to transfer the money into South Central.  And then, as a member of the management agreements team, they would have to log into the Treasury Manager as a member of South Central to accept those funds.

Q.   And then, while still logged in under the South Central Treasury Manager account, they can transfer those funds from the operating account to the payroll account, right?

A.   Yes.

Q.   Is there a reason why the funds from Sterling Sugars to South Central that would assist in covering the

payroll aren't transferred directly to the payroll accounts?

A.   No, I don't think there's any specific reason.  It just needs to go -- it -- the funds need to just go from one company as a loan into the other company.  I believe that Desiree has the ability to transfer to either one of those accounts, whichever one is needed.  I don't think there's a specific policy that says it has to go to the operating account.

Q.   And it's -- it's Ms. Lange who would be the one who would request the loan to cover that payroll expense; is that right?

A.   Yes.

Q.   She's the one who gets the -- the report of the -- the -- the funds needed for the week; is that right?

A.   Yes.  Kellie gives them to -- Kellie gives the report to Desiree.

Q.   When the funds from Sterling Sugars are transferred to South Central, the accounting for that is an entry in the accounting as -- as a credit to the bank account of South Central.  Is that how it's categorized?

A.   No.  Are you --

Q.   How does --

A.   Are you referring to South Central's books rights now?

Q.   Yes, ma'am.  Whenever South Central receives money

ASHLEE GARY - VOL. III                                                JOB NO. 2592817
APRIL 13, 2026

Q.   Does South Central do business for Teche
Vermilion?

A.   No.

Q.   South Central doesn't haul sugarcane for Teche
Vermilion, right?

A.   No.

Q.   And so this wouldn't be a payment -- or -- but, I
guess, does Teche Vermilion provide some services to South
Central that South Central would be paying for?

A.   No.

Q.   I want to show you what's previously been marked
as Exhibit 28 and ask you to look at that.  Do you recognize
this as a deposit slip for a Sterling Sugars bank account?

A.   Yes.

Q.   And then, on the second page, there's a check from
South Central to Sterling Sugars.  Do you see that?

A.   Yes.

Q.   It's for $1.9 million; is that right?

A.   Yes.

Q.   And it references some invoice numbers here.
These would have been invoices that were generated and
reviewed before payment was authorized; is that right?

A.   More than likely these were lease payments.

Q.   And so we looked at the handwriting on here.  Do
you recognize the handwriting, by any chance?

ASHLEE GARY - VOL. III                                          JOB NO. 2592817
APRIL 13, 2026

A.   Yes.

Q.   Whose handwriting is that?

A.   I believe that's Desiree's hand -- well, it's a -- there's a mixture of handwritings on here.  Some of it looks like my handwriting.  Some of it looks like -- it would be either Desiree or Michelle.  But I have seen it before.

Q.   Okay.  And, you know, it mentions tires, management fee, parking lot, employee housing, and equipment lease.  Are those all things that South Central has agreements with Sterling Sugars to pay for?

A.   The management fee, the parking lot, the employee housing, and the equipment lease, yes.  The -- there are agreements in place for those four items.

Q.   Those are the things that we were talking about earlier in the day, right?

A.   Yes.

Q.   And then the tires is maybe -- is to some other expense that was incurred by South Central that Sterling is asking it to pay back, right?

MR. ALBRITTON:  Object to the form.

A.   Yes.

Q.   (BY MR. KNOEPP) And the -- the numbers to the left of the amounts, like the 10900 related to tires, are those some sort of accounting codes?

A.   Those are -- look like GL numbers, general ledger

numbers.

Q.   Okay.  And so that would link to, like, the chart of accounts?

A.   Yes.

Q.   And am I right that you created the chart of accounts for South Central; is that right?

A.   Yes.

Q.   And you asked Ms. Lange to add those to the accounting software; is that right?

A.   Yes, in the creation of the South Central database in the accounting software.

Q.   So -- and just so I keep in -- this is a check that's dated June 16 of 2025, right?

A.   Yes.

Q.   And, again, the amount is approximately, like, $1.9 million, right?

A.   Yes.

Q.   And this is for the payment of approved invoices, right?

A.   Yes.

Q.   I'm going to show you what we're marking as Exhibit 67 and ask you to look at that.  This is a bank statement for June of 2025 for South Central's operating account, right?

          (Exhibit 67 subsequently marked.)

A.   Yes.

Q.   (BY MR. KNOEPP) And we were just talking about that check made out to Sterling Sugars for the $1.9 million. And that appears in this bank statements on the second page. Do you see that?

A.   Yes.

Q.   And so that check looks like it was cashed on June 26; is that right?

A.   Yes.

Q.   And there's also a check that was made out to Patout Equipment Company for $1.9 million that was cashed on -- that had the same date -- it was issued on the same date, on June 16th; is that right?

A.   Yes.

Q.   And so those two checks totaling, you know, a little bit more than $3.8 million were issued on June 16th, correct?

A.   Yes.

Q.   And on June 18th, there was a $4 million transfer, using Treasury Manager, from the 3091 Sterling Sugars account to the South Central account, right?

A.   Yes.

Q.   Why is Sterling Sugars transferring money to the South Central account just to have South Central write it a check back for half -- almost half of that money?

MR. ALBRITTON:  Object to the form.

A.   I'm sorry.

MR. ALBRITTON:  You can go ahead.

A.   Because there is a lease in place that requires South Central to pay for equipment and housing and boarding of -- of employees.  It's -- it was an expense that was incurred by South Central and had to be paid to Sterling. The --

Q.   (BY MR. KNOEPP) They -- yeah.

A.   The income -- the expenses and the income had to be reflected on South Central's books because those are expenses that were incurred.

Q.   But at the time that South Central was going to -- was writing the check to Sterling Sugars, it didn't have $1.9 million in the bank account to pay that -- pay those invoices, right?

A.   Correct.

Q.   And so, in order to pay the invoice -- invoices that Sterling Sugar sent to South Central, South Central asked Sterling Sugars to loan it money in order to cover that expense; is that right?

MR. ALBRITTON:  Object to the form.

A.   Yes.

Q.   (BY MR. KNOEPP) And for the audited accounting purposes, these are all -- these transactions are all

disregarded; is that right?

A.    For general accounting purposes, yes.  For tax purposes, no.

Q.    It still appears as a income or expense on either entity's taxes for purposes of determining what, you know, they might owe in federal or state taxes?

A.    Yes.  They're a -- on tax -- on their tax return.  You spoke earlier about the elimination.  For tax purposes, there is no elimination.  They file -- South Central files its own federal and state tax return.

Q.    Does South Central file a Form 990 federal tax return as a nonprofit?

A.    No.  I believe it files an 1120 as a corporation.  It's a non -- it's a -- it's a nonprofit corporation, so I believe it files an 1120.  I would need to check on that to be certain.

It looks like an 1120.  That's why I'm saying that.

Q.    It's fine.  It's not that -- if you can -- if you can remember or if it comes to mind, fine.  If not, you know, it's not a memory test here.

When we were talking before about the -- the South Central accounts at Hancock Whitney Bank, you mentioned one of the accounts was a -- was a savings account that was used to obtain a corporate credit card.  Do you remember that?

A.   Yes.

Q.   And is the corporate credit card through Hancock Whitney Bank?

A.   Yes.

Q.   And South Central applied for that corporate credit card shortly after it was -- after South Central was formed; is that right?

A.   Yes.

Q.   And the credit card application required M.A. Patout to guarantee South Central's repayment of that credit card; is that right?

A.   That was done a few years ago.  I don't -- I don't remember.

Q.   I'll show you what's being marked as Exhibit 68. And it starts with Bates No. HW35.  And I'm sure you don't -- you probably don't recognize the first page. But --

(Exhibit 68 subsequently marked.)

A.   No, this -- this is probably a bank -- a internal bank document.

Q.   (BY MR. KNOEPP) Yeah, I believe so.  It does say on there "Secured by," savings account that ends in 6109.

A.   Okay.

Q.   But then there's a business credit card application for South Central Growers' Association.  Do you

see that?

A.   Yes.

Q.   And it lists the nature of the business is harvesting and hauling of sugarcane.  Do you see that?

A.   Yes.

Q.   And then further down, it has some terms and conditions.  And then there's a signature there on behalf of South Central.  Is that your signature?

A.   Yes, it is.

Q.   And then, next to that, there's a signature of Mr. Romero.  Do you see that?

A.   Yes.

Q.   And he's signing that on behalf of M.A. Patout & Sons -- & Son Limited, LLC.

A.   Yes.

Q.   Is that right?

A.   Yes, I see that.

Q.   And so is it your recollection that the -- in order to obtain the corporate credit card, that M.A. Patout needed to guarantee South Central's repayment on the -- of the credit limit?

A.   Can you scroll down again, please?

Q.   Yes, ma'am.  Which -- how far do you want?  Just let me know how far you want me to go.

A.   Keep go -- keep going.  Okay.  Right there.

I don't recall why that was done.  I don't recall where, underneath my name, it says "For South Central Sugar Cane Growers' Association."  That's not my handwriting.  So I -- I'm not aware of why that was designated as such by the bank.  I'm not aware of that.

Q.   Right.  And the other -- the guarantor, it has a typed -- typewritten M.A. Patout.  Do you see that?

A.   Yes, I do.  I don't recall that being there.

Q.   Do you recall the bank notifying you, as the treasurer of South Central, that if you wanted to corporate credit card, as a new business, you needed to have somebody act as the guarantor?

MR. ALBRITTON:  Object to the form.

A.   Yes, which is why the savings account was created at South Central.

Q.   (BY MR. KNOEPP) And the savings account that was created was funded by a transfer from Sterling Sugars; is that right?

A.   I do not know that.

Q.   We could -- we could see -- by looking at the savings account statement, we could -- we could tell one way or the other, right?

A.   Yeah.  We could trace it, yes.

Q.   There's a -- there's a fax number listed on the account here.  Do you know what fax number that is?

or dues to South Central for membership?

A.   No.

Q.   Are the members responsible for any loss that South Central may have, like operating losses that South Central may have?

A.   No.

Q.   Those losses we discussed before, those are covered by Sterling Sugars, right?

A.   There's a revenue balance agreement that allows Sterling Sugars to give income to the association in order to balance their books to zero.

Q.   Does South Central own any real property?

A.   No, it does not.

Q.   Does South Central own any personal property?

A.   It owns a bank account, if that's considered personal property.

Q.   Sure.  I think that qualifies, yes.

If -- does -- other than the bank accounts, any other personal property that you can think of that South Central owns?

A.   No.

Q.   For accounting purposes or tax purposes, as the treasurer of South Central, is there, like, a inventory list that you maintain of property that South Central owns?

A.   South Central doesn't own any property.

Q.   Does it own -- does South Central own any equipment used for harvesting?

A.   No.

Q.   Does South Central own any trucks used for hauling of sugarcane?

A.   No.

Q.   It rents equipment and trucks to do that, right?

A.   Yes.

Q.   And we talked about that before.  It rents some of that from Sterling Sugars, right?

A.   Yes.

Q.   And rents some of it from Sterling Sugars Sales Corporation; is that right?

A.   Yes.

Q.   Some of it's rented from West Truck Lease, a third party; is that right?

A.   Yes.

Q.   And some of the equipment is rented from Patout Equipment Company; is that correct?

A.   Yes.

Q.   And there's agreements, I think, that have been produced in this case related to all of those leases; is that right?

A.   Yes.

We're coming up to another hour.

ASHLEE GARY - VOL. III                                      JOB NO. 2592817
APRIL 13, 2026

MR. KNOEPP:  Oh, let's --

THE WITNESS:  Shall we take another break?

MR. ALBRITTON:  Let's take a break.

MR. KNOEPP:  Yes.  Perfect.  This is a great time, yes.  Thank you for reminding us.

THE WITNESS:  How long?

MR. KNOEPP:  Let's go off the record.

THE REPORTER:  We're off the record.

(Recess taken from 4:02 p.m. to 4:15 p.m.)

THE REPORTER:  Okay.  We're back on the record.

Q.   (BY MR. KNOEPP) Ms. Gary, South Central has insurance that covers the trucks that are driven by the truck drivers who do the hauling work, right?

A.   Yes.

Q.   How does South Central go about obtaining insurance for the truck drivers?

A.   The Patout organization has what we call, like, a global policy for all of our entities.  Because we own the equipment that's being leased, we carry, you know, the equip -- the insurance as the owners.  Each company within that global policy is named as an additional insured on the global policy, and then the insurance company invoices each one of the entities separately for their allocation of premium.

Q.   And so the policy itself, though, is -- that South

Central has for the truck drivers is the same policy that applies to Sterling Sugars as well, right?

MR. ALBRITTON:  Object to the form.

A.    I'm sorry.  Can you ask that question again?

Q.    (BY MR. KNOEPP) Sure.  The -- let's -- there's an automobile policy that covers the trucks and the truck drivers that are driving them, right?

A.    Yes.

Q.    And that's a -- that's a policy in the primary name of M.A. Patout; is that right?

A.    Yes.

Q.    And then all of the entities that are part of the Patout Group, that you were referring to before, are also insured under the same insurance agreement for automobile insurance, right?

A.    Okay.  Can we go back and clarify "Patout Group"? Because --

Q.    Okay.

A.    -- there are other additional insureds on the policy that are not owned by M.A. Patout.  So I don't -- I don't want to confuse Patout Group and South Central just because they're on that policy.

Q.    Okay.  Sure.  So, in addition to South Central being on that policy, who are the other entities that are on the policy?

ASHLEE GARY - VOL. III                                              JOB NO. 2592817
APRIL 13, 2026

A.   I don't recall all of them, but I know they're on the policy written.  I believe that Patout Brothers is on that policy, or it may be called Little Valley Plantation. I don't know which name they're going by these days. Sippermeau (phonetic) Planting, I believe, is on that policy.  Those would be companies that are not owned by M.A. Patout.  There's probably seven or eight compan -- no, more than that -- maybe ten companies total on that policy.

Q.   Is Sterling Sugars, LLC on that policy?

A.   Yes, it is.  I'm sorry.  Yes.

Q.   And the -- the three growers' associations that deliver sugarcane to the M.A. Patout mills are also on that policy?

A.   Teche Vermilion Sugar Cane Growers, South Central Sugar Cane Growers, South Louisiana Sugar Cane Growers are named insureds on that policy.

Q.   And you mentioned that separate invoices are sent to each one of the named insureds; is that right?

A.   Yes.

Q.   And where are those invoices for South Central sent?

A.   They should be sent to the office of South Central.

Q.   That's the Sterling Sugars office that you're in right now?

ASHLEE GARY - VOL. III                                    JOB NO. 2592817
APRIL 13, 2026

A.   Each --

          MR. ALBRITTON:  Object to the form.  And, also,

     object to the scope to the extent that this is asking

     her to testify on the thinking of a different entity

     than the entity that she's testifying on behalf of,

     whether the insurance company or M.A. Patout.

          You can answer if you know.

     A.   Yes, I do know.  Each company will turn -- during

the renewal, each of the entities that are considered

additional insured would turn in to the insurance company --

it's basically a renewal packet of information that the

insurance company asks us for.  And each company separately

turns in that information to the income -- insurance company

and we get our premium.

     Q.   (BY MR. KNOEPP) And the -- for South Central, is

it Sterling Sugars employees who handle the renewal packet

information on behalf of South Central?

     A.   Desiree Lange, as part of the management

contract -- services contract of South Central, because one

of the things that -- one of the items that's line-itemed in

that management service contract is insurance.  She would

handle, along with Jaime Robison, any renewal information

that would need to be sent to the insurance company.

     Q.   And how much is the overall insurance premium?  Do

you know?

A.   They should be stored with the support -- with the -- with the -- the copy of the check, the -- the stub. They should be filed with the stub of the check that was processed, or if it was a wire, then there should be, like, a wire remittance and it should be stored with the -- with the information.

Q.   And the invoice would be sent to South Central and the other entities, not on $8.5 million invoice sent to M.A. Patout; is that -- is that right?

A.   To my knowledge, it's sent as an individual invoice, for whatever the installment plan is, to South Central.

Q.   We were talking -- talking before about there's a agreement between Sterling Sugars and South Central related to the H-2A worker housing.  Do you remember us talking about that a little bit before?

A.   Yes.

Q.   I'll show you what's being marked as Exhibit 70. And do you recognize this agreement that starts with Bates No. 4315?

(Exhibit 70 subsequently marked.)

A.   Yes, I do.

Q.   (BY MR. KNOEPP) Is this the housing agreement we were just talking about that's between Sterling Sugars and South Central?

ASHLEE GARY - VOL. III                                    JOB NO. 2592817
APRIL 13, 2026

A.    Yes.

Q.    This one was signed in 2022, right?

A.    Yes.

Q.    And has this been renewed every year since 2022?

A.    Let me see.  Some of the agreements were renewed and some of them are, like, in perpet -- in -- they continue until we stop.  I don't remember if this agreement is one of those.  I would need to find that date of the term.

Q.    Here it says the term --

A.    Oh, yes.  That one is renewed every year, yes, because it's five months.

Q.    And so does that help -- this -- the same lease agreement applied between 2022 and 2025; is that right?

A.    Yes.

Q.    And this -- first of all, the housing -- South Central is required to provide the H-2A workers with housing; is that right?

A.    Yes, per the contract.

MR. ALBRITTON:  Just object to the form.

Q.    (BY MR. KNOEPP) I'm sorry.  Were you finished your answer, Ms. Gary?

A.    Yes, I am.

Q.    And so, pursuant to the H-2A contract, that's something that South -- South Central needs to provide the H-2A workers with housing; is that right?

A.    Yes.

Q.    And South Central doesn't own any housing; is that right?

A.    Correct.

Q.    But Sterling Sugars owns some housing that South Central rents from it; is that right?

A.    Yes.

Q.    And the agreement -- the rental cost is $100 per employee per month; is that right?

A.    Yes.

Q.    The -- the housing is -- it's a -- it's a former motel; is that right?

A.    We have multiple housing, but there is -- there is one that is an old motel, yes.

Q.    That's the largest of the housing that's available; is that right?

A.    Yes.

Q.    Is that where the truck -- truck drivers live during the season?

A.    Yes.

Q.    It's pretty close to the sugar mill; is that right?

A.    Yes.

Q.    It's right there in Franklin itself; is that correct?

A.    Yes.

Q.    The -- the hundred-dollar-per-employee-per-month charge is approximately, like, $20 a week; is that fair to say?

A.    I would need to see the math on that.  You said how much per week?  I'm sorry.

Q.    I would say -- is it approximately about $20 per week, right?

A.    Per employee, give or take.

Q.    And do you know who came up with that figure?

A.    No, I don't.

Q.    Is --

A.    I know -- I -- I can tell you that we have other growers that have housing out in their fields, and we pay them $100 per man per month.  I believe that that was a carryover from an agreement that we had with other growers because that was a fair and equitable -- what we were paying them.  So this was fair and equitable for us to pay to Sterling.

Q.    And do you think the -- does the $20 per week per employee -- is that sort of the fair market value of the housing or is -- is South Central getting a good deal from Sterling?  Would it cost more?

MR. ALBRITTON:  Object to form.

A.    I'm not a real estate agent, so I don't know the

I said that correct.  Okay.

But, again, as a fair mar -- you asked earlier about a fair market value.  Because we have other growers that charge us the same amount, that would be what the market is paying.

MR. ALBRITTON:  Ashlee, just want to note that we're at 4:45.  So, if you need to let Sterling know anything, now would be a good time.  And then, also, we wanted to check in and see what our time on the record is as it's 4:45.

THE REPORTER:  Do we want to go off the record to find that out?

MR. ALBRITTON:  Sure.  If that's easier, yeah. Thanks.

THE REPORTER:  Yeah, give me a moment.  We're off the record.

(Recess taken from 4:45 p.m. to 4:47 p.m.)

THE REPORTER:  We're back on the record.

Q.    (BY MR. KNOEPP) Ms. Gary, the H-2A truck drivers that work at South Central typically work more than 40 hours in a workweek; is that right?

A.    Yes.

Q.    Do the truck drivers get paid overtime pay when they work more than 40 hours in a week?

A.    No, they do not.

Q.   And has that -- that's been the case every year between 2022 and 2025, that they're not -- they've not been paid overtime pay; is that right?

A.   That's correct.

Q.   Who made the decision to not pay the truck drivers overtime pay?

A.   I don't believe there was a decision that was made.  I believe that it was an understanding.  Our association is made up of agricultural farmers that perform agricultural activities and have agricultural exemptions.  Because they've gotten together to associate to hire H-2A workers, they still have agricultural exemptions.  So it was my understanding that overtime would not be paid based on those ideas.

Q.   And so did somebody at South Central determine that because the farmers were the members of the association, that overtime pay wasn't -- didn't need to be paid?

A.   I don't think that it was one or -- or a group of people that determined.  I think it was just an understanding that because there was agriculture exemption, that we would not pay overtime.

Q.   And who had that understanding at South Central?

A.   The growers who have the agricultural exemption and, I guess, myself as, you know, the treasurer of the

ASHLEE GARY - VOL. III                                        JOB NO. 2592817
APRIL 13, 2026

organization would have had to understand how that

agriculture exemption goes, you know, hand in hand.

Q.    Did South Central believe that because the growers

grew sugarcane and may have had an exemption related to

that, that that exemption carried over to South Central and

applied to South Central as an entity itself?

A.    Yes.

Q.    What was that belief based on?

A.    The definition of agricultural activities includes

the growing, cultivation, the harvesting, and getting their

product to market.

Q.    Anything else?

A.    No, not that I'm aware of.

Q.    Are there any memos related to this belief about

the exemption to overtime applying to the association

itself?

A.    What type of memo?

Q.    Any type of memo.  Like a written memo of any

sort?

A.    Not that I've seen, no.

Q.    Any type of notes or anything like that that you

or anybody else at South Central has related to discussions

about the agricultural exemption to overtime?

A.    No, I don't think so.

Q.    Are there any emails that South Central has

MR. ALBRITTON:  Jim, this line of questioning is -- is really dangerously close to privilege.  I mean, we're -- we're pushing the boundaries here.  So I'm going to instruct Ashlee not to answer further questions about the email collection process as it relates to the discovery in this case.

Q.   (BY MR. KNOEPP) Okay.  Besides the belief that the -- that the association was entitled to claim the exemption because its members might have the ability to claim an exemption, did South Central rely upon anything else in determining that -- to not pay truck drivers overtime pay?

A.   No.  We believed that because we were an association that was coming together to hire H-2A agricultural workers, that we did not have to pay overtime.

Q.   Did anybody at South Central review any regulations related to the applicability of the agricultural exemption to associations?

A.   Ricky Gonsoulin would have because he's a grower and is familiar with the agricultural exemption.

Q.   Do you know whether he did that?

A.   I do not know.

Q.   Other than your belief that Mr. Gonsoulin might have reviewed such a regulation, are you aware of anybody else, on behalf of South Central, reviewing regulations

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF VOLUSIA


        I, Jennifer Lynn Harris, Registered Professional

Reporter, Notary Public, State of Florida, certify that

ASHLEE GARY remotely appeared before me on the 13th day of

April, 2026 and was duly sworn in accordance with Fed. R.

Civ. P. 29(a).




        Signed this 24th day of April, 2026.




_____

Jennifer Lynn Harris

Notary Public - State of Florida

Commission No. HH652509

Expires:  March 25, 2029

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF VOLUSIA

        I, Jennifer Lynn Harris, Registered Professional Reporter and Notary Public in and for the State of Florida at large, certify that I was authorized to and did stenographically report the remote deposition of ASHLEE GARY, AS CORPORATE REPRESENTATIVE OF SOUTH CENTRAL SUGAR CANE GROWERS' ASSOCIATION, INC., pages 232 through 479; that a review of the transcript was requested; that the transcript is a true record of my stenographic notes; and that pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

        James M. Knoepp, Esq. (5 hours 41 minutes)
        Attorney for Plaintiffs
        Brandon Davis, Esq. (0 hours 0 minutes)
        Attorney for Defendants

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties to this cause, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

        DATED THIS day, April 24, 2026.

        _____
        Jennifer Lynn Harris, RPR
        Registered Professional Reporter

Job No. 2592817

Date: April 13, 2026

Witness Name: ASHLEE GARY - VOL. III

Case: AVILA-SOTO, et al. v SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC., INC., et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 30th day of April, 2026.

_Ashlee Gary_

Signature  ASHLEE GARY  VOL. III

PAGE 1 OF 3

ASHLEE GARY - VOL. III
APRIL 13, 2026

JOB NO. 2592817

DEPOSITION ERRATA SHEET

Page No. 443 _____ Line No. 5 _____

Change: Sippermeau to Cypermort _____

Reason for change: spelling _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Signed on the _30th_ day of

_April_____, 20_26___.

Signature ASHLEE GARY - VOL. III

PAGE 3 OF 3