# EXCERPTS FROM 30(B)(6) DEPOSITION OF STERLING SUGARS, LLC BY AND THROUGH DESIREE LANGE

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


FELIPE DE JESUS AVILA-SOTO,      )

FELIPE DE JESUS SUAREZ-PALAFOX, )  NO. 6:24-cv-01392

ON BEHALF OF THEMSELVES AND      )

ALL OTHERS SIMILARLY SITUATED,   )

    Plaintiffs,                 )

v.                               )

SOUTH CENTRAL SUGAR CANE         )

GROWERS' ASSOCIATION, INC., AND )

STERLING SUGARS, LLC.,           )

Defendants.                      )




DEPOSITION OF

DESIREE LANGE

SIGNATURE RESERVED

APRIL 17, 2026 - 10:13 A.M. CST

Zoom Video Deposition Proceeding


Vickie E. Wiechec, CVR-M, CCR

Certified Court Reporter

Certificate No.:  B-2237

A P P E A R A N C E S

(VIA ZOOM)


ON BEHALF OF THE PLAINTIFFS:

DAWSON MORTON, LLC

DAWSON MORTON, ESQUIRE

Admitted Pro Hac Vice

1808 Sixth Street

Berkeley, California  94710

(404) 590-1295

dawson@dawsonmorton.com


AND


JAMES M. KNOEPP, ESQUIRE

Admitted Pro Hac Vice

1612 Crestwood Drive

Columbia, South Carolina  29205

(828) 379-3169

jim@dawsonmorton.com

A P P E A R A N C E S (Continued)

(VIA ZOOM)


ON BEHALF OF THE DEFENDANTS:

PHELPS DUNBAR, LLP

BRANDON DAVIS, ESQUIRE

ANDREW ALBRITTON, ESQUIRE

364 Canal Street, suite 2000

New Orleans, Louisiana  70130

(504) 584-9312

brandon.davis@phelps.com

andrew.albritton@phelps.com


ALSO PRESENT:

ASHLEE GARY

MR. ROMERO

address?

A    My home address is 126 Oxford Loop, Franklin, Louisiana, 70538.

Q    Okay.  And do you have a -- a spouse, Ms. Lange?

A    I sure do.

Q    And what's their name?

A    Dana, D-A-N-A (spelling).  Last name Lange, L-A-N-G-E (spelling).

Q    And are they employed?

A    No.  He's disabled.

Q    Okay.  And do you have any children that are employed?

A    Any children that are employed?  Yes.

Q    Okay.  And can -- can you -- Do they work in the Franklin area?

A    Yes.

Q    Can you tell me their names and where they work?

A    Okay.  I have -- Jeremy Lange works at Bayou Pipe, New Iberia.  Kelly Jackson works here at Sterling Sugars.  Joshua Lange works for Guice Offshore.  Corey Wimberly owns her own business.  And Kailyn Wimberly works at a Young-Sanders Center.

Q    Okay.  And what -- what kind of business

does Corey Wimberly own?

A    A dog grooming and boarding.

Q    My daughter has -- has dreams of having a business like that.

A    Oh.

Q    Okay.  And -- and -- and Kelly Jackson's position at Sterling, is she the payroll clerk?

A    Yes, sir.  She sure is.

Q    Okay.  I guess I want to go through a little bit more of your -- your work, Ms. Lange, but I also -- Maybe we'll just try out one of these exhibits.

And I'm just going to show you -- Because is it your understanding, Ms. Lange, that you've been designated by Sterling Sugars to testify on certain topics today?

A    Correct.  Yes.

Q    I was just going to -- I'm going to show you that document.  Do you happen to know the topics that you've been designated for?

A    Yes.  Do I need to -- do I need to tell you or...

Q    Well, I just want to confirm our understanding.  So I -- I'm going to let everyone else see this document.  And then, I'm going to try

Q   All right.  And -- and do you have a title there?

A   I'm administrative assistant.

Q   Okay.  And besides administrative assistant, do you have any other titles?

A   No, sir.  Assistant secretary.

Q   Okay.  That was the one I was thinking of.

A   Yeah.

Q   And it's my understanding that that's kind of like a -- a corporate position that you're assistant secretary on the board; is -- is that right?

A   Correct.  Correct.

Q   Okay.  And that's also for Sterling Sugars, LLC?

A   Correct.

Q   Okay.  And outside of Sterling Sugars, LLC, do you have any other employment?

A   I own a little side-by-side repair shop.

Q   Okay.  And that's for like -- like what someone who lives in the city might call an ATV?

A   Yeah.  Correct.

Q   Okay.  And is -- Does that business have a name?

A   Bad Intentions Off Road, LLC.

Q    Okay.  And do you -- do you work there or it's just something you own?

A    No, I don't work there.  That's something I own.

Q    Okay.  And it's -- Is that located in Franklin?

A    Yes, sir.

Q    Okay.  And does that -- does that repair vehicles that are used for like recreational purpose?

A    Correct.

Q    Okay.

A    Yes.

Q    It -- it doesn't repair things that are used for like at Sterling Sugars, for example?

A    Oh, no, sir.

Q    Okay.  And how long have -- how long have you worked at Sterling Sugars?

A    I've worked at Sterling Sugars since 1983.

Q    Oh, wow.  Okay.  And -- and has your position over time changed at Sterling Sugars?

A    Yes.  I came in as an accounts payable clerk.  And in 1988, I was given the administrative assistant position, and I have maintained that position ever since.

Q    Okay.  And when you originally started at

further details about them.

What -- Or what programs do you typically use as part of your daily work?

A    Sage BusinessWorks is our accounting software.  Attendance on Demand is our timekeeping software.  And I have -- CBM is our cane.

Q    And does -- does CBM stand for something or not?

A    Computers Business Management.  Computers -- Yeah.  Computers for Business Management.

Q    Okay.  And I had heard that maybe also referred to as Pay Tracks?

A    No, sir.

Q    Okay.  You -- you would call it CBM?

A    Yes.

Q    Okay.  And any further general tasks that you do and people in your office like Ms. Prados and Ms. Jackson do, are those the three programs that are in use?

A    Yes, sir.

Q    Okay.  I guess I'd like to talk first about the timekeeping system, which you said was Attendance on Demand?

A    Correct.

Q    And can you explain to me what's involved

in that system and -- and how it's used as part of like payroll processing, for example?

A    Okay.  Attendance on Demand, we -- Prior to August of 2025, we were on Attendance Enterprise, which we had been on that from 2005 through two -- to August of 2025.  That was a hand punch.  You would key in -- You would walk up to the clock, you would key in your number, place your hand -- It would shoot your time in and out.  August of 20 -- And that was on backup service.

Okay.  In August of 2025, we went to Attendance on Demand, which is now a facial reader that is cloud-based.

Q    Okay.  And I guess by cloud-based, do you mean that the information is stored like somewhere else, not at Sterling Sugars in --

A    In the cloud.  Correct.

Q    Okay.  And -- and the prior system, Attendance Enterprise, was that stored locally like on a computer at Sterling Sugars?

A    Yes.  Backup server.

Q    And is -- is the -- is the Attendance on Demand something where Sterling Sugars has -- has a contract for the provision of this cloud based payroll service?

A    Yes.  Concept Electronics.

Q    And I -- I missed the first part of that.
Concept Electronics?

A    Concept.  Yes, sir.  C-O-N-C-E-P-T
(spelling).

Q    Okay.  And were you involved in picking
that -- the Attendance on Demand Software?

A    My chief -- My -- One of my engineers
actually spearheaded it.  It was the latest and
greatest.  And he -- Calvin Tiemann did that, my
chief -- assistant chief engineer.

Q    Okay.  And can you spell his last name?

A    T-I-E-M-A-N-N (spelling).

Q    Okay.  And -- and he's the chief --
assistant chief engineer at Sterling Sugars?

A    Correct.

Q    And did anyone else contribute to the
decision making on that -- on that purchase of --

A    No.

Q    -- that attendance --

A    No.

Q    Okay.  And going back to Attendance
Enterprise for a minute, that was also like a time
clock software that -- that was owned by Sterling
Sugars?

DESIREE LANGE                                                    JOB NO. 2620500
APRIL 17, 2026

A    It was purchased through Concept Electronics.  It was called Attendance Enterprise.  It was a software.

Q    Okay.  And you mentioned that you -- There's an associated time clock with each of these -- these software -- both Attendance Enterprise and Attendance on Demand?

MR. ALBRITTON:  Object to the form.

THE DEPONENT:  Say that again.

BY MR. MORTON:

Q    Sure.  Let's start with Attendance on Demand, the more recent one.  Is there a -- a physical thing that's associated with the software for like, I guess, clocking in?

A    It's -- it's a facial reader.

Q    Okay.

A    Facial reader mounted on the wall.

Q    Okay.  And I don't -- So, can you just describe very simply what that looks like?

A    It looks like a little iPad, basically.  And it's mounted on the wall and it has a button and you hit punch and it -- it shoots your -- your face -- your image.

Q    Okay.  And -- and how -- Is there just one of those or how --

A    No.  We currently have four.

Q    Okay.  And where are they located?

A    Two are located at the factory building.
One is located at the mechanic shop.  And one is
located here in the office for enrollment.

Q    Oh, because like if -- if -- if I -- if I
were to get hired, you -- you would need to like
basically take a picture of me and put it in the
payroll software so that when I go to the time clock,
it knows it's me?

A    Yes, sir.

MR. ALBRITTON:  Object to the form.

BY MR. MORTON:

Q    Okay.  And are all of those networked
together such that if -- if, for whatever reason, I
-- I didn't go to the right time clock, I could still
clock in?

A    Yes, sir.

Q    Okay.  And then, I'm -- And I'm -- Were
those also purchased from Concept Electronics?

A    Yes.  That's what we purchased.

Q    And where is Concept Electronics located?

A    Baton Rouge, Louisiana.

Q    And those were purchased by Sterling
Sugars?

A    Correct.

Q    And -- and prior -- I'll try and speed it up.  I'm sorry I'm going slow.  But that -- When we go back to Attendance Enterprise, did it also have like a physical thing and what did that look like and where was it located?

A    That was --

MR. ALBRITTON:  Object to form.

THE DEPONENT:  -- also mounted to the wall.  Sorry if I spoke over you.

It was mounted to the wall.  Employees would walk up to it, key in their employee identification number, insert their hand.

MR. MORTON:  Okay.

THE DEPONENT:  It was a hand punch.

BY MR. MORTON:

Q    And was there also -- Were there the same number of those devices?

A    Correct.

Q    Four?

A    Correct.

Q    And -- and was it the same thing that if you got hired, you needed to come into the administrative office and -- and basically scan your hand so that the next time you go, the machine knows,

the use of these softwares is true across all the
Sterling affiliated companies like Sterling Sugars,
Sterling Sugar Sales?  And I'm also asking about the
South Central Association?

          MR. ALBRITTON:  Objection.

          THE DEPONENT:  Correct.

          MR. ALBRITTON:  Object to the form.  And
     also object to the scope that Ms. -- Ms. Lange
     is not testifying on behalf of any entity other
     than Sterling Sugars.

          MR. MORTON:  That's fine.  I'm just asking
     for your -- your -- your knowledge as
     representative of Sterling Sugars, Ms. Lange.

BY MR. MORTON:

     Q    And besides the time clock and the cloud
aspect of Attendance on Demand was -- I think the
prior one was called Attendance Enterprise.  Was it
the same in terms of things like missing punch, how
many times you punch in?  And like you can input a
punch if somebody forgot to clock out, for example?

     A    Yes, sir.

     Q    And does -- does someone -- The time
records, to get into the Sage BusinessWorks, can you
just explain that process for me?

     A    There is -- It's an import.  It's called a

bridge.  It's set up and it takes attendance and it throws it over.  In Attendance, you -- you get a report which shows hours and totals.  You take that through the process, you import it into BusinessWorks and then you get a -- you do the payroll calculation and then you balance hours.

Q    Can you explain to me what balance hours means?

A    Attendance hours versus Sage hours.

Q    Okay.  And does Sage already have some hours in it?

A    No, it'll have a previous -- No, it has no hours in it.

Q    Okay.

A    You just want to confirm that the import is correct, you know.

Q    Oh, so for instance, attendance for Tommy has nine hours.  You want to make sure when it gets into Sage, it still shows nine hours?

A    Tommy's still there.  Correct.

Q    Okay.  And is that something that's done -- Is that -- Does that just happen automatically or is it something that sort of requires a human to -- to do it?

A    It requires a -- Sorry.  It requires a

human.

Q    And is that done daily, weekly?

A    Bi-weekly.  Payroll day only.  When you are processing payroll, you will take the two-week period, you will do that import.  That two-week period rolls over into Sage BusinessWorks.

Q    Okay.  And does -- We talked about -- Okay. There's time clocks at the mechanic's shop.  There's time clocks at the factory, do you need to walk over to those time clocks and get the information or is it somehow connected to the computers at the Sterling Sugars' office?

A    It's connected to the computers.

Q    Okay.  And -- and was that true back when it was a hand scan as well?

A    Yes, sir.

Q    And do you know what file format that payroll data is in, the time data?  Sorry.

A    Not -- not exactly.

Q    Okay.  And -- and are -- You said it's called a bridge.  Is there something -- Like, do you take a file or is it more like you click buttons?

A    You click buttons.

Q    Okay.  And you say like --

A    Click buttons.

DESIREE LANGE
APRIL 17, 2026

JOB NO. 2620500

great.

And Andrew, can you -- And Vickie, I think we're off the record now.

MR. ALBRITTON:  Yeah, yeah.

THE COURT REPORTER:  Okay.  Off the record at 12:06 p.m. (sic).

(Whereupon, a break was taken in the proceedings at approximately 11:06 a.m. until approximately 11:19 a.m.)

MR. MORTON:  Okay.  Well, we're back on the record after a short break.

Ms. Lange, you understand that you're still under oath?

MS. LANGE:  Yes, sir.

BY MR. MORTON:

Q    Ms. Lange, I'm just going to show you the -- the other attachment.  It's being marked as Exhibit 74.

(Whereupon, Plaintiff's Exhibit No. 74 was identified for the record.)

BY MR. MORTON:

Q    And I should also just explain, as you'll probably note, we didn't start at one today because

we're numbering the exhibits sequentially, so.

I'm going to show you just the other attachment.  It's -- it's in Spanish to that email.  Do you speak Spanish, Ms. Lange?

A    Not at all.  No, sir.

Q    Okay.  All right.  I'm just -- I'm just showing you that it says Spanish Safety Violation Policy.  And it's my understanding it's Bates Stamped ending 36335.  You see that in the first -- the bottom of the first page.  It's my understanding that this was the Spanish version of the notice I showed you previously in English.

A    Okay.

Q    And -- and your understanding about these notices is either they would be posted with the time clock, or they could be distributed as part of the on-boarding process?

A    It is -- it is part of the on-boarding process.

Q    Okay.  And so, employees would receive papers about the job, sort of job notices, as part of the on-boarding process?

A    Say that again.

Q    Employees would receive papers or notices about the job as part of the on-boarding process?

A    What employees are we talking about?  Can you be clear?

Q    Any employees subject to on-boarding.  This one that we're talking about from the email I understood was for truck drivers.

A    Okay.  The truck drivers, I think they -- Yes.  I think I'm -- I'm not 100 percent sure, but yes.  I do believe they get their -- their job titles and I think they're signed off on.

Q    And when you say signed off on, signed off on by who?

A    By the employee.

Q    Okay.  I'm going to stop showing you this -- this exhibit and in -- Before -- before someone can be paid through the Sage BusinessWorks, they -- they have to be entered into the Sage BusinessWorks software?

A    Yes, sir.

Q    And is that a process that you would refer to as on-boarding?

A    There's paperwork that needs to be filled out.

Q    Okay.  Can you tell -- Would that paperwork be things like the I-9?

A    Yes, sir.

Q    Okay.  And tax forms?

A    Yes, sir.

Q    Okay.  And what -- You would want they're like home address to send them tax documents at the end of the year?

A    Correct.

Q    And in that process, if someone had not worked previously, they would be assigned an employee number?

A    Correct.

Q    And like -- And that -- Is that on-boarding process also when the scan, for example, currently of the face, would occur?

A    Yes.

Q    All right.  And this is -- This would all be done by Kelly Jackson or anyone else?

A    Kelly Jackson.

Q    Okay.

A    If there's an excess at one time, then we do assist her.

Q    And who would assist?

A    Desiree Lange and Michelle Prados.

Q    Okay.  And do -- do any of you speak Spanish?

A    No.

BY MR. MORTON:

Q    That they would go over to the motel and sign the paperwork?

A    Correct.

Q    All right.  And -- and that -- the process of on-boarding, it's the same, whether it's somebody who's going to work at the Sterling Sugars factory or somebody who's going to work at the South Central Association?

MR. ALBRITTON:  Object to the form.

MS. LANGE:  Can I -- (overlapping speakers) --

MR. ALBRITTON:  You can answer.  Yeah.

MS. LANGE:  Okay.  Can you repeat the question?

MR. MORTON:  Sure.  Yes.

BY MR. MORTON:

Q    The process of on-boarding is the same whether someone is going to work at the South Central Association or at the Sterling Sugars factory?

A    Paperwork is the same.  Majority of the paperwork is the same.  I'm not 100 percent sure. That memo you sent me, apparently that referred to truck drivers.  My factory people, you know, they will not get that.

Q    Okay.  So based on your job position, you might get a notice that's specific to your job position?

A    When you're hired, they -- they let you know what you -- what your position is.

Q    Okay.  And they might give you a notice -- like that notice seemed to be like, hey, don't hold your phone while you're driving a truck.

A    We have safety --

MR. ALBRITTON:  Object to the form.

THE DEPONENT:  They're given safety rules.

BY MR. MORTON:

Q    Okay.  And those -- those -- Who do those safety rules come from?

A    It's part of the on-boarding.  Management has -- has safety rules.

Q    Okay.  And like in that example that we were looking at there, Rivers Patout had sent the safety rules to you?

A    He has -- He is management.  Him, chief engineer.

Q    Okay.  And the chief engineer was Mr. Burke?

A    Correct.

Q    Okay.  Anybody else who could set safety

rules?

A    Not to my knowledge.

Q    Okay.  And does the wage rate -- As part of the on-boarding process, does the wage rate need to be entered into the Sage BusinessWorks software?

A    Yes, it does.

Q    Okay.  And where would you get that information from?

A    Okay.  Are we speaking -- Mr. Jason Burke will give us a raise -- rate.

Q    Okay.  And he's the chief engineer?

A    Correct.  He does the hiring and he gives the rates.

Q    Okay.  And what about if it's for a truck driver?

A    There is a truck driver -- Okay.  Are you talking about factory truck drivers?

Q    I'd like to talk about both.  Why don't we start with factory truck drivers?

A    Jason Burke will give the rate.

Q    Okay.  And if it's a -- a truck driver who's going to work at South Central Association?

A    There's a job order.

Q    Okay.  And do you get a copy of that?

A    Yes, we do.

Q    Okay.  And you would take the rate then from the job order?

A    Most correctly.

Q    Okay.  And did someone tell you to do that?

A    Specific?  Ricky.  Ricky will send them here and we -- Once it's approved, Ricky will send it to us and we run with those rates.  That's -- that's the official rate.

Q    And did someone tell you that the truck driver should be paid off of something listed on a job order?

A    That is basically -- I mean, Tim tells me. Tim will tell me that this, you know, this is the job order.

Q    Okay.  And --

A    And then Jamie.

Q    And I just want to clarify, we're talking about Tim Swallow?

A    Tim Swallow, Jamie Robison.

Q    Okay.  And does it also get entered into the Sage BusinessWorks whether someone is eligible for overtime?

A    Is it entered -- Say -- Can you repeat that?

Q    Yeah.  So -- so I'm just -- I know we

probably could have on-boarded 20 people by now, but I'm still just going through the steps that I understand of on-boarding.  And so, I'm talking about the things that get entered into the computer program.

And my question on this now is, does it need to be entered in whether somebody would receive overtime?

A    Let me see how I can -- Let me -- Hold on. When you enter it into -- When you're entered into the Sterling, the parameters are set for the overtime.  Parameters are set.

Q    Okay.  And -- and who set those parameters and what are they?

A    They were set when the -- when the system came in.  Overtime after 40 during idle season, over 48 during idle season for the first 14 weeks, I think it is.

Q    Okay.  And -- and what about for a truck driver?  What's set for them?

A    It's -- it's no overtime per the job order.

Q    Okay.  And -- and who communicated that to you?

A    That's on the job order.  Tim, Jamie.

Q    Okay.  And that's Tim Swallow, Jamie

Robison?

    A    Correct.

    Q    All right.  And we talked earlier about factory truck drivers.

    A    Correct.

    Q    Is -- How many factory truck drivers are there?

    A    Oh, just one or two.

    Q    Okay.  And do you know their names?

    A    We have Emmett Abraham and I just lost -- Arthur Marcotte.  He just gave his termination.  I mean, he gave his resignation.

    Q    Okay.  And could you spell his last name?

    A    Which one?  Abraham or Marcotte?  Marcotte is M-A-R-C-O-T-T-E (spelling).

    Q    Okay.

    A    Arthur Marcotte, Emmett Abraham.

    Q    All right.  And -- and are they paid overtime?

    A    Yes, they are.

    Q    Okay.  And -- and what -- How long have each of them worked for -- at Sterling Sugars?

    A    Emmett's been here possibly three years.  Arthur might have made a year and a half.

    Q    Okay.  And do you know the hourly rate they

A    They're not --

Q    If you work in the factory, you -- you -- If you work in the factory, you receive overtime, just as a matter of --

A    There's -- there's -- there's no job order saying that they don't get overtime.

Q    Okay.  Did -- did someone tell you that the job order said that truck drivers don't get overtime?

A    Tim Swallow possibly.

Q    Okay.  Anyone else?

A    Or I could have read it.

Q    Where would you have read it?

A    In the job order.

Q    Okay.  Anywhere else besides the job order?

A    No.

Q    Okay.  When -- Do you have a recollection of Mr. Swallow telling you that -- that truck drivers do not receive overtime?

A    If he actually said that or if it was just in the job order, no, I do not.  I do not have definite recollection.

Q    Okay.  If -- if Mr. Swallow told you to pay the truck drivers overtime, would you follow his direction?

A    I can't answer that.

Q    Okay.  I'd like an answer.  How -- Why can't you answer it?  Do you understand my question?

A    Yeah.  He comes in here and -- I guess if he tells me I have to pay him overtime, I have to pay overtime.  I guess -- I guess I have to.

Q    Okay.  Like that's something that Mr. Swallow could do, right?  He can direct --

A    Yeah.  Yes.

Q    And he could direct the payroll staff and say this, I want you to do it this way.  And the payroll staff would follow his direction.

A    Yes.  He -- Yes.

Q    But he -- And just to be clear, he hasn't come and told you you should pay --

A    No.

Q    -- the -- the foreign truck drivers overtime?

A    No, sir.  He has not.

Q    Okay.  The -- the system that you described in terms of the software, the employee number assignment, the on-boarding, that -- that system is the same whether the employee gets a paycheck from Sterling Sugars, like the factory, or whether that employee gets a paycheck from the South Central Association; is that right?

A    Correct.  The software is the same.

Q    Okay.  And -- and if -- In the past, truck drivers receive their paychecks from Sterling Sugar Sales Corporation?

A    Yes.  Years ago.

Q    Okay.  And if -- if -- Was the system the same at that time as well, that the -- the on-boarding and the pay clock, et cetera, were the same for Sterling Sugars, the factory, and Sterling Sugars Sales Corp?

A    Yes.  As far as I can -- Yes.

Q    Okay.  And if an employee -- And I'm talking now about a foreign truck driver -- had worked for Sterling Sugar Sales Corp and had an assigned employee number, when he returns and is on-boarded again, say this past year, for the South Central Association, would he keep that same employee number?

A    Most likely.

Q    Okay.  And what would cause his employee -- Like --

A    If the payroll clerk was not familiar that he previously has a number, then she will just give it another number.

Q    Okay.

A    And not being familiar with it -- with him.

Q    Okay.  But -- And that would sort of be like -- That would be a mistake, I guess.  Would --

A    Yeah.  It's -- it's -- It would probably be easy to happen.  You know, Ms. Jackson's here.  She had a new employee.  She didn't know he was here in 2022.  And he came this year and she felt like he was a new employee, she would give him a new number not --

Q    Okay.

A    -- knowing he had a previous number.

Q    Okay.  And the -- Is -- I want to talk for just a second about, I guess -- We've been talking about like electronic data, and I'd like to talk about like paper for a second.

So if -- You know, if an -- Does an employee also have like a paper file at the Sterling Sugars' office?

A    Most definitely.  Yes.  Yes.

Q    Okay.  And what would be contained in that file and -- and how is it organized?

A    It's -- it's normally organized by year. We just put -- As they come, it's -- it's put on top. You have all the on-boarding packet, you have their applications, you have their passports, visas.  You

have any reprimands, any -- you know, any -- anything
dealing with their doctor's excuses.  We -- we just
compile everything, 401k records, anything, goes in
there.

Q    Okay.  And is it -- is it just alphabetized
by name or is it by employee number?  How is it
organized?

A    Last name.

Q    Last name.  Okay.  And so for example,
Emmett Abraham, who you mentioned earlier, he would
have a file like that.

A    Yes, he would.

Q    And -- and like a foreign truck driver,
like Felipe Suarez, would also have a file like that?

A    Yes, he would.

Q    And -- and those are kept for prior years
as well?

A    Yes, sir.

Q    And those are located where -- Well, tell
me where those are located.

A    Those are located at 831 Irish Bend Road.

Q    Okay.  And is -- Are they located like in
your office or --

A    The Emmett Abraham would be located in -- I
think they're located in Kelly's office.  The -- I

think was another individual.  He is in another room in Hall room.

Q   Okay.  The -- It -- If for -- I want to talk about other uses of that -- the payroll software information for a second, Ms. Lange.

Do -- Are you able to like export out things like employee information from the Sage BusinessWorks?

A   Just what are you referring to, import out?

Q   Okay.  I was going to show you an example and I'll show it to you in just a minute.  But like, for example, if -- if you wanted a list of people who had worked last year, is that something that that the Sage BusinessWork -- Is -- is that something you could produce from the Sage BusinessWorks software?

A   Never report -- Never did -- You could do like check registers, payroll registers.  If you need be, you could probably do a custom export -- report, which we have not been very successful in.

Q   Okay.  The -- Like does -- does Mr. -- Has Mr. Swallow ever asked you, for instance, to prepare a list of prior employees?

A   Me, personally, no.

Q   Does -- Is that --

A   Not that I can -- not that I can remember.

maybe to make it specifically about payroll, but --

MR. MORTON:  I think --

MR. ALBRITTON:  We started this through Worker's Compensation, which is not part of the scope.

MR. MORTON:  Okay.  I -- I -- Your objection is registered and I think we should just move on.

BY MR. MORTON:

Q    So I -- In responding to a Worker's Comp audit, you mentioned quarterly tax reports.  Are there documents that you could export for that purpose from Sage BusinessWorks?  Like for -- And I guess just to be clear, Ms. Lange, I'm asking like if they -- if the audit wants to see, you know, sort of the employees on the books, how would you provide that information?

A    I send quarterlies.  I mean, I've never been asked that.  We send quarterlies and I send a total.  I've never had to export anything.

Q    Okay.  And do you prepare quarterly tax reports for Sterling Sugars?

A    Yes, I do.

Q    And did you also prepare them for Sterling

Sugar Sales Corp.?

A    Yes.

Q    And did you also prepare them for the South Central Growers Association?

A    At one time.  And Kelly now does those.

Q    Okay.  And that's Kelly Jackson?

A    Kelly Jackson.  Yes.

Q    Your daughter.  And when did you stop doing those?

A    I think when the association -- I passed that responsibility off to Kelly probably in -- She came here in May of 2024.  So probably shortly thereafter.

Q    Okay.  And do -- It -- How are -- As part of the payroll process, right, there's -- there's also the -- the actual payments.  I'd just like to talk briefly about, you know, like moving of money. How -- how are wages paid through the Sterling Sugars office?  And I'm talking, you know --

A    The -- the wages are -- I'm not sure what year.  It's been -- it's been a few years, we went to where everything's put on a pay card.  We use Intermex, I-N-T-E-R-M-E-X (spelling).

Q    Okay.  And who made the decision to do that?

A    Ms. Ashlee Gary.

Q    Okay.  And do you -- Were you part of the decision making?

A    No.

Q    And do you know -- Do you -- do you know why that decision was made?

A    Not --

MR. ALBRITTON:  Object to the form.

THE DEPONENT:  What's that?

MR. ALBRITTON:  I just objected to the form, Desiree.  You can answer.

THE DEPONENT:  Okay.

BY MR. MORTON:

Q    I'm not -- I wasn't sure if I got your answer.

A    Okay.  What's your question?

Q    Do you know why that decision to use Intermex was made?

A    I think for the convenience of the employees.

Q    Okay.  Because what was convenient for employees about it?

A    Now, which -- which employees are you talking -- Which employees are we talking about?

Q    I guess anyone who gets paid through

Intermex.

A    Okay.  The Intermex is solely the association.

Q    Okay.

A    They use Intermex.

Q    Okay.

A    And I -- I may have got stumped up somewhere, but they use Intermex with a few that have now gotten personal bank accounts, and we -- we also honor that.  It was just a convenience of them being able to send money home.

Q    Okay.  And -- and then, so if you have a personal bank account, you can also come into the Sterling Sugars' office and ask that your wages like be direct deposited into your personal account?

A    Yes.

Q    Okay.  And that's true whether an individual is -- works at the Sterling Sugars' factory or works at the association?

A    Correct.  We encourage it.

Q    Okay.  And -- and do those -- On the back end, setting up that payment, does -- where is it entered, the -- how the payment is going to occur?

A    They're -- Each individual, it's assigned to their number.  There is a direct deposit in the

payroll module.  And you will key in their information and click the direct -- and activate the direct deposit.

Q    Okay.  And so for instance, if someone already had a bank account, that's something that could occur at on-boarding?

A    Yeah.

Q    And were you involved in -- in selecting -- Well, you said you weren't involved in selecting Intermex, but did you, I guess, communicate, finalize the agreement with Intermex so that South Central employees would be paid through that Intermex system?

A    No, I did not.

Q    And who did?

A    Ashlee Gary.

Q    Okay.  And I'm going to show you a document that's going to be marked as Exhibit 80.  And it's been it has a Bates Stamp that ends 36860.

(Whereupon, Plaintiff's Exhibit No. 80 was identified for the record.)

BY MR. MORTON:

Q    I'm sharing my screen.  So I think you can see it.  Let me know if you can see this, Ms. Lange. And it has a Bates Stamp here at the bottom 36860.

A    Okay.  I see it.

Q    Okay.  And it -- it look -- it looks to me like this was -- You were providing the paperwork to finalize the Intermex agreement with somebody named Rafael at Intermex.  Does -- does that look right to you?

A    Correct.

Q    Okay.  And this was based on directions that you had received from Ms. Gary?

A    Correct.

Q    And does the Intermex agreement provide a notice to Sterling Sugars like each time, for instance, that a transfer goes through or if there's a transfer problem?

A    I can't answer that.  That would be a payroll -- payroll clerk.

Q    Okay.

A    Or whatever emails associated with it.

Q    Okay.

A    I have never -- I have not seen one on that.

Q    Okay.  Do you -- Have you heard of any problems with Intermex and have Sterling employees that you supervise addressed those problems?

A    I think Kimberly had a couple of issues

where she -- Because at one time, she would call Intermex occasionally.  As to what those problems are, I am not familiar.  She resolved them.

Q   Okay.  So she would have stepped in and -- and addressed them?

A   Correct.

Q   Okay.  And -- and that would be by reaching out to that same individual at -- at -- like Rafael at Intermex?

A   Rafael or customer service.

Q   Okay.  I'll show you just this -- I'm going to show you another document.  It's -- it's going to be marked as Exhibit 81.  And it's -- it's -- has a Bates Stamp that ends 36891.  It was an attachment to the -- the email we just looked at, the Intermex agreement that I think you were forwarding that had been signed by Ms. Gary.

(Whereupon, Plaintiff's Exhibit No. 81 was identified for the record.)

BY MR. MORTON:

Q   Can you see the document I'm --

A   Yes, sir.  Yes, sir.

Q   And I was just going to show you it had a provision on Page 10 that -- that provides -- that a

copy of the notice goes to your attention at Sterling

Sugars.  Do you see that here on -- on Page 10 --

A    Okay.  Okay.

Q    -- of Exhibit 81?  You're -- you're not

aware, though, of having received copies of those

notices?

A    I don't recall what -- I may have.  I don't

recall any.

Q    Okay.

A    I'm not sure.  I'm sure Rafael has sent me

some correspondence.  Now, would it pertain to that?

I do not recall.

Q    Okay.  And do you keep a copy about the

Intermex agreement at the office there?

A    I'm sure we have one.

Q    And do you know who filled out this

information on this document?

A    I'm sure it was done through finance.  I --

I cannot be 100 percent sure who filled that out.

Q    Okay.  And when you say finance, who would

that be?

A    Ashlee Gary.

Q    Okay.  And do you think that there's

somebody else who's receiving these notes?  Even

though they're to your attention, do you think the

notices are going to somebody else at Sterling Sugars instead of you?

A    Kelly may be getting some notices, Kelly Jackson.  I mean, as being payroll, she -- you know, that's her responsibility.  She sends the money.  And if there's any issues, she does correspond with Intermex.  If you have a new employee and we don't -- he does not have a card, she has to correspond with them.  So I would say Kelly Jackson.

Q    Okay.  And the -- Does Intermex, like these other programs, have sort of like authorized users, people who can, you know, direct changes to the relationship?

A    I'm sure they do.  I'm not sure.  I'm not sure.

Q    Okay.  Do you -- Who does correspond with -- with Intermex?

A    In that -- in that respect, it would probably be Ashlee Gary.

Q    Okay.  Ashlee Gary.

A    Yeah.

Q    And it sounds like you and Ms. Jackson have corresponded as well?

A    Yes.

Q    And either of you could add an employee and

say this employee needs a card?

A    Yeah.  Well, that's one -- done 100 percent by Ms. Jackson.

Q    Okay.  Nobody else does it, just her?

A    No.  Just Ms. Jackson.

Q    Okay.  I wanted to ask briefly about when -- when you prepare payroll in the Sage BusinessWorks, does it provide you information about the total amount of payroll to be -- to be paid?

A    Yes.  It does.

Q    And -- and then, does someone have to make sure that that amount of money is in -- is in the payroll, you know, before payroll?

A    Yes.

Q    And who -- Okay.  Thanks.

A    Yeah.  Yes, I do.  I transfer the money over.

Q    Okay.  And -- and how do you get that information and how do you make the transfer?

A    I get the information from a payroll register.  Once payroll is done, we get a payroll register.  Then I take -- I go to Hancock Whitney, and I transfer from the general account to the payroll account.

Q    Okay.  And -- and the payroll register that

DESIREE LANGE                                                    JOB NO. 2620500
APRIL 17, 2026

you receive, is that -- is it a piece of paper, is it
an email, is it --

        A     It's a piece of paper.

        Q     -- something else?

        A     It's a piece of paper.

        Q     Okay.  And do you receive one for the
factory and one for the association?

        A     Yes.

        Q     Okay.  And is --

        A     Each entity.

        Q     And is payday the same day?

        A     Yes.  Payroll is the same.  Payday is the
same day.

        Q     Okay.  And do you receive this, the payroll
register, on -- on payday or like the day before?

        A     Normally, when it's completed.  When it is
completed, she will bring it to me and I fund it.
Then I --

        Q     Okay.

        A     -- I give that -- Yeah.

        Q     And are you -- Are you the only person
authorized to do that, the funding of the payroll?

        A     Yeah.  Here in my admin office, yeah.  Tim
Swallow.  Tim Swallow can do it.

        Q     Okay.  So he has -- Tim Swallow has access

to the Treasury Manager.  Is that what it's called?

A    Yes.  Yes --

Q    Okay.  And you have access?

A    -- I have access.  I'm not 100 percent sure
if he has the transfers, but he should.  But I'm not
100 percent correct.

Q    Okay.  Do you have any recollection of him
ever actually doing it or --

A    No.  No.

Q    No.  It's always been you?

A    It's always -- Yeah.  Correct.

Q    Okay.  And -- and so you would take money
from the operating account and put it into the
payroll account?

A    Correct.

Q    And do you -- do you round up a little bit
just to make sure or do you transfer --

A    Oh, no, sir.  No, sir.

Q    You transfer the exact amount?

A    Yes, sir.

Q    And would this occur on the day of payday,
the day before payday?

A    Like I said, whenever she's completed with
payroll, she brings me the payroll register.  I fund
it then.  That way we have -- That way, there's no

error.

Q    Okay.  And -- and in Treasury Manager, can you see just all of the accounts then that you have access to?

A    Yes.

Q    And you see both the Sterling Sugars accounts and also the South Central Association accounts?

A    Yes, sir.

Q    Okay.  And if -- if South Central did not have enough money to -- to cover its payroll, what would you do?

A    I would have to make a promissory note and grab some from -- Sterling would have to fund it.

Q    Okay.  And has that happened?

A    Possibly, yes.  I would say yes.

Q    Okay.  And then that transfer would occur from the Sterling Sugars' operating account to the South Central payroll account?

A    No, sir.

Q    Can you explain to me how it would happen?

A    It would probably -- It would go into the South Central general account.

Q    Okay.  And then from there, would you transfer it again to the payroll account?

A    Correct.

Q    And this has to be done fairly quickly.  Is that fair to say?  Because --

A    Yes.

Q    -- you want to make the payroll and not have it bounce.

A    Correct.  You cannot withdraw -- overdraw.

Q    Yeah.  Okay.  And besides you, was anyone else monitoring these -- these bank account balances?

A    Possibly.  I'm sure my -- I'm sure Ashlee Gary has access to them.

Q    Okay.  But as to the transfers, it's -- you're the one doing them?

A    Yeah.  I do the transfers.

Q    Okay.  And do you also -- Do you -- I want to -- We're still sort of just talking about, you know, pay and -- but I want to talk also about checks.  Do -- Is it -- Would it be Ms. Prados who does checks if it's a non-payroll check?

A    Correct.

Q    Okay.  And if it's a payroll check, are there people that get paid a payroll check still?

A    Yes.

Q    And with a new employee, would it sometimes happen if, where things haven't been set up, that

they would get a payroll check, and then later, they might get some other kind of transfer?

A    Correct.

Q    And would those checks be done by Ms. Jackson now?

A    Correct.  Payroll is done by Ms. Jackson.

Q    Okay.  And Ms. Broussard previously?

A    Correct.  Yes.

Q    And does that also extend, for example --
Going to accounts receivable checks for a minute.
The checks that are needed to apply for H-2A workers, would that be something that that Ms. Prados would print?

A    Yes.  Yes.

Q    So she would make out checks, for example, to the government to pay for the cost of applying for H-2A labor certifications?

A    Yes.

Q    And is that also the kind of thing that you would monitor in terms of account balances using that Treasury Manager platform?

A    Yes.  And Ms. Prados.  She lets me know.

Q    Okay.  And do you get a report for those --
You know, you talked about you got an -- a payroll register.  Do you get like a check register for

accounts payables?

A    There's one produced.  Ms. Prados has it.

Q    And does she provide you a copy?

A    I'll look at it.

Q    Okay.  And is it the same thing where you would need to make sure that there's adequate funds available to cover the -- the -- the accounts payable payments?

A    Yes.  I will go to finance.  Finance -- That's a finance question.  Yes.

Q    Okay.  And -- and -- and would you -- If there wasn't, for example, enough funds in the South Central account to cover checks being printed from South Central, is that -- would you be the person who makes a transfer?

A    I would -- At the advice of finance, yes, I would have to make the transfer.

Q    Okay.  And -- and when you say finance, who's involved in finance?

A    Ashlee Gary.

Q    Okay.  Anyone else?

A    No.

Q    Okay.  And -- and so, if there wasn't enough funds, you would use that same, the Treasury Manager at Hancock Whitney bank?

A    Yes.

Q    Okay.  And you would transfer funds from Sterling Sugars into the South Central operating account?

A    Correct.

Q    And -- and the accounts -- Here's a basic question for you, but accounts payable checks, those just come out of the operating account; is that right?  There's not like a separate account, the way there is for payroll?

A    No.  They -- they come out of the general account.

Q    Okay.

MR. MORTON:  All right.  I think that it might kind of be lunchtime.  We could go off the record for a minute.

MR. ALBRITTON:  That's fine.

THE COURT REPORTER:  Off the record.

(Whereupon, a break was taken in the proceedings at approximately 12:25 p.m. until approximately 12:44 p.m.)

MR. MORTON:  All right.  Let's go back on the record.  And you realize you're still under oath, Ms. Lange?

DESIREE LANGE                                                    JOB NO. 2620500
APRIL 17, 2026

THE DEPONENT:  Correct.

BY MR. MORTON:

Q   I -- I was going to -- I just wanted to follow up.  When we -- we left, we were talking just a teeny bit about that Treasury Manager before we took like a short, fake, lunch break.  And I just wanted to show you a document that's already been marked.  Just that I think shows the type of Treasury Manager transfer you were talking about.

A   Okay.

Q   I'm going to show you a document that's been marked as Exhibit 67, and it has a Bates Stamp that ends 5429.  It's -- it's -- it's a bank statement.

(Whereupon, Plaintiff's Exhibit No. 67 was identified for the record.)

BY MR. MORTON:

Q   Let me -- let me know if you can see it.

A   Okay.  Got it.

Q   Okay.  And basically, I was -- I think maybe I can highlight this.  Can you see my highlight there?

A   Yes.

Q   Okay.  So I was just going to -- Oh, now I

highlighted everything.  I was just going to ask you about the -- that sort of the middle thing there that says Treasury Manager CR.

A    Correct.

MR. ALBRITTON:  Just a -- Noting an objection to the form.  This -- this document was an exhibit to the South Central deposition. I don't know that we -- we have any foundation for Ms. -- Ms. Lange to know what this document is.

MR. MORTON:  Okay.  Well, let's just -- I just want to ask --

MR. ALBRITTON:  Sure.

MR. MORTON:  -- her that.

MR. ALBRITTON:  Sure.  Sorry.

BY MR. MORTON:

Q    And Ms. -- Ms. Lange, do you -- The Treasury Manager is a program that you use?

A    It is.

Q    And -- and do you recognize -- I think this -- It says like -- I -- I think it's an abbreviation of from, and then there's a whole bunch of digits. Do you recognize that at the end?

A    That's correct.

Q    Okay.  Is that the Sterling Sugars' bank

account number?

A    Yes, that is.

Q    Okay.  And so, does this entry here represent a Treasury Manager transfer into South Central from the Sterling Sugars bank account?

A    Yes.

Q    All right.  And this is a transfer that you would have made?

A    I would have made it upon Ms. Guest -- Ms. Gary's advice.

Q    Okay.  Like Ms. Gary would have -- Because she's in charge of finance for the --

A    She's -- she's finance.  Correct.

Q    Okay.

A    I --

Q    And so -- And you would have received information about the checks that -- that you needed to cover and -- and would have made a transfer to cover those checks?

A    Correct.

Q    Okay.  And -- and if you see here, there are checks, right, going out just a few days after, you know, that mostly take out the full four million of the transfer.

A    Correct.

Q    And -- and the other thing that I noticed was when you look at the second page here of Exhibit 67, those checks actually -- Can you see it?  It's a -- Sorry.  I'm making them just a little bigger. Those checks actually have a -- a June 16th date.  Do you see that?

A    Correct.

Q    And that Treasury Manager transfer is -- is on the 18th?

A    Correct.

Q    So would this just be an example where there was some delay in making the transfer because there -- there wasn't actually money to cover the checks right before the transfer was made?

A    Correct.

Q    And so, typically, do you try and do it the same day the checks are written, but this time it just didn't quite happen that way?

A    Yeah, possibly.

Q    Okay.  I wanted to ask about overtime.  The -- Oh, yeah.

Can I just ask you one more thing about the -- the checks?  Do you -- do you determine when checks are deposited into the Sterling account?

A    Into the Sterling account?  No.  Ms. Prados

handles that.

Q    Okay.  And so for instance, if -- if Sterling receives a check, Ms. Prados either takes it to the bank or somehow --

A    She -- she prepares a deposit slip, and it is submitted to the bank.

Q    Okay.  And Ms. Prados also handles the writing of checks for the South Central Association?

A    Yes, she does.

Q    Okay.  So -- so for instance, if South Central wrote a check to Sterling Sugars, Ms. Prados would write the check, and she would also deposit the check?

A    Correct.

Q    Okay.  And so, she could check with you, make sure there's money in the account before she deposits it?

A    Oh, most -- most definitely.

Q    Okay.  Because you don't want to like bounce the check.

A    Correct.

Q    And in that example, right, the check looks like it was held onto for a couple of days, probably to allow for that transfer?

A    Possibly.

Q    Okay.  Do you have any reason to think that's not the case?

A    No.

Q    And, I mean, there's no -- South Central Association doesn't need to mail its checks to Sterling Sugars, right, because it's just Ms. Prados handing it to herself?

A    Correct.

Q    So, there's no time lag in -- from when the check is printed?

A    No.  When she prints it, then she deposits it.  It's at her discretion.

Q    Okay.  And does -- does she have a stamp then to deposit those checks like, you know, to -- to endorse the back of the check?

A    Association?  I'm not quite sure.  I'm not sure.  I know we -- we have one for Sterling Sugars.

Q    Okay.  And -- and who uses the -- the Sterling Sugars?

A    Ms. Prados.

Q    Okay.  And for -- To -- to deposit a check to South Central, you're not sure if there's a stamp?

A    I'm not sure.  There probably is one.  I'm not 100 percent sure.

Q    Okay.  Is it the case that South Central

really just gets all of its transfers through Treasury Manager?

A    No.  No.  It's just I'm not sure if we had -- if she ever requested, but I'm -- I don't fool with that side of it.  So, I'm not 100 percent sure. I would assume she has a stamp.  I would assume I have -- have gotten her one, but I can't 100 percent say.

Q    Okay.  Are you aware of -- of South Central receiving any -- any check payments?

A    That would be a finance question.  I don't -- I'm not in that aspect of it.

Q    Okay.  In terms of your involvement at Sterling Sugars with the South Central accounts, you're moving money through Treasury Manager?

A    Correct.

Q    Okay.  Ms. Lange, I wanted to step back for a second.  I wanted to change topics and talk about overtime again for a minute.

The -- For -- There's van drivers at Sterling Sugars.  Is that right?

A    Yes, there is.

Q    Do you know their names?

A    Oh, let's see.  The van drivers are Willie Robison, Dean DeRouen, and Gregory Merrifield.

Q    Okay.  And are they paid hourly?

A    Yes, they are.

Q    And do they receive overtime?

A    Yes, they do.

Q    And -- and they're paid by Sterling Sugars, LLC?

A    Yes, they are.

Q    Okay.  And do they clock in with the Attendance on Demand time clocks that we've described?

A    Yes, they do.

Q    Okay.  Do they use the one at the mechanic shop?

A    I could not answer that.

Q    Okay.  They could use, I guess, any of them because they're all connected together.

A    Other than the office.  Yes.

Q    Okay.  The office one is really just for --

A    Enroll, onboarding.

Q    Okay.  And do -- do you know what -- who decided that they would receive overtime?

A    They're just -- They're factory employees.

Q    Okay.  If --

A    They work -- they work for Sterling Sugars.

Q    Okay.  If you work for Sterling Sugars, you

get overtime?

MR. ALBRITTON:  Objection.

THE DEPONENT:  Yes.

MR. ALBRITTON:  Object to the form.

You can still answer, Desiree.

THE DEPONENT:  I can still answer it?

Okay.  What's the question?

BY MR. MORTON:

Q    If you work for Sterling Sugars, you get overtime pay?

A    If you are a Sterling Sugars manufacturer, you know, the -- you do get overtime.  Yes.

Q    Okay.  And do you know how long those individuals have worked for Sterling Sugars?

A    Maybe a couple of years.

Q    And do you know what their hourly rates are?

A    No, I do not.

Q    And is part of their job to transport truck drivers from the motel to the Sterling Sugars yard?

A    They do transfer.  Yes.

Q    And do the mule drivers -- We talked about those.  To me, they're yard trucks, but I know that we saw the mule term used.  And just to be clear, we're not talking about animals, right?

A    Correct.

Q    Do the mule drivers receive overtime?

A    No, they do not.

Q    Okay.  And do you know who decided that?

A    The work order.

Q    Okay.  And that -- that -- It's your understanding that the job order specifies that they should not receive overtime?

A    I don't know what -- I know they were -- They do not get overtime.

Q    Okay.  And I'm -- I'm just wanting to sort out how that came to be.  Someone had to mark them in the computer system to not receive overtime, correct?

A    Well, there's a parameter in the -- in the time clock system.

Q    At -- So in the Attendance on Demand?

A    Correct.

Q    And -- and you can set someone to or not to receive overtime?

A    It's in the parameters.  It's a whole -- It's the whole system.  And within a -- within a location.

Q    Okay.  I'm -- Can you -- can you --

A    Go ahead.

Q    Can you explain that to me just slightly

more?

A    I -- I confused you.  There's a location. Sterling Sugars is set up on a location and then South Central has its location.  And the overtime is set in the Sterling, and it's also set in the association.

Q    Okay.

A    And it may -- it may have been told from Tim Swallow that there's no overtime.  I'm not 100 percent who -- who -- who mentioned it, who said it. And I don't know if it's exactly in the -- the job order.

Q    Okay.  And -- and anybody else besides Tim Swallow who would have decided that, to your knowledge?

A    No.

Q    And -- and I just want to unpack that location thing.  So, it sounds like what you're describing is some kind of setting in the software. And -- and so, if you clock in with a number that's assigned or with a face that's assigned to the South Central Association, then your location specifies no overtime.  But if you clock in with a face that's assigned to Sterling Sugars, then your location specifies, yes, overtime?

A    Yes.

Q    Okay.

A    Over -- overtime.  Overtime after so many hours.

Q    Okay.  And -- and we're -- we're not -- The location itself is not actually different, correct?  Like --

A    The location I'm speaking of is if -- if the parameters within, that way, when you hit that import, you're importing a location.  May it be Sterling's factory or may it be association.

Q    Okay.  But it -- the -- If people were lined up to scan their faces, one face might go to Sterling Sugars' factory, one face might go to South Central Association.  If we're talking about the location, the way, just like I'm standing here, the -- the location would be the same.  It's just the setting within the software is different?

A    Correct.  It's a parameter within the software.

Q    Okay.  And that -- that parameter would have been set by someone in your office?

A    Correct.  Me or payroll or somebody or -- or the -- the time clock people with their assistants.

DESIREE LANGE                                                             JOB NO. 2620500
APRIL 17, 2026

There's not --

A    Yeah.

Q    There's not like a fourth program that you haven't told me about that somehow tracks hauling too?

A    Oh, no, sir.  It's all done through CBM.

Q    Okay.  And -- and is there -- You mentioned payday and that payday was the same for, you know, Sterling Sugars and South Central.  I forgot to ask you what day of the week it was.

A    Okay.  Payroll is a bi-weekly payroll.  It starts on a Wednesday.  It finishes two weeks later. It closes out at the end of the Tuesday shift. Paychecks are in their bank account by Monday.

Normally, we -- normally, we don't leave the week -- normally, by Friday, but no later than Monday.  Monday is payday.

Q    Okay.

A    Everything is dated for the following Monday.

Q    Okay.  And so every -- every other Wednesday is payday?

A    No, no, let's back up.  Payroll starts -- payroll starts on a Wednesday.  It goes two weeks. Ends on the two week Tuesday, their shift on Tuesday.

The payroll is the following Monday.

So every other Monday.  The payroll ends on the Tuesday, but we -- It takes us a couple of days to process it.  Payday is the following Monday.

Q    Okay.

A    (Overlapping speakers.)  Go ahead.

Q    Okay.  I -- I think I'm getting it.  So, the -- the pay period closes every other Tuesday.

A    Correct.

Q    And -- and then the payday is the following Monday?

A    Correct.

Q    Bi-weekly.  So every other Monday?

A    Yes, sir.

Q    Okay.  And is that -- is that something that you set?

A    It's been like -- it's been like that forever and ever.

Q    Okay.  It's just -- That's just how Sterling Sugars does it?

A    Correct.

Q    And so that's how they do it for South Central, too?

A    Correct.

Q    And -- and then is there a different --

DESIREE LANGE                                                              JOB NO. 2620500
APRIL 17, 2026

CERTIFICATE OF REPORTER

I, VICKIE E. WIECHEC, CVR-M, CCR, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

__XX_    That the witness requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____    Signature is waived.

_____    The changes made by the witness are appended to the transcript.

_____    No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 24TH day of APRIL, 2026.

_____
Vickie E. Wiechec, CVR-M, CCR
Certification No. B-2237

Job No. 2620500

Date: April 17, 2026

Witness Name: DESIREE LANGE

Case: AVILA-SOTO v SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC., et al.

DECLARATION UNDER PENALTY OF PERJURY

  I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

  Signed on the 6th day of May , 20 26 .

_____
Signature  DESIREE LANGE

PAGE 1 OF 3

DESIREE LANGE
APRIL 17, 2026

JOB NO. 2620500

DEPOSITION ERRATA SHEET

Page No. 501 Line No. 11

Change: of 20 years

Reason for change: 20 left out

Page No. 521 Line No. 7

Change: NOT one hundred

Reason for change: NOT was left out

Page No. 601 Line No. 7 & 8

Change: grower / landlord.

Reason for change: CARD shows both grower / landlord info

Page No. 602 Line No. 1

Change: farmer / landlord CARD

Reason for change: Same as Line 10

Page No. 609 Line No. 21

Change: PAying

Reason for change: Paying not playing

Page No. 488 Line No. 7

Change: BEA should be B.

Reason for change: Incorrect spelling (Initial only)

Page No. 500 Line No. 9

Change: Plus bonus, option M

Reason for change: Bonuses are optional not part of my salary.

PAGE 2 OF 3