# EXCERPTS FROM 30(B)(6) DEPOSITION OF STERLING SUGARS, LLC BY AND THROUGH ASHLEE GARY

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


FELIPE DE JESUS AVILA-SOTO,        )

FELIPE DE JESUS SUAREZ-PALAFOX, )  NO. 6:24-cv-01392

ON BEHALF OF THEMSELVES AND        )

ALL OTHERS SIMILARLY SITUATED,  )

     Plaintiffs,                   )

v.                                 )

SOUTH CENTRAL SUGAR CANE           )

GROWERS' ASSOCIATION, INC., AND )

STERLING SUGARS, LLC.,             )

Defendants.                        )




DEPOSITION OF

ASHLEE COMEAUX GARY - CORPORATE REPRESENTATIVE

VOLUME V

SIGNATURE RESERVED

APRIL 17, 2026 - 2:26 P.M. CST

Zoom Video Deposition Proceeding


Vickie E. Wiechec, CVR-M, CCR

Certified Court Reporter

Certificate No.:  B-2237

A P P E A R A N C E S

(VIA ZOOM)


ON BEHALF OF THE PLAINTIFFS:

DAWSON MORTON, LLC

DAWSON MORTON, ESQUIRE

Admitted Pro Hac Vice

1808 Sixth Street

Berkeley, California  94710

(404) 590-1295

dawson@dawsonmorton.com


AND


JAMES M. KNOEPP, ESQUIRE

Admitted Pro Hac Vice

1612 Crestwood Drive

Columbia, South Carolina  29205

(828) 379-3169

jim@dawsonmorton.com

A P P E A R A N C E S (Continued)

(VIA ZOOM)


ON BEHALF OF THE DEFENDANTS:

PHELPS DUNBAR, LLP

BRANDON DAVIS, ESQUIRE

ANDREW ALBRITTON, ESQUIRE

364 Canal Street, suite 2000

New Orleans, Louisiana  70130

(504) 584-9312

brandon.davis@phelps.com

andrew.albritton@phelps.com

were deposed -- I think it was Monday, right?  This is -- would be your second deposition.

A    Yes, sir.

Q    All right.  And if -- Will you let me know if you don't understand my -- my question?

A    Yes, I can.

Q    Okay.  And if you answer my question, is it fair to -- for me to assume that you understood it?

A    Yes.

Q    And is there any reason that you can't give full and complete answers today?

A    No.

Q    And just because it's a separate transcript, am I right in understanding that your title is Chief Financial Officer at -- at M.A. Patout, LLC?

A    M.A. Patout & Son Limited, LLC.  Yes, sir.

Q    Okay.  And does that include also being the director of finance for Sterling Sugars?

A    Yes.

Q    And as part of your job, do you supervise Ms. Lange, who was just here earlier, testifying?

A    Yes.

Q    Was there anything that you heard from Ms. Lange that you thought was incorrect or that you

are lots of different types of equipment that go through there, and it could be in excess of $1 million.  Yes.

Q    Okay.  And -- An excess of $1 million in terms of like annual operating expense?

A    Yes.

Q    Okay.  And that would -- that would include maintaining things like trucks, trailers, those mules that you heard discussed earlier?

A    That would be some of the equipment that would go through the mechanic shop.

Q    Okay.  And the individuals who work in the mechanic shop are -- are employed by Sterling Sugars?

A    To my knowledge, yes.

Q    And the -- Is it also the case that -- that the -- that the equipment operated by -- in the Sterling business is insured by -- by Sterling or by the parent company, M.A. Patout?

A    I'm sorry.  Can you ask that question again?

Q    Sure.  I'll try and make it like more specific.  So -- so, I want to talk about things like truck insurance.

A    Okay.

Q    And -- and -- and what -- how those items

are covered by insurance.  And -- and so, I guess what I wanted to know is if equipment used to haul cane to Sterling Sugars is insured by -- on a Sterling Sugars' insurance policy?

A   We have what we call global policy where Sterling Sugars would be named as an additional insured on the policy.

Q   Okay.  And in whose name is the global policy?

A   M.A. Patout & Son Limited.

Q   Okay.  And is there -- is there one annual premium for that policy?

A   Which policy are you referring to?  There's a -- there's a lot of policies.  Could you be a little more specific?

Q   Yes.  Sure.

A   Okay.  Thank you.

Q   So, I -- I want to talk about a policy covering trucks in which Sterling Sugars would be an additional insured.  How would you -- Would that be called a truck policy or is it --

A   It an auto -- It -- We -- It's our auto policy.

Q   Okay.  And -- and just -- because I don't drive a truck.  And when we say auto, we're also

talking about things that are much bigger than like a

Ford Taurus, right?

    A    Yes.

    Q    Like 18-wheelers and those things are in this policy, too?

    A    Yes.

    Q    Okay.  And so, is there one annual premium for that auto policy?

    A    I believe that the way it works is all of the companies that fall under -- All the companies that are named insured on the policy, we all submit our information, our -- our adds, deletes to the carrier.  It is, I guess, sent to market as a global policy, you know, as -- as one -- as one policy.  And we're given a premium.  And then, in turn, the insurance company will bill each individual company for their -- their allocated part of the premium based on their number of trucks and trailers listed on the policy.

    Q    Okay.  And -- and is this called like captive insurance?

    A    We are part of a captive program.  Yes, sir.

    Q    Okay.  And could you just, for the record, explain what a captive program is?

A    In the captive program, we become basically, an owner.  Well, M.A. Patout is an owner of part of the insurance captive.  It -- it has an owner.  We -- All the -- all the members of the captive participate in the -- the running of the captive.  We all pay premiums.  That money is invested.  Claims are paid out of the dollars that are -- are paid by the members.  And I -- don't -- I think that's -- that about covers it.

Q    Okay.  And if it all goes well, M.A. Patout could get back a part of the premium if -- if not all of the -- if the investment gains exceed the policy payouts?

A    Yes.  To help reduce future premium -- future premium payments.

Q    Okay.  And the -- the -- the auto policy premium that you -- you receive is one premium that covers all the insureds.  And then, you can divide it up, but it's -- it's not -- To get the policy, you have to pay the full premium; is -- is that right?

A    The full premium must be paid.  Yes.

Q    Okay.  And an additional named insured on that policy then is the South Central Association?

A    Yes.  They are listed as an additional insured.

year?

A    Without seeing -- without seeing a document, I can't agree or disagree.

Q    Okay.  And is the Workers' Comp policy -- Workers' Compensation policy for Sterling Sugars handled in a similar way?

A    Yes.

Q    And -- and it names M.A. Patout & Sons and Sterling Sugars as an additional insured?

A    Yes.

Q    All right.  And is that -- is that true that South Central Association is included as well?

A    Yes.

Q    And do you have any recollection about the -- the approximate annual premium for that policy?

A    It's part -- It would be part of that 8 million of total premium.

Q    Okay.  And Sterling Sugars also handles like the -- the licensing of trucks?

MR. ALBRITTON:  Object to the form.

THE DEPONENT:  Yes.

BY MR. MORTON:

Q    And pays the -- both the administrative expense and the associated like licensing fees associated with licensing trucks and trailers?

A    Could you be a little more specific about which license you're referring to?

Q    Sure.  I'm talking about sort of like -- not -- not like a driver's license, but like vehicle operating permits, which could include license plates, but also just like use taxes that are associated with operating motor vehicles over the road.

A    Sterling Sugars does pay some, but I believe South Central also pays for some of those licenses and permits.

Q    Okay.  And -- and what -- Do you know what the division is on that?

A    No, I don't.

Q    Okay.  And -- Oh, I want to go back for a second.  We -- When we were talking about like Sterling Sugars' assets, I also wanted to talk about Sterling Sugars' gross income.  Do you -- do you have an understanding of the annual gross income for Sterling Sugars?

A    Yes, I do.

Q    And could you tell me what it was last year or the rough range that --

A    It's -- it's approximately $130 million a year.

ASHLEE COMEAUX GARY - CORP. REP. - VOL. V                                    JOB NO. 2651078
APRIL 17, 2026

Q    Okay.  And that would be -- that's before like the -- the expenses of operating the mill?

A    Yes, sir.  That's the gross income.

Q    Okay.  And -- and do you have an idea of the -- the gross profit that Sterling Sugars has like before interest expense?

A    Let's see if I can do a rough calculation in my head.  Between ten and 12 million.

Q    Annually?

A    Yes.  I'm sorry.  Say that again.  Was that a -- Was that a question?  I was confused.

Q    No, I was just -- I understood you to be answering that the ten and 12 million is gross profit before interest expense.  And I was just confirming that that's like an annual number.

A    That would be a range.  Yes.

Q    Yeah.  Okay.

A    Depending on -- you know, depending on outside factors and different -- It changes from year to year.

Q    Okay.  Right.  But the -- the rough annual range is between ten and 12 million in gross profit annually?

A    Yes.

Q    And does -- does Sterling Sugars pay

dividends?

A    Sterling Sugars does not pay dividends.

Q    Okay.  And does Sterling Sugars -- Sterling -- It's my understanding Sterling Sugars is a wholly owned subsidiary of M.A. Patout?

A    Yes.

Q    Does Sterling Sugars pay -- And so that -- that would mean that Sterling Sugars doesn't have, for example, individual shareholders?

A    Correct.

Q    Does Sterling Sugars pay dividends to M.A. Patout?

A    No.

Q    Okay.  And does Sterling Sugars -- I was just trying to understand, I guess, with the net profit of Sterling Sugars where do those proceeds go?

A    So, it will -- M.A. Patout pays a dividend to its shareholders.  Sterling Sugars pays a reimbursement of their pro rata share of the net -- the company's net income.  M.A. Patout will ask Sterling Sugars to remit their portion of the dividend to the parent company to cover that dividend.

Q    Okay.  Do you know how many shareholders M.A.  Patout has?

distinguishing the tract of land ownership from the person who's listed on like the grower card as the grower.

A    Sterling Sugars -- I'm sorry.  Can you ask the question again?  I want to make sure -- I want to make sure I answer it correctly.

Q    Sure.

A    And exactly what you're asking me for.

Q    Okay.  So -- Well, let's just start with Sterling Sugars in that land category on its balance sheet.  It owns farmland.

A    Yes.  It owns farmland.

Q    Okay.  And in fact, like recently, it has been approved to make some additional purchases of farmland.  So like --

A    Yes.

Q    Okay.  And so, I -- Apart from farmland ownership, it -- Does Sterling Sugars operate a farm or share joint ownership in -- in a farm as distinguished from the tract of land?

A    No.

Q    I --

MR. MORTON:  How long have we been going for here?  I didn't pay attention.

THE DEPONENT:  About --

I know that he has a relationship with South Central.

Q    Okay.

A    I'm aware of that relationship, but I was -- I'm not aware of the relationship between Sterling and Great Labor.

Q    Okay.  And are you -- Like, for instance, are you aware of Great Labor providing services to the Sterling Sugar Sales Corporation?

A    He may have been the recruiter for Sterling -- Sterling Sugars Sales Corp.

Q    Okay.

A    I -- I don't remember, but he may have been.

Q    And does -- does Sterling Sugars also use H-2B workers?  It's a visa type as opposed to H-2A visas.

A    To my knowledge, yes.  They have H-2B workers --

Q    Okay.

A    -- at the Sterling Sugars mill.

Q    And does Mr. Deese and Great Labor assist with the provision of H-2B workers to Sterling Sugars?

A    Jason Burke, the plant manager, is the person that handles the H-2B process for Sterling

Sugars.  Besides knowing any financial arrangements where things are paid, I don't know of that relationship and what he -- what he provides and what he doesn't for that service.

Q   Okay.  I mean, do you know whether Great Labor Is -- is paid by Sterling Sugars for a service related to obtaining workers for the Sterling Sugars operations?

A   Not without reviewing a check register or general ledger records.

Q   Okay.  If --

A   I -- I would -- I would need to -- I would need to go back and review that.  I did review some general ledger records, but those were not records that I reviewed for today.

Q   Okay.  And do you know what general ledger entry would be made for that kind of expense?

A   On Sterling Sugars' books?

Q   Yeah.

A   It should be -- I believe there is an account for foreign labor.  It would be a -- a debit. It would be a -- an expense to foreign labor expense and a credit to accounts payable or cash when it's paid.

Q   Okay.  And -- and the -- Just so I'm

understanding, the -- the foreign labor expense would

be -- That wouldn't be the wage expense, that would

just be like the expense associated with obtaining

certification, going through the process, that kind

of thing?

    A   Yes.  That's what -- that's what the

character of that account is.  Yes.

    Q   Okay.  And are you familiar with the codes

used to describe Sterling Sugars' business for the

purpose of applying for foreign workers?  And I'm

referring to this, I think it's called the North

American Industry Code, but it's sometimes

abbreviated as an NAICS code.

    A   I do know what the -- the NAICS system is.

Yes.

    Q   Okay.  Do you know what code is used to --

or what code would properly classify Sterling Sugars'

business?

    A   The number?

    Q   Sure.  If you know the number, great.

    A   No, I do not know the number.  I know that

it's listed on a tax return somewhere, but I believe

it's sugar -- I know the name of it is sugar

manufacturing.

    Q   Okay.  Okay.

A    Whatever number is associated with that.

Q    Okay.  And that's the -- a code that accurately describes the business that Sterling Sugars is in?

A    It is the -- I believe you assign a NAICS code based on your -- the majority of what your business operation does.  And that is what the majority of our business operation does.

Q    Okay.  And -- and you indicated that -- Are you involved in the preparing of tax returns?

A    I do assist our tax firm with any information that they would request.  Yes.

Q    Okay.  And you believe that NAICS code is also listed on the -- on the tax return itself?

A    I do believe so.

Q    And does -- does Sterling Sugars file its own tax return or is it consolidated with the M.A. Patout tax return?

A    For federal or state purposes?

Q    Well, I guess I'd like to know both, but let's start with federal.

A    For federal purposes, it is part of a consolidated tax return with M.A. Patout because we are -- It's considered an aggregate because it's 100 percent wholly owned or its wholly owned is, I guess,

With regards to the association, Ricky Gonsoulin would have been a part of those conversations as the president of the association. Jamie Robison would have had to have been a part of those conversations as the general manager of the association.  My position as the chief financial officer of all of the companies.

There are lots of people sometimes present from different companies that are part of those conversations, not always specifically just Sterling Sugars.  Not -- I'm sorry, not -- not just South Central's Sugar Cane Growers' Association.

Q   Okay.  And when -- when Sterling Sugars employs truck drivers, we heard earlier that they're paid overtime?

A   Sterling Sugars, yes.

Q   Okay.  And is that -- You don't have any knowledge that's different than that?

A   No.

Q   And -- and has -- Have you also listed advertisements for local truck drivers where one of the items listed was that overtime pay would be available?

A   I have not listed that.  I have not seeked -- seeked advertisement.  But I do know that as part

Q    Are -- are you aware of any discussion since the Sterling Sugar Sales lawsuit was filed by individuals at Sterling Sugars over whether overtime should be paid to truck drivers?

MR. DAVIS:  Objection.

MR. ALBRITTON:  Same objection.  You can answer.

THE DEPONENT:  I -- Can you say that again?

MR. MORTON:  Sure.

THE DEPONENT:  Not Mr. Dawson.  I'm sorry. Andrew, can you state -- I didn't hear what you just said.

MR. ALBRITTON:  Sorry.  I said objection. But you can answer.  Yeah.

THE DEPONENT:  Oh, okay.  I know that there were discussions about changes in rates due to different activities.  To my knowledge and my understanding is that all of those activities were still considered agricultural activities, even though they were maybe given a different job title or classification.  And because they were still part of the scope of the agricultural activities, that overtime would not be paid.

BY MR. MORTON:

Q    Okay.  And -- and is that -- I'm trying to

understand, did you -- did you participate in -- Did you participate in a discussion that this -- that -- that it was agricultural or that was just a view that you reached?

A     That was just a view that I reached off of listening to people talk and reading some of the -- I guess, reviewing the timeline of what happened between 2018 and now, just going back and reviewing some of my notes and -- and different things --

Q     Okay.

A     -- in preparation for today.

Q     And the order in the Sterling Sugar Sales corporation lawsuit didn't change that understanding for you or anyone else at Sterling Sugars?

MR. ALBRITTON:  Objection.

But you can answer.

THE DEPONENT:  Sterling Sugars, the -- the type of business I -- Well, I don't think that that case has been completely settled and final yet.  So I know that they're still working on that.  The business model of Sterling Sugar Sales Corporation as a farm labor contractor, I believe, had some bearing on that case.

But this association, it -- It's a different ownership structure.  It's a different

business model.  These are growers, whereas, Sterling Sugar Sales Corp was owned by the sugar mill.  We -- It -- It's my understanding now that those activities were not deemed agricultural.

In this new business model, this is a group of agricultural growers that perform agricultural activities that control and manage the business.

BY MR. MORTON:

Q    Okay.  And it's your understanding that -- that the ownership of a business is determinative of whether like overtime rules apply?

MR. ALBRITTON:  Object to the form.

THE DEPONENT:  I believe the -- Well, yes, because on the application that we file, we have to -- In the application that Sterling Sugar Cane Growers Association has filed, we have to -- we have to note the nature of the employee -- employer, the nature of the employer.  We have to note where the work is being performed.  And we have to note who produces the crop.

In the Sterling Sugars case, it -- it was deemed that there was a -- I -- a decision that was made that that was incorrect.

So as part of the new policy, we have met the requirements for the association to be considered an agricultural activity and have agricultural labor.

BY MR. MORTON:

Q    Okay.  And so, in response to the prior lawsuit, Sterling Sugars changed to like an association structure, but didn't change the practice in regards to paying overtime to truck drivers?

MR. ALBRITTON:  Objection.

THE DEPONENT:  I'm sorry.  Can you repeat that question?

MR. MORTON:  Sure.

BY MR. MORTON:

Q    In response to the prior lawsuit, Sterling Sugars changed to an association structure from Sterling Sugars Sales Corp, but didn't change the practice of not paying overtime to truck drivers?

MR. ALBRITTON:  Same objection.

THE DEPONENT:  When Sterling Sugars realized that through the -- the -- the lawsuit that we would not be able to employ H-2A workers anymore under that business model, we had to let our growers know that they were -- because they're responsible for getting their cane to

the mill.

We had to let our growers know that under this old business model, we would not be able to perform those services for them anymore.  So they had to figure out how they were going to get their cane to the mill with H-2A labor since Sterling Sugar Sales Corporation could no longer perform that function under that model.

And so, the change that was made is that the growers had to associate in order for them to be able to continue to bring in H-2A labor for agricultural purposes.

BY MR. MORTON:

Q    Okay.  And this is something that's referred to internally as the Patout Group Associations; is -- is that right?

A    Can you clarify what you're asking?  I'm not quite sure what you're meaning by that.

Q    Sure.  There -- there's three of these associations that were formed.  I think we talked about them earlier.  Teshe Vermillion Louisiana and --

A    Yes.  Each -- each one of our sugar mills has a group of growers that deliver cane to our sugar mill.  And each mill, I guess, based on their

really -- That would be a question for him.  I don't know who he met with.

Q    Okay.  And that -- And the end result of those meetings was that -- that he proposed this association structure for employing truck drivers?

MR. DAVIS:  Objection.  Foundation.

THE DEPONENT:  This was the business model that was discussed.  I guess once the decision was made, I was presented with the administrative side of creating these entities of -- the paperwork side of getting the entities prepared for the growers.

BY MR. MORTON:

Q    Okay.  And -- and that was -- You were presented that by -- by Mr. Romero or someone else?

A    I -- It was a combination of people.  The -- Once the association members decided who they were going to be, they had to, you know, work with me to help them through the -- the paperwork process. That's all part of our management fee that the association pays to the respective sugar mills.

We had to file for EIN numbers.  We had to file for lots of different things that become, you know, whenever you create a new business.  Their articles of organization had to be created, lots of

different things.  And so, I worked with the growers to help them do some of these activities.

Q    Okay.  And EIN numbers is employer identification numbers?

A    Yes.

Q    And those are used in like the payment of wages?

A    That's your --

MR. DAVIS:  Objection.  Form.

THE DEPONENT:  It -- it's your federal --

It's your federal number that identifies you to the government.

BY MR. MORTON:

Q    Okay.  And besides those discussions that Mr. Romero had with other industry leaders, is there anything else you're aware of in terms of that shift in the investigation of the legality of that shift from Sterling Sugar Sales to an association structure?

A    No, I'm not aware.  Not that I recall, of anything else at this time.

MR. MORTON:  Okay.  I don't have any further questions.

MR. ALBRITTON:  We tender the witness.

THE DEPONENT:  Thank you.  Does this mean

ASHLEE COMEAUX GARY - CORP. REP. - VOL. V                    JOB NO. 2651078
APRIL 17, 2026

CERTIFICATE OF REPORTER

I, VICKIE E. WIECHEC, CVR-M, CCR, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

__XX_    That the witness requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____    Signature is waived.

_____    The changes made by the witness are appended to the transcript.

_____    No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 24TH day of APRIL, 2026.

.

Vickie E. Wiechec, CVR-M, CCR
Certification No. B-2237

Job No. 2651078

Date: April 17, 2026

Witness Name: ASHLEE COMEAUX GARY - CORP. REP. - VOL. V

Case: AVILA-SOTO, et al. v SOUTH CENTRAL SUGAR CANE GROWERS' ASSOC., INC., et al.


DECLARATION UNDER PENALTY OF PERJURY

 I declare under penalty of perjury

that I have read the entire transcript of

my Deposition taken in the captioned matter

or the same has been read to me, and

the same is true and accurate, save and

except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION

ERRATA SHEET hereof, with the understanding

that I offer these changes as if still under

oath.

 Signed on the 30th day of

April , 20 26.

Signature  ASHLEE COMEAUX GARY - CORP. REP. - VOL. V

                PAGE 1 OF 3

ASHLEE COMEAUX GARY - CORP. REP. - VOL. V    JOB NO. 2651078
APRIL 17, 2026

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Page No. _____ Line No. _____

Change: _____

Reason for change: _____

Signed on the _30th_ day of

_April_____ , 20_26_.

Signature   ASHLEE COMEAUX GARY - CORP. REP. - VOL. V

PAGE 3 OF 3