# EXCERPTS FROM 30(B)(6) DEPOSITION
# OF STERLING SUGARS, LLC
# BY AND THROUGH RANDALL ROMERO

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

CASE NO. 6:24-cv-01392

_____

FELIPE DE JESUS AVILA-SOTO, et al. )

    Plaintiffs,                       )

v.                                   )

SOUTH CENTRAL SUGAR CANE GROWERS'  )

ASSOCIATION, INC., et al.            )

    Defendants                       )

_____ )

Remote deposition of

RANDALL K. ROMERO

STERLING SUGARS, LLC

VOL II

Monday, April 20, 2026

10:04 a.m. CT - 6:40 p.m. CT

Pages 1-246

REPORTED BY:  Ahuva Goldberger, Stenographic

Reporter & Notary Public

A P P E A R A N C E S

(VIA ZOOM)


ON BEHALF OF THE PLAINTIFF:

DAWSON MORTON, LLC

DAWSON MORTON, ESQUIRE

Admitted Pro Hac Vice

1808 Sixth Street

Berkeley, California 94710

(404) 590-1295

dawson@dawsonmorton.com

AND

JAMES M. KNOEPP, ESQUIRE

Admitted Pro Hac Vice

1612 Crestwood Drive

Columbia, South Carolina 29205

(828) 379-3169

jim@dawsonmorton.com

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

A P P E A R A N C E S   C O N T I N U E D

                    (VIA ZOOM)


ON BEHALF OF THE DEFENDANTS:

PHELPS DUNBAR, LLP

BRANDON DAVIS, ESQUIRE

ANDREW M. ALBRITTON, ESQUIRE

365 Canal Street, Suite 2000

New Orleans, Louisiana 70130

(504) 584-9312

brandon.davis@phelps.com


ALSO PRESENT:

Rivers Patout

Ashlee Gary

RANDALL K. ROMERO - VOL. II                                           JOB NO. 2620528
APRIL 20, 2026

Whereupon,

RANDALL K. ROMERO,

STERLING SUGARS, LLC

called as a witness, having been first duly sworn

to tell the truth, the whole truth, and nothing

but the truth, was examined and testified as

follows:

EXAMINATION

BY MR. KNOEPP:

    Q.   Mr. Romero, could you please state your
full legal name for the record?

    A.   Randall K. Romero.

    Q.   Does the K stand for something?

    A.   Oh, Keith.  Randall Keith Romero.

    Q.   And what's your home address,
Mr. Romero?

    A.   8034 LA Highway 339, Abbeville,
Louisiana, 70510.

    Q.   And I'm going to show you what's
previously been marked as Exhibit 71.  Do you see
that on your screen?

        (Deposition Exhibit 71 was marked for
purposes of identification.)

        THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Okay.  And this is the Amended Notice of Deposition of Sterling Sugars, LLC.  Have you seen this before?

A.   Yes.

Q.   And do you understand that you have been designated today by Sterling Sugars, LLC, to testify on its behalf regarding certain topics?

A.   Yes.

Q.   Before we get started, I just want to go over what those topics are, so that we're in agreement as to the topics you've been designated for.  Is that okay?

A.   Yes.

Q.   Okay.  My understanding is that you've been designated for topics 1, 2 --

MR. DAVIS:  I beg your pardon, Counsel. I just wanted to use this opportunity to reference our February objections, which have been circulated.  We're going to mark that as Exhibit A, but subject to that, please go ahead.

MR. KNOEPP:  Sure.  Understood.

(Deposition Exhibit A was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   Okay.  Mr. Romero, what I was saying, my

understanding is that you've been designated to testify on behalf of Sterling Sugars, LLC, with respect to topics 1, 2, 3, 4, and 5.  Is that your understanding as well?

A.   Yes.

Q.   And I also understand you've been designated to testify with respect to topics 14, 15, and 16; is that right?

A.   Yes.

Q.   And you've been designated to testify with respect to topics 18, 19, 20 and 21; is that right?

A.   Yes.

Q.   And finally, you've been designated to testify with respect to topic number 23; is that right?

A.   Yes.

Q.   Okay.  I understand that Rivers Patout has also been designated for some of the same topics as you have.  Is that your understanding as well?

A.   Yes.

Q.   And those joint topics are 2, 3, and 4; is that right?

A.   Yes.

Q.   And 15 and 16, is that also a joint topic?  Are those also joint topics?

A.   Yes.

Q.   I'm sorry?

A.   Yes.

Q.   And topics number 20 and 21, are those also joint topics with Mr. Rivers Patout?

A.   Yes, sir.

Q.   Is there any division in any of those topics between the two of you that I need to be aware of before we get started?

MR. DAVIS:  Yes, depending on whether there's a policy question or an operations question, that -- that distinction might be significant to Sterling, and so that's why we're making sure that both Mr. Patout and Mr. Romero can address your concerns.

MR. KNOEPP:  Great.  That's helpful. And I guess, am I correct in assuming that, with respect to policy, Mr. Romero, you're the person who would be prepared to testify about policy questions?

THE WITNESS:  Yes, sir.

BY MR. KNOEPP:

Q.   And with respect to operations questions

that would fall under Mr. Rivers Patout's designation?

A.   That's correct.

Q.   Okay.  Great, that's helpful.  Thank you.

Now, you put --

MR. DAVIS:  Not always the case, depending on what your scope of inquiry is, but generally we think that that are the contours.

MR. KNOEPP:  Okay.  That's great. That's helpful.  Thank you.

BY MR. KNOEPP:

Q.   And, you know, as we go along if, Mr. Romero, you -- you know, I ask you a question and you believe that's an operations question that's better asked of Mr. Patout, that he's prepared to answer that kind of question, just let me know; okay?

A.   I will.

Q.   Thanks.  You provided deposition testimony before; is that right?

A.   Yes, sir.

Q.   That was during the lawsuit against the Sterling Sugars Sales Corporation that was brought by some H-2A truck drivers; is that correct?

RANDALL K. ROMERO - VOL. II                                           JOB NO. 2620528
APRIL 20, 2026

A.    Independent grower that -- where Patout Equipment Company was picking up sugar cane.

Q.    And was it picking up sugar cane and then delivering it to one of the M.A. Patout sugar cane mills?

A.    It would have been to the M.A. Patout mill.

Q.    It was called M.A. Patout at the time?

A.    Yes.

Q.    And just -- again, we're just getting just a little bit of background.  Does M.A. Patout currently operate three different sugar mills?

A.    Yes, it does.

MR. DAVIS:  Object to form.

BY MR. KNOEPP:

Q.    What are the -- what are the names of the three different sugar mills?

A.    Okay.  M.A. Patout & Son Limited, LLC, operates the Enterprise Factory.  Sterling Sugars, LLC, operates its factory, and Raceland Raw Sugar, LLC, operates the third facility.

Q.    Is that one usually referred to as Raceland?

A.    Yes, sir.

Q.    You mentioned that you had testified

Q.   Okay.  Excuse me.

I'll just start a little bit with a little bit more background.  Could you tell me who your current employer is?

A.   M.A. Patout & Son Limited, LLC.

Q.   And is it okay, during the course of the deposition, if we use a shorthand for that entity as well, and just say M.A. Patout?

A.   Yes, sir.

Q.   And it's -- it's -- just for the court reporter's purposes and the record, it's M period, A period and then a space, Patout, P-A-T-O-U-T; right?

A.   Yes.

Q.   Do the M and the A stand for anything?

A.   Mary Ann.

Q.   Who is -- is that Mary Ann Patout?

A.   Yes.

Q.   And who is Mary Ann Patout?

A.   She was one of the original founders of the M.A. Patout factory.

Q.   I think I've a read newspaper article or two about -- a little bit about this.  How long ago was the M.A. Patout factory founded?

A.   Well, the company started about

RANDALL K. ROMERO - VOL. II                           JOB NO. 2620528
APRIL 20, 2026

200 years ago.

Q.   And has it been in continuous operation during that period of time?

A.   Repeat it -- repeat your question.

Q.   Has the company been in continuous operation during that entire 200-year period of time?

A.   Yes, sir.

Q.   And how -- I'm not trying to -- ask you this.  How long have you worked at M.A. Patout?

A.   About 25 years.

Q.   Who -- who hired you when you first started working there?

A.   Craig Caillier.

Q.   Can you spell the last name, just for the court reporter?

A.   C-A-I-L-L-I-E-R.

Q.   And who was Mr. Caillier at the time when you were hired?

A.   He was CEO.

Q.   And what was your position when you were first hired 25 years ago?

A.   I was CFO.

Q.   And how long did you serve as the CFO of M.A. Patout?

A.   12 years.

Q.   And then, what was your next position after that?

A.   Chief executive officer.

Q.   And you've been the CEO since that time; is that right?

A.   2013.

Q.   Do you -- just asking about your employment.  Are you employed by any other entities, besides M.A. Patout?

A.   No, sir.

Q.   And so when you get your paychecks they're -- they just come from M.A. Patout; is that right?

A.   Yes.

Q.   You do hold some positions or titles at some other companies; is that right?

A.   Yes.  I'm considered a CEO over the Patout entities.

Q.   And when you say Patout entities, I -- I think I know now what -- what that means, but can you tell me what you consider to be the Patout entities?

A.   M.A. Patout, Sterling Sugars, LLC, Raceland Raw Sugar, LLC, and Patout Equipment

Company, LLC.

Q.   Okay.  And you serve as the CEO of all four of those entities; is that right?

A.   Correct.

Q.   And how long have you been the CEO of Sterling Sugars, LLC?

A.   Since 2013.

Q.   Can you tell me a little bit about your educational background?

A.   Okay.  I graduated from the University of Southwestern Louisiana in 1981 with a degree in accounting.  I proceeded to become a certified public accountant I believe in 1985.  Between 1981 and 1989, I worked in a public accounting firm in Abbeville, Louisiana.  And in 1989 I went to work for Sterling Sugars, Inc., from 1989 to 1998. Then I was manager and accountant for Sterling Sugars, Inc.  In 1998 until 2002 I was the CFO for a food service distributor in New Iberia, Louisiana.  And after 2002, I went to work for the M.A. Patout group.

Q.   And the -- within the M.A. Patout group, you mentioned the four entities.  I'm familiar with another entity called the Sterling Sugar Sales Corporation.  Are -- you're familiar with

RANDALL K. ROMERO - VOL. II                                          JOB NO. 2620528
APRIL 20, 2026

that entity as well; yes?

    A.    Yes, sir.

    Q.    And that's a wholly-owned subsidiary of Sterling Sugars, LLC; is that right?

    A.    Correct.

    Q.    And do you hold any title, with respect to the sales corporation?

    A.    Not directly, no.

    Q.    Just indirectly as the CEO of Sterling Sugars, LLC?

    A.    Correct.

    Q.    The -- there are three associations that are connected to the Patout entities; is that right?

    A.    Yes.

    Q.    Obviously, one is South Central that we're here about today, and that's connected to Sterling Sugars; is that right?

    A.    Yes.

    Q.    There's Teche Vermilion, and that's connected to the -- to M.A. Patout; is that right?

    A.    Yes, sir.

    Q.    And then there's South Louisiana Growers Association that's connected to Raceland; is that right?

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

A.    Yes, sir.

Q.    Do you consider those entities part of the Patout entities that you were referring to?

A.    No, sir.

Q.    Why not?

A.    Because they are independent associations that were formed by the growers in those regions.

Q.    The -- they're all part of M.A. Patout's consolidated financial reporting though; right?

A.    No.  No, they're not.

Q.    Do you refer to them as Patout group associations in corporate communications?

A.    No, sir.

Q.    And do you have any ownership interest in M.A. Patout?

A.    No, sir.

Q.    Do you have any ownership interest in Sterling Sugars, LLC?

A.    No, sir.

Q.    And my understanding is that Sterling Sugars, LLC, is a wholly-owned subsidiary of M.A. Patout; is that right?

A.    Yes.

Q.    How long has that been the case?

A.    I believe since 2009.  2009 or '10.

Q.    And do you have an office address, Mr. Romero?

A.    Yes, sir.

Q.    And what is -- what is that?

A.    3512 J Patout Burns, B-U-R-N-S, Road, Jeanerette, Louisiana, 70544.

Q.    And that's where you're located right now; yes?

A.    Yes, sir.

Q.    And I realize that you wear several different hats, so I want to sort of break this next question down a little bit.

In your role as the CEO of M.A. Patout, what are your job duties?

A.    I basically oversee the operation's care of the Enterprise, as well as oversight of Patout Equipment Company, Sterling Sugars, LLC, and Raceland Raw Sugar, LLC.

Q.    And whenever you say you'd oversee the operations, what do you mean by oversee the operations?

A.    You know, just overall management of those entities.

Q.    And whatever you -- do you -- do you

RANDALL K. ROMERO - VOL. II                                      JOB NO. 2620528
APRIL 20, 2026

oversee the management of Sterling Sugars?

A.    Yes.

Q.    Do you have any, I guess, specific job duties with respect to your role as the CEO of Sterling Sugars?

A.    None specific, other than the oversight of, you know, Rivers Patout as the general manager and president of the organization.

Q.    And does each one of those entities, the Patout entities, have a general manager -- or strike that.

Does each one of the Patout entities have a president that oversees the day-to-day operations?

A.    Yes.

Q.    And do all of those people report to you as the CEO?

A.    Yes.

Q.    And is it a -- is it a president and general manager position?  Is that what it's called?

A.    Sterling and Raceland have presidents and general managers.  Patout Equipment Company is only a general manager.

Q.    And the president and general manager of

Sterling Sugars is Rivers Patout; right?

A.    Yes.

Q.    And he's responsible as the president and general manager for the day-to-day operations of the Sterling Sugars mill?

A.    Yes, sir.

Q.    And -- and he reports to you as the -- the CEO of both Sterling Sugars and M.A. Patout; is that right?

A.    Repeat that?

Q.    Sure.  He reports to you as both the CEO of Sterling Sugars and the CEO of M.A. Patout; is that right?

A.    He reports to me as CEO to M.A. Patout in his capacity as president and general manager of Sterling Sugars, LLC.  I think you said CEO twice.

Q.    Yeah, well, I was referring to your role as the CEO, since you're the CEO of both entities.

A.    Okay.  All right.  I got you.

Q.    I think we're on the same page.  I -- I realize that, you know, now when you gave your answer, the question could have been slightly confusing, and so, you know, I think I understand. I'm just trying to get a sense of how the -- the

structure works.

A.    Okay.

Q.    And -- yeah.

And do you also oversee the accounting work that's done by the CFO, Ashlee Gary?

A.    Yes.

Q.    And do you do that with respect to the accounting work as it relates to M.A. Patout?

A.    You know, her capacity as CFO is over all of the entities, and she does report to me in respect to that -- in relation to that.

Q.    And -- and so -- and I meant -- we've taken her -- she was a designee earlier and, you know, my understanding is she's the CFO of M.A. Patout, as well as Sterling Sugars; right?

A.    Correct.

Q.    And so in her role as the CFO of Sterling Sugars she would report to you; is that correct?

A.    Yes.

Q.    Do you oversee, then, some of the accounting work that happens at Sterling Sugars?

A.    Not directly.

Q.    You just do that through reports that Ms. Gary might provide to you.

A.   It was food service, hauling gas service to -- to offshore, and industrial governmental, white tablecloth, just a complete array of service.

Q.   We were talking a little bit before the break about people who were officers and directors of the different Patout entities or -- and people who had -- and, I guess, Ashlee Gary is the CFO of all of the Patout entities; is that right?

A.   Yes.

Q.   And is it your understanding, she's also an officer at -- of South Central?

A.   Yes.

Q.   She's the treasurer at South Central; is that right?

A.   Yes.

Q.   And she oversees the financials of South Central, as well as Sterling Sugars; is that correct?

A.   Yes.

Q.   And do you know how she became an officer of South Central?

A.   You know, at the creation of the association by the growers, they felt strongly that having an individual with her credentials

would be a benefit for the operations of the association.

Q.   And who -- who in particular felt strongly about that; do you know?

A.   I think it was the consensus of the board, association board.

Q.   And did you -- did she talk to you at all about taking on that role?

A.   Yeah, I'm certain we've had -- we had some discussion regarding.

Q.   You're her supervisor; right?

A.   Yes.

Q.   Okay.  And were you in favor of her taking on that role as treasurer of South Central?

A.   Yes.

Q.   And why?

A.   You know, as part of the organization, we realized that we would need to have a management services agreement to assist with the association, and -- and we felt like her capacity there would -- would help with regards to those services.

Q.   And in -- in helping provide some of the management services to South Central, you felt that she would be an asset in that regard?

A.   Yes.  Yes, sir.

Q.   Any other reason that you were in favor of her being the treasurer at South Central?

A.   No.  I believe the financial oversight was the leading factor.

Q.   And she was not taking on that role as a volunteer for South Central; is that right?

A.   Well, I guess it -- I mean, she could have chose not to do it.

Q.   And she was -- the work that she does in overseeing the financials of South Central is something she's paid for as part of her employment at M.A. Patout; is that right?

A.   Yes.

Q.   You mentioned the -- you know, the management agreement.  Is it fair to say that Sterling Sugars' employees handle most of the management functions for South Central?

A.   Yes.

Q.   The Sterling Sugars' employees cancel -- handle all the accounting work for example; is that right?

A.   Yes.

MR. DAVIS:  Object to form.

BY MR. KNOEPP:

Q.   The Sterling Sugars' employees handle the processing of the payroll for South Central; is that correct?

MR. DAVIS:  Object to form.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And the Sterling Sugars' employees manage the South Central bank accounts; is that right?

MR. DAVIS:  Object to form.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And so you were saying like having Ms. Gary be the treasurer of South Central, you felt would help in making sure that those management functions were performed properly.  Is that fair to say?

A.   Yes.

Q.   Excuse me, I'm sorry.

When South Central first formed, it applied for a credit card with Hancock Whitney Bank; is that right?

A.   Yes.

Q.   And M.A. Patout was required to be a guarantor on that credit card account; is that

RANDALL K. ROMERO - VOL. II                                        JOB NO. 2620528
APRIL 20, 2026

correct?

A.    I'm not certain.

Q.    Do you remember signing a form on behalf of M.A. Patout to be the guarantor?

A.    I may have, I don't recall.

Q.    Let me show you what we previously marked as Exhibit 68.

(Deposition Exhibit 68 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.    And I want to have you look at this. This is something that says Bates label HW35, is the first page.  Like I said, it's a previous exhibit that we used, and the -- you can see this is the application for a business card -- a business credit card.  Do you see that?

A.    Yes, sir.

MR. DAVIS:  Objection.  Counsel, I'm no longer seeing the link.  I don't know if you need to refresh.

MR. KNOEPP:  Sure.  Let me re-invite you.

MR. DAVIS:  Thank you.  Thank you.

MR. KNOEPP:  Sure.

BY MR. KNOEPP:

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

BY MR. KNOEPP:

Q.   Do you remember setting any conditions on the credit card, the number of credit cards that would be issued for the associations when these applications were being submitted?

MR. DAVIS:  Objection.  Vague.

THE WITNESS:  I do not recall.

BY MR. KNOEPP:

Q.   Let me show you what we're marking as Exhibit 88.

(Deposition Exhibit 88 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   And ask you to look at that -- let me make it bigger.

It has a Bates label of 101009.

And do you see this e-mail string from May of 2022 that begins with an e-mail from Jim Glorioso?

A.   Yes.

Q.   And who is Mr. Glorioso?

A.   He is the accountant CPA for Race- -- Raceland Raw Sugar, LLC.

Q.   And is he still in that position?

A.   Yes.

Q.   And he was -- and Raceland Raw Sugar is connected to the South Louisiana Sugar Cane Association; right?

A.   Correct.

Q.   And he sent you an email about the credit card for the South Louisiana Association; right?

A.   Yes, sir.

Q.   And he asked you if you would sign the -- the guarantee on that, on behalf of Raceland Raw Sugar; is that right?

A.   Yes, sir.

Q.   And you did that?  Is that your signature on the third page?

A.   Yes.

Q.   And -- and when you sent that back to him, you said that you'd discussed the -- this with Ashlee, and -- and you said that only one card should be issued in the name of the association, in the name of the treasurer.  Is that what you wrote to him?

MR. DAVIS:  Object to the characterization.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And why -- why did you only want one card issued in the name of the association in the name of the treasurer?

MR. DAVIS:  Object to the characterization.

THE WITNESS:  For internal control purposes.  You know, as an organization we -- very restrictive with regards to the issue -- issuing of any company credit cards, and I would believe that in this instance that's why one card would have been issued.

BY MR. KNOEPP:

Q.   And you -- did you require -- you required a -- and so that one card would -- strike that.

The one card would be issued to Ms. Gary as the treasurer; is that right?

A.   Correct.

Q.   And the same for South Central Association?  You only wanted one credit card issued to South Central in the name of Ms. Gary?

A.   Yes.

Q.   And do you know if that did, in fact, happen, that only one credit card for South Central was issued in the name of Ms. Gary?

A.   Yes, I would believe it was only one.

Q.   Mr. Romero, we were talking about the management services contract.  I'm showing you what's been marked as Exhibit 11.

(Deposition Exhibit 11 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   Do you recog- -- do you recognize that as the management services agreement between Sterling Sugars and South Central?

A.   Yes, sir.

Q.   This is the original one that -- it says it has a term of May of 2022 to April of 2025; is that right?

A.   Yes, sir.

Q.   And there's -- there was another management contract that was entered into that covers the period from May of 2025 until 2028; is that right?

A.   Yes.

Q.   And this particular document, I believe it -- it wasn't signed by you.  It was signed by Rivers Patout on behalf of Sterling Sugars; is that right?

A.   Yes.

Q.   And it was entered into on June 6th of 2022.  Is that your understanding, based on what the document says?

A.   Yes.  Yes, sir.

Q.   Whose idea was the management services agreement?

MR. DAVIS:  Objection.

THE WITNESS:  You know, in -- with the growers, you know, grouping to form associations, specifically for South Central, I felt that it was the best interest that if we were to work, allow the farmers to operate in the association, it was in their best interest if there was a management agreement whereby we could provide the necessary needed services so that that op- -- that association could operate.

BY MR. KNOEPP:

Q.   Were you concerned that without Sterling Sugars providing those services that South Central wouldn't be able to operate?

A.   You know, I believe that, you know, the -- the experience and knowledge and expertise that we could provide to the association would help it achieve the efficiencies that the association would be available to achieve.

Q.    Was Sterling the one that approached South Central to offer these management services?

MR. DAVIS:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  It was proposed once there had been some discussions with regards to the establishment of the association.

BY MR. KNOEPP:

Q.    And who on behalf of Sterling proposed the management services idea to South Central?

A.    It would have been myself and Rivers Patout speaking to Chris Patout and other growers at that time.

Q.    And you thought the proposed -- the proposal was a good idea?

MR. DAVIS:  Objection.  Form.

THE WITNESS:  Yes, sir.

BY MR. KNOEPP:

Q.    The management services that Sterling was going to be providing were -- the Sterling Sugars' employees that were doing that had previously done those services for the Sterling Sugars Sales Corporation; is that right?

A.    Yes, sir.

Q.    And that's part of where their

experience came from that they had to offer as part of the management services functions?

A.   Yes.

Q.   There's a -- there's a fee for the management services in Paragraph 5.  Do you see that?

A.   Yes, sir.

Q.   And there's a fee for -- that is set at $0.17 per ton of sugar cane harvested and $0.15 per ton of sugar cane trucked or transported.  Do you see that?

A.   Yes.

Q.   Who came up with that -- those figures as part of the fee for the management services?

A.   I think there was a combination of Ashlee Gary and myself kind of formulating a fee based on -- on prior years' costs that we had incurred to just determine a fair rate.

Q.   When you say the prior year, are you referring to the 2021 harvest season?

A.   Yes, it could have been '21 or maybe even two or three or four years back, as an average.

Q.   And are you referring -- did you look at some financials related to the Sterling Sugars

Sterling Sugars was providing to the sales

corporation in those prior years?

           MR. DAVIS:  Objection.  Form.

           THE WITNESS:  I can't answer.

           THE REPORTER:  I'm sorry.  I didn't hear

your answer.

           THE WITNESS:  I cannot answer.

BY MR. KNOEPP:

     Q.   And -- and not -- I'm just asking the

reason why you can't answer is because you don't

know or don't remember?

     A.   I don't know.

           MR. DAVIS:  Same objections.

BY MR. KNOEPP:

     Q.   Was there any negotiation with South

Central regarding the fee for the management

services that we see here in Exhibit 11?

     A.   No, sir.

     Q.   Prior to South Central forming in 2022,

the hauling work that South Central is currently

doing was done by the Sterling Sugars Sales

Corporation for several years, prior to 2022; is

that right?

           MR. DAVIS:  Objection.  Form.

           THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Why did the Sterling Sugars Sales Corporation stop doing the hauling work of hauling sugar cane to the Sterling Sugars mill?

A.   Are you -- are you specifically referring to a year?

Q.   Well, yeah.  I guess, my understanding is that -- and thanks for letting me know.  I'll try and clarify.

My understanding is that Sterling Sugars Sales Corporation stopped doing the hauling work of hauling sugar cane to the Sterling Sugars mill after the 2021 harvest season; is that correct?

A.   Yes.

Q.   And so why after that 2021 harvest season did the sales corporation stop doing that hauling work?

MR. DAVIS:  Objection.  Form.

Counsel, we reference you to our February 12th objections, which have been marked as Exhibit A, and made a part of this record.  We are appearing today as Sterling Sugars, LLC.  Your question is directed to south -- I'm sorry, to Sterling Sugars Sales Corporation, but the party here and the witness here is here to speak on

behalf of Sterling Sugars, LLC.

Subject to that objection, Mr. Romero, you can answer.

THE WITNESS:  You know, within the industry, there was concern with regards to the Department of Labor changing the methodology of how wages would be paid for Ag workers, specifically those involving with the transporting of sugar cane.  And knowing potentially some risk of the farm labor survey being eliminated, industry-wide there were concerns amongst the growers of what the cost to the industry would be, whereby creating some significant financial harm to producers.  And -- and that triggered growers across the Louisiana cane industry to look at alternatives whereby they could potentially form associations to allow them to harvest and/or transport their sugar cane under an association. Which was -- the belief would be that they would be able to continue to transport their cane to the factories as part of their farming operations.

BY MR. KNOEPP:

Q.   And during the time period prior to South Central forming, Sterling Sugars Sales Corporation was providing that service to the

farmers of hauling their sugar cane to the sugar mill; is that right?

MR. DAVIS:  Objection.  Form.  It -- it's too imprecise at that time period, and you're -- and you're asking Sterling Sugars, LLC.

But subject to that, if you want to proceed, go ahead, Mr. Romero.

THE WITNESS:  Repeat the question?

BY MR. KNOEPP:

Q.  Sure.

Immediately prior to South Central forming the harvest season, prior to that Sterling Sugar Sales Corporation was providing the hauling services for the growers to get their sugar cane to the mill; is that right?

A.  Yes, harvesting and transporting.

Q.  And with respect to the transporting of the sugar cane, Sterling Sugars paid the Sterling Sugars Sales Corporation for that hauling work; is that right?

MR. DAVIS:  Objection.  Foundation.

Counsel, we -- we urge our express objection at Part 19, in the February 12th letter. And we remind you that we are present as Sterling Sugars, LLC.

So, Mr. Romero, go ahead and answer, please.

Ma'am, will you read that question back?

(The record was read as requested.)

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   The growers, themselves, were not paying the Sterling Sugars Sales Corporation for the hauling activities; is that correct?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

THE WITNESS:  That is correct.

BY MR. KNOEPP:

Q.   The Sterling Sugar Sales Corporation was sued in October of 2021 by H-2A truck drivers alleging wage violations; is that right?

MR. DAVIS:  Objection.  Foundation. Exceeds scope.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And that was the lawsuit that you testified at -- you testified at the trial of previously; is that right?

A.   Yes, sir.

Q.   And the truck drivers in that lawsuit

against the sales corporation also claimed that they were improperly classified as agricultural workers; is that right?

MR. DAVIS:  Objection.  The lawsuit brought by your client, Mr. Barron, speaks -- speaks for itself, and we certainly don't dispute anything that he alleged in his complaint.

Subject to that, go ahead.

THE WITNESS:  Repeat the question?  I'm sorry.

MR. KNOEPP:  Ms. Goldberger, would you mind reading that one back, please?

(The record was read as requested.)

THE WITNESS:  Yes.

MR. DAVIS:  The Barron complaint speaks for itself, and we -- we don't dispute what is written therein.

BY MR. KNOEPP:

Q.   The truck drivers in that lawsuit against the sales corporation claim that they had been misclassified and unlawfully denied overtime pay; is that right?

MR. DAVIS:  Same objection.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Did the lawsuit against the Sterling Sugar Sales Corporation have anything to do with the sales corporation no longer doing the hauling work?

MR. DAVIS:  Objection.

THE WITNESS:  No, sir.

BY MR. KNOEPP:

Q.   You mentioned that there were industry concerns around the time that the sales corporation stopped doing the hauling work that -- about how the wages would be determined by the Department of Labor.  What was the concern?

A.   Well, you know, the -- the transportation labor, the Department of Labor was considering new rules whereby the trucking would be outside of the agricultural class, which would trigger the wage rate to be significantly higher for the transportation activity.  So because of -- you know, with that financial burden would have been overall to the industry, including the farmers directly that were incentivized to look at opportunities or other avenues to deliver cane.

Q.   Was there a concern that under the structure of the Sterling Sugar Sales Corporation that it would no longer be able to get H-2A truck

drivers to do the hauling work?

MR. DAVIS:  Objection.  Asked and answered.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Was there a concern that the Department of Labor would classify the Sterling Sugars Sales Corporation truck drivers as nonagricultural and subject to the H-2B program instead?

A.   Yes.

Q.   And did -- was there a concern that if the truck drivers were classified as H-2B workers that they would be required to be paid a higher wage rate than they were being paid as H-2A workers?

MR. DAVIS:  Objection.  Calls for speculation.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   Was part of the reason to try and find a new model a way to make sure that truck drivers would still be approved for H-2A visas?

MR. DAVIS:  Objection.  Form.  Exceeds the scope.

BY MR. KNOEPP:

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

Q.   You can answer, Mr. Romero.

A.   Repeat the question?

MR. KNOEPP:  Ms. Goldberger, would you mind reading that one back, as well?  I'm sorry.

(The record was read as requested.)

MR. DAVIS:  Objection.  Exceeds the scope.  Foundation.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And -- and in turn, that would keep the wages at the lower H-2A wage rate, as opposed to the higher H-2B truck driving rate.  Is that fair to say?

MR. DAVIS:  Objection.  Calls for speculation.

THE WITNESS:  Yes, sir.

BY MR. KNOEPP:

Q.   You -- you mentioned that if a higher wage rate needed to be paid to the truck drivers there would be a direct cost that associated with the growers themselves.  What did you mean by that?

A.   You know, going forward, you know, the additional cost of the elevated wage rate would trigger the sugar mills in Louisiana to defer

those costs to the producers directly, because financially the sugar mills could not absorb tot- -- the total cost of that additional transportation.

Q.   And so some of that cost would be passed on to the producers.  Is that what you mean?

A.   Yes, I would say probably the total cost would be.

Q.   And why would the total cost be passed on to the producers?

A.   Because the sugar mills financially just couldn't absorb all of those costs.  They would have to be passed on to the growers.

Q.   But in 2023 and 2024 the wage rate that needed to be paid to H-2A agricultural truck drivers was, in fact, increased to almost $23 an hour; is that right?

MR. DAVIS:  Objection.  Foundation.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And was that cost increase of hourly rate to the truck drivers passed on to the producers by the mills?

A.   Not for those two years.

Q.   And why not?

A.   We believed it to be only a temporary situation.

Q.   And so did Sterling Sugars absorb that increased cost during that -- those two years?

A.   Yes, they did.

Q.   Was there a concern that -- that Sterling Sugars could not do that long-term, after doing it for those two years?

A.   That is correct, it's not sustainable.

Q.   And what -- I'm sorry, I may sound like a crazy question, but why -- why would that not be sustainable?  What kind of money would be lost, as far as, you know, decreased profit margin or income?

A.   You know, I would say it would increase the overall transportation cost, eight to ten dollars a ton.  That's off the top of my head.

Q.   And what does that do to the -- the bottom line profit of the mill?

A.   Oh, it reduces it several million dollars annually.

Q.   Can you give me a percentage of -- of, you know, what the reduction would be annually if Sterling Sugars had to continue paying the higher wage rates?

an hour amount, did Sterling Sugars still make a profit in 2024?

A.   Yes.

Q.   But if I understand your testimony, there was a concern that that might not last, the continued ability to make a profit.  Is that fair to say?

A.   Yes, sir.  23 and 24 were record sugar years, price wise.

Q.   And so these concerns about the wage rate, and whether the truck driving would be considered H-2A work or H-2B work, ultimately lead to a decision to look for a new model to do the hauling work.  Is that fair to say?

MR. DAVIS:  Object to the characterization.

THE WITNESS:  Yes, amongst the whole industry in Louisiana.

BY MR. KNOEPP:

Q.   And when did Sterling Sugars first start thinking about the idea that an association model might be a better way to handle the hauling than the Sterling Sugars Sales Corp.?

MR. DAVIS:  Object to the characterization of the testimony.

Mr. Romero, you can answer, if you can.

THE WITNESS: You know with the efficiencies, the potential to generate some cost savings through the association would allow the overall labor costs to be significantly lower than if it would have been operating through South Central or south -- Sterling Sales Corporation.

BY MR. KNOEPP:

Q. Are you saying that those cost savings would be passed on to the growers?

A. It would. The cost savings --

Repeat your question, Jim.

Q. Sure. I wasn't understanding what you meant by the cost savings that -- you mentioned there would be some cost savings that would be associated with this -- the new model. And I'm trying to understand, the costs at the time before the model, were incurred by Sterling Sugar Sales Corporation, is that right, first of all?

A. Yes.

Q. Okay. And so under the new model you mentioned that there could be some cost savings associated with that. Would those cost savings be -- that would certainly benefit Sterling Sugar Sales Corporation, right, if there were cost

savings, or benefit Sterling Sugars as their -- I meant Sterling Sugars -- that -- those cost savings would certainly benefit Sterling Sugars; right?

MR. DAVIS:  Objection.

THE WITNESS:  Indirectly.

BY MR. KNOEPP:

Q.   Well, how would those cost savings be passed on?  Would the -- would the cost savings be passed on to the growers or would it just increase the cost to Sterling Sugars?

A.   There would -- there would not be any cost savings if we continued to operate under Sterling Sugars Sales Corporation.  The association would allow some cost savings whereby there would not be increase in transportation labor costs that otherwise would need to be passed on to the work- -- to the farmers.

Q.   I understand now, I think.  This goes back to our discussion earlier that with the increase in wage rate that cost was going to need to be passed on to the farmers; is that right?

A.   Yes.

Q.   Okay.  And so that by forming the association, the idea was that you could keep --

you could maintain the lower wage rate for the truck drivers, and thereby see some cost savings; is that right?

MR. DAVIS:  Object to the characterization.

THE WITNESS:  Yes, and not pass those costs on to the association members.

BY MR. KNOEPP:

Q.   And did you discuss this with the growers?

A.   Yes, there was some discussion, but I think, as an industry, you know, all of the growers across the state did realize that this was a big issue that would impact them and our industry.

Q.   And so, do you -- did you assume that the growers just knew this and they understood this?

A.   No.  I think they were getting information through the American Sugarcane League as members.

Q.   And do you -- do you remember seeing publications from the American Sugarcane League about the -- the issue related to the wage rates for truck driving?

MR. KNOEPP:  Sure, yeah.  Are you finished with your answer?

THE WITNESS:  Yes.

MR. KNOEPP:  Yeah, let's go ahead and take a break.  Off the record.

THE REPORTER:  We're off the record.

(A short break was taken.)

THE REPORTER:  Back on the record.

BY MR. KNOEPP:

Q.    Before we took a break, Mr. Romero, we were talking about, you mentioned some of the growers who had contacted you about the concerns related to the increase in wage rates.  What did you -- and you mentioned Chris Patout.  Do you remember what you spoke with Mr. Chris Patout about?

A.    I think, you know, there was some discussion about what the increase in wage rates would do with regards to the -- to the farmers' operations, contributing to some financial harm and that, you know, they'll -- there needed to be some action with regards to operations moving forward.

Q.    And again, the action would be to make sure that the wage rates for the truck driving

work were not increased; right?

MR. DAVIS:  Objection.

THE WITNESS:  Yeah.  Well, you know, I've -- you know, what was discussed is what are avenues that the growers could take to prevent future financial burdens that ultimately they likely could not sustain, and -- and to that effect, you know, the association was -- was an avenue to achieve that.

BY MR. KNOEPP:

Q.   But the financial burden we're talking about here is increased wage rates that would be required to be paid to truck drivers; right?

MR. DAVIS:  Objection. Vague.  It?

THE WITNESS:  Yes, that -- that would be the case.

BY MR. KNOEPP:

Q.   They weren't talking about an increase in like fertilizer price or other farm inputs; right?

A.   Well, in perspective of the farmer, all of those are legitimate cost concerns but, you know, the association was an avenue to be discussed that would potentially help with the labor cost.

Counsel, with respect to Topic 19, Mr. Romero is present to testify concerning the corporate structure of Sterling Sugars, LLC.  We don't believe that Mr. Romero would have knowledge of this particular unnoticed topic, and if you're wanting to probe it you -- you likely would need a different witness, but subject to that, please go ahead.

BY MR. KNOEPP:

Q.   You can go ahead and answer, Mr. Romero.

A.   Can you repeat the question?

Q.   Sure.

MR. KNOEPP:  Would you mind reading that back, please?

(The record was read as requested.)

THE WITNESS:  It was included on an M.A. Patout policy as an additional insured.

BY MR. KNOEPP:

Q.   Did you include Mr. Bonaventure on the email because you wanted to make sure that there would be appropriate insurance coverage, with respect to any of the trucks that would be used for hauling?

MR. DAVIS:  Calls for speculation.

THE WITNESS:  It was important that he

understand that going forward that trucking

equipment was going to be under a contractual

agreement leased to the association, and we needed

to ensure that the association would have adequate

coverages.

BY MR. KNOEPP:

Q.   All right.  Did you have any concern

about whether a new association, like South

Central, would be able to get insurance for the

vehicles that Sterling Sugars was planning to

lease to it?

MR. DAVIS:  Objection.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And why -- why did you have concerns

about that?

A.   The insurance market environment in

Louisiana is very, very unstable and very

expensive for coverages, especially when it

involves new businesses, because of loss

experiences incurred in the state of Louisiana.

Q.   So -- and what was ultimately decided

with respect to getting insurance coverage that

would cover the vehicles that Sterling Sugars was

leasing to South Central?

RANDALL K. ROMERO - VOL. II                                JOB NO. 2620528
APRIL 20, 2026

A.    Well, in '23 and '24, the insurance underwriter agreed to allow the coverage extend to the association, and that was only because, although we were -- you know, the farmers were setting up an association, the fact that we had a management services agreement, it allowed that they, because of that, in our, I guess, expertise in managing losses and incidences involving transportation, they agreed to extend the coverages to named association additionally insured.

Q.    In part because you had in place a management services agreement --

A.    Well, we would --

MR. DAVIS:  Objection.

Mr. Romero, please allow Mr. Knoepp to finish his question.

MR. KNOEPP:  You're fine.  You're fine. It's -- it's no problem.

BY MR. KNOEPP:

Q.    Being able to get the insurance, South Central added as the insured, was facilitated in part by having this management services agreement, whereby Sterling Sugars' employees were helping to manage South Central?

RANDALL K. ROMERO - VOL. II                                   JOB NO. 2620528
APRIL 20, 2026

can read it again, though, if you'd like.

MR. KNOEPP:  If the witness needs it read again, that -- that would be great.

MR. DAVIS:  Please.

(The record was read as requested.)

THE WITNESS:  Early before -- this was due diligence in advance of the association, in communicating with Mr. Bonaventure what were the possibilities with regards to coverage for the association that the farmers were looking to establish.

BY MR. KNOEPP:

Q.  And the insurance company was -- was familiar with Sterling employees who knew how to manage a fleet of tractor trailer trucks hauling sugar cane; is that correct?

A.  Yes.

Q.  And so is it your understanding that one of the reasons that the insurance company added South Central to the policy was because Sterling Sugars had entered into this management agreement with South Central?

MR. DAVIS:  Objection.  Calls for speculation.

THE WITNESS:  It -- it was in

anticipation of Sterling Sugars, LLC, getting in a management agreement with the association.

BY MR. KNOEPP:

Q.    Is that something the insurance company was requiring of --

A.    Yes.

Q.    -- Sterling Sugars and South Central?

A.    Yes.

Q.    And is that something that happened prior to the formation of South Central, that the insurance company notified Sterling Sugars and South Central that you needed to have a management services agreement?

A.    That they would -- they would accept the coverage, if we were successful in having a management agreement with the association.

Q.    And you -- you mentioned, when we first started talking about the insurance coverage, you mentioned that in 2023 and 2024, the underwriter agreed to allow coverage to extend to the association.  Did I -- first of all, is that what you said before?

A.    Yes.

Q.    And what about in 2022, the first year that South Central was operating, what happened in

that year?

A.   Okay.  Let me be correct, that it was '22, '23.  It's '22 and '23, not '24.  I'm sorry.

Q.   No, you're fine.  Thank you for clarifying that.

And so in 2022 and 2023, South Central was added to the M.A. Patout insurance as an additional named insured; is that right?

A.   Correct.

Q.   And then did something different happen in 2024?

A.   Beginning in '24, the Patout group was invited to join a captive insurance program for workers' comp auto liability and general liability, whereby we became an owner/a member of that -- of that program.  In that instance, the same held true.  The captive agreed to extend, you know, additional insured coverage to the association of South Central, as long as there existed a management services agreement between the management team with the association.

Q.   And if -- if I understand that -- a captive program correctly, that there's no like broker involved in that; right?

A.   Yes, there's still a broker involved.

Q.   And then claims administrators; is that right?

A.   Yes, third party administrators, loss prevention.

Q.   Okay.  And I believe, is the company that does that, is it called Rester?

A.   No, no.  It's called the Summit -- Summit Insurance.

Q.   Okay.  I've seen -- I've seen some insurance documents related to a company called Rester.  Are -- are you familiar with a company called Rester?

A.   Yes.

Q.   What -- what is it -- what is it they do with respect to the insurance?

A.   Basically, Rester company is a claims adjuster, claims investigator.

Q.   Like a loss adjusting service?

A.   Yes.

Q.   And so going back to -- you said that the captive agreed to extend South Central, as long as there was a management services agreement; right?

A.   Yes.

Q.   Did that management services agreement

need to be with Sterling Sugars?

        A.    Yes.

        Q.    I'm going to show you what I'm marking as Exhibit 89.

            (Deposition Exhibit 89 was marked for purposes of identification.)

BY MR. KNOEPP:

        Q.    Ask you to look at that.  It starts with a Bates number 36129.  And I'll just scroll down so you can read it.  Starts with an email from a Lance Weber at M.A. Patout.  Do you see that?

        A.    Mm-hmm.  Yes.

        Q.    Okay.  And -- and then Ms. Ramagos responds to the email from -- from Mr. Weber, and you're included on this email.  Do you see that?

        A.    Yes.

        Q.    It's March 29th of 2022; is that correct?

        A.    Yes.

        Q.    And do you know why Ms. Ramagos sent you this email and the attachments?

            MR. DAVIS:  Objection.  Foundation.  The document speaks for itself.

            THE WITNESS:  Let me read it real quick here.

didn't raise that to -- to waste time with banter between the two of us.  Rather, I raised it to notify, so that we would not waste time.

BY MR. KNOEPP:

Q.   Why did you believe that the overtime provisions were not yet required?

MR. DAVIS:  Counsel, this -- this issue, with respect to Exhibit 91, is -- is not a noticed issue, and you're asking Sterling Sugars to answer a question that obviously they did not author.  I believe that this particular scope of your inquiry is inappropriate, and I would ask you to either move on or simply make a proffer, if you want to certify these questions.

MR. KNOEPP:  Your objection has been noted.

The witness can answer.

MR. DAVIS:  Ma'am, will you read the last question back?

(The record was read as requested.)

MR. DAVIS:  Okay.  Counsel, so we've -- we've already explained to you that we're Sterling Sugars.  Please -- please go ahead and proceed, and we'll -- Mr. Romero will answer, but we're not answering this on behalf of Sterling Sugars, LLC.

MR. KNOEPP:  That's fine.  I understand that objection.  That's -- that's a proper objection.

MR. DAVIS:  All right.  Thank you.

THE WITNESS:  You know, the fact that the association would be providing the services of harvesting and trucking of -- of the commodity from the field to the mill would exclude the requirement of overtime.

BY MR. KNOEPP:

Q.   And so that's -- that was the basis for your statement here about overtime provisions not being required; right?

MR. DAVIS:  Objection.  Mischaracterizes the testimony.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And is -- is that because they were driving from a field?

MR. DAVIS:  Objection.  Same objection.

THE WITNESS:  Because the farmers were performing the activities from the farm to the mill.

BY MR. KNOEPP:

Q.   But the farmers, themselves, were not

hauling the sugar cane; right?

MR. DAVIS:  Objection.

THE WITNESS:  The association -- the association of farmers was hauling the sugar cane.

BY MR. KNOEPP:

Q.    The association was a separately organized entity; is that right?

A.    Correct.

Q.    And that's the entity that was hauling the sugar cane; correct?

A.    Correct.

Q.    Yeah.  For a fee that it was being paid by the sugar mill; right?

A.    Yes.

Q.    You then said that -- that I would like to add at this time, operating under the association structure remains to be the avenue for our operations unless overtime requirement comes into play.  Do you see that?

A.    Yes.

Q.    And what -- if overtime did come into play, what would -- how would that impact the association structure?

MR. DAVIS:  Objection.  Same objection. Counsel, we're present to respond to the issues

that are noticed for Sterling, and -- and not on behalf of any other entity that you're examining now.

But subject to that, Mr. Romero, go ahead and answer.

THE WITNESS:  If the association was required to incur the overtime for those workers, then it's possible the association would continue in existence or may not continue in existence.

BY MR. KNOEPP:

Q.   And why would it not continue in existence?

MR. DAVIS:  Objection.  Foundation. Calls for speculation.  Outside of the scope of the notice.

MR. KNOEPP:  You can answer, Mr. Romero.

THE WITNESS:  Repeat the question, please.

MR. KNOEPP:  I think I asked you, like why would it not continue in operation?

MR. DAVIS:  Objection.  Calls for speculation.  No foundation.  Exceeds the scope of the notice.

THE WITNESS:  You know, I think what I was saying here, it's an option, not necessarily

that would be the avenue that would be taken, but it could be an option whereby the association would not exist.

BY MR. KNOEPP:

Q.   If the association had to pay overtime, I'm just trying to understand why would it not be able to exist, just because it had to pay overtime?

MR. DAVIS:  Objection.  Lacks foundation.  Calls for speculation.  Exceeds scope of the notice.

THE WITNESS:  You know, likely there would -- there would be a need for the growers to organize as an organization if they weren't able to avoid the overtime rules.

BY MR. KNOEPP:

Q.   Did you share that view with staff at Sterling Sugars, the view that the, you know, about the association not existing if it was still required to pay overtime?

MR. DAVIS:  Objection.  Foundation. Calls for speculation, and exceeds the scope of the notice.

THE WITNESS:  I would say I would not have.  It would have been restricted to Rivers on

RANDALL K. ROMERO - VOL. II                                          JOB NO. 2620528
APRIL 20, 2026

Teche, because we -- we weren't noticed.  Whether

you continue to seek that discovery from us

certainly is your own choice based on how you

think that you should proceed, but we -- but we

certainly would not try to regulate your conduct.

          MR. KNOEPP:  Great.  I will move forward

with asking my questions.

BY MR. KNOEPP:

     Q.   Mr. Romero, I'm going to show you what's

been -- what I've marked as Exhibit 92.

          (Deposition Exhibit 92 was marked for

purposes of identification.)

BY MR. KNOEPP:

     Q.   It has a Bates label 36094.  Do you

recognize the email that you sent on October 3rd

of 2024?  It is on this first page, or on the only

page of this exhibit.

     A.   Can you go back from the -- at the top.

     Q.   Hold on.  I believe the top portion is

just Ashlee Gary forwarding this on to other

people or, I'm sorry, replying all to the email

string.

     A.   Okay.  Go down a little bit.  Okay, stop

there, please.

     Q.   Sure.

A.    Okay.

Q.    Do you remember this email?

A.    Yes, sir.

Q.    And what -- you're referring to sending an English and Spanish version of a wage rate notification to truck drivers; right?

A.    Correct.

Q.    What was the wage rate notification about?

A.    Because of the preliminary injunction with Teche Vermilion, it was questionable whether we would be required to pay the higher wage rate as a result of the injunction.  And we just put our workers on notice that potentially there could be a change with the rates being paid in 2024.

Q.    And this notice was going to the H-2A truck drivers; is that right?

A.    Yes.  Yeah.  It may have gone to all of the workers, but I'm not for certain.

Q.    When you say all of the workers, you mean all of the H-2A workers, not just truck drivers?

A.    Yes.  It could have -- but I -- I'm pretty certain it was targeted to the truck drivers, but may have been sent to all of -- all

of the workers.

Q.   And -- and you decided that it should be distributed to all of the workers?

A.   I'm not certain how -- who we did distribute it to, if it was all or just the drivers.  I'm not really certain, but it could have been all or it could have been only the truck drivers.

Q.   And my question was, were you the person who decided to distribute the notice?

A.   Yes, it would have been.

Q.   It says:  This notice does not state we are changing the rates at this time.  Do you see that?

A.   Yes.

Q.   And that's consistent with what you were just saying, is that you weren't sure whether the wage rate, you know, needed to be changed based on the ruling and the lawsuit; is that right?

A.   Correct.

Q.   Would -- and whose decision was that to not change the wage rates?

A.   It was mine.

MR. DAVIS:  Objection.

With respect to the injunction?

Counsel, we just want to make sure our -- our

testimony is truthful, and so you've -- you've

asked this in the context of the injunction?

MR. KNOEPP:  I'm asking in terms of the

email.  The email says we're not changing the

rates -- wage rates, and I believe the ans- -- the

witness answered the question, so --

MR. DAVIS:  Okay.  Subject to that

objection.

THE WITNESS:  Can I elaborate?

BY MR. KNOEPP:

Q.   Yes, of course.

A.   So at the time when this was put out it

was a question whether or not the higher wage rate

would be paid or, because of an injunction, the

lower rates rate would have been paid.  I took the

position that it was in the best interest that we

would pay and continue to pay the higher wage rate

for the 2024 crop, and that's what we did.

Q.   And that decision that you made applied

to all of the H-2A workers, regardless of which

association they were working for, there was --

which association of the three that were part of

the Patout group; right?

MR. DAVIS:  Object to form.

THE WITNESS:  That is correct.

BY MR. KNOEPP:

Q.   And just to clear up the objection, that it -- your decision about the wage rate not changing applied to the South Central H-2A truck drivers; is that right?

A.   Correct.

Q.   Mr. Romero, I want to show you what I'm marking as Exhibit 93.

(Deposition Exhibit 93 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   And this was a -- we were provided this supplemental production this morning by Mr. Davis right before the deposition started.

My first question is, are you familiar with this document at all?

A.   Yes, sir.  I've seen it before.

Q.   And where -- where have you seen it or when have you seen it?  I'm sorry.

A.   I guess three or four years ago, possibly.

Q.   And it's dated October 23rd of 2019; right?

A.   Correct.

what Sterling Sugars reviewed with respect to this document, if anything?

A.    I mean, I would have reviewed the document on behalf of Sterling Sugars.

Q.    And you remember doing that; right?

A.    Yes, sir.

Q.    Okay.  Did you instruct anybody at Sterling Sugars with respect to the contents of this document as it relates to agricultural labor services?

A.    I don't recall.

Q.    Did you provide any instructions to anybody at South Central related to the information contained in this document after you reviewed it?

A.    Not to my knowledge.

Q.    Okay.  Let's take a break, go off the record, if that's okay.

MR. DAVIS:  All right.

THE REPORTER:  Off the record.

(A short break was taken.)

THE REPORTER:  Back on the record.

BY MR. KNOEPP:

Q.    Mr. Romero, a number of the truck drivers who started working for South Central in

2022, after it formed, were actually truck drivers who had previously worked for the Sterling Sugars Sales Corporation; is that right?

A.    Yes, I would believe so.

Q.    Many of those were on a list that was prepared, of Sterling Sugars Sales Corporation truck drivers who had worked in prior seasons; is that right?

A.    Yes, I would believe that is true.

Q.    When additional or new truck drivers are needed, several different recruiters were used; is that right?

A.    I think Great Labor was a primary recruiter, but it could have been another person or two, possibly, yeah.

Q.    And are you familiar with Jose Santos?

A.    Yes.

Q.    Do you know somebody named Melchor Maya?

A.    I've heard the name.

Q.    Okay.  You do know that Jose Santos is somebody who does recruiting work to find new or additional truck drivers; right?

A.    Correct.

Q.    With respect to the initial batch of truck drivers that were hired to work in 2022, was

it the Sterling Sugars employee -- management

employees' preference to have experienced truck

drivers, who were familiar with the hauling work,

return under the new association structure?

MR. DAVIS:  Object to form.

THE WITNESS:  Yes.  You know, as part of

the management services, we felt it was important

that we continue to bring in the same drivers that

would have been brought in previously.

BY MR. KNOEPP:

Q.   And with respect to new drivers who were

recruited -- and we said some of that was done by

Jose Santos; right?

A.   Yes.

Q.   And at one point in time you actually

met with -- or had a meeting with Mr. Santos; is

that right?

A.   I don't -- I don't -- myself, I don't

recall.

Q.   Do you remember meeting with him

and -- along with Sandor Garcia?

A.   Sandor Garcia, possibly.  But I don't

recall a meeting, but it could have occurred, Jim.

Q.   Well let me -- I'm going to pull up a

document, see if that will help your memory at

Q.   And so you -- you are sending an email to John and Ashley and you mentioned that we, and you put in parentheses Chad, Sandor, Lance and myself, had a two-and-a-half-hour meeting with Santos and Nicholas, his interpreter, this morning to cover our H-2A and recruitment programs going forward.  Do you see that?

A.   Correct.

Q.   And does that help refresh your memory about meeting with Mr. Santos at some point?

A.   Yes, it does.

Q.   All right.  And was this a -- was this a meeting that happened in person, over the phone, by Zoom; do you remember?

A.   No, it -- it was in person.

Q.   Okay.  And where was that?

A.   It was here at Enterprise.

Q.   Mr. Santos came to your office, along with his interpreter?

A.   Yes.

Q.   Okay.  And was that a planned meeting?

A.   Yes, it was.

Q.   Who asked for the meeting?

A.   I did.

Q.   Okay.  Why did you ask for the meeting

with Mr. Santos?

A.    Because there was a question about his registration as a recruiter going forward, and because he was utilized we wanted to make sure we were not in any violations, meaning we, on behalf of the management services agreement that we were providing to these associations, that we would not jeopardize the program if he was not, as a recruiter, legally registered.

Q.    And you understood that it was important that the recruiter be licensed by the federal government in order to engage in recruitment work?

A.    Yes.

Q.    Did you ask Mr. Santos if he was licensed?

A.    From what I recall from the meeting, it was determined that he had -- he had done everything required, you know, by law, to be considered a recruiter with the Department -- Department of Labor.

Q.    And you said the concern was that you didn't want, in the case of South Central, Sterling Sugars to run a file with any requirements that a recruiter that was working with it was unlicensed; right?

A.    Yes, sir.

Q.    And your email says that he clearly understands now, and you put now in all capital letters, the requirement that he, Santos, personally needs to be registered as a recruiter and will take the necessary steps immediately to start the process; right?

A.    Yes.

Q.    Does that mean that at the time you met with him in January of 2023 he was not properly registered at that time?

A.    Well, from what I remember, he had been registered.  I think there was some misunderstanding about his regis- -- his registration, but he was going to make -- ensure us that he was, in fact, registered in accordance with the government requirements.

Q.    Okay.  And did you inform him that unless he was registered that he would not be allowed to do any recruiting work on behalf of Sterling Sugars or South Central?

A.    That is correct.

Q.    And he understood that; is that right?

A.    Yeah.  Yeah, he did, I think.

Q.    You say, I believe he was 100 percent on

Central?

A.    I'm not certain.

Q.    When you say you're not certain, you just -- you're not sure whether it occurred?

A.    That is correct, yeah.

Q.    You did, at one point, have some concerns about the truck drivers that Mr. Santos was recruiting to be hired, though; right?

A.    Can you be more specific?

Q.    Sure.  Was there a time when you were concerned that Mr. Santos was sending truck driver recruits for people who had been rejected by other Patout entities?

A.    Yes, that is true.

Q.    And you had actually sent staff at the mills an email about that; right?

A.    Yeah, maybe -- maybe I did.  I don't recall how long ago that was, but --

Q.    Well, and this -- I'm going to show you what we're marking as Exhibit 54.

(Deposition Exhibit 54 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.    This was previously marked at an earlier deposition.

Do you -- you see that this is an email from you to people at M.A. Patout and Sterling Sugars and Raceland, titled with the subject H-2A labor?  Do you see that?

A.    Yes.

Q.    Is this an email you sent July 2nd of 2024?

A.    Yes, sir.

Q.    And you mentioned concerns about people needing to be aware of new H-2A hires being offered by Jose Santos; right?

A.    Correct.

Q.    And does this help refresh your memory about sending something to staff at the mills about some of the recruits he was providing?

A.    Yes.

Q.    And you say that he's offering fill-ins for positions with some workers that have been terminated or rejected from one of our other mills.  Do you see that?

A.    Yes.

Q.    How did you learn that that was happening?

A.    Well, the -- the no-return list originated for simply -- for one reason.

RANDALL K. ROMERO - VOL. II                              JOB NO. 2620528
APRIL 20, 2026

Individuals that had been coming here, say driving

the trucks, had incurred violations, perhaps of

cell phone usage, improper cell phone usage,

tinkering with dash cams, being involved in some

accidents, some minor, some maybe a little bit

more severe, and ultimately those individuals

are -- another reason of perhaps leaving early

without any real good reason before the crop

ended, and for that reason I felt it was important

for our programs, meaning for the associations, as

part of our management services that we work

towards having the best workers operate amongst

the associations that we had in place, you know,

with regards to safety, efficiencies, that was

critical.  And that's what triggered the no-return

list because the recruiters, to some degree, are

out there to fill positions, not necessarily the

best person for these positions.

     Q.   And so you sent this email to the -- the

mill personnel who were part of the different

management teams; is that right?

     A.   Yes, sir.

     Q.   And with -- is it fair to say that you

wanted the -- the mill management teams to make

more coordinated hiring decisions with respect to

happen, but that's part of Rivers Patout question.

Q.    There was in fact a do-not-hire-list that was created and circulated among the different management teams; right?

A.    I can't say that I ever witnessed a list.  Personally, I have not witnessed a list.

Q.    Who was in charge of making the -- the list?

MR. DAVIS:  Objection.  Foundation.

THE WITNESS:  I would say with -- with Teche Vermilion association it was -- it was Chad Crochet.

BY MR. KNOEPP:

Q.    And with respect to South Central, who would have been in charge of that?

A.    I think Jaime Robison.

Q.    Let me show you what's being marked as Exhibit 95.

(Deposition Exhibit 95 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.    And -- and see if -- first of all, it's a document with a Bates number 88482, that starts with 88482, and then continues on for five more pages.  It's an email string from July of 2024.

Do you see that, first of all?

A.   Yes, sir.

Q.   And it's -- the emails are among people who worked at Sterling Sugars; right?

A.   Yes.

Q.   And Mr. Gonsoulin is also on this email; right?

A.   Yes.

Q.   And the -- and so Mr. -- Mr. Robison is -- forwarded this actually to Ms. Jackson at Sterling Sugars.  Do you see that?

A.   Yes.

Q.   And then the attachment is -- it looks like individual sheets of lists of names.  The first one is -- says P-E -- sorry P-E-C.  Do you see that?

A.   Yes.

Q.   That would refer to Patout Equipment Company?

A.   Yes.

Q.   And then it says D-N-H-L.  Do you understand that to mean do-not-hire-list?

A.   I presume that's what it is.  I've never seen this before.

Q.   Okay.  It sort of -- the first two pages

appear to go together.  They're both PEC, and the -- the first page has a person's name and the employee number, and then the second page has what appear to be reasons such as, you know, suspected of taking truck parts, deleted video after accident, not a good worker, left before Christmas, things like failed drug test.  Do you see that?

A.   Yes, sir.

Q.   Is this the type of list that you were talking about that you wanted people to create of -- so that people across the Patout entities would know not to hire one of these people that had been terminated or left under bad circumstances at a different group?

A.   Yeah, that is correct.

Q.   And then, going down to the fourth page of the exhibit, it says Raceland D-N-H-L.  Do you see that?

A.   Yes.

Q.   And again, it has a list of names and some reasons for -- just, you know, passing a cane truck in a no passing zone, watching a movie on phone while driving, always sick, never showed up, accident tampered with camera.  Do you see those?

A.    Yes, sir.

Q.    Again, is this -- this would be the list prepared by the Raceland mill that you were asking people to put together of a do-not-return-list; right?

A.    Correct.

Q.    And it continues on to Page 5 with a few more workers that say Raceland, and then the last page says Sterling DNHL.  Do you see that?

A.    Yes.

Q.    And then there are a number of names listed here, and then towards the bottom there's some names with reasons -- with the reasons like speeding in excess of 90 miles per hour, tampering with camera, disobeyed dispatch orders, fighting at the hotel, running the clock.  Do you see that?

A.    Yes.

Q.    Again, this would be the list for Sterling Sugars of people who should not be rehired by one of the Patout entities; is that right?

A.    Yes.

Q.    There are a number of individuals listed here that have no information next to their name. Do you know why that would be?

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

A.   No, sir.

Q.   Do you recognize these names as people who were -- who joined the lawsuit against the Sterling Sugars Sales Corporation as plaintiffs?

A.   I notice the first one, Barron, but outside of that, I don't -- I don't -- I don't know.

Q.   Do you know if anybody was instructed at -- at Sterling to put the names of people who had previously filed a lawsuit against this sales corporation on a do-not-hire-list?

A.   I was not aware of that.

Q.   And is it something that causes you any concern?

MR. DAVIS:  Objection.  Vague.

BY MR. KNOEPP:

Q.   Is it something that you would -- would approve of?

MR. DAVIS:  Objection.  Vague.

Is -- is what something?

BY MR. KNOEPP:

Q.   Do you understand my question, Mr. Romero, or do you need me to restate it?

A.   Yeah, restate it, please.

Q.   Sure.  Just let me know if you don't

RANDALL K. ROMERO - VOL. II                                          JOB NO. 2620528
APRIL 20, 2026

the managers at Sterling Sugars?

A.   No, I -- I think those are Rivers' questions.

Q.   Okay.

A.   Because I think all those individuals were rehired, they might have been on the list, but I don't think they were not hired.

Q.   Do you think Mr. Rivers Patout would be able to answer that -- that type of question better?

A.   Yeah, he or Jaime Robison.

Q.   I wanted to ask about the -- the hauling that's done from the farms to the mill.  I think that we already covered earlier that the hauling fee is paid by the mill to the hauler; right?

A.   Yes.

Q.   And there's a particular rate that's paid per ton; is that right?

A.   Correct.

Q.   How is the rate paid per ton set?

A.   It's a formula based on the radius from the mill to the farm headquarters, so much per mile.

Q.   And is that a rate that you set?

A.   Well, it's a rate that -- a rate that's

been in place before my time.

Q.   Wow.  Well, I've asked this question of a few people now, and they've all said that the rate existed long before them.  So does anybody know who set the -- the rates back before you all got there?

A.   I would think the general managers, you know, back 35 years ago, possibly.

Q.   So one question that I have is, is the rates that's paid per ton, it hasn't changed at all in the more than 25 years that you've been there, even though, you know, the cost of doing business or gas and other things have gone up during that time?

A.   That's correct.  It has not changed.

Q.   Why -- just out of curiosity, why is that?

MR. DAVIS:  Objection.  Foundation, scope.

THE WITNESS:  Historically, and I'm speaking on behalf, I believe, of the industry, 35 years ago the -- those rates that were established were sufficient to cover the costs of the sugar cane producers to haul their crop to the mill and cover all of their expenses.  Over

THE WITNESS:  I'm not certain.

BY MR. KNOEPP:

Q.   Okay.  During the 35 years since the rates were established, the price of sugar has gone up during that time, is that fair to say?

MR. DAVIS:  Objection.  Exceeds scope.

THE WITNESS:  Not until maybe 2015 or '16.

BY MR. KNOEPP:

Q.   Have you ever considered adjusting the hauling rates that are paid by Sterling Sugars?

MR. DAVIS:  Objection. Vague.  Exceeds scope.

THE WITNESS:  No, it's never been considered.

BY MR. KNOEPP:

Q.   You mentioned that the formula for the rate is based on the radius of the farm headquarters to the mill; right?

A.   Yes.

Q.   Is it therefore more advantageous for the mill to have farmers providing sugar cane who are located closer to the mill property?

MR. DAVIS:  Objection.  Form.  Vague.

THE WITNESS:  Yes.

take delivery of that sugar cane.

BY MR. KNOEPP:

Q.    In fact, with the leased land there's a requirement that the sugar cane be delivered to the Sterline mill, as part of the lease; right?

MR. DAVIS:  Was it complete?

THE WITNESS:  I think I mentioned earlier, that was a Rivers Patout question.

BY MR. KNOEPP:

Q.    Oh, okay, sir.  Thanks.

I want to switch gears a little bit and go back to talking a little bit, again, about insurance.  And you -- you monitored accidents involving truck drivers at South Central and potential insurance claims; is that right?

A.    Yes, through management services, we do for the associations.

Q.    I'm showing you what's being marked as Exhibit 96.

(Deposition Exhibit 96 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.    And this is a document that starts with the Bates label 77934, just a two-page document there.  Do you see that, Mr. Romero?

A.   Yes.

Q.   And this is an email that you sent to Rivers Patout at Sterling, and Tim Soileau at Sterling, and Jaime Robison at Sterling, and other -- people at other mills in October of 2024; right?

A.   Yes.

Q.   And you also copied Mr. Bonaventure, the -- the insurance person; right?

A.   Yes.

Q.   And this was an email about truck driver accidents at the start of the season, for the 2024 harvest season; is that right?

A.   Correct.

Q.   And it was reported to you by Mr. Sandor Garcia that there had been several accidents, so far, at the beginning of the year; is that right?

A.   Correct.

Q.   Including two involving South Central truck drivers; correct?

A.   Yes.

Q.   And -- and as a result of receiving this report, you sent this email to the people at the different mills, the managers at the different

mills; is that right?

A.   Correct.

Q.   What was the reason for, you know, sending this email to them?

A.   Well, it was to reinforce to the -- to the management teams of the associations that they needed to communicate to the association members of the policies that we've had to reinforce that safety is an ultimate concern regarding operations, and it's just a reminder regarding our safety program and where we stood at that point in time.

Q.   And you were asking the managers at Sterling to communicate to all truck drivers to reinforce safe practices on the roadways; right?

A.   Correct.

Q.   And do you know if they did that?

A.   I would assume they did.

Q.   Is it your expectation that people will follow your directives in this regard?

A.   Yes, sir.

Q.   I mean, is it also fair to say that everybody, yourself and the managers at the different mills, take safety seriously?

A.   Yes, sir.

the -- the safety of the public.

Q.   And, you know, as a result, you've taken steps to make sure that the truck drivers are operating their trucks safely; right?

MR. DAVIS:  Objection.  Asked and answered.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   You've -- you've asked people to implement safety policies that applied to the truck drivers who work at South Central; is that right?

MR. DAVIS:  Objection.  Asked and answered.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And back in 2024, a group of people worked on developing a new policy related to safety violations; right?

MR. DAVIS:  Objection.

THE WITNESS:  Correct.

BY MR. KNOEPP:

Q.   And that safety policy applies to all of the H-2A truck drivers at South Central; right?

MR. DAVIS:  Objection.  Excessive.

THE WITNESS:  That is correct.

BY MR. KNOEPP:

Q.   I'm going to show you what's previously been marked as Exhibit 72.  And --

(Deposition Exhibit 72 was marked for purposes of identification.)

MR. DAVIS:  Counsel, it's been about a little over 60 minutes from our last start time.  Do you mind if we take a break?

MR. KNOEPP:  Sure.  We can do that.  I haven't asked a question yet, so we can go ahead and go off the record.

MR. DAVIS:  Okay.

THE REPORTER:  Off the record.

(A short break was taken.)

THE REPORTER:  Back on the record.

BY MR. KNOEPP:

Q.   Before we took a break, Mr. Romero, I was showing you what's previously been marked as Exhibit 72.  We were talking about some policies, safety policies that had been developed.  And I'm just going to ask, do you recognize this email string that's marked as Exhibit 72?

A.   Yeah, I remember seeing it.

Q.   And this was a truck driver violation

protocol that was developed in 2024; is that right?

A.    Well, let me -- let me try to read this here.

Q.    Yes, sir.

A.    Okay.  Scroll down a little bit.

Q.    Yup.

A.    Okay.  Go up.

Q.    Did you want me to go up?  I'm sorry.  I didn't hear.

A.    Yeah, go down a little bit.

Q.    Oh, okay.  Sorry.

A.    All right.  Stop.

And when -- when was this issued by Sandor?

Q.    The email that we're looking at here, which is the first email in the string is -- it has a date of October 20th of 2024.  Do you see that?

A.    Yes, sir.

Q.    And you were included on the email.  Do you see that?

A.    Yeah.

Q.    Is this something that Mr. Garcia was doing at your direction?

A.   Yes.

Q.   Did he -- did he -- did you ask Mr. Garcia to work on this policy?

A.   Yes, I did.

Q.   And do you agree with what he says in this email here that one of the goals is to have the same policy across all companies?

A.   Yes, that is correct.

Q.   And the purpose of the policy was to establish some standards for the truck drivers who were involved in incidents and the consequences those should have; is that right?

MR. DAVIS:   Object to the characterization.

THE WITNESS:   Yes, sir.

BY MR. KNOEPP:

Q.   Is that something that you asked Mr. Garcia to address in the -- the policy that he was working on?

A.   Yes.

Q.   And he noted in his email that the policy had some penalties that were outlined for violations; right?

A.   Correct.

Q.   Is that something you asked him to make

sure was part of the policy?

A.   Yes, sir.

Q.   There would be consequences if people violated the policy?  I'm sorry.

A.   Yes, sir.

Q.   And then -- then Mr. Garcia sends another email the next day after receiving -- saying that, you know, he got some feedback and he was reviewing those as part of the development of the policy; right?

A.   Correct.

Q.   And then the next email is the -- is about a week or so later when he sends a final driver policy for distribution; is that right?

A.   Correct.

Q.   Did you -- well, first of all, did you approve of the final policy that was developed?

A.   Yes, sir.

Q.   Did you -- was your approval required in order for the policy to be implemented, as the person who was the CEO of M.A. Patout?

A.   Yes, sir.  Yes, I would.

Q.   And he -- and he -- Mr. Garcia, in his email, sending this final policy around, asked that it be passed onto every driver operator on

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

their paycheck stub.  Do you see that?

A.    Yes.

Q.    Do you know if that -- if that happened with respect to the Sterling Sugars and South Central?

A.    I would believe that the South Central drivers were given this policy.

Q.    And the -- there's also -- it appears like a suggestion to post the memo by the time clocks.  Do you see that?

A.    Yes.

Q.    Do you know if the memo about the policy -- the safety violation policy was posted by the time clocks at the Sterling Sugars mill?

A.    I'm not certain if it was posted.  I can't answer that.

Q.    Okay.  It may be a Rivers Patout question as a day -- more day-to-day person; fair?

A.    Yes, sir.

Q.    Okay.  Whether it was posted or -- and/or provided in the text, the purpose of developing a policy like this is to inform the truck drivers that there is, in fact, a safety protocol and consequences for violating it; right?

MR. DAVIS:  Objection.  The document

speaks for itself.

THE WITNESS:  That is correct.

BY MR. KNOEPP:

Q.   And the hope is that with such a policy, you would have fewer incidents.  Is that fair to say?

MR. DAVIS:  Objection.

THE WITNESS:  Yes, sir.

BY MR. KNOEPP:

Q.   I'm going to -- I want to show you what's been marked as Exhibit 73 previously.

(Deposition Exhibit 73 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   And the previous email had mentioned there were two attachments to it.  One was the English version and one was the Spanish version of the policy.  Are you able to confirm that this was the safety violation policy that was developed in October of 2024 in --

A.   Yes.

Q.   -- the English version?

A.   Yes.

Q.   And for example, it has -- says first section here is cell phone use.  Do you see that?

A.   Yes.

Q.   And then it has some rules, and then it also has a section here where it says consequences for violating the rules; right?

A.   Yes.

Q.   That a driver could be suspended without pay; right?

A.   Correct.

Q.   Or subject to immediate termination on a second offense; correct?

A.   Yes.

Q.   And this policy would have applied to all of the H-2A truck drivers at South Central?

A.   Yes.

Q.   And it's signed at the bottom management; right?

MR. DAVIS:  Objection.  Foundation. Mischaracterization.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   I wanted to go back for just a second to Exhibit 72, which was the email that Mr. Garcia sent, along with the final policies.  He mentions that drivers operators involved in accidents are to be submitted to a drug test, must have a

negative result before returning to work.  Nothing changes regarding that.  Do you see that?

A.    Yes.

Q.    Prior to this policy, was there a policy in place with respect to truck drivers who got into an accident, related to what the -- what steps would be taken after an accident?

MR. DAVIS:  Objection.  Scope.

THE WITNESS:  There's nothing new here. Any time there is an accident, the driver is subject to a drug test.

BY MR. KNOEPP:

Q.    And is that -- that's just a rule that applied across all of the entities?  Is it some other kind of law?

MR. DAVIS:  Objection.  Vague.

THE WITNESS:  I believe in Louisiana, by law, you are required to take a drug test.  I'm not for certain.  However; we established a policy that, you know, if you're involved in an accident we will submit you to a drug test.

BY MR. KNOEPP:

Q.    And -- and that policy is enforced by the Sterling Sugars managers, with respect to the South Central truck drivers who get involved in

accidents?

MR. DAVIS:  Objection.  Foundation.

THE WITNESS:  Yes, sir.

BY MR. KNOEPP:

Q.   And -- and when -- when South Central truck drivers have been involved in accidents, does Sterling Sugars' employees schedule them to go to the clinic for a drug test; is that right?

MR. DAVIS:  Objection.

THE WITNESS:  Management services, that is correct.

BY MR. KNOEPP:

Q.   Showing you what we're marking as Exhibit 97.

(Deposition Exhibit 97 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   It starts with a Bates number 38927, and it's just a two-page document.  It's another email from Mr. Sandor Garcia from October 7th of 2024, with a subject line, driver clearance protocol after drug testing.  Do you see that?

A.   Employment.

MR. DAVIS:  Mr. Romero, have you been able to read the document in full, or do you need

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

additional time, or do you need this to be

scrolled to a specific area?

          THE WITNESS:  I mean, I -- I haven't

read it in full, but --

BY MR. KNOEPP:

     Q.   Let me know if you need me to scroll.  I

was trying to scroll slowly through it, but you're

right, you just let me know if you need me to move

somewhere else.

     A.   Just go down very slow.  Go down a

little bit more, sir.

     Q.   Um-hum.

     A.   Oh, wait.  Stop.  Okay, I've read it.

     Q.   So going back to the beginning of the

email; first of all, this was sent by Mr. Garcia

in October of 2024; right?

     A.   Yes.

     Q.   And you're copied on the email?  Do you

see that?

     A.   Yes.

     Q.   Is he describing a driver clearance

protocol after drug testing that was already in

existence at the time that he sent this email in

2024?

     A.   Yes.

Q.   How long has the driver clearance protocol after drug testing been in place?

MR. DAVIS:  Objection.  Form.

THE WITNESS:  Repeat your question?

BY MR. KNOEPP:

Q.   Sure.  How long has the driver -- has a driver clearance protocol after drug testing been in place at M.A. Patout?

A.   I'm not certain.

Q.   Okay.  Has it been in place -- has a -- has a driver clearance protocol after drug testing been in place at M.A. Patout since at least 2022?

A.   I can't answer that.

Q.   Do you expect -- well, strike that.

Let me ask this question.  Does this driver clearance protocol after drug testing apply to truck drivers driving trucks for South Central?

A.   It would.

Q.   And do you expect the Sterling Sugars managers to make sure that the protocol is being complied with, with respect to the truck drivers at South Central?

A.   Yes, under the -- under the authority of the management services agreement, that would be their responsibility.

Q.   We were looking before at the safety violation protocol that was developed, related to the cell phones and the cameras that was Exhibit 73.  I'll show it to you again.

You're familiar with this policy; right? We just talked about it; right?

A.   Yes.

Q.   Prior to this, this is dated in 2024, there -- were there other policy statements provided in writing to the -- to truck drivers about cell phone usage?

A.   I believe as part of the orientation process there would have been some communication in Spanish and English with regards to that.  That would be a Jaime Robison question for South Central.

Q.   With respect to South Central, when truck drivers arrive for the season, is there a paperwork process that gets completed --

A.   Yes.

Q.   -- at the Sterling Sugars office?

A.   Yes.  Part of -- part of the services is orientation, safety, drug screens, all that occurs in advance of the workers being employed, upon arrival.

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

Q.   And that's all handled by the Sterling Sugars staff at the office at Sterling Sugars?

A.   As part of the services agreement of -- management services agreement.

Q.   And the -- the paperwork that gets filled out, as part of that process, gets put into a person's personnel file; is that right?

A.   Yes, there should be personnel files, files on behalf of the association.

Q.   And those are stored at the Sterling Sugars office; right?

A.   I would believe so.  Yes, sir.

Q.   And the Sterling Sugars' employees who work at the Sterling Sugars office handle the filing and maintenance of those personnel records; is that right?

A.   Right, as part of the manager -- managerial contract.

Q.   And prior to the -- the policy we were looking at in 2024, that was Exhibit 73, there -- there were rules already in place about cell phone use while driving trucks; is that right?

MR. DAVIS:  Objection.

THE WITNESS:  Definitely.

BY MR. KNOEPP:

RANDALL K. ROMERO - VOL. II                          JOB NO. 2620528
APRIL 20, 2026

Q.   Okay.  And the rule was you were not allowed to do that while you were driving?

A.   That's right.  That is Louisiana law.

Q.   And that was enforced by Sterling Sugars' employees, with respect to the South Central truck drivers; is that right?

MR. DAVIS:  Objection.  Form.

BY MR. KNOEPP:

Q.   Truck drivers had been disciplined for --

THE REPORTER:  I'm sorry.  I didn't hear an answer to that question.

MR. KNOEPP:  Oh.

MR. DAVIS:  Ma'am, will you read that last question back?

(The record was read as requested.)

MR. DAVIS:  Objection to the form.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And the -- the discipline for using a cell phone while driving, prior to the 2024 policy being circulated, was similar to what the 2024 policy states; is that right?  Somebody would -- could be suspended without pay.  Is that one of the consequences?

A.   Yes, I believe it would have been.  Yes.

Q.   And one of the other consequences could have been termination for multiple violations; is that right?

A.   Yes.

Q.   And those are things that were handled by the Sterling Sugars management employees with respect to the South Central truck drivers?

A.   Yes.

MR. DAVIS:  Object to form.

THE WITNESS:  Yes, sir.

BY MR. KNOEPP:

Q.   You -- you mentioned that when the truck drivers arrived that they would receive some training; is that right?

A.   They did.  New drivers would undergo some training, and some safety meetings would be held to reinforce safety and -- and policy.

Q.   Who -- with respect to South Central truck drivers, who would have organized those trainings?

A.   I believe it would be Jaime Robison, maybe with the assistance of Tim -- Tim Soileau.

Q.   And what about going over the policies?  Who would be charged with doing that with respect

to the South Central truck drivers?

A.   Jaime and Tim.

Q.   I'm going to show you what I'm marking as Exhibit 98.

(Deposition Exhibit 98 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   It is a document that has a Bates label of 38122.  And the -- the top email is an email from you, but there -- you're forwarding an email that you received from somebody else at the Louisiana -- originally came from the Louisiana State Police Transportation Safety Services.  Do you see that?

A.   Yes, sir.

MR. DAVIS:  Did -- the someone else was -- are you referencing the forward from Jim Simon?

MR. KNOEPP:  Yeah, I was going to scroll up to the next --

BY MR. KNOEPP:

Q.   You received this because it was forwarded to you by somebody at the American Sugarcane League; right?

A.   Yes.

MR. DAVIS:  And that -- that somebody,

the document identifies is Jim Simon, unless --

unless we're misreading, and I'm only asking

because we asked for the confirmation and we

didn't get it.

MR. KNOEPP:  Okay.  Yeah, it -- the last

name is spelled S-I-M-O-N; right?

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And he was a -- letting you know about a

safety opportunity or presentation by the

Louisiana State Police; right?

A.   Yes.

Q.   And you then forwarded that information

on to Mr. Soileau and Mr. Robison at Sterling

Sugars, as well as other people; right?

A.   Yes, sir.

Q.   And you were -- you wanted them to

participate in the -- have the H-2A truck drivers

participate in the safety trainings; right?

MR. DAVIS:  Objection.

Mischaracterization.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   And you stated that you would like these

presentations to be coordinated, in an addition to

our existing safety orientations for H-2A truck

and chauffeur drivers; right?

          A.    Yes.

          Q.    And then you specifically said, Sugar

truck drivers need to be included; right?

          A.    Yes.

          Q.    And so that would -- you wanted the

truck drivers who work as H-2A workers at South

Central to receive this training from the

Louisiana State Police; right?

          A.    Yes.

          Q.    And did -- do you know if Mr. Soileau

and/or Mr. Robison or anybody else at Sterling

Sugars followed through on that request to

provide -- make sure that the truck drivers got

this training?

          A.    I -- I can't answer.

          Q.    I see that Rivers Patout is also copied

on your -- more of a day-to-day operations thing,

to ask him about?

          A.    Yes, sir.

          Q.    From a policy standpoint, your

expectation was that people would follow your wish

to make sure that the H-2A truck drivers got this

additional training; right?

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

A.   Yes, sir.

Q.   Are you familiar with the on-boarding paperwork that's filled out by the -- completed by the H-2A truck drivers who work at South Central?

A.   No, sir.

Q.   But you are aware that there are some forms that are completed as part of an on-boarding process; right?

A.   Yes.

Q.   I'm showing you what's being marked as Exhibit 99, and the Bates label on the first page is 79186.

(Deposition Exhibit 99 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   And it's an email from Jaime Robison to Ricky Gonsoulin.  Do you see that?

A.   Yes.

Q.   And it says:  Ricky, this is the application we want to use.  Thanks.  Do you see that?

A.   Yes.

Q.   And then the attachment is a job application.  Do you see that?

A.   Yes.

RANDALL K. ROMERO - VOL. II                                            JOB NO. 2620528
APRIL 20, 2026

this one.

MR. DAVIS:  Okay.  It's no problem.  We -- we'll take time to compare.

Ma'am, will you please read that last question back?

(The record was read as requested.)

MR. DAVIS:  Okay.  All right, Counsel. We're going to -- we're going to -- Mr. Romero will take time and find the document and answer.

MR. KNOEPP:  Okay.  Well, let's go off the record then, so you can do that.

MR. DAVIS:  Ma'am, what is -- what's the record testimony time?

THE REPORTER:  I'm sorry.  Did you want to go off?

MR. KNOEPP:  Yes, please.

THE REPORTER:  Okay.  We're off the record.

(A short break was taken.)

THE REPORTER:  Back on the record.

BY MR. KNOEPP:

    Q.  Mr. Romero, we're back on the record.

Have you had an opportunity to review the two exhibits that we were talking about?

    A.  Yes, sir.

RANDALL K. ROMERO - VOL. II                                JOB NO. 2620528
APRIL 20, 2026

MR. DAVIS:  We certainly do appreciate you for taking on the time -- these exhibits that you've questioned us about, so that we can see them and read them before answering them.  We appreciate you giving us that break and doing this for us.

BY MR. KNOEPP:

Q.   Now, with respect to the code of -- the employee code of conduct for M.A. Patout and the employee code of conduct for South Central, they're -- they're almost identical with a couple of minor differences.  Is that fair to say?

MR. DAVIS:  Objection.  Foundation.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.   So, for example, Number 4 for the M.A. Patout code of conduct lists a phone number that is presumably for M.A. Patout; is that right?

A.   Yes.

Q.   And the phone number listed for South Central in Paragraph 4 is a different phone number than the one for M.A. Patout; is that right?

A.   Yes.

Q.   That phone number there 828-0620, extension 103 or 105, what is that main line phone

RANDALL K. ROMERO - VOL. II                                  JOB NO. 2620528
APRIL 20, 2026

number?

A.    That would be Sterling's main line.

Q.    And then the other difference between the two employee code of conduct is that for -- there's an extra line in the South Central code of conduct that's labeled Number 15 that says the use of cell phones is prohibited, emergencies only. Do you see that?

A.    Yes.

Q.    That particular line does not appear in the M.A. Patout code of conduct; right?

A.    15?  Yes, that is correct.

Q.    And otherwise, the other code of conducts are virtually identical; is that right?

MR. DAVIS:  Objection. Mischaracterization.

THE WITNESS:  Yes.

BY MR. KNOEPP:

Q.    And just for the record, we were showing Exhibit 100 and 101 side by side.  Is that right? Exhibit 100 was the M.A. Patout?

MR. DAVIS:  No, Jim.  We've understood -- we asked that you show us Exhibit 99.  You -- you then invited us to find it ourselves and so we took the break.  And so -- but we were glad that

Central's basis for accepting the $100 per man per month.

BY MR. KNOEPP:

Q.   How do you know that's how South Central felt about the price that you proposed?

A.   They agreed to pay it.

Q.   Who, on behalf of South Central, agreed to pay it?

A.   Chris Patout.

Q.   Let me show you what's been marked as Exhibit 102.

(Deposition Exhibit 102 was marked for purposes of identification.)

BY MR. KNOEPP:

Q.   It has a Bates number 4245.  Do you see that?

A.   Yes.

Q.   And this is titled lease of equipment. Do you see that?

A.   Correct.

Q.   This is between Sterling Sugars, LLC, Sterling Sugars Sales Corporation as the lessors, and South Central as the lessee; right?

A.   Yes.

Q.   And is -- do you recognize the lease?

A.   Yes, I do.

Q.   It has a lease period of September 1st, 2022, through January 31st, 2023; right?

A.   Yes, sir.

Q.   And what is this lease pertaining to?

MR. DAVIS:  Objection.  The document speaks for itself.

THE WITNESS:  It is the lease agreement to support the equipment lease that was leased on behalf of South Central from Sterling Sugars and Sterling Sugars Sales Corporation.

BY MR. KNOEPP:

Q.   And the -- there's some attachments to the lease that have the equipment that's actually being leased; right?

A.   Yes, sir.

Q.   And from Sterling Sugars, LLC -- what is being leased by South Central from Sterling Sugars, LLC?

A.   This is 18-wheeler trucks, referenced as tractors, and cane trailers.

Q.   And then from the Sterling Sugars Sales Corporation, what equipment is being leased from the sales corporation?

A.   That is cane trucks, as well as cane

trailers.

Q.   And when you say cane trucks you're referring to 18 wheelers?

A.   Yes, sir.

Q.   And that -- there's a price set for the lease; correct?

A.   Yes, sir.

Q.   And it's $2.80 per ton of sugar cane harvested and $2.25 per ton of sugar cane trucked or transported for grinding; correct?

A.   Correct.

Q.   Are those figures that you came up with?

A.   Yes, myself and Ashlee Gary.

Q.   And how did you arrive at those figures?

A.   We evaluated what the actual cost that Sterling Sales Corporation was incurring for those activities and formulated a per ton cost to charge South Central.

Q.   And are you referencing the Sterling Sugars Sales Corporation costs from prior years when it was performing the harvesting and hauling work?

A.   Yes, sir.

Q.   And that was used to come up with the price that would be charged for the lease for

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary will be made on the Errata Sheet.

_____

RANDALL K. ROMERO

STERLING SUGARS, LLC

_____

DATE

(If needed, make additional copies of the Errata Sheet on the next page or use a blank piece of paper.)

RANDALL K. ROMERO - VOL. II
APRIL 20, 2026

JOB NO. 2620528

ERRATA SHEET

Case:  Felipe de Jesus Avila-Soto, et al. v. South

Central Sugar Cane Growers' Association, Inc., et

al.

Witness:  Randall K. Romero - Sterling Sugars, LLC

Date:  April 20, 2026

PAGE/LINE          SHOULD READ      REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Steno Job 2620528

RANDALL K. ROMERO - VOL. II                                    JOB NO. 2620528
APRIL 20, 2026

CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Notary Public of the State of Maryland, City of Baltimore, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.