UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| FELIPE DE JESUS AVILA-SOTO,  et al. | ) | |
| | ) | Case No. 6:24-cv-01392 |
| Plaintiffs, | ) | |
| | ) | JUDGE ROBERT R. SUMMERHAYS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE CAROL B. |
| SOUTH CENTRAL SUGAR CANE | ) | WHITEHURST |
| GROWERS' ASSOCIATION, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT ON
EMPLOYER STATUS OF DEFENDANT STERLING SUGARS, LLC**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1

II.    STERLING SUGARS WAS THE EMPLOYER OF THE PLAINTIFFS, OPT-IN PLAINTIFFS, AND CLASS MEMBERS UNDER THE FLSA, THE EMPLOYMENT CONTRACTS, AND THE LWPA AND IS THEREFORE JOINTLY LIABLE ALONG WITH DEFENDANT SOUTH CENTRAL. ............................................................................................ 1

    A.    Applicable Summary Judgment Standard ........................................................... 1

    B.    Sterling Sugars, LLC is an Employer Pursuant to the FLSA. ........................................ 2

    C.    Sterling Sugars, LLC is an employer pursuant to the Employment Contracts. ................ 16

    D.    Sterling Sugars, LLC is an employer pursuant to the LWPA. ........................................ 18

CONCLUSION ....................................................................................................................... 19

# TABLE OF AUTHORITIES

**CASES**

*Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242 (10th Cir. 2020) .................................. 16

*Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228 (11th Cir. 2002).................................... 16

*Arriaga-Zacarias v. Lewis Taylor Farms,  Inc.*, 2008 U.S. Dist. LEXIS 98064 (M.D. Ga. Dec. 4, 2008) ..................................................................................................................... 17

*Donovan v. Sabine Irrigation Co.*, 695 F.2d 190 (5th Cir. 1983).................................................... 3

*Falk v. Brennan*, 414 U.S. 190 (1973)...................................................................................... 2, 15

*Gordon v. Huriston*, 854 So. 23 469 (La. Ct. App. 2003) ............................................................. 18

*Gray v. Powers*, 673 F.3d 352 (5th Cir. 2012) .............................................................................. 3

*Hodgson v. Griffin and Brand of McAllen, Inc.*, 471 F.2d 235 (5th Cir. 1973).............................. 3

*Matsushita Electric Industrial Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................... 2

*McLaughlin v. Seafood, Inc.*, 867 F.2d 875 (5th Cir. 1989) ............................................................ 3

*Mendoza v. Essential Quality Const., Inc.*, 691 F. Supp. 2d 680 (E.D. La. 2010) ....................... 18

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ............................................................. 3

*Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527 (5th Cir. 2015) ................................... 2

*Perez-Benites v. Candy Brand, LLC*, 2011 U.S. Dist. LEXIS 55003 (W.D. Ark. May 20, 2011) 17

*Reich v. Circle C Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993) ................................................. 3

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985) ........... 16, 17

*Singleton v. Gulf Coast Truck Serv.*, 409 So. 2d 377 (La. Ct. App. 1982).................................... 18

*United States v. Rosenwasser*, 323 U.S. 360 (1945)........................................................................ 3

*Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990) .......................................................................... 3

*Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185 (5th Cir. 1979)........................................ 3

**STATUTES**

29 U.S.C. § 203(d) ........................................................................................................ 2, 15

29 U.S.C. § 203(e)(1) ........................................................................................................ 2

29 U.S.C. § 203(g) ............................................................................................................ 2

**RULES**

Fed. R. Civ. P. 56(c) ........................................................................................................ 1

**REGULATIONS**

20 C.F.R. § 653.501 ........................................................................................................ 16

20 C.F.R. § 655.0 ............................................................................................................ 16

20 C.F.R. § 655.100(a)(ii) .............................................................................................. 16

20 C.F.R. § 655.103(b) .............................................................................................. 16, 17

20 C.F.R. § 655.122 ........................................................................................................ 16

## I.    INTRODUCTION

Defendant Sterling Sugars, LLC ("Sterling Sugars") operated Defendant South Central Sugar Cane Growers' Association, Inc. ("South Central") as its manager. Employees of Defendant Sterling Sugars hired, fired, reprimanded, and paid the employees of Defendant South Central. Employees of Defendant Sterling Sugars also controlled the bank accounts of Defendant South Central and managed the balances so that South Central could make payroll and pay its bills, which were paid by the employees of Defendant Sterling Sugars. The undisputed facts detailing Sterling Sugars' control of Defendant South Central and the employment of the Plaintiffs and other truck drivers are set forth as a separate document attached as an exhibit to Plaintiffs' companion "Memorandum in Support of their Motion for Partial Summary Judgment Related to Violations of the Fair Labor Standards Act, Employment Contracts, and the Louisiana Wage Payment Act."[1] In this motion, the Plaintiffs, opt-in Plaintiffs, and class members seek a determination that Defendant Sterling Sugars is their "employer" and therefore liable under the FLSA, for beach of the Employment Contracts, and for violations of the LWPA.

### ARGUMENT

## II.    STERLING SUGARS WAS THE EMPLOYER OF THE PLAINTIFFS, OPT-IN PLAINTIFFS, AND CLASS MEMBERS UNDER THE FLSA, THE EMPLOYMENT CONTRACTS, AND THE LWPA AND IS THEREFORE JOINTLY LIABLE ALONG WITH DEFENDANT SOUTH CENTRAL.

### A.    Applicable Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  A factual dispute is material only if it "might affect the outcome of the suit under the governing law," and it is genuine "if the evidence is such that a reasonable jury

---

[1] To avoid filing a duplicate version of the exhibits referenced in the Statement of Undisputed Material Facts to this motion, Plaintiffs incorporate by reference the exhibits filed with their companion motion (ECF No. 119-3 through ECF No. 119-56) related to Defendants' violations of the law as if fully set forth herein.

1

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issues of material fact." *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (citation omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See Matsushita Electric Industrial Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (noting that, to defeat summary judgment, an opponent "must do more than simply show there is some metaphysical doubt as to the material facts" and must come forward with "specific facts showing there is a genuine issue for trial") (cleaned up). Because there are no genuine issues as to any material facts with respect to the status of Sterling Sugars as an employer within the meaning of the FLSA, the employment contracts, and the LWPA, summary judgment for the Plaintiffs, opt-in Plaintiffs, and class members is appropriate with respect to this issue.

### B.      Sterling Sugars, LLC is an Employer Pursuant to the FLSA.

It is undisputed that the Plaintiffs and other truck drivers were employed by South Central.[2] The FLSA defines employer expansively as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA further defines an "employee" as any individual "employed" by an employer, and "employ" as "to suffer or permit to work." 29 U.S.C. § 203(e)(1), 29 U.S.C. § 203(g). Given the breadth of the FLSA's definition, there may be several simultaneous employers of any individual worker. *Falk v. Brennan*, 414 U.S. 190, 195 (1973). The Supreme Court has noted that "[a] broader or more comprehensive coverage of employees within the stated categories . . . would be difficult to

---

[2] Pls.' SOF ¶ 33.

2

frame." *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"). As the Fifth Circuit stated, "the FLSA's definition of employer must be liberally construed to effectuate Congress' remedial intent." *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993); *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) ("The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications."). The undisputed evidence shows that the Plaintiffs and other truck drivers were jointly employed by Sterling Sugars and South Central.

The Fifth Circuit employs an "economic reality" test to determine whether an entity is a joint employer liable under the FLSA. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012); *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983); *Hodgson v. Griffin and Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973). "The 'economic reality' test includes inquiries into whether the alleged employer (1) has the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990). Not all elements need to be established. *Gray*, 673 F.3d at 357. As the Fifth Circuit has noted, a determination of "economic reality" should also focus on whether the worker is "economically dependent" on the alleged joint employer. *Watson*, 909 F.2d at 1553 ("For purposes of the FLSA, determination of employee status focuses on economic reality and economic dependence."); *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 (5th Cir. 1979) ("The touchstone of 'economic reality' in

3

analyzing a possible employee/employer relationship for purposes of FLSA is [economic] dependency"). In this case, the evidence shows that the economic realities test is satisfied, Sterling Sugars supplied the funds for Plaintiffs' and other truck drivers' wages, and Sterling Sugars was the Plaintiffs' and other truck drivers' joint employer under the FLSA.

Even before applying the Fifth Circuit's joint employment factors, the evidence is overwhelming that the Plaintiffs and other truck drivers were, as a matter of "economic reality," entirely "economically dependent" on Sterling Sugars in order to receive their wages. In fact, South Central as an entity itself was entirely economically dependent on Sterling Sugars and was operated by Sterling Sugars' employees. South Central is primarily engaged in the hauling of sugarcane,[3] which it exclusively delivers to Sterling Sugars and for which it is paid by Sterling Sugars.[4] The rate that South Central is paid by Sterling Sugars for hauling was set by Sterling Sugars.[5] Because the hauling rates paid by Sterling Sugars have not changed in almost 35 years, South Central cannot afford the expenses of its operations and runs a deficit of almost $5 million *each year*.[6] As a result, in order to pay its employees South Central relies exclusively on Sterling Sugars to subsidize its operations and provide the cash necessary to operate, including, importantly, cash transfers necessary to pay the payroll of the truck drivers[7] or to pay expenses associated with leasing and operating the trucks that are used by the truck drivers to haul the sugarcane.[8] Sterling Sugars' employees have access to South Central's bank accounts and monitor those accounts to determine whether there are enough funds to make payroll[9] or pay

---

[3] Pls.' SOF ¶ 20.
[4] Pls.' SOF ¶¶ 66, 142.
[5] Pls.' SOF ¶¶ 143.
[6] Pls.' SOF ¶¶ 143, 144, 149.
[7] Pls.' SOF ¶¶ 131, 135, 149.
[8] Pls.' SOF ¶¶ 136, 137.
[9] Pls.' SOF ¶¶ 130, 133, 134, 135.

invoices.[10] Indeed, South Central's president does not have access to its own bank accounts and did not even know where the accounts were located.[11] When there are not sufficient funds to make payroll or pay other expenses, South Central "borrows" money from Sterling Sugars via a bank transfer that is handled by Sterling Sugars' office employees,[12] who also handle all of the payroll processing for the truck drivers,[13] the payment of invoices,[14] and the accounting work for South Central.[15] Without such transfers, there would not be enough money to make payroll and the truck drivers would not be paid.[16] Sterling Sugars' employees prepare promissory notes reflecting the "loans" to South Central—these can total more than $5 million per year—in which no security for the loan is required and no stated interest rate is specified because the box for interest on each loan document remains unchecked.[17] But the "loans" are not paid back to Sterling Sugars by South Central because they are eliminated through intercompany transactions each fiscal year whereby South Central is considered a "disregarded entity" and the expenses of South Central are brought onto the accounting records of Sterling Sugars.[18] The extension of millions of dollars in funds from Sterling Sugars to South Central each year and the subsequent non-repayment of those funds is memorialized in a formal agreement between the two titled a "Revenue Balancing Agreement" in which Sterling Sugars has agreed "to provide adequate revenue necessary to cover the general operating expenses" of South Central "on a nonrecourse

---

[10] Pls.' SOF ¶¶ 130, 134, 136.
[11] Pls.' SOF ¶ 126.
[12] Pls.' SOF ¶¶ 133, 134, 135, 136.
[13] Pls.' SOF ¶¶ 16, 89.
[14] Pls.' SOF ¶ 122.
[15] Pls.' SOF ¶ 123. Sterling Sugars' employees also prepares and file the annual tax filings related to South Central's payroll taxes and quarterly tax reports for South Central related to workers' compensation audits. Pls.' SOF ¶¶ 124, 125.
[16] Pls.' SOF ¶ 135.
[17] Pls.' SOF ¶¶ 130, 132.
[18] Pls.' SOF ¶ 148.

basis"[19] so that South Central can continue to operate and "to be able to have a financially stable environment in order to be able to bring in workers to harvest and haul cane."[20] That has resulted in Sterling Sugars providing more than $20 million in "nonrecourse" funds to South Central during the time period relevant to this lawsuit.[21] "Nonrecourse" funds are of course just another term for a gift—Sterling Sugars has kept South Central afloat through the time period of this litigation by gifting it more than $20 million dollars.

Separate from the financial dependence described above, the Plaintiffs and other truck drivers are also dependent on Sterling Sugars in order to be able to perform their truck driving work at all. There was a concern that South Central, as a new entity, would not be able to obtain auto insurance coverage for the truck drivers and coverage for the trucks that Sterling Sugars was going to lease to South Central. The insurance company agreed to add South Central to a master policy if Sterling Sugars and South Central entered into a Management Services agreement whereby Sterling Sugars manages South Central's operations since Sterling Sugars' employees had experience managing sugarcane hauling operations.[22] This agreement expressly details that Sterling Sugars provides the management of South Central. Obviously, without insurance coverage, the Plaintiffs and other truck drivers would not be able to work, but that issue was resolved by Sterling Sugars, which also handles all issues related to renewal of the vehicle insurance policy, including adding truck drivers to the policy,[23] notifying the insurance company if a truck driver has been terminated and needs to be removed from the policy,[24] and handling issues related to accidents and insurance claims.[25] Many of the trucks and trailers themselves are

---

[19] Pls.' SOF ¶ 146; Ex. 24.
[20] Pls.' SOF ¶¶ 145, 147; Ex. 24.
[21] Pls.' SOF ¶ 149.
[22] Pls.' SOF ¶ 85.
[23] Pls.' SOF ¶ 86.
[24] Pls.' SOF ¶ 87.
[25] Pls.' SOF ¶¶ 97, 103, 113.

leased from Sterling Sugars and one of its subsidiaries since South Central does not own any trucks or trailers.[26] Sterling Sugars' employees handle the registration of the trucks with the Louisiana Department of Transportation,[27] Sterling Sugars' mechanic shop fixes the trucks if they break down or have flat tires,[28] Sterling Sugars' employees handle the purchasing of supplies needed to keep the trucks operating like fuel, oil, brake pads, and tires,[29] schedule and perform all of the maintenance on the trucks like oil changes and brake jobs,[30] and handle all issues related to the stickers that are legally required to be affixed to both sides of the trucks since South Central is an intrastate carrier.[31] Sterling Sugars provides use of fuel pumps that it owns and that are located at the mill so the truck drivers can refuel their trucks,[32] and Sterling Sugars provides the fuel cards used to operate the pumps.[33] Without Sterling Sugars performing all of these tasks, the truck drivers would not have trucks to drive, fuel to run them, and would not be able to work, further illustrating their deep economic dependence on Sterling Sugars.

There is also overwhelming evidence with respect to the other factors that Fifth Circuit courts review when analyzing the economic realities of an employment situation. First, Sterling Sugars has the power to hire and fire the truck drivers and did, in fact, fire Plaintiff Felipe de Jesus Avila-Soto.[34] Sterling Sugars' employees set the number of truck drivers to be hired each season and therefore how many workers need to be requested on the clearance orders seeking

---

[26] Pls.' SOF ¶¶ 31 (South Central doesn't actually own *anything*), 118.
[27] Pls.' SOF ¶ 88.
[28] Pls.' SOF ¶ 108.
[29] Pls.' SOF ¶ 114. The purchasing of supplies for South Central is handled at Sterling Sugars' mill property and is done by Sterling Sugars' employee Tim Soileau using the same computer that is used to make purchases for Sterling Sugars by "simply . . . click[ing] a button between [the] Sterling database and the association's database." Pls.' SOF ¶ 115.
[30] Pls.' SOF ¶ 119.
[31] Pls.' SOF ¶ 121.
[32] Pls.' SOF ¶ 117.
[33] Pls.' SOF ¶ 116.
[34] Pls.' SOF ¶¶ 58, 87.

certification for H-2A visas to employ H-2A workers.[35] Sterling Sugars' employees select the truck drivers who are hired to work at South Central,[36] and determine which truck drivers are allowed to be re-hired to work at South Central from season to season.[37] In fact, Sterling Sugars' CEO Randall Romero testified about the maintenance of a "do not return" list of truck drivers who should not be re-hired—a list that included the lead plaintiff in the lawsuit that was filed against the Sterling Sugar Sales Corporation.[38] Mr. Romero informed Sterling Sugars' employees that the "NO RETURN LIST" should be shared "to avoid unwanted workers" being hired.[39] Sterling Sugars' employees assign the positions to the H-2A workers—whether it is truck driver or agricultural equipment operator—and make the decisions on any requests by workers to change positions.[40] Sterling Sugars' employees decided which truck drivers would receive extensions of their H-2A visas in 2022 to work for a longer period of time than originally anticipated and which truck drivers would not receive extensions because they had been terminated or were otherwise ineligible for extensions.[41] Sterling Sugars' employees also make the decision on whether any additional workers are needed, deciding to deny visas to individuals waiting in Mexico to have their visas processed, concluding that the workers should no longer be hired.[42]

---

[35] Pls.' SOF ¶ 43.

[36] Pls.' SOF ¶ 47 ("We hired a management firm and the management firm provided the names to hire as truck drivers. Q. And by manage[ment] firm, you are referring to Sterling Sugars? A. Yes, sir."); ("I would agree that the management firm [Sterling Sugars] has the right to determine which employees that we issue visas to on a yearly basis."); ("We hired the management firm [Sterling Sugars] to determine the list that [] can apply for visas."); ("You know, as part of the management services, we felt it was important that we continue to bring in the same drivers that would have been brought in previously.").

[37] Pls.' SOF ¶ 50 ("As far as a list of people everyone that was here at [South Central] last year is welcome back this year with the exception of the ones that are on the do not return list.").

[38] Pls.' SOF ¶ 51.

[39] Pls.' SOF ¶ 49.

[40] Pls.' SOF ¶ 52 (example of a worker requesting to be switched to a truck driver position and Sterling Sugars' employee denying the request stating "he is to stay as a tractor driver").

[41] Pls.' SOF ¶ 53 (list of individuals who would not receive visa extensions included Plaintiff Felipe de Jesus Avila-Soto).

[42] Pls.' SOF ¶ 54.

With respect to firing, Sterling Sugars' employees address issues related to any misconduct by truck drivers, violations of work rules, and discipline involving truck drivers,[43] including whether a truck driver should be terminated.[44] Employees of Sterling Sugars' parent company M.A. Patout, with the assistance and input of Sterling Sugars' employees, developed the South Central company policies and safety rules related to the work of the truck drivers that were then distributed to the truck drivers by Sterling Sugars' employees.[45] Sterling Sugars' employees handle all employment matters at South Central, including issues related to violations of work rules or the Code of Conduct[46] by truck drivers.[47] South Central truck drivers are disciplined by Sterling Sugars' employees Jaime Robison or Tim Soileau and are provided a written warning or written termination notice that Sterling Sugars' employees prepare and sign.[48] Sterling Sugars also purchased driver and road-monitoring cameras for the trucks and installed them in the trucks so that any issues related to accidents or unsafe driving by the truck drivers can be reviewed by Sterling Sugars.[49] Sterling Sugars' employees Jaime Robison and Tim Soileau have reviewed camera footage and made determinations of whether a truck driver should be disciplined, including being terminated, for violation of safety rules observed on camera

---

[43] Pls.' SOF ¶ 55.

[44] Pls.' SOF ¶ 57 ("Q. The management firm [Sterling Sugars] makes those assessments on whether or not certain truck drivers should be terminated? A. Yes.").

[45] Pls.' SOF ¶ 99; Ex. 72, 73, 74 (safety violation policy listing consequences for violations including suspension without pay and immediate termination depending on the violation).

[46] The Code of Conduct that applies to the truck drivers is almost identical to the Code of Conduct of Sterling Sugars' parent company, M.A. Patout. Pls.' SOF ¶ 101.

[47] Pls.' SOF ¶ 102 (disciplinary decisions involving truck drivers are handled by Sterling Sugars employees Jaime Robison, Tim Soileau, and M.A. Patout employee Sandor Garcia); Ex. 8 (reprimand for Plaintiff Felipe de Jesus Suarez-Palafox prepared by Sterling Sugars employee Tim Soileau and signed by Sterling Sugars employee Jaime Robison suspending Mr. Suarez-Palafox from work for two days); Ex. 9 (reprimand for Plaintiff Felipe de Jesus Avila-Soto signed by Sterling Sugars employee Jaime Robison suspending Mr. Avila-Soto from work for three days).

[48] Pls.' SOF ¶ 56; Exs, 8, 9.

[49] Pls.' SOF ¶ 104. The truck drivers are informed that if there are any issues with the cameras that they are not to continue driving and should wait until someone can address the issue. Sterling Sugars' employees Tim Soileau, Jaime Robison, and Roddy Patout have spare cameras and spare parts to fix the cameras so that a truck driver may continue working. Pls.' SOF ¶ 105.

footage.[50] If a truck driver is terminated, Sterling Sugars' employees handle reporting that to the U.S. Government.[51]

Second, Sterling Sugars supervised and controlled the truck drivers' work schedules and conditions of employment. Sterling Sugars' employees determine when they want the truck drivers to arrive at the Franklin, Louisiana sugar mill of Sterling Sugars for the season.[52] Sterling Sugars' employee Jaime Robison sets the daily start time for the South Central truck drivers in the daily work schedules he prepares that show their start time, list their names, their Sterling Sugars' assigned employee identification number, the time they are to leave the Sterling Sugars' truck yard, the location(s) where they are to pick up sugarcane each day, and the number of their assigned truck.[53] Mr. Robison personally drives to the truck drivers' housing facility each afternoon to post the next day's work schedule in the cafeteria of the housing.[54] Sterling Sugars provides transportation for the truck drivers from their housing[55] to the truck parking area at the Sterling sugar mill each workday and then transports the truck drivers back to the housing at the end of the workday.[56] The truck drivers are expected to arrive 30 minutes before the time indicated on the schedule that Mr. Robison prepares so they can depart the truck yard at the scheduled time.[57] The truck drivers clock-in and out at a Sterling Sugars' timeclock and then start and end their work each day at the truck yard on the Sterling Sugars' mill property where the trucks and trailers are parked each night at the end of their shifts.[58] At the end of the season,

---

[50] Pls.' SOF 106.
[51] Pls.' SOF 109.
[52] Pls.' SOF ¶ 44.
[53] Pls.' SOF ¶ 58.
[54] Pls.' SOF ¶ 58.
[55] Sterling Sugars owns and operates the housing provided to the truck drivers. The housing is a required term of the H-2A contracts. Pls.' SOF ¶ 62.
[56] Pls.' SOF ¶ 60. Sterling Sugars employs three drivers who transport the truck drivers to and from their housing and who are paid overtime wages. Pls.' SOF ¶ 61.
[57] Pls.' SOF ¶ 58.
[58] Pls.' SOF ¶ 59.

Sterling Sugars' employees determine the date that return transportation for the truck drivers from Mexico should be available so they can return to their homes.[59]

Third, Sterling Sugars determined the rate and method of payment for the truck drivers. Because the truck drivers are employed pursuant to employer-sponsored temporary visas, their wage rates are set by the federal government. But Sterling Sugars played a significant role in which visa program South Central used to apply for H-2 workers, thereby impacting the wage rates that were paid to the truck drivers. Prior to the hauling work being performed by South Central, the hauling work was done by Sterling Sugar Sales Corporation, which is a wholly owned subsidiary of Sterling Sugars.[60] At the time South Central was formed, there was a concern that the Department of Labor would not consider truck drivers hauling sugarcane for entities like the Sterling Sugars Sales Corporation to be agricultural workers and that such workers would need to be employed on H-2B visas at a higher wage rate instead of on H-2A visas.[61] That concern led to a decision to create a growers' association, a new model to do the hauling work which resulted in the formation of South Central.[62] Individuals employed by Sterling Sugars and its parent company, including Sterling Sugars' CEO Randall Romero, were heavily involved in the creation and formation of South Central.[63] There was a belief that by forming an association like South Central rather than continuing to have the hauling done by the Sterling Sugars Sales Corporation that the association could maintain the ability to pay lower

---

[59] Pls.' SOF ¶ 112.
[60] Pls.' SOF ¶ 24.
[61] Pls.' SOF ¶ 25.
[62] Pls.' SOF ¶ 26.
[63] Pls.' SOF ¶¶ 22, 154. Even after the formation of South Central, Sterling Sugars' employees maintained their heavy involvement in the corporate work of South Central (in addition to all of the management responsibilities discussed *supra* and *infra*) by scheduling member and board meetings, maintaining member and board meeting minute files, creating agendas for those meetings, attending the meetings, maintaining the South Central membership list, and storing all of South Central's corporate records at the Sterling Sugars' office. Pls.' SOF ¶¶ 150, 151, 152, 153.

11

*agricultural* hourly wage rates for the truck driving work and therefore not have increased hauling costs passed on to Sterling Sugars, with Mr. Romero testifying at his deposition that "the association was an avenue to be discussed that would potentially help with the labor cost."[64] Mr. Romero also believed that the new association structure meant that South Central truck drivers did not have to be paid overtime wages because the association was providing the hauling services and "[b]ecause the farmers were performing the activities from the farm to the mill," even though Mr. Romero understood that the farmers themselves were not hauling the sugarcane but "an association of farmers was hauling the sugar cane" and that the association was a separately organized entity.[65] Mr. Romero later expressed his concern that if the truck drivers were required to be paid overtime wages that the association structure would no longer be viable and associations like South Central might no longer exist if they could not avoid the overtime rules.[66]

Sterling Sugars' employees Tim Soileau and Jaime Robison provide Sterling Sugars' office staff with what wage rate should be paid to the truck drivers and directed that no overtime wages are to be paid to the truck drivers.[67] Mr. Soileau has the authority to direct the payroll staff in Sterling Sugars' office to pay the truck drivers overtime pay.[68] Sterling Sugars' employees handle any communications with the truck drivers about their hourly wage rates, including whether there would be any reductions in their wage rates.[69] Sterling Sugars' CEO Randall Romero made the decision following an injunction issued in a lawsuit involving wage rates paid to H-2A truck drivers to not reduce the hourly wages of the South Central truck drivers and

---

[64] Pls.' SOF ¶ 27.
[65] Pls.' SOF ¶ 171.
[66] Pls.' SOF ¶ 172.
[67] Pls.' SOF ¶ 72.
[68] Pls.' SOF ¶ 73.
[69] Pls.' SOF ¶ 74.

directed Sterling Sugars' staff to distribute a notice to the truck drivers notifying them about the injunction and the wage rate issue.[70] When asked during his deposition "[W]hose decision was that to not change the wage rates?", Mr. Romero testified "It was mine."[71]

With respect to the "method of payment," the payroll period and the date employees are paid is the same for Sterling Sugars and South Central and was set by Sterling Sugars.[72] As already noted, Sterling Sugars' employees prepare and process the payroll for the truck drivers.[73] The South Central truck drivers were previously paid by check, but Sterling Sugars' employees set up the payroll card system that is currently used to pay the truck drivers their wages.[74] When paychecks were issued, Sterling Sugars' employees would personally deliver the paychecks to the truck drivers.[75] Now with the payroll card system, Sterling Sugars' employees personally deliver paycheck stubs to the truck drivers.[76] Finally, Sterling Sugars' employee Jaime Robison provided cash advances to truck drivers at the beginning of the season by personally going to the bank to cash a check and get $100 bills to distribute.[77]

The evidence also shows that the Plaintiffs and other truck drivers are dependent on Sterling Sugars with respect to the actual logistics and mechanics of being paid their wages, and that the system set up by Sterling Sugars was done with parameters that deny them overtime wages. Sterling Sugars provides the time clocks that are used by the truck drivers to record their

---

[70] Pls.' SOF ¶ 75.
[71] Pls.' SOF ¶ 75.
[72] Pls.' SOF ¶ 90.
[73] Pls.' SOF ¶ 89.
[74] Pls.' SOF ¶ 91. If a truck driver has a bank account and prefers to be paid through direct deposit in his bank account rather than the payroll card system he can let Sterling Sugars' staff know at the office and they will honor that request, input the information in the payroll system, and setup the direct deposit for the truck driver. Pls.' SOF ¶ 94.
[75] Pls.' SOF ¶ 93.
[76] Pls.' SOF ¶ 92.
[77] Pls.' SOF ¶ 95; Ex. 58.

work hours.[78] The time clocks are owned by Sterling Sugars and are located on the property of Sterling Sugars' mill in Sterling Sugars' mechanic shop, and are connected to payroll software which was purchased and is owned by Sterling Sugars.[79] The software works in connection with the time clocks and allows for information to be imported into the program used by Sterling Sugars for payroll processing, for which Sterling Sugars also pays the monthly subscription fee.[80] The time clock software has parameters set in the system by Sterling Sugars' employees whereby if an employee is assigned to be paid by Sterling Sugars they will be paid overtime, but if the employee is assigned to be paid by South Central they will not be paid overtime.[81]

Fourth, Sterling Sugars maintained all of the employment records of the truck drivers. South Central does not employ any office staff since its entire workforce is H-2A workers,[82] and it does not have an office, computers, or file systems.[83] Sterling Sugars' employees maintain the personnel files for the South Central truck drivers.[84] South Central does not have any physical location and uses the address for Sterling Sugars' mill as its mailing address and Sterling Sugars' employees store South Central' personnel, accounting, and corporate files at Sterling Sugars' offices.[85] Sterling Sugars' office staff handled the processing of all new hire paperwork for the South Central truck drivers such as I-9 forms, tax documents, and the distribution and signing of work rules.[86] Sterling Sugars' employees provided the application forms that the truck drivers complete as part of the new hire process.[87] Sterling Sugars' employees make copies of the truck

---

[78] Pls.' SOF ¶ 63.
[79] Pls.' SOF ¶ 63.
[80] Pls.' SOF ¶ 64.
[81] Pls.' SOF ¶ 65.
[82] Pls.' SOF ¶ 35.
[83] Pls.' SOF ¶ 78.
[84] Pls.' SOF ¶ 76.
[85] Pls.' SOF ¶ 77.
[86] Pls.' SOF ¶ 70.
[87] Pls.' SOF ¶ 79.

driver's licenses and the medical exams associated with their licenses and maintain those in the truck drivers' personnel files at Sterling Sugars' office.[88] Sterling Sugars' employees prepare and send out W-2 tax forms at the end of each year to the truck drivers.[89] Finally, if an employee is terminated or leaves his employment early to deal with a family or medical issue, Sterling Sugars' employees handle getting truck drivers to sign paperwork for their personnel files as to the reason for their early departures.[90]

In sum, Sterling Sugars is an entity that acted "directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and the Plaintiffs and other truck drivers, as a matter of "economic reality," are entirely "economically dependent" on Sterling Sugars such that Sterling Sugars is their employer under the FLSA along with South Central. This case is similar to the Supreme Court's decision in *Falk*, where maintenance workers who were directly employed by apartment complexes were found to also be employed by an entity that was hired by the apartment complexes to provide "management services" for their buildings. *Falk*, 414 U.S. at 195. Like Sterling Sugars here with respect to South Central's sugarcane hauling work, the management firm in *Falk* agreed to perform "virtually all management functions that are ordinarily required for the proper functioning of an apartment complex." *Id.* at 192 & n.4. The Supreme Court ruled that it was "unquestionably correct" that the management firm was "also an 'employer' of the maintenance workers" under the FLSA based on the extent of their "managerial responsibilities" at each of the buildings. *Id.* at 195. The same is true here with respect to Sterling Sugars.

For all of the above reasons, summary judgment is appropriate against Sterling Sugars

---

[88] Pls.' SOF ¶ 80.
[89] Pls.' SOF ¶ 96.
[90] Pls.' SOF ¶¶ 109-111.

with respect to its status and liability as an employer pursuant to the FLSA.

**C.      Sterling Sugars, LLC is an employer pursuant to the Employment Contracts.**

Federal regulations govern the minimum terms and conditions of employment for H-2A workers and impose various obligations on "employers." *See* 20 C.F.R. § 655.122 (setting out minimum wages and terms and conditions of employment that "employers" must offer to H-2A workers). These minimum standards are intended to ensure that "[t]he employment of the H-2A worker(s) will not adversely affect the wages and working conditions of workers in the United States similarly employed." 20 C.F.R. § 655.100(a)(ii); *see also* 20 C.F.R. § 655.0. Employers requesting H-2A workers must file a temporary alien labor certification application with the U.S. Department of Labor ("USDOL"), called an ETA-790 clearance order, that complies with the requirements set forth in 20 C.F.R. § 653.501 and 20 C.F.R. § 655.122. The terms and conditions set forth in these regulations and the applications filed with the USDOL constitute mandatory contractual terms of employment. 20 C.F.R. § 655.103(b) (defining "work contract" as "the terms and conditions of the job order and any obligations required by 8 U.S.C. 1188, 29 CFR part 501, or this subpart [B, 20 C.F.R. §§ 655.100-655.304"); *see also Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1248 (10th Cir. 2020) ("'[T]he required terms of the [clearance] order and the certified Application for Temporary Employment Certification' became their work contracts.") (quoting 20 C.F.R. § 655.122(q)); *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1233 n.5 (11th Cir. 2002) ("clearance orders ultimately become the work contract between the employers and the farmworkers"); *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1341-42 (5th Cir. 1985).

The definition of "employer" within the H-2A regulations that form part of the H-2A contract is an individual or entity that "[h]as an employment relationship (such as the ability

16

to hire, pay, fire, supervise, or otherwise control the work of employee) with respect to an H-2A worker . . . ." 20 C.F.R. § 655.103(b) (defining "employer"); *see also* 29 C.F.R. § 501.3(a) (defining "employer"). As with the FLSA, the H-2A program contemplates multiple employers may meet the H-2A "employer" definition and be jointly liable. *See, e.g.*, *Salazar-Calderon*, 765 F.2d at 1346 (labor contractor that petitioned in its name for H-2 guestworkers and individual growers who actually used H-2 workers' services were joint employers and therefore both responsible for violations of H-2 regulations); *Perez-Benites v. Candy Brand, LLC*, No. 1:07-cv-1048, 2011 U.S. Dist. LEXIS 55003, at *15-16, 23-33 (W.D. Ark. May 20, 2011) (finding an entity and multiple individuals not listed on the H-2A clearance order to be "employers" who were liable for "breaches of the H-2A employment contracts as embodied in the relevant work clearance orders"); *Arriaga-Zacarias v. Lewis Taylor Farms, Inc.*, No. 7:08-CV-32(HL), 2008 U.S. Dist. LEXIS 98064, at *15-*16 (M.D. Ga. Dec. 4, 2008) (H-2A contract adopts the definition of employer found in the regulations and a breach of contract suit may be maintained against an individual not listed on the clearance order who fits the definition).

As already discussed extensively, the undisputed facts show that Sterling Sugars meets the definition of an "employer" for purposes of the H-2A regulations and the employment contracts since it had the ability (and exercised that ability) to "hire, pay, fire, supervise, or otherwise control the work" of the Plaintiffs and other truck drivers. *See supra* Section II.B. To summarize those facts, Sterling Sugars determined the number of truck drivers to be employed and when they would start and end each season, decided who could be hired, and maintained a "do not return" list.[91] Sterling Sugars also handled all of the

---

[91] *See supra* Section II.B & nn. 35-39, 41-42.

payroll related to the truck drivers, determined how they were paid, and provided the funds so that they could be paid.[92] And, finally, Sterling Sugars controlled the work of the truck drivers by making their daily schedules, assigning their trucks, setting the work rules, and monitoring their work and issuing reprimands or making decisions to terminate truck drivers for violations.[93] Summary judgment for the Plaintiffs and the other truck drivers is therefore appropriate regarding Sterling Sugars' status as an employer with respect to the employment contracts.

### D.     Sterling Sugars, LLC is an employer pursuant to the LWPA.

The LWPA does not provide a definition of "employer," but courts have focused on the "right to control" the work as significant in analyzing whether an entity is an "employer" within the meaning of the LWPA. *See, e.g.*, *Mendoza v. Essential Quality Const., Inc.*, 691 F. Supp. 2d 680, 686 (E.D. La. 2010) ("The fact that one defendant exercises more control over an individual than another defendant does not preclude an employment relationship between the individual and the second defendant."); *Gordon v. Huriston*, 854 So. 23 469, 472 (La. Ct. App. 2003) (analyzing employee/independent contractor situation but noting that the right to exercise control is an important factor in analyzing employer/employee status dispute). Like the FLSA and H-2A regulations, the LWPA also contemplates that an individual can have more than one "employer" who may be held liable for any violations. *See Singleton v. Gulf Coast Truck Serv.*, 409 So. 2d 377, 378 (La. Ct. App. 1982) (noting that truck driver was "supervised, managed, and controlled" by company that claimed they were not an employer and stating that "the evidence supports the apparent factual conclusions reached by the trial judge that plaintiff was employed by both defendants").

---

[92] *See supra* Section II.B & 7, 9, 12-13, 16, 61-77.
[93] *See supra* Section II.B & nn. 43-48, 50, 52-53.

As already discussed, Sterling Sugars exercised near complete control of the Plaintiffs' and other truck drivers' work in providing all of the management functions for South Central. *See supra* Section II.B. As such, Summary judgment for the Plaintiffs and the other truck drivers is therefore appropriate regarding Sterling Sugars' status as an "employer" within the meaning of the LWPA is appropriate.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion should be granted with respect to Defendant Sterling Sugars, LLC's status as the employer of the Plaintiffs, FLSA opt-in Plaintiffs, and Rule 23 class members pursuant to the FLSA, pursuant to the Employment Contracts, and pursuant to the LWPA.

Respectfully submitted,

**/s/ James M. Knoepp**
James M. Knoepp* (Lead Attorney)
South Carolina Bar No. 102757
*Admitted Pro Hac Vice*
1612 Crestwood Drive
Columbia, SC 29205
Telephone: (828) 379-3169
Email: jim@dawsonmorton.com

**/s/ Dawson Morton**
Dawson Morton
California Bar No. 320811
*Admitted Pro Hac Vice*
1808 Sixth St.
Berkeley, CA 94710
Phone: (404) 590-1295
Email: dawson@dawsonmorton.com

**/s/ Daniel Davis**
Daniel Davis, LA Bar No. 30141
Estes Davis Law, LLC
4465 Bluebonnet Blvd, Suite A
Baton Rouge, LA 70809
Telephone: (225) 336-3394

Fax: (225) 384-5419
Email: dan@estesdavislaw.com