Q.   And has that -- that's been the case every year between 2022 and 2025, that they're not -- they've not been paid overtime pay; is that right?

A.   That's correct.

Q.   Who made the decision to not pay the truck drivers overtime pay?

A.   I don't believe there was a decision that was made.  I believe that it was an understanding.  Our association is made up of agricultural farmers that perform agricultural activities and have agricultural exemptions. Because they've gotten together to associate to hire H-2A workers, they still have agricultural exemptions.  So it was my understanding that overtime would not be paid based on those ideas.

Q.   And so did somebody at South Central determine that because the farmers were the members of the association, that overtime pay wasn't -- didn't need to be paid?

A.   I don't think that it was one or -- or a group of people that determined.  I think it was just an understanding that because there was agriculture exemption, that we would not pay overtime.

Q.   And who had that understanding at South Central?

A.   The growers who have the agricultural exemption and, I guess, myself as, you know, the treasurer of the

organization would have had to understand how that agriculture exemption goes, you know, hand in hand.

Q.   Did South Central believe that because the growers grew sugarcane and may have had an exemption related to that, that that exemption carried over to South Central and applied to South Central as an entity itself?

A.   Yes.

Q.   What was that belief based on?

A.   The definition of agricultural activities includes the growing, cultivation, the harvesting, and getting their product to market.

Q.   Anything else?

A.   No, not that I'm aware of.

Q.   Are there any memos related to this belief about the exemption to overtime applying to the association itself?

A.   What type of memo?

Q.   Any type of memo.  Like a written memo of any sort?

A.   Not that I've seen, no.

Q.   Any type of notes or anything like that that you or anybody else at South Central has related to discussions about the agricultural exemption to overtime?

A.   No, I don't think so.

Q.   Are there any emails that South Central has

related to their belief that the agricultural exemption

applied to the association?

A.   I don't know.

Q.   Have you looked for any emails -- has South Central looked for any emails that would -- that discuss the agricultural exemption to overtime and its applicability to the association?

A.   The association was asked, as part of the discovery process, to look for emails.  So I assume that everyone did scan their emails to check for that.  It was --

Q.   And so --

A.   -- part of the discovery process.

Q.   So, if any emails had been found, they would have been produced to the plaintiffs; is that right?

A.   To my knowledge, yes.

Q.   Did you find -- did you look for any such emails?

A.   No, I do not believe I did.

MR. KNOEPP:  I'm -- I'm sorry.  There was, like, a -- some feedback there.  I couldn't hear.  I don't know, Ms. Harris, if you could read me back the answer or --

A.   I don't remember looking -- I don't remember searching my email specifically for that, no.

Q.   (BY MR. KNOEPP) Do you remember being asked to do that at all?

MR. ALBRITTON:  Jim, this line of questioning is -- is really dangerously close to privilege.  I mean, we're -- we're pushing the boundaries here.  So I'm going to instruct Ashlee not to answer further questions about the email collection process as it relates to the discovery in this case.

Q.    (BY MR. KNOEPP) Okay.  Besides the belief that the -- that the association was entitled to claim the exemption because its members might have the ability to claim an exemption, did South Central rely upon anything else in determining that -- to not pay truck drivers overtime pay?

A.    No.  We believed that because we were an association that was coming together to hire H-2A agricultural workers, that we did not have to pay overtime.

Q.    Did anybody at South Central review any regulations related to the applicability of the agricultural exemption to associations?

A.    Ricky Gonsoulin would have because he's a grower and is familiar with the agricultural exemption.

Q.    Do you know whether he did that?

A.    I do not know.

Q.    Other than your belief that Mr. Gonsoulin might have reviewed such a regulation, are you aware of anybody else, on behalf of South Central, reviewing regulations

related to the applicab -- the applicability of the agricultural exemption to associations?

A.   On behalf?  Is that your question?  If someone on behalf of the -- the South Central association?

Q.   Yes, ma'am.

A.   Randy Romero is another person that would have been involved with others to determine that.

Q.   And what was Mr. Romero's involvement in reviewing any regulations related to the applicability of the agricultural exemption to associations?

MR. ALBRITTON:  Object to the form and to the scope.  I don't know that Ashlee can testify as to what somebody else reviewed or thought about.

Q.   (BY MR. KNOEPP) You can answer, Ms. Gary.

A.   I'm sorry.  Can you ask me the question again?

MR. KNOEPP:  Yeah.  Ms. Harris, would you mind reading that one back, please?

THE REPORTER:  One moment.  "QUESTION: And what was Mr. Romero's involvement in reviewing any regulations related to the applicability of the agricultural exemption to associations?"

A.   I don't know what his involvement was.

Q.   (BY MR. KNOEPP) But do you believe --

A.   He --

Q.   Yeah.  But do you believe that -- as the -- the

ASHLEE GARY - VOL. III                                                    JOB NO. 2592817
APRIL 13, 2026

designee for South Central with respect to Topic 10, do you

believe that Mr. Romero did something, on behalf of South

Central, related to reviewing the agricultural exemption and

its applicability to South Central's operations?

A.   Yes.

Q.   But you're not sure what it was that he did?

A.   No.

Q.   I don't -- I don't want you to take this the wrong

way, Ms. Gary, but can you describe what you did to prepare,

with respect to Topic No. 10, for today's deposition related

to the reasons why de -- why South Central didn't pay

overtime pay?

A.   I don't know that I prepared specifically out

of -- out of the role that I play as the treasurer or the

CFO of -- of South Central.  I guess I'm trying to figure

out what you mean by that.

Q.   In a deposition of a corporation, the person who

wants to take the deposition sends topics that we want to

ask the witness about.  And then the witness -- the -- the

corporation designates certain people to testify about those

topics.  And you were designated to testify about this

topic.  And so it -- I'm just asking what you had done to

prepare to testify about this topic at today's deposition.

MR. ALBRITTON:  Objection.  I -- that's asked and

answered.  You asked her who she knew who would have

had those -- those -- made those decisions, and she provided you with two names.  I don't think she can testify as to the individual thinking of those members, but she can tell you who those people were.

MR. KNOEPP:  Yeah, I -- that wasn't the question that I was asking, Andrew.  I was asking what she did to prepare for answering questions on this topic.

MR. ALBRITTON:  And I believe that was asked this morning.  I wasn't here in that portion of the deposition, but I believe she already talked about the things she did to prepare for this deposition.

Q.   (BY MR. KNOEPP) Yeah.  I'm just talking specifically about this topic because I -- and, again, I'm -- I don't want you to take this the wrong way, Ms. Gary, but it doesn't seem like you're the person most knowledgeable with respect to this topic.  And so I'm trying to understand what you did to prepare to see if we need to get a different witness to be designated with respect to this topic.  So I'm just asking what you did to prepare for --

MR. DAVIS:  We understood your question.

Q.   (BY MR. KNOEPP) -- this topic.

MR. DAVIS:  Tell us -- tell us where your examination is deficient, because we answered this question this morning.  We've answered your

examination.  So where -- where have you not exhausted?  And how is this not asked and answered?  She asked -- she answered this this morning.  You probed it for 60 minutes.

Q.    (BY MR. KNOEPP) The question's still pending, Ms. Gary.  You can answer.  You haven't been instructed not to answer.

MR. DAVIS:  There was -- no.  We didn't instruct her not to answer.  We objected.  The basis that I gave you is appropriate.

MR. KNOEPP:  I -- I know.  But your objection's been noted.  I want an answer to my question.

MR. DAVIS:  It was asked and answered.  So we're not giving you a different answer than we gave you this morning.

MR. KNOEPP:  Are you instructing the witness not to answer?

MR. DAVIS:  Well, no, Jim.  I told you that when I do that, I tell you that to your face.

MR. KNOEPP:  Okay.  Well, then your objection has been noted and I would like to get the answer to the question.

MR. DAVIS:  You can go ahead and repeat, Ms. Gary.

THE WITNESS:  Can you repeat the question, please?

MR. KNOEPP:  Ms. Harris, if you wouldn't mind, if

ASHLEE GARY - VOL. III                                                      JOB NO. 2592817
APRIL 13, 2026

you could go back to the question asked.

THE REPORTER:  "QUESTION: Yeah.  I'm just talking specifically about this topic because I -- and, again, I'm -- I don't want you to take this the wrong way, Ms. Gary, but it doesn't seem like you're the person most knowledgeable with respect to this topic.  And so I'm trying to understand what you did" --

MR. KNOEPP:  I don't know if it's just me, Ms. Harris, but I -- your audio is breaking up.

THE REPORTER:  I'm going to start from the beginning again.  And this was the last question.  You may need me to go back.  So, at the end of this one, tell me if I need to go back a question.

The last question was: "Yeah.  I'm just talking specifically about this topic because I -- and, again, I'm -- I don't want you to take this the wrong way, Ms. Gary, but it doesn't seem like you're the person most knowledgeable with respect to this topic.  And so I'm trying to understand what you did to prepare to see if we need to get a different witness to be designated with respect to this topic.  So I'm just asking what you did to prepare for this topic."

MR. DAVIS:  So it's the same objection.  Since y'all believe that, tell me what it is and what's the basis and who you want and what you need to exhaust.

MR. KNOEPP:  I mean, I understand.  Your objection's been noted.  I just want to answer the question but what she did to prepare on this topic.  That's all.

A.   Can you --

MR. DAVIS:  Yeah, go ahead.

A.   Can you repeat the exactly -- can you re -- can you read to me the exact topic we're discussing at this time so I can make sure I answer --

Q.   (BY MR. KNOEPP) Sure.

A.   -- the question?

Q.   Yes, ma'am.  So the topic is Topic No. 10: Whether Defendant South Central Sugar Cane Growers' Association, Inc. paid overtime pay to any employees at any time between 2022 and the present, the reasons why defendant paid or did not pay overtime pay, and all individuals involved in the decisions to pay or not pay overtime pay.

A.   Okay.  To prepare for this, I would have had to go back and try to remember the things or the discussions that were had, back in 2022, as to why the decision was made.  I spoke with Randy Romero and Rivers Patout and Ricky Gonsoulin as to the decisions that were made at that time.

I'll go back to, again, we are asso -- we were an association that was formed of agricultural workers to bring in H-2A workers to perform agricultural activities.  So,

because these agricultural farmers had an agricultural exemption, it was understood that overtime would not be paid to any of the workers in the association.

Q.    When you -- did Mr. Romero, Mr. Rivers Patout, or Mr. Gonsoulin mention to you reviewing any documents related to the decision to not pay overtime?

MR. DAVIS:  Objection; asked and answered.

Q.    (BY MR. KNOEPP) You can answer, Ms. Gary.

A.    Okay.  I remember that, during this period of time, there were a lot of changes going on with how things were paid, as far as rates are concerned, within the federal government.  There were -- it seems like every year there was a new rule or change that was coming out.

I'm sorry.  Ask the question again.  I think I just got lost in my thought.

Q.    It's okay.  Do -- were there any documents that anybody mentioned to you that they had reviewed as part of a decision to not pay overtime pay?

MR. DAVIS:  Objection; asked and answered.

A.    I'm trying to think about what that's called.  I don't remember what the document's called.  I'm sorry.

I'm sure the government would have put out some type of document or -- you know, it's a regulated -- we're a regulated industry.  I'm sure that if we -- you know, we needed to do that, the government would have put that out.