# EXCERPTS FROM DEPOSITION OF PLAINTIFF FELIPE DE JESUS AVILA-SOTO

Transcript of the Testimony of
# Felipe De Jesus Avila-Soto (Volume II)

## Date: April 23, 2026

## Felipe De Jesus Avila-Soto, et al v. South Central Sugarcane Growers' Association, et al

All electronic deposition & exhibit files
are available at **www.psrdocs.com**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**

# Professional Shorthand Reporters, Inc.
**Phone:  504-529-5255**
**Fax:  504-529-5257**
**Email:  reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Felipe De Jesus Avila-Soto (Volume II)

Felipe De Jesus Avila-Soto, et al v. South Central Sugarcane Growers' Association, et al

Page 45

MR. DAVIS:

We're off the record.

(Break.)

MR. DAVIS:

Counsel, thank you for meeting with me.  We talked about managing anything that might be lost in translation during these proceedings.

And so what I think that we've decided in how we'll operate with one other is at the times that Mr. Avila has an objection to translation, he would announce that.  And I certainly would pause.  And whatever clarification that he wants to make, of course, we would wait to hear it and proceed.

Is that how you all want to manage translation concerns?

MR. MORTON:

Yeah.  With respect to the translation concerns that I -- I just -- obviously, Mr. Avila speaks Spanish; I speak both languages.

Page 46

And so if there's a translation concern, I just want to get it on record after the translation before the next question, and then we can move forward.

MR. DAVIS:

So what I -- that's fine.  We're sitting next to each other.  And the occasions where this has happened, you waved a hand or whatever, and I certainly understand that you're wanting to say something.

So what -- what would be helpful I think to the record and would ease the work for the court reporter as well as the translator is if Mr. Avila has an objection to the translation, we would ask that he state the objection and then make whatever clarification that he needs to.  And we'll be quiet until you and the translator speak about that.

And then Marlene -- MarLane

Page 47

would have to have sufficient space to be able to take it all down.

And so we'll keep moving forward.  I appreciate that.

BY MR. DAVIS:

Q.  Mr. Soto, I want to resume taking a look at your testimony.  You mentioned that you had just -- you had mentioned that you had just returned from Monterrey.

A.  Santiago Papasquiaro.

THE WITNESS:

(corrects translator)

"Papasquiaro."

INTERPRETER:

Papasquiaro.

BY MR. DAVIS:

Q.  Did you drive from Santiago Papasquiaro directly here this morning?

A.  It was yesterday.

Q.  Okay.  So you slept in your own home last night and in your own bed in Torreon last night?

A.  That is correct.  Yes.

Q.  Approximately what time did you go to bed for sleep?

A.  Between 8:30 and 9:00.

Page 48

Q.  And approximately what time did you wake this morning?

A.  At 6 a.m.

Q.  Okay.  So why did you sue South Central Sugar Cane Growers' Association, Inc?

A.  I didn't sue them.  I sued Sterling.

Q.  Okay.  Why did you sue Sterling Sugars, LLC?

A.  Because I was not paid the salary I should have been paid as a truck driver.

Q.  When you put your lawsuit together, in terms of the allegations that you made, what research did you do about Sterling Sugars, LLC, before you wrote the lawsuit against them?

MR. MORTON:

Objection.

BY MR. DAVIS:

Q.  You can answer, sir.

A.  Well, I mean, what investigation?  It's just simple.  They had me drive a truck when I was hired as an agricultural worker.

Q.  Does that -- are you communicating to me that you did not do any investigation for the purposes of drafting your lawsuit?

MR. MORTON:

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com

1-504-529-5255
www.psrdocs.com

Page 73

"go to the field where my truck was supposed to be loaded."

MR. DAVIS:

Okay.  MarLane, did you get that?

COURT REPORTER:

Yes.

BY MR. DAVIS:

Q.  Okay.  Now was that the same -- that work was the same work for all of you?

A.  The ones that were driving trucks, yes.

Q.  Okay.  All right.

So did you all as truck drivers, did y'all do any other work than what you described?

A.  No.  We were just driving trucks.

Q.  Okay.  Now you -- in your lawsuit you said that you brought this lawsuit against defendants, and there are two defendants on your lawsuit that I see.

INTERPRETER:

The interpreter did not hear the answer.

MR. MORTON:

Can I just -- I'd just like to -- objection.

Page 74

Translation note:  The witness said "it is Sterling and the association."

THE WITNESS:

Yeah.  I was suing Sterling and the association.

BY MR. DAVIS:

Q.  Okay.  All right.

Now did you work for the association?

A.  I worked for Sterling.  When it became an association, I don't know why it was an association.

Q.  So your testimony is you did not work for the association?

MR. MORTON:

Objection.

THE WITNESS:

It's just that I don't know at what time it became an association.

BY MR. MORTON:

Q.  I'm just asking you did you ever work for the association.

A.  Well, the thing that I'm answering is that I don't know when it became an association.  I worked for Sterling, and then I don't know when it

Page 75

became an association.

Q.  It seems like -- would you need to know when the association was formed to be able to answer whether you worked for the association?

A.  Okay.  I'm going to answer your question.

So us, the truck drivers, we would always go to the offices of Sterling.  And so I don't know when it became an association.  We always went to the same place.  It was the same secretary, Rivers and Tim, we always dealt with the same people.  And it was Sterling.

Q.  So do you know if you ever worked with the association?

A.  I repeat again, I don't know if it ever became an association.  I always went and worked with -- with them.

Q.  My question was do you know if you worked for an association.  It wasn't when the association was formed.

A.  Okay.  So I'm saying that I never knew that there was an association.  Whenever we went, we always met with Rivers with Jaime, with the same Lady and Tim.  I didn't know anything about an association.

Q.  So when you worked in the United States,

Page 76

your belief was that you always worked for Sterling.  Is that correct?

A.  I didn't know anybody else except those people that I mentioned.  There was never a meeting where all the partners were there.  It was just those people at Sterling.  That was all.

Q.  Now what partners are you talking about?

A.  Well, I'm talking about the partners of the association that you're talking about.

Q.  Who are those people?

A.  Well, I mean, that's what I'm trying to ask you, because you're saying this was an association.  So I don't know anything about the association.

I'm telling you that I only met with these people.  Those were the only ones that I knew.

Q.  Understood.

MR. DAVIS:

Can we take a break?

THE WITNESS:

As you wish.

(Off the record.)

BY MR. DAVIS:

Q.  Okay.  Mr. Avila, I'll move forward.

Let me ask -- let me then just ask you

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com

1-504-529-5255
www.psrdocs.com

Page 77

your knowledge about the association.

A.  Okay.  All I want to say is that I don't know anything about an association.  I only saw the same people.  The check came from Sterling, and that is all I know.

INTERPRETER:

And this is the interpreter speaking.

I believe there is a language issue that is becoming confusion -- confusing.

So "partnership" in Spanish is "asociación."

MR. DAVIS:

Oh, I see.

INTERPRETER:

And so I believe that when we're saying "asociación" --

MR. DAVIS:

South Central.

INTERPRETER:

-- he's thinking it's a partnership because of the way the language, it translates into Spanish.

Page 78

BY MR. DAVIS:

Q.  Mr. Avila, I'm sorry.  The interpreter just explained something to me about our language. Let me ask you this question.  It may be better.

Did you ever work for South Central while you were in the United States?

A.  Well, I don't remember it.  Like I said, I always knew it as Sterling.  Now Sterling.

Q.  So you have no recollection of having been employed by South Central.  Is that accurate?

A.  Yeah.  So it always said there -- it just said "Sterling."  And then after that it said "Sterling" and something else, but I don't know what that was.

Q.  Okay.  What was that?  What was that answer?

MR. DAVIS:

Cathy, can you repeat may answer?

I'm sorry.  MarLane, will you please repeat that answer?

MR. MORTON:

I'm just going to let the witness know he can have water if he wants.

Page 79

(The answer was read as follows:

"A.  Yeah.  So it always said there -- it just said 'Sterling.'  And then after that it said 'Sterling' and something else, but I don't know what that was.")

BY MR. DAVIS:

Q.  Okay.  Now do you intend -- did you intend to sue South Central?

A.  Well, I am suing Sterling and the association.

Q.  And why did you sue the association?

A.  Because I don't know which is one and the other.  It seems like they're together.

Q.  Okay.  So do you -- do you believe that you worked for both while you were in the United States?

A.  Well, the way they're presenting the things, I believe so.

Q.  Okay.  So let me ask you, in your lawsuit it says that the H-2A temporary visas were obtained by the defendants.  So when did South Central obtain a visa for you?

A.  Well, the person that filed for the visas for us was the recruiter.  And so he asked that we have a license that was in effect.

Page 80

MR. MORTON:

He said "APTO."

INTERPRETER:

Huh?

MR. MORTON:

He said --

MR. DAVIS:

Is that an objection to the translation?

MR. MORTON:

No.  He used an acronym, "APTO."

THE WITNESS:

And then we had to have a certificate that said that we were -- it was a medical certificate that said that we were eligible.

BY MR. DAVIS:

Q.  All right.  Now who sent -- what's the name of the recruiter?

A.  His name is Jose Santos.

Q.  When is the last time you talked to Jose Santos?

A.  The last time he canceled my visa.

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com

1-504-529-5255
www.psrdocs.com

Page 81

Q.  Why was your visa canceled?

A.  Because of the accident that I had at Sterling.

Q.  Who is Jose Santos?

A.  Well, he was a --

INTERPRETER:

I need to clarify the answer.

So he was a recruiter for --

he was a recruiter for Sterling,

and he worked for Patout as well as

Mr. Rivers.  That's what I know.

MR. DAVIS:

Thank you.

BY MR. DAVIS:

Q.  Did you see Jose Santos in Mexico as it related to getting your visa?

A.  It's correct.  He would come here to Mexico for meetings he would have with the drivers.

Q.  All right.  Now, so when you obtained your visa, is it correct that the only Sterling employee who was in Mexico with you was Jose Santos?

A.  Look, here in Mexico, we would have a meeting.  Then there was a person that would come and would collect all of our passports.  So we had to have a current driver's license and a current

Page 82

medical certificate.

After that, they would give us an appointment in Monterrey.  After that, we would stay at a hotel, and the next day in the afternoon they would tell us which one of us would go to an interview.  And after that, around 5 or 6 o'clock in the afternoon, we would have our visas.

Q.  Okay.  And the person who would either pick up the passport or give out the information, was that Jose Santos or was that somebody else?

A.  It was the secretaries.

Q.  What was the -- do you know any of their names?

A.  I don't remember, which is the truth.

Q.  Was there an office here in Torreon where the secretaries worked?

A.  It was in Monterrey.

Q.  Okay.  And who was -- was Jose -- was that Jose Santos' office?

A.  I imagine it was his, because he had his secretaries there.

Q.  Okay.  And did --

A.  So he has one in Monterrey, one in Veracruz, one in San Luis, and I think one in Quintana Roo.

Page 83

Q.  Are all -- are these Sterling offices that are operating in Mexico?

A.  Yes.  They would recruit drivers from Quintana Roo, Veracruz, Chiapas, Jalisco, Coahuila, and Durango.

Q.  Okay.  And the process of getting the visa, is -- did that process that you explained work the same way each season that you worked?

A.  For me it did.

Q.  Was it different for any of the other drivers?

A.  Just that the ones that had to do the interviews there was different than the rest.

Q.  Okay.  Now tell me about interviews.  Did you ever have to do any interview to get a visa when you came into the United States to work?

A.  I never had to.

Q.  And do you know of other members that you're representing now that did have to go to an interview to obtain their visas?

A.  Well, yeah.  They did.  I mean, year after year some of them had to go to an interview.

Q.  Why would they need to go to an interview?

A.  I don't know the reason.  But they would rotate us, and some of them had to go.  I never had

Page 84

to go.

Q.  Okay.  What -- do you know -- do you know what happened at the consolate when those members would need to go for an interview?

A.  I don't know, because it was just for them.

Q.  Okay.  All right.

Are you -- you worked in the United States for the 2022 season, the 2023 season, and the 2024 season.  Is that right?

A.  On '24 was when they canceled my visa.

Q.  Okay.  So now -- so is it -- is it correct that you worked in the 2022 season, the 2023 season, and the 2024 season?

A.  I will comment again.  On '24 was when he canceled my visa.

Q.  All right.  When --

MR. MORTON:

Brandon, I just -- it's just -- I think there's a little bit of confusion.

I think that the visa was canceled in the 2023 season.  He received a visa in --

MR. DAVIS:

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com

1-504-529-5255
www.psrdocs.com

Page 161

about the expired license we've shown him? It expired in 2020.

BY MR. DAVIS:

Q. Huh-uh. We were asking him when he was first licensed. He said that he was licensed before this document.

So I asked him, okay, when was he first licensed.

A. Well, I don't remember.

This one here was issued in 2015.

Q. Were you licensed before 2015?

A. I think so.

Q. Were you licensed in 2014?

A. These licenses work in five years.

Q. Okay. So were you licensed in 2009 also?

A. Well, I can't remember when I had my first license.

I've always had a driver's license. It's just that the federal one is a separate one.

Q. Just in general, can you -- do you know how many years you've held a federal license?

A. Federal. So now we're talking about the federal one.

MR. DAVIS:

Is that what he said?

Page 162

THE WITNESS:

The federal one you're talking about, probably, like, around 17 years.

BY MR. DAVIS:

Q. All right. Now I've showed you Exhibit F. Is that what you're calling the federal?

A. That one. Yes.

Q. Okay. So you've had that kind of license in Mexico for approximately 15 years?

MR. MORTON:

Objection. Mischaracterizes.

THE WITNESS:

This is the license that I use to work here. Without this one, I can't work. I can't drive a truck.

BY MR. DAVIS:

Q. Now is this the same one that you would use in America?

A. Here it says "international."

Q. So was this what you needed to drive the truck in the United States?

A. So just the regular license, like, the federal license.

But in order to go in to drive a truck

Page 163

over there, you have to get an international one. And so you have to go to the course, and you have to take a driver's test.

Q. I know.

A. To show that you can drive a truck.

Q. Is that the international license, Exhibit F?

A. No. This was not an F -- no, I mean -- you mean the exhibit? Yeah.

Q. Well, will you put your license in your hand? The one that you used to go to the United States, pick it up, and put it in your hand.

MR. MORTON:

Objection. We're looking at a license that's expired.

THE WITNESS:

Like I said, it's not these anymore.

BY MR. DAVIS:

Q. No. I understand. But I'm just --

MR. DAVIS:

Can he pick up Exhibit F, or is there competing documents?

MR. MORTON:

No. We're --

Page 164

MR. DAVIS:

I'm just trying to make sure that -- I understand if he had a license that he needed. I think that's what you were saying. I'm trying to make sure. Because I don't want to waste his time here.

MR. MORTON:

This license expired in 2020.

MR. DAVIS:

That's true. Which is true of all of his documents that's he's been working -- you see?

But this issue is -- I don't want to waste his time, and I don't want to test his time. I just want to know are we on the same page. Is this the license that he's claiming that he would have used to try to drive trucks.

MR. MORTON:

Okay. (Mr. Morton translates.)

THE WITNESS:

I didn't try to use it. I used it.

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com

1-504-529-5255
www.psrdocs.com

Page 165

BY MR. DAVIS:

Q. I understand. I'm wanting to get on the same page with you that I understand that, okay, you're saying this is the federal license that I need for the U.S.

MR. MORTON:

And, again, I just want to object to this license expiring in 2020 before any claims at issue.

THE WITNESS:

That's correct. That I have my license here.

BY MR. DAVIS:

Q. Show it to me.

A. So the license now is -- what do you call it?

Q. Now so does that mean that you have had an international license since 2020?

A. That's correct.

Q. Have you had an international license since 2009?

A. This is it.

Q. Okay. All right. Okay. We're on the same page.

But you've had this credential since about

Page 166

2009. Is that right?

MR. MORTON:

Objection. Mischaracterizes.

THE WITNESS:

Correct.

BY MR. DAVIS:

Q. Did you have this license before 2009?

A. No.

Q. Okay. Now I recall that you left the Mexico City area as a young man and moved to Torreon to drive trucks. Do you remember testifying about that?

A. So we're going to talk about the question that you asked.

My dad had trucks. My dad had trucks, and he died. After all of this, it took everything away from my mom -- almost everything away from my mother. So that's why we ended up in Torreon.

Q. So have you had a federal license to drive for about 20 years?

MR. MORTON:

Objection.

THE WITNESS:

So I have been driving trucks since I was 17 years old.

Page 167

BY MR. DAVIS:

Q. How long have you had the federal license?

A. You didn't have to have a federal driver's license when we're able to drive with a state one.

Q. How long have you had the federal license?

MR. MORTON:

Objection. Asked --

THE WITNESS:

So I've been working with the federal license since, well, probably like 15 years, something like that. I'm not really sure.

I started working with the federal license once I was no longer able to work with the state one.

BY MR. DAVIS:

Q. Okay. How much -- when you got the -- is there an office in Torreon that you go to apply for the federal license?

A. Yes. At the ministry of commerce and transportation.

Q. Do you have to put in an application to get the license?

A. You go and make an appointment in person

Page 168

there. So they give you a piece of paper that you go and you make the payment at the bank. And then once you make the payment, you bring it back, and that's when they give you the dates for your appointment.

Q. How much is the payment?

A. It depends.

Q. A couple hundred dollars?

A. Well, that would be 400,000 pesos. Right?

So here it goes from 9 to 12 to 15,000 pesos. It just depends the category.

Q. Has Somos Fleites paid -- reimbursed you for your license?

A. That's correct.

Q. What's the last time that they reimbursed you?

A. So this license that I have on my cell phone, it's called a digital license. So I renewed it in May of last year. That's when I renewed it, and that's when they reimbursed me.

Q. Okay. This means you already had a federal license for about 10 years before you ever worked in the United States?

MR. MORTON:

Objection. Mischaracterizes.

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com

1-504-529-5255
www.psrdocs.com

Page 169

THE WITNESS:

I think so.  About 10 years.

So -- but in order to go over there, I had to make it international.  I didn't have an international one before that.

BY MR. DAVIS:

Q.  How much -- what were the fees that you paid for the international license?

A.  I already had it, and so I added the international.  And it cost me another about another 3,000 pesos more.

Q.  You believe that South Central Sugar Cane Growers' Association should reimburse you for your license?

MR. MORTON:

Objection to the form.

THE WITNESS:

I think so.

BY MR. DAVIS:

Q.  How much should they pay to reimburse you?

MR. MORTON:

Objection.  Form.

THE WITNESS:

Well, the license the last

Page 170

time I renewed it, I paid about 13,000 pesos.

BY MR. DAVIS:

Q.  Do you believe that South Central should reimburse the other class members that you want to represent for licenses that they obtained to work in the United States?

MR. MORTON:

Objection.  Form.

THE WITNESS:

Well, I think so.  I mean, if they're demanding that we have that and that we have it in effect.

BY MR. DAVIS:

Q.  Okay.  Would the other people have also paid about 1,300 pesos for their licenses to work in the United States?

MR. MORTON:

Objection.  Mischaracterizes.

THE WITNESS:

Well, see, I don't know if they already had an international license or if they went and got it.

BY MR. DAVIS:

Q.  Your demand is that we reimburse you.

Page 171

Please tell us how many people we need to reimburse.

MR. MORTON:

Objection.  Form.

THE WITNESS:

The ones that are in the lawsuit.

BY MR. DAVIS:

Q.  Okay.

A.  Because they demanded it from all of us.

Q.  Now what other expenses do you want reimbursed?

A.  So the license and the device that we had to have working in Louisiana that they would use to send us information and notifications on.

Q.  Did you pay money for a device?

A.  Yes.  And the line as well.

Q.  How much did you pay for the device?

A.  Well, it's just that the place depends.  I think mine cost, like, $230 I think.

Q.  Did any of the other class members that you want to represent buy devices to work in the United States?

A.  That's correct.  Yes.

Q.  How much did they pay for their devices?

Page 172

A.  Well, it just depends on which one every person got.  I mean, like, some of them were 180, and some of them were other places I don't know.

Q.  Have you asked for the receipts so that the reimbursements can be paid?

A.  Well, we have -- I mean -- well, me, myself, I had it, but I don't know where it's at right now.

Q.  Do you know -- do you know where any of the other receipts are that you want reimbursed concerning the devices that were bought?

A.  I don't know about the other devices.  I mean, mine, I lost it.

Q.  You lost the receipt?

A.  I lost the receipts.

Q.  Did you also lose the device?

A.  No.  I still have the device.  This is one of them.

Q.  Well, how much did you pay per month for the line?

A.  For the line we were paying $80.

Q.  Do you -- is that $80 per month?

A.  So it was $80.  There were four people of us in the group, and so we were each paying $80.

Q.  Was that your monthly bill?  Monthly phone

Professional Shorthand Reporters, Inc.        1-504-529-5255
reporters@psrdocs.com                          www.psrdocs.com